JUDGE HOLWELL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| JULIO & SONS COMPANY, | x  **08 CV 03001** |
| Plaintiff, | x |
| | x  **(RJH) (DCF)** |
| v. | x  Civ. |
| | x  **ECF CASE** |
| TRAVELERS CASUALTY AND SURETY | x |
| COMPANY OF AMERICA, | x  **JURY TRIAL DEMANDED** |
| Defendant. | x |
| | x  RECEIVED |
| | x  MAR 2 4 2008 |
| | U.S.D.C. S.D. N.Y. |
| | CASHIER'S |

### COMPLAINT

Plaintiff Julio & Sons Company ("Julio & Sons") files this complaint, by its counsel undersigned, against Travelers Casualty and Surety Company of America ("Travelers" or "Defendant") and, in support thereof, alleges as follows, upon information and belief:

### The Parties

1.    Julio & Sons is a Delaware corporation with its principal place of business in Dallas County, Texas.

2.    Travelers is an insurance company incorporated under the laws of Connecticut, with its principal place of business also located in Connecticut.  Travelers actively and substantially conducts business within the State of New York and within this judicial district.

### Jurisdiction and Venue

3.    This Court has subject matter jurisdiction over this action on grounds of diversity of citizenship.  The amount in controversy exceeds $75,000.

4.    Venue lies in this judicial district under 28 U.S.C. § 1391(c).

<u>Facts</u>

5.    Julio & Sons, as a "Subsidiary" to Julio Investors LLC, the "Parent Corporation" named in a liability policy issued by Travelers entitled "Wrap Policy – Directors & Officers Liability Insurance and Employment Practices Liability Insurance" (the "Policy"), is an "Insured Organization" under the Policy.    A copy of the Policy is attached hereto as **Exhibit A**.    In addition, each of Robert Glaser, Rick Levitt, Buster Glosson, Bill Tillet, Greg Morris and Robert Reale, is a past, current and/or future employee or director of the Insured Organization and, thus, is an Insured Person under the Policy.

6.    The Policy is a claims-made policy that designates the policy period as September 1, 2006 to September 1, 2007.    The promises made by Travelers in the Policy included its promises to:

A.    … pay on behalf of the Insured Persons Loss resulting from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts, including Wrongful Employment Practices, except for Loss which the Insured Organization pays to or on behalf of the Insured Persons as indemnification.

B.    … pay on behalf of the Insured Organization:

1.    Loss resulting from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts, including Wrongful Employment Practices, which the Insured Organization pays to or on behalf of the Insured Persons as indemnification; and

2.    Loss resulting from Claims first made during the Policy Period against the Insured Organization for Wrongful Acts other than Wrongful Employment Practices.

7.    "Claim" is defined by the Policy to include any lawsuit.

8.    "Wrongful Act" is defined by the Policy to include any alleged breach of fiduciary duty or misrepresentation.

2

9.    "Loss" is defined by the Policy to include reasonable attorneys' fees and other costs incurred in defending a Claim alleging a Wrongful Act. The Policy requires Travelers to "advance" such defense costs upon the insured's request:

> Upon written request, the Company will advance Defense Expenses for which such Liability Coverage Part provides coverage.

- **The RRGC Suit**

10.    On or about February 15, 2007, Retail and Restaurant Growth Capital, L.P. ("RRGC") filed suit in Dallas County District Court against Julio & Sons and Robert Glaser, among other insureds, alleging claims for, *inter alia*, "breach of fiduciary duties," and "negligent misrepresentation." RRGC filed its Amended Petition on or about October 25, 2007, reasserting those causes of action (and others). The RRGC suit alleged breaches of fiduciary duty and misrepresentations that pertained to future contractual arrangements that the insureds were merely "planning to enter into."

11.    By letter dated March 7, 2007, Travelers acknowledged receipt of the RRGC suit and acknowledged that the suit alleged that the insureds "breached various duties owed to the Plaintiff including fiduciary duties and duties to disclose information pertaining to financial transactions that they had entered into *or were planning to enter into.*"

12.    Notwithstanding this express admission that the RRGC suit alleged Wrongful Acts, Travelers issued a letter dated October 5, 2007 disclaiming coverage. Whereas Travelers' March 2007 letter acknowledged that the suit alleged breaches of fiduciary duty and misrepresentations that pertained to future contractual arrangements that the insured was merely "planning to enter into," the disclaimer re-characterized the suit as *not* including such allegations. In its disclaimer, Travelers asserted that the suit alleged that "all" of the plaintiff's claims accrued *after* a contract had been formed – and breached – by Julio & Sons and the other

3

defendants. Based on this re-characterization of the RRGC suit, Travelers argued that the Policy's "breach of contract" exclusion barred coverage of any Loss arising out of the suit.

13.     Of course, the "breach of contract" exclusion cannot operate to negate Travelers' duty to advance defense costs where, as here, the Claim against the Insured Organization actually includes at least one theory of liability that does not depend on a finding that the insured entered into and subsequently breached a valid contract. Clearly, allegations of pre-contract breaches of duty – such as those originally acknowledged by Travelers – do not require such a finding. Further, there is no contract between RRGC and Glaser therefore this alleged exclusion is inapplicable.

14.     Travelers' mischaracterization of the Policy's application to the suit was manufactured solely for the purpose of creating a pretext to forestall performance of its duty to advance defense costs.

15.     With Travelers having so abandoned its insureds, Julio & Sons has spent the past thirteen (13) months diligently defending itself and Mr. Glaser against the RRGC suit, incurring legal fees which are, in fact, Travelers' responsibility. This defense is ongoing, and the legal fees incurred by Julio & Sons and Mr. Glaser continue to mount.

16.     By its disclaimer, Travelers repudiated its contractual duty to contemporaneously pay the costs incurred by Julio & Sons in its own defense. Travelers also has repudiated its duty to indemnify Julio & Sons for the amount it has paid to satisfy the liability incurred by the Insured Person named in the suit, Robert Glaser, for his defense costs.

4

- **The Shashy/Green Suit**

17.　On or about June 19, 2007, Abdo Joseph Shashy and Gerald Green filed a suit in Dallas County District Court that included a shareholder derivative action brought on behalf of Julio & Sons (the "Shashy/Green suit").

18.　The Shashy/Green suit named as defendants, among others, Julio & Sons, Julio Investors LLC, a named insured under the Policy, and each of the following Insured Persons: Robert Glaser, Rick Levitt, Buster Glosson, Bill Tillet, Greg Morris and Robert Reale.

19.　The shareholder derivative claim alleges, *inter alia*, breach of fiduciary duty by the Insured Persons.

20.　By letter dated October 5, 2007, in response to the insureds' notice of the suit, Travelers disclaimed coverage and refused to indemnify Julio & Sons for its liability for costs incurred in its own defense or for the amounts it has paid to indemnify the costs incurred by Insured Persons in their defense of the suit.

21.　With Travelers having abandoned its insured, Julio & Sons has spent the past nine (9) months diligently defending itself and other insureds against the Shashy/Green suit, incurring legal fees which are, in fact, Travelers' responsibility.  This defense is ongoing, and the legal fees incurred by Julio & Sons and the other insureds continue to mount.

22.　By its disclaimer, Travelers repudiated its contractual duty to contemporaneously pay the costs incurred by Julio & Sons in its own defense.  Travelers also has repudiated its duty to indemnify Julio & Sons for the amount it has paid to satisfy the liability incurred by the Insured Persons named in the suit, Robert Glaser, Rick Levitt, Buster Glosson, Bill Tillet, Greg Morris and Robert Reale, for their defense costs.

5

23.     Travelers' disclaimer was based on Travelers' mischaracterization of the "insured v. insured exclusion." By its terms, however, this exclusion is inapplicable to a claim that is a non-collusive derivative claim. Moreover, Travelers did not assert that the derivative claim was collusive as it relied solely on the underlying allegations which certainly do not allege collusion. Accordingly, Travelers' disclaimer constitutes a further repudiation of its contractual obligations under the Policy.

## COUNT ONE:
### Declaratory Judgment Concerning the RRGC Suit

24.     Julio & Sons re-alleges and incorporates by reference all prior allegations contained herein.

25.     Pursuant to 28 U.S.C. § 2201, there exists a justiciable controversy between Julio & Sons and Travelers concerning their rights, status and legal relations with regard to the RRGC suit and the Policy.

26.     As set forth, Julio & Sons is entitled to a judicial declaration declaring that (i) Julio & Sons is entitled to the advancement and reimbursement of defense costs (including those incurred on behalf of Robert Glaser) for the RRGC suit from Travelers, and (ii) Travelers is contractually bound to advance defense costs on a going-forward basis.

## COUNT TWO:
### Declaratory Judgment Concerning the Shashy/Green Suit

27.     Julio & Sons re-alleges and incorporates by reference all prior allegations contained herein.

28.     Pursuant to 28 U.S.C. § 2201, there exists a justiciable controversy between Julio & Sons and Travelers concerning their rights, status and legal relations with regard to the Shashy/Green suit and the Policy.

6

29.    As set forth, Julio & Sons is entitled to a judicial declaration declaring that (i) Julio & Sons is entitled to the advancement and reimbursement of defense costs (including those incurred on behalf of other insureds) for the Shashy/Green suit from Travelers, and (ii) Travelers is contractually bound to advance defense costs on a going-forward basis.

## COUNT THREE:
### Breach of Contract in Connection with the RRGC Suit

30.    Julio & Sons re-alleges and incorporates by reference all prior allegations contained herein.

31.    Julio & Sons has substantially performed all material obligations on its part to be performed under the Policy.

32.    Travelers has repudiated its duty to advance defense costs incurred by Julio & Sons and Mr. Glaser in defending the RRGC suit.

33.    As a proximate result of Travelers' breach, Julio & Sons has suffered damages in an amount to be determined at trial.

## COUNT FOUR:
### Breach of Contract in Connection with the Shashy/Green Suit

34.    Julio & Sons re-alleges and incorporates by reference all prior allegations contained herein.

35.    Julio & Sons has substantially performed all material obligations on its part to be performed under the Policy.

36.    Travelers has repudiated its duty to advance defense costs incurred by Julio & Sons and the other insureds in defending the Shashy/Green suit.

37.    As a proximate result of Travelers' breach, Julio & Sons has suffered damages in an amount to be determined at trial.

## COUNT FIVE:
### Breach of Duty of Prompt Payment in Connection with the RRGC Suit

38.     Julio & Sons re-alleges and incorporates by reference all prior allegations contained herein.

39.     The RRGC suit alleges claims that fall within the Policy's insuring clause(s).

40.     Julio & Sons timely noticed the RRGC suit to Travelers and requested the advancement of defense costs incurred in defense of the claims asserted therein.

41.     By refusing to timely advance and reimburse the defense costs and refusing to indemnify Julio & Sons in connection with the RRGC suit, Travelers has violated TEXAS INSURANCE CODE § 524.051, *et seq.*

42.     As a result of Travelers' breach of its duty of prompt payment, Julio & Sons is entitled to recover damages in an amount to be determined at trial, attorneys' fees and interest.

## COUNT SIX:
### Breach of Duty of Prompt Payment in Connection with the Shashy/Green Suit

43.     Julio & Sons re-alleges and incorporates by reference all prior allegations contained herein.

44.     The Shashy/Green suit alleges claims that fall within the Policy's insuring clause(s).

45.     Julio & Sons timely noticed the Shashy/Green suit to Travelers and requested the advancement of defense costs incurred by insureds in defense of the claims asserted therein.

46.     By refusing to timely advance and reimburse the defense costs and refusing to indemnify Julio & Sons in connection with the Shashy/Green suit, Travelers has violated TEXAS INSURANCE CODE § 524.051, *et seq.*

47.    As a result of Travelers' breach of its duty of prompt payment, Julio & Sons is entitled to recover damages in an amount to be determined at trial, attorneys' fees and interest.

## COUNT SEVEN:
### Bad Faith Refusal to Advance Defense Costs in Connection with the RRGC Suit

48.    Julio & Sons re-alleges and incorporates by reference all prior allegations contained herein.

49.    Travelers' disclaimer as to the RRGC suit is predicated on its willful mischaracterization of the Policy's terms, as applied to the RRGC suit.

50.    By making such willful misrepresentations to its insureds, Travelers has engaged in bad faith misrepresentation of an insurance policy in violation of TEXAS INSURANCE CODE § 541.061.

51.    As a result of Travelers' bad faith, Julio & Sons is entitled to recover damages in an amount to be determined at trial, including treble damages and attorneys' fees pursuant to TEXAS INSURANCE CODE § 541.152.

## COUNT EIGHT:
### Bad Faith Refusal to Advance Defense Costs in Connection with the Shashy/Green Suit

52.    Julio & Sons re-alleges and incorporates by reference all prior allegations contained herein.

53.    Travelers' disclaimer is predicated on its willful mischaracterization of the Policy's terms as applied to the Shashy/Green suit.

54.    By making such misrepresentation to its insureds, Travelers has engaged in bad faith misrepresentation of an insurance policy in violation of TEXAS INSURANCE CODE § 541.061.

55.    As a result of Travelers' bad faith, Julio & Sons is entitled to recover damages in an amount to be determined at trial, including treble damages and attorneys' fees pursuant to TEXAS INSURANCE CODE § 541.152.

## COUNT NINE:
### Statutory Attorneys' Fees

56.    Julio & Sons re-alleges and incorporates by reference all prior allegations contained herein.

57.    TEXAS CIVIL PRACTICE & REMEDIES CODES § 37.009 and 38.001 sets forth a statutory substantive right to attorneys' fees incurred by counsel in an action to vindicate a breach of any contract governed by the substantive law of the State of Texas.

58.    Pursuant to such positive law, Julio & Sons is entitled to recover all reasonable attorneys' fees incurred in the prosecution of this lawsuit.

## COUNT TEN:
### Permanent Injunction

59.    Julio & Sons re-alleges and incorporates by reference all prior allegations contained herein.

60.    Julio & Sons is entitled to an injunction enjoining Travelers from withholding advances of attorneys' fees previously incurred and which may be incurred in the future.

### Jury Demand

61.    Plaintiff requests trial by jury.

### PRAYER FOR RELIEF

For the foregoing reasons, Julio & Sons requests that, upon final trial of this case, the Court declare and award the following:

a.    declaratory judgment in connection with the RRGC suit in favor of Julio & Sons as set forth above;

10

    b.    declaratory judgment in connection with the Shashy/Green suit in favor of

Julio & Sons as set forth above;

    c.    actual damages in an amount to be determined by the trier of fact;

    d.    exemplary damages;

    e.    all attorneys' fees incurred herein by Julio & Sons;

    f.    an injunction permanently enjoining Travelers from withholding advances

of defense costs previously incurred and which may be incurred in the future; and

    g.    all such other and further relief to which Julio & Sons is justly entitled.

New York, New York
Dated:  March 24, 2008

Respectfully submitted,

**PATTON BOGGS LLP**

By: _____
Philip M. Smith (PS 8132)
1185 Avenue of the Americas
30th Floor
New York, New York 10036
(646) 557-5100 Telephone
(646) 557-5101 Facsimile

– and –

John W. Schryber (JS 7881)
2550 M Street, N.W.
Washington, D.C. 20037
(202) 457-6000 Telephone
(202) 457-6315 Facsimile

*Attorneys for Plaintiff Julio & Sons Company*

Of Counsel
Joseph M. Cox
Shannon W. Conway
Patton Boggs LLP
2001 Ross Avenue, Suite 3000
Dallas, Texas 75201
(214) 758-1500 Telephone
(214) 758-1550 Facsimile

EXHIBIT A



**UNCLE JULIO'S**
C O R P O R A T I O N

January 4, 2007

Travelers Casualty and Surety Company
One Tower Square, Bond, 3PB
Hartford, CT  06183

Re:  .   The Wrap Policy -- Directors & Officers Liability Insurance and Employment Practices
Liability Insurance

        $2,000,000 Excess of $3,000,000 for the Directors & Officers, Fiduciary and
Employment Practices  Liability Coverage
        Policy No.

As part of the Application for the Policy referenced above (the "Policy"), the undersigned
hereby represents and warrants on behalf of the Insureds, as defined in the Policy, that as of
the date of this letter:

(a)     no Insureds has knowledge of any act, error, omission, fact, circumstance or
        situation which might give rise to a claim under the policy. (Exceptions must be
        disclosed.)

(b)     there are no pending claims against the Insureds. (Exceptions must be disclosed.)

(c)     no claims have been made against any Insureds in their capacity as a director or
        officer of the Parent Corporation. (Exceptions must be disclosed.)

It is agreed that, without prejudice to any other rights and remedies of the Underwriter, any
claim arising from any act, error, omission, fact circumstance or situation disclosed, or
required to be disclosed above, is excluded from coverage under the Policy.

It is agreed that this warranty letter forms part of the Application and that the Underwriter
relied upon the representations contained therein and that the Policy is issued in reliance
upon the truth of such representations.

Acknowledged and Agreed:

By: _____   Print Name: Richard Levitt

Title: CEO

Date: Jan 4, 2007

UNCLE JULIO'S • HACIENDA • RIO GRANDE CAFE • CASA GRANDE

3101 N Union Bower  Suite 160

Irving Texas 75061

t 972 554 6886   f 972 554 6888

 **ST PAUL TRAVELERS**

Broc  Wyatt
4400 North Point Parkway
ALPHARETTA, GA 30022

Phone:(770) 521-4024
Fax:(770) 521-3551
Email:BWYATT@travelers.com

September 19, 2006

Jason Wetmore
WACHOVIA INS SVC-ATLA (0FU159)
4401 NORTHSIDE PARKWAY NW
SUITE 400
ATLANTA, GA 30327

**This is an Agency Billed Policy.**

This is the  Renewal for:

**JULIO INVESTORS, LLC**
**1101 North Union Bower**
**Suite 160**
**IRVING, TX 75061**

Product Type: WRAP
Policy Number: 104468586
Total Policy Premium: $98,420.00

Policy Period: September 1, 2006    to  September 1, 2007
Billing Period: September 1, 2006    to  September 1, 2007
Trans Effective Date: September 1, 2006
Commission-Percentage: 16%
Special Commission: $0.00

Countersignature Commission: $0.00
Countersignature Rate: 0%

| Coverage | Liability | Retention | Year 1 | Premium Years Year 2 | Year 3 |
|---|---|---|---|---|---|
| D & O | $3,000,000 | $50,000 | | | |
| EPL | $3,000,000 | $250,000 | | | |
| Surcharge: | | | $0.00 | $0.00 | $0.00 |
| Tax: | | | $0.00 | $0.00 | $0.00 |
| Combined Premium: | | | $98,420.00 | $0.00 | $0.00 |

Comments:

Thank you for placing your business with us.

PE-007 (10-98)



**ST PAUL
TRAVELERS**

## IMPORTANT DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

On November 26, 2002, President Bush signed into law the Terrorism Risk Insurance Act of 2002 (the "Act"). The Act establishes a short-term program under which the Federal Government will share in the payment of covered losses caused by certain acts of international terrorism. We are providing you with this notice to inform you of the key features of the Act, and to let you know what effect, if any, the Act will have on your premium.

Under the Act, insurers are required to provide coverage for certain losses caused by international acts of terrorism as defined in the Act. The Act further provides that the Federal Government will pay a share of such losses. Specifically, the Federal Government will pay 90% of the amount of covered losses caused by certain acts of terrorism which is in excess of an insurer's statutorily established deductible for that year. The Act also caps the amount of terrorism-related losses for which the Federal Government or an insurer can be responsible at $100,000,000,000.00, provided that the insurer has met its deductible.

Please note that passage of the Act does not result in any change in coverage under the attached policy or bond (or the policy or bond being quoted). Please also note that no separate additional premium charge has been made for the terrorism coverage required by the Act. The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium, and is no more than one percent of your premium.

ILT-1018 (9/04)

**ST PAUL TRAVELERS**

**The Wrap®**

The Wrap® Declarations

Policy No. 104468586

Travelers Casualty and Surety Company of America
Hartford, CT 06183
(A Stock Insurance Company, herein called the Company)

NOTE: THE DIRECTORS AND OFFICERS LIABILITY, EMPLOYMENT PRACTICES LIABILITY AND FIDUCIARY LIABILITY COVERAGE PARTS ARE WRITTEN ON A CLAIMS-MADE BASIS. THOSE COVERAGE PARTS COVER ONLY CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF PURCHASED. THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM UNLESS DUTY-TO-DEFEND COVERAGE HAS BEEN SPECIFICALLY PROVIDED HEREIN.

| ITEM 1 | PARENT CORPORATION:<br>JULIO INVESTORS, LLC<br><br>Principal Address<br>1101 North Union Bower<br>Suite 160<br>IRVING, TX 75061 |
|---|---|
| ITEM 2 | POLICY PERIOD:<br>    (a) Inception Date: September 1, 2006        (b)    Expiration Date: September 1, 2007<br>    12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |

ITEM 3 — COVERAGE PARTS INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:

| Liability Coverage Parts | Aggregate Limit(s) of Liability | Coverage Part Limit(s) of Liability | Single Loss Limit(s) of Liability |
|---|---|---|---|
| Directors and Officers Liability | ☒ | ☐ | NA |
| Employment Practices Liability | ☒ | ☐ | NA |
| Fiduciary Liability | ☐ | ☐ | NA |
| Crime Coverage Parts | | | |
| Fidelity | ☐ | ☐ | ☐ |
| Kidnap and Ransom/Extortion | ☐ | ☐ | ☐ |

Coverage is only available for those Coverage Parts where indicated by ☒.

For Coverage Part and Single Loss Limit(s) of Liability for each purchased Coverage Part, see each Coverage Part Declarations for the applicable Limit(s) of Liability.

| ITEM 4 | AGGREGATE LIMIT(S) OF LIABILITY (inclusive of Defense Expenses):<br>    (a)  Aggregate Limit of Liability for all purchased Coverage Parts combined:<br>    Amount<br>    (b)  Aggregate Limit of Liability for all purchased Liability Coverage Parts combined:<br>    Amount $3,000,000.00<br>    (c)  Aggregate Limit of Liability for all purchased Crime Coverage Parts combined:<br>    Amount |
|---|---|

W-1000 3/99

Page 1 of 2

The Wrap® Declarations (continued)                                    Policy No. 104468586

| ITEM 5 | TYPE OF LIABILITY COVERAGE<br>Reimbursement |
|--------|---------------------------------------------|
| ITEM 6 | PREMIUM FOR THE POLICY PERIOD:<br>    Amount $98,420.00 |
| ITEM 7 | FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE:<br>ILT-1018 09-04, WEP-1000 12-00, WEP-1001 03-99, WDO-1001 03-99, PN-042 04-92, WDO-1000 12-00,<br>W-1537 03-99, WDO-2125 01-03, WEP-1098 01-03, WEP-1106 04-05, W-1051 02-00, W-1100 01-03,<br>WDO-2116 04-02 |

The Declaration Pages, the signed and completed Applications, the Common Terms and Conditions, each **Coverage Part** purchased, and any endorsements, constitute the entire agreement between the Company and the **Insureds**.

_____                    _____
Countersigned By                                    Authorized Company Representative



The Wrap®

ST PAUL
TRAVELERS

## Common Terms and Conditions

**THE LIABILITY COVERAGE PARTS OF THIS POLICY ARE WRITTEN ON A CLAIMS-MADE BASIS, WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.**

IN CONSIDERATION of the payment of the premium stated in the **Wrap Declarations**, in reliance on the statements in **The Wrap Application** and each **Coverage Part Application** and subject to all Declarations for this **Policy** and for each **Coverage Part**, the Common Terms and Conditions, all of the terms, exclusions, conditions and limitations of all purchased **Coverage Parts**, and all endorsements, the **Company** and the **Insureds** agree as follows:

I.    <u>TERMS AND CONDITIONS.</u>

The Common Terms and Conditions of this **Policy** apply to all **Coverage Parts**. Unless stated to the contrary in any **Coverage Part**, the terms and conditions of each **Coverage Part** of this **Policy** apply only to that **Coverage Part** and shall not apply to any other **Coverage Part** of this **Policy**. If any provision in the Common Terms and Conditions is inconsistent or in conflict with the terms and conditions of any **Coverage Part**, the terms and conditions of such **Coverage Part** shall control for purposes of that **Coverage Part**.

II.    <u>DEFINITIONS.</u>

Whenever appearing in this **Policy**, words and phrases appearing in **bold type** shall have the meanings set forth in this provision:

A.    "**Coverage Part(s)**" means, individually or collectively, the Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability, Fidelity, and Kidnap and Ransom/Extortion Coverage Parts, if purchased.

B.    "**Coverage Part Application**" means the application completed for each **Coverage Part** and any materials submitted in connection therewith.

C.    "**Crime Coverage Part(s)**" means, individually or collectively, the Fidelity and Kidnap and Ransom/Extortion Coverage Parts, if purchased.

D.    "**Defense Expenses**" means reasonable and necessary legal fees and expenses incurred in the investigation, defense, settlement and appeal of a **Claim**, including the premium for appeal bonds regarding such **Claim**; but **Defense Expenses** shall not include salaries, wages, benefits or overhead of any **Insured** or any of the **Insured Organization's** directors, officers, members of the Board of Managers, trustees or **Employees**.

E.    "**Discrimination**" means:

1.    any actual or alleged failure or refusal to hire or employ an applicant for employment with the **Insured Organization**;

2.    any actual or alleged termination or constructive termination of an employment relationship with the **Insured Organization**;

3.    any actual or alleged refusal to train or promote, or demotion of, an **Employee**; or

4.    any other act or omission by which an **Insured** allegedly treats one **Employee** differently from another in compensation, terms, conditions, opportunities or privileges of employment, including acts or practices taken for the purpose of or which have the impact of distinguishing among, limiting, segregating or classifying **Employees** or applicants for employment with the **Insured Organization** in their compensation terms, conditions, opportunities or privileges of employment;

on any of the following grounds: race, color, national origin, religion, creed, gender, sexual orientation, pregnancy, disability, medical condition, age, marital status, Vietnam Era Veteran status, military service, or any other legally protected category, status or characteristic established pursuant to federal, state or other law, regulation or ordinance, including but not limited to Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Americans With Disabilities Act or the Family Medical Leave Act.

F.    "Employee" means any natural person whose labor or service is engaged by and directed by the Insured Organization and who is paid through the payroll of the Insured Organization, including part-time, seasonal and temporary workers. Leased workers and independent contractors are not Employees. The status of an individual as an Employee shall be determined as of the date of the alleged Wrongful Act, Wrongful Employment Practice, or act or event giving rise to loss under the Crime Coverage Parts.

With regard to the Fidelity Coverage Part only:

    1.    "Employee" also means:

        a.    any Employee for 60 days after termination of service;

        b.    any natural person leased to the Insured Organization, under an agreement between the Insured Organization and a labor leasing firm, while that person is subject to the direction and control and performing services for the Insured Organization;

        c.    any non-compensated natural person:

            (i)    other than one who is a fund solicitor, while performing services for the Insured Organization that are usual to the duties of an Employee or officer; or

            (ii)    while acting as a fund solicitor during fund raising campaigns;

        d.    any natural person who is:

            (i)    a trustee, officer, employee, administrator or manager, except an administrator or a manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan insured under the Fidelity Coverage Part, and

            (ii)    a director, Officer-shareholder or trustee of the Insured Organization while that person is handling funds or other property of any ERISA Plan insured under the Fidelity Coverage Part.

    2.    But "Employee" does not mean:

        a.    any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character;

        b.    any seasonal or temporary workers while having care and custody of the Insured Organization's property outside the Premises; or

        c.    any director or trustee except while performing acts coming within the scope of the usual duties of an Employee or while acting as a member of any of the Insured Organization's elected or appointed committees to perform on its behalf specific, as distinguished from general, directorial acts.

G.    "Employee Benefit Plan" means:

    1.    any Welfare Plan which was, is now, or becomes sponsored solely by the Insured Organization or jointly by the Insured Organization and a labor organization exclusively for the benefit of Employees of the Insured Organization;

    2.    any Pension Plan or other plan identified in the endorsements to this Policy;

3.    any **Pension Plan** for which coverage is provided pursuant to Section III.H (Changes in Exposure) of the Common Terms and Conditions.

H.    "**ERISA**" means the Employee Retirement Income Security Act of 1974, including amendments thereto and regulations promulgated thereunder.

I.    "**Executive Officer**" means the chairperson, chief executive officer, president, chief financial officer, in-house general counsel, chief information officer, managing director, and any equivalent executive officer of the **Insured Organization**. For purposes of the Employment Practices Liability Coverage Part only, **Executive Officer** shall also include the members of the staff of the human resources department and the staff of the corporate legal department or the staff of the general counsel's office of the **Insured Organization**.

J.    "**Financial Insolvency**" means, with respect to the **Parent Corporation** and each **Subsidiary**, the appointment of a receiver, conservator, liquidator, trustee, or similar official; or the inability of the **Insured Organization** financially or under applicable law to indemnify the **Insured Persons**.

K.    "**Insured Organization**" means the **Parent Corporation** and any **Subsidiary**.

L.    "**Liability Coverage Part(s)**" means, individually or collectively, the Directors and Officers Liability, Employment Practices Liability, and Fiduciary Liability Coverage Parts, if purchased.

M.    "**Parent Corporation**" means the entity named in ITEM 1 of the Declarations for this **Policy** and for each **Coverage Part**.

N.    "**Pension Plan**" means any plan so defined in Section 3(2) of **ERISA** or in any related or similar state, local or foreign law or regulation.

O.    "**Policy**" means, collectively, the Wrap Declarations, The Wrap Application, the Common Terms and Conditions, each purchased **Coverage Part**, each **Coverage Part Application**, each **Coverage Part Declarations**, and any endorsements thereto.

P.    "**Policy Period**" means the period from the Inception Date to the Expiration Date in ITEM 2 of the Wrap Declarations, or the dates set forth in the most recent Renewal Certificate with respect to the **Policy**, whichever period is later; in no event, however, shall the **Policy Period** continue past the effective date of cancellation or termination of the **Policy**.

Q.    "**Pollutants**" means any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants.

R.    "**Pollution**" means any actual, alleged or threatened exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, escape, treatment, removal or disposal of **Pollutants**; or any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any action taken in contemplation or anticipation of any such regulation, order, direction or request.

S.    "**Related Claims**" means all **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, events, **Wrongful Acts** or **Wrongful Employment Practices** or the same or related series of facts, circumstances, situations, transactions, events, **Wrongful Acts** or **Wrongful Employment Practices**.

T.    "**Retaliation**" means adverse employment action with regard to an **Employee** on account of such **Employee**'s exercise or attempted exercise of rights protected by law, including but not limited to the Family Medical Leave Act, or on account of the **Employee** having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law.

U.    "**Sexual Harassment**" means unwelcome sexual advances or requests for sexual favors and other verbal, physical or other conduct of a sexual nature (i) which is made a term or condition of an **Employee**'s employment or advancement, or (ii) submission to or rejection of which is used as a basis for decisions affecting an **Employee** or applicant for employment, or (iii) which has the purpose or effect of creating an intimidating, hostile or offensive work environment which unreasonably interferes with the job performance of an **Employee**.

V.    "Single Loss" means all covered loss under the Crime Coverage Parts:

1.    caused by any Employee(s) or in which any Employee(s) is (are) concerned or implicated, either resulting from a single act or any number of such acts, regardless of when, during the period of the Crime Coverage Part such acts occurred;

2.    caused by Forgery or alteration committed by any person or in which such person is concerned or implicated, either resulting from a single act or any number of such acts, regardless of the number of Covered Instruments involved, or when, during the period of the Crime Coverage Part, such acts occurred; or

3.    resulting from an actual or attempted fraudulent or dishonest act or event or a series of related acts or events whether committed by one or more persons;

4.    resulting from any single act or series of related acts of Kidnapping, Extortion, or Detention/Hijack by one or more persons or collaborating persons; or

5.    resulting from any single casualty or event or series of related casualties or events not specified in subsections 1, 2, 3 or 4 preceding.

W.    "Subsidiary" means:

1.    any corporation in which, on or prior to the Inception Date in ITEM 2 of the Wrap Declarations, the Parent Corporation owns, directly or through one or more Subsidiaries, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such corporation's directors;

2.    any limited liability company organized under the laws of any state, in which, on or prior to the Inception Date in ITEM 2 of the Wrap Declarations, the Parent Corporation owns, directly or through one or more Subsidiaries, the right to elect, appoint or designate more than fifty percent (50%) of the members of such limited liability company's Board of Managers; and

3.    subject to the terms of Section III.H, any entity that the Insured Organization forms or acquires during the Policy Period in which the Parent Corporation owns, directly or through one or more Subsidiaries, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

X.    "Welfare Plan" means any plan so defined in Section 3(1) of ERISA or in any related or similar state, local or foreign law or regulation.

Y.    "Workplace Harassment" means harassment, other than Sexual Harassment, which actually or allegedly creates a work environment that interferes with job performance, or creates an intimidating, hostile, or offensive working environment.

Z.    "The Wrap Application" means the Wrap Application and any materials submitted in connection therewith.

AA.    "Wrongful Employment Practice" means any of the following actual or alleged matters occurring in the course of and arising out of an Employee's employment or an applicant's application for employment with the Insured Organization: (1) Discrimination, (2) Sexual Harassment, (3) Wrongful Termination, (4) Retaliation, (5) Workplace Harassment, (6) breach of oral, implied or written employment agreement, (7) negligent evaluation, (8) wrongful discipline, (9) wrongful deprivation of career opportunity, (10) wrongful denial of training, (11) wrongful deprivation or denial of seniority, (12) wrongful evaluation, (13) wrongful failure to grant tenure, (14) wrongful failure to employ or promote, (15) invasion of privacy, (16) employment-related misrepresentation, (17) employment-related defamation, and (18) employment-related infliction of emotional distress.

BB.    "Wrongful Termination" means actual or constructive termination of an employment relationship with the Insured Organization in a manner or for a reason which is contrary to applicable law or in violation of a written, oral or implied agreement, other than a collective bargaining agreement, for continued employment.

III.    **CONDITIONS.**

A.    **TERRITORY.**

This insurance applies to Claims or loss occurring anywhere in the world.

B.   **RETENTIONS.**

    1.   Liability Coverage Parts

        The Company's liability under any **Liability Coverage Part** with respect to **Loss** arising from any single **Claim** shall apply only to that part of such **Loss** which is excess of the applicable Retention set forth in the Declarations for such Coverage Part. If different parts of **Loss** arising from a single **Claim** are subject to different Retentions, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention. The **Insureds** shall bear uninsured at their own risk the amount of any applicable Retention. The Company shall have no obligation to pay **Loss**, including **Defense Expenses**, until the Retention amount has been paid by the **Insured**; however the Company may, at its sole discretion, pay all or part of the Retention amount on behalf of any **Insured**, in such event, the **Insureds** agree to repay the Company any amounts so paid.

    2.   Crime Coverage Parts

        The Company will not pay for any loss under any Insuring Agreement of the **Crime Coverage Parts** unless the amount of loss exceeds the Retention for the Insuring Agreements in ITEM 2 of the **Crime Coverage Part** Declarations. The Company will then pay for the amount of loss in excess of the Retention subject to any applicable Aggregate Limit(s) of Liability stated in ITEM 4 of the **Wrap Declarations** and/or the Coverage Part Limit(s) of Liability and Single Loss Limits of Liability stated in ITEM 2 of the **Crime Coverage Part** Declarations. This provision does not apply to legal expenses paid under Insuring Agreement B of the Fidelity Coverage Part. In the event more than one Retention could apply to the same loss, only the highest Retention may be applied.

C.   **LIMITS OF LIABILITY.**

    1.   <u>Aggregate Limit(s) of Liability</u>

    Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company:

        a.   If the Aggregate Limit of Liability for all purchased **Coverage Parts** is applicable as provided in ITEM 4(a) of the **Wrap Declarations**, the Company's maximum limit of liability in a single **Policy Period** for all **Claims**, including **Related Claims**, under all applicable **Liability Coverage Parts** and all loss under all applicable **Crime Coverage Parts** shall not exceed the Aggregate Limit of Liability for all purchased **Coverage Parts** stated in ITEM 4(a) of the **Wrap Declarations**.

        b.   If the Aggregate Limit of Liability for all purchased **Liability Coverage Parts** is applicable as provided in ITEM 4(b) of the **Wrap Declarations**, the Company's maximum limit of liability in a single **Policy Period** for all **Claims**, including **Related Claims**, under all applicable **Liability Coverage Parts** shall not exceed the Aggregate Limit of Liability for all purchased **Liability Coverage Parts** stated in ITEM 4(b) of the **Wrap Declarations**.

        c.   If the Aggregate Limit of Liability for all purchased **Crime Coverage Parts** is applicable as provided in ITEM 4(c) of the **Wrap Declarations**, the Company's maximum limit of liability in a single **Policy Period** for all loss under all applicable **Crime Coverage Parts** shall not exceed the Aggregate Limit of Liability for all purchased **Crime Coverage Parts** stated in ITEM 4(c) of the **Wrap Declarations**.

    2.   <u>Coverage Part Limit(s) of Liability</u>

    Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company; and further subject to any applicable Aggregate or Single Loss Limit(s) of Liability:

If Coverage Part Limit(s) of Liability are applicable for a Coverage Part as provided in ITEM 3 of the Wrap Declarations, the Company's maximum limit of liability for all Claims, including Related Claims, under each applicable Liability Coverage Part or all loss under each applicable Crime Coverage Part in a single Policy Period shall not exceed the Coverage Part Limit of Liability stated in the Declarations for each applicable Coverage Part. In the event that a Claim or loss triggers more than one Coverage Part, the Company's maximum limit of liability shall not exceed the highest available remaining Coverage Part Limit of Liability of the applicable Coverage Parts.

3.    Single Loss Limit(s) of Liability

Regardless of the number of persons or entities bringing Claims or the number of persons or entities who are Insureds, and regardless of when payment is made by the Company; and further subject to any applicable Aggregate or Coverage Part Limit(s) of Liability:

If a Single Loss Limit of Liability for each Insuring Agreement is applicable for the Crime Coverage Part(s) as provided in ITEM 2.B. of the Declarations for the Crime Coverage Parts, the Company's maximum limit of liability for each Single Loss under the applicable Insuring Agreement shall not exceed the Single Loss Limit of Liability for the applicable Insuring Agreement. In the event that a loss triggers more than one Insuring Agreement in any of the Crime Coverage Parts, the Company's maximum limit of liability for each Single Loss shall not exceed the highest available Single Loss Limit of Liability for the applicable Insuring Agreements.

4.    Other Provisions

a.    If any Claim against the Insureds gives rise to coverage both under this Policy and under any other liability policy or similar insurance issued by the Company or any of its affiliates to any Outside Entity, the Company's maximum aggregate limit of liability under all such policies for all Loss, including Defense Expenses, from such Claim shall not exceed the largest single available limit of liability under such policy, including this Policy.

b.    Defense Expenses incurred by the Company or by the Insureds in defense of a Claim are part of and not in addition to all applicable Limit(s) of Liability. The payment by the Company or by the Insureds of Defense Expenses reduces all applicable Limit(s) of Liability.

c.    All Aggregate and Coverage Part Limit(s) of Liability applicable to this Policy or a Coverage Part shall be reduced by the amount of any payment made under the terms of each applicable Coverage Part. If the Aggregate or Coverage Part Limit(s) of Liability applicable to this Policy or a Coverage Part are exhausted by the payment of amounts covered under this Policy or the Coverage Part, the premium under the Policy or Coverage Part will be fully earned, all obligations of the Company under the Policy or Coverage Part will be completely fulfilled and exhausted, including any duty to defend, and the Company shall have no further obligations of any kind or nature whatsoever under this Policy or Coverage Part.

d.    The purchase of any Extended Reporting Period shall not increase or reinstate any applicable Limit(s) of Liability, and said Limit(s) of Liability shall be the Company's maximum liability for the Policy Period and Extended Reporting Period, combined.

e.    Regardless of the number of years any of the Crime Coverage Parts or similar insurance issued by the Company or its affiliates remains in force or the number of premiums paid, no Limit of Liability under any Crime Coverage Part or Insuring Agreement thereunder cumulates from year to year or period to period.

f.    In the event that any director of the Insured Organization who is not an Employee thereof is an Insured Person under any other similar policy issued by the Company and a loss, as respects such director, is reported under the Kidnap and Ransom/Extortion Coverage Part of this Policy and one or more such other policies, then the aggregate liability of the Company for each Single Loss shall not be cumulative and shall in no event exceed the highest Limits of Liability applicable to each Single Loss under the Kidnap and Ransom/Extortion Coverage Part or such other applicable policy.

D.    DEFENSE, INVESTIGATION AND SETTLEMENT.

1.    If duty-to-defend coverage is provided with respect to the Liability Coverage Parts as indicated in ITEM 5 of the Wrap Declarations:

W-1001 3/99

a.    The Company shall have the right and duty to defend any Claim covered by such **Liability Coverage Part**, even if any of the allegations are groundless, false or fraudulent; provided however, that the Company shall not be obligated to defend or continue to defend any **Claim** after the applicable Limit of Liability for such **Coverage Part** has been exhausted by payment of **Loss**; and

b.    The **Insured** shall cooperate with the Company and, upon the Company's request, assist in making settlements and in defense of **Claims** and in enforcing rights of contribution or indemnity against any person or entity which may be liable to the **Insured** because of an act or omission covered under this **Policy**, shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

2.    If reimbursement coverage is provided with respect to the **Liability Coverage Parts** as indicated in ITEM 5 of the Wrap Declarations:

a.    The Company has no duty to defend any **Claim**. It shall be the duty of the **Insureds** to defend **Claims**. The Company shall have the right to associate with the **Insureds** in the investigation, defense and settlement, including but not limited to the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by this **Policy** and the selection of appropriate defense counsel;

b.    Upon written request, the Company will advance Defense Expenses for which such **Liability Coverage Part** provides coverage. Such advanced payments by the Company shall be repaid to the Company by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** shall not be entitled to payment of such **Loss** under the **Policy**. As a condition of any payment of Defense Expenses or other **Loss** under this subsection, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any **Defense Expenses** or other **Loss** paid to or on behalf of any **Insured** if it is finally determined that any such **Loss** incurred by such **Insured** is not covered under the **Policy**.

3.    The **Insureds** shall not settle or offer to settle any **Claim**, incur any **Defense Expenses**, assume or admit any liability, or otherwise assume any obligation without the Company's prior written consent, such consent not to be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

4.    The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient, and if the **Insured** shall refuse to consent to the settlement of any **Claim** as recommended by the Company based upon a judgment or a bona fide offer of settlement, then the **Insured** thereafter shall negotiate and/or defend such **Claim** independently of the Company and on the **Insured's** own behalf and solely at the expense of the **Insured**; in such event, all **Defense Expenses** and other costs and expenses incurred or paid by the **Insured** after the date the **Insured** refused to consent to settlement as recommended by the Company shall be the sole responsibility of the **Insured** and shall not be recoverable under this **Policy**, and the **Insured** also shall be solely responsible for all **Loss** in excess of the lower of the amount for which settlement could have been made as recommended by the Company or the remaining portion of the applicable Limit(s) of Liability.

5.    The **Insureds** will provide the Company with all information, assistance and cooperation that it reasonably requests, and will do nothing that may prejudice its position or potential or actual rights of recovery. The Company will be subrogated to the extent of any payment to all of the rights of recovery of the **Insureds**. The **Insureds** will execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Company effectively to bring suit in their name. The obligations of the **Insureds** under this subsection survive the **Policy**.

6.    With regard to the Kidnap and Ransom/Extortion Coverage Part, the Company shall have the right to investigate, negotiate or settle any claim or suit subject to coverage under that **Coverage Part**, or to take over the conduct of the defense thereof. The **Insured** shall cooperate with the Company to these ends and shall not admit liability in any such claim or suit. The **Insured** shall use due diligence and do all things reasonably practical to avoid or diminish any loss.

E.    CLAIMS.

1.    A **Claim** shall be deemed to have been made on the date of service upon or receipt of notice by any **Insured** of the written demand or proceeding, whichever occurs earlier.

2.    All Related Claims are a single Claim for purposes of all applicable Liability Coverage Parts, and all Related Claims shall be deemed to have been made at the time the first of such Related Claims was made, regardless of whether such date is before or during the Policy Period.

F.    CLAIMS MADE EXTENSION CLAUSE.

With respect to the Liability Coverage Parts, if, during the Policy Period, the Insured shall first become aware of any Wrongful Act or Wrongful Employment Practice which may subsequently give rise to a Claim under a purchased Liability Coverage Part, and shall, during such Policy Period, give written notice thereof as set forth herein to the Company, then any Claim which subsequently is made against the Insured with regard to such Wrongful Act or Wrongful Employment Practice shall be deemed to have been first made during such Policy Period. The written notice shall include the particulars of such Wrongful Act or Wrongful Employment Practice, including all facts constituting the alleged Wrongful Act or Wrongful Employment Practice, the identity of each person allegedly involved in or affected by the Wrongful Act or the Wrongful Employment Practice, and the dates of the alleged event(s), all of which shall be provided as soon as practicable, but in any event prior to the end of the Policy Period. All notices under this subsection must be sent by certified mail or prepaid overnight mail to the address set forth in ITEM 5 of the applicable Liability Coverage Part Declarations. Notice of any actual Claim which is subsequently made with respect to such Wrongful Act or Wrongful Employment Practice must be given in accordance with Section III.K of the Common Terms and Conditions.

G.    SPOUSAL EXTENSION.

1.    The coverage afforded under the Liability Coverage Parts will, subject to all of their terms, conditions, limitations and exclusions, be extended to apply to Loss resulting from a Claim made against a person who, at the time the Claim is made, is a lawful spouse of an Insured Person, but only if:

a.    the Claim against such spouse results from a Wrongful Act or Wrongful Employment Practice actually or allegedly committed by the Insured Person, to whom the spouse is married, and

b.    such Insured Person and his or her spouse are represented by the same counsel in connection with such Claim.

2.    No spouse of an Insured Person will, by reason of this subsection, have any greater right to coverage under any of the Liability Coverage Parts than the Insured Person to whom such spouse is married.

3.    The Company shall not be liable under this subsection to make any payment of Loss in connection with any Claim against a spouse of an Insured Person for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse.

H.    CHANGES IN EXPOSURE.

1.    Formation or Acquisition of Subsidiary, Premises or Pension Plan

a.    With regard to the Liability Coverage Parts, if, during the Policy Period, the Insured Organization forms or acquires a Subsidiary or Pension Plan (other than an employee stock ownership plan) which is then solely sponsored by the Insured Organization or jointly by the Insured Organization and a labor organization exclusively for the benefit of the Employees of the Insured Organization, the Policy will provide coverage for that acquired or formed Subsidiary or Pension Plan and their respective Insured Persons, subject to all other terms and conditions of this Policy, but only for Claims for Wrongful Acts or Wrongful Employment Practices under the Liability Coverage Parts which occur wholly during the time that the Insured Organization is sole sponsor with regard to the Pension Plan or owns more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors, provided written notice of such formation or acquisition has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company's underwriters may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for the acquired or formed Subsidiary or Pension Plan shall not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the Parent Corporation has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement shall not apply, however, if (1) the assets of the acquired or formed Subsidiary do not exceed ten percent (10%) of the total assets of the Insured Organization as reflected in the Insured Organization's most recent audited consolidated financial statements, (2) the total assets of the acquired or formed Pension Plan, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the Insured Organization, or (3) the acquisition or formation occurs less than ninety (90) days prior to the end of the Policy Period.

Notwithstanding the foregoing, no coverage shall be provided pursuant to this Subsection III.H.1. for any employee stock ownership plan or any natural person or Insured Organization with respect thereto unless the Company, by specific written endorsement hereto, agrees to provide such coverage. Any such coverage shall be at the terms and conditions set forth in the endorsement and for such additional premium as may be required by the Company.

        b.      With regard to the **Crime Coverage Parts**, if through consolidation or merger with, or purchase of assets of, some other entity any additional persons become **Employees** or the **Insured Organization** acquires the use and control of any additional **Premises**, or if the **Insured Organization** acquires an additional **Subsidiary**, any insurance afforded for **Employees, Premises** or **Subsidiaries** also applies to those additional **Employees, Premises, or Subsidiaries**, provided that the **Insured** (1) gives the Company written notice within ninety (90) days thereafter; and (2) pays the Company an additional premium. Any **Pension Plan** or **Welfare Plan** acquired as above and sponsored exclusively by the **Insured Organization** shall be included as an **Insured(s)** under **Insuring Agreement G** of the **Fidelity Coverage Part**. The 90-day notice requirement shall not apply and the Company agrees to extend automatically such coverage under the **Crime Coverage Parts**, without payment of an additional premium, to any consolidatation or merger with, or purchase of assets of, some other entity or **Subsidiary** (1) the assets of which do not exceed ten percent (10%) of the **Insured Organization's** total assets, or (2) which occurs less than ninety (90) days prior to the end of the **Policy Period**, subject to all other terms and conditions of the **Crime Coverage Parts** and only for so long as the **Coverage Part(s)** remain in effect as to the **Insured Organization**.

     2.     <u>Merger of Plans</u>

If, during the **Policy Period**, a **Welfare Plan** or **Pension Plan** for which coverage is provided under the **Fiduciary Liability Coverage Part** is merged with another **Welfare Plan** or **Pension Plan** for which coverage is also provided under that **Coverage Part**, the **Fiduciary Liability Coverage Part** shall continue to provide coverage for both plans, subject to all other terms and conditions of that **Coverage Part** and only for so long as that **Coverage Part** remains in effect as to the **Parent Corporation**.

If, during the **Policy Period**, a **Welfare Plan** or **Pension Plan** for which coverage is provided under the **Fiduciary Liability Coverage Part** ("Covered Plan") is merged with another **Welfare Plan** or **Pension Plan** for which coverage is not provided under this **Coverage Part** ("Uncovered Plan"), the **Fiduciary Liability Coverage Part** shall continue to provide coverage for only the **Covered Plan**, subject to all other terms and conditions of the **Fiduciary Liability Coverage Part** and only for so long as that **Coverage Part** remains in effect as to the **Parent Corporation**, but only for **Claims** with regard to **Wrongful Acts** which occurred prior to the date of such merger.

     3.     <u>Sale or Termination of Plan</u>

If, prior to or during the **Policy Period**, any **Welfare Plan** or **Pension Plan**, other than an employee stock ownership plan not identified in the endorsement, is sold or terminated, the **Fiduciary Liability Coverage Part** shall provide coverage for such plan, subject to all other terms and conditions of the **Fiduciary Liability Coverage Part** and only for so long as the **Fiduciary Liability Coverage Part** remains in effect as to the **Parent Corporation**. The coverage provided pursuant to this Subsection III.H.3 shall apply only:

        a.      for **Claims** with regard to **Wrongful Acts** which occurred prior to the date of such sale or termination,

        b.      while such plan was sponsored solely by the **Parent Corporation** or jointly by the **Parent Corporation** and a labor organization exclusively for the benefit of employees of the **Parent Corporation**, and

        c.      if notice of such sale or termination is given to the Company prior to the end of such **Policy Period**.

     4.     <u>Change of Control</u>

If during the **Policy Period**, any of the following events occur:

a.    the acquisition of the Parent Corporation, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the Parent Corporation into or with another entity such that the Parent Corporation is not the surviving entity;

b.    the appointment of a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official, for or with respect to the Parent Corporation; or

c.    the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least fifty percent (50%) of the directors of the Parent Corporation

(hereinafter "Change of Control"), coverage under the Policy shall continue in full force and effect, subject to all other terms and conditions of the Policy, but only with respect to Claims for Wrongful Acts or Wrongful Employment Practices or loss under the Crime Coverage Parts committed or incurred before such Change of Control, but coverage will cease with respect to Claims for Wrongful Acts and Wrongful Employment Practices or loss under the Crime Coverage Parts committed or incurred after such Change of Control, and further provided that any loss under the Kidnap and Ransom/Extortion Coverage Part must be discovered and reported to the Company within twelve months of the Change of Control. After a Change of Control, the Liability Coverage Parts may not be cancelled, regardless of Section III.J. of the Common Terms and Conditions, and the entire premium for the Liability Coverage Parts will be deemed fully earned.

I.    EXTENDED REPORTING PERIOD.

If the Company or the Parent Corporation fails or refuses to renew an applicable Liability Coverage Part or if the Parent Corporation cancels an applicable Liability Coverage Part, the Parent Corporation shall have the right, upon payment of the additional premium as determined by ITEM 4 of the applicable Liability Coverage Part Declarations, to the period of time set forth in ITEM 4 of that Coverage Part Declarations following the effective date of such nonrenewal or termination ("the Extended Reporting Period") in which to give the Company written notice of Claims first made during the Extended Reporting Period against persons or entities who at the effective date of nonrenewal or cancellation were Insureds, but only for Wrongful Acts or Wrongful Employment Practices occurring wholly prior to the effective date of the nonrenewal or cancellation and which otherwise would be covered by the applicable Liability Coverage Part, subject to the following conditions:

1.    The Extended Reporting Period shall not provide a new, additional or renewed limit(s) of liability. The Company's total liability for all Claims made during the Extended Reporting Period shall be limited to the remaining portion of the maximum aggregate limit of liability set forth in ITEM 4 of the Wrap Declarations and, if applicable, ITEM 2 of the applicable Liability Coverage Part Declarations as of the effective date of the nonrenewal or cancellation;

2.    The entire premium for the Extended Reporting Period, if purchased, shall be deemed to have been fully earned at the commencement of such Extended Reporting Period;

3.    Section III.F of the Common Terms and Conditions ("Claims Made Extension Clause") does not apply and may not be invoked during the Extended Reporting Period; and

4.    The right to elect the Extended Reporting Period under this subsection III.I shall terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days of the effective date of the nonrenewal or cancellation.

J.    CANCELLATION.

1.    The Company may cancel this Policy or any Coverage Part for failure to pay a premium when due, in which case twenty (20) days written notice shall be given to the Parent Corporation, unless however payment is made within (20) days of the Parent Corporation's receipt of such notice of cancellation. The Company shall have the right to the premium amount for the portion of the Policy Period during which the Policy or Coverage Part was in effect.

2.      The **Parent Corporation** may cancel this **Policy** or any **Coverage Part** by mailing the Company written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Wrap Declarations, such cancellation will be effective. In the event the **Parent Corporation** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

3.      The Company will not be required to renew this **Policy** or any **Coverage Part** upon its expiration. If the Company elects not to renew this **Policy** or any **Coverage Part**, it will deliver or mail to the **Parent Corporation** written notice to that effect at least sixty (60) days before the Expiration Date set forth in ITEM 2(b) of the Wrap Declarations.

K.      **INSURED'S DUTIES IN THE EVENT OF A CLAIM.**

1.      As to all **Liability Coverage Parts**, it is a condition precedent to all insurance provided thereunder that:

a.      In the event of a **Claim** made against any **Insured**, written notice concerning all particulars of such **Claim**, including all facts constituting the alleged **Wrongful Act** or **Wrongful Employment Practice**, the identity of each person allegedly involved in or affected by such **Wrongful Act** or **Wrongful Employment Practice**, and the date(s) of the alleged events, shall be provided to the Company as soon as practicable; and

b.      All notices under this subsection must be sent by certified mail or prepaid overnight mail to the address set forth in ITEM 5 of the applicable **Liability Coverage Part** Declarations.

2.      As to the Fidelity **Coverage Part**, it is a condition precedent to all insurance provided thereunder that:

a.      After discovery by the **Insured Organization** or any of its partners, officers or directors of a loss or a situation that may result in loss of, or loss from damage to, **Money, Securities** and other property that would be covered under the Fidelity **Coverage Part**, the **Insured Organization** must:

(i)     provide the Company with written notice as soon as possible and if the **Insured Organization** has reason to believe that any loss (except for loss under Insuring Agreements A or B of the Fidelity **Coverage Part**) involves a violation of law, the **Insured Organization** must also notify the police;

(ii)    submit to examination under oath at the Company's request and give the Company a signed statement of the **Insured Organization's** answers;

(iii)   give the Company a detailed, sworn proof of loss within 120 days. Proof of loss under Insuring Agreement B of the Fidelity **Coverage Part** must include an affidavit of forgery setting forth the amount and cause of loss and (1) the original instrument(s) or (2) a copy of the instrument(s) involved in that loss; and

(iv)    cooperate with the Company in the investigation and settlement of any claim.

b.      The Company waives the written notice requirement if the amount of loss does not exceed 25% of the Retention for the applicable Fidelity **Coverage Part** Insuring Agreement.

3.      As a condition precedent to the Company's liability under Insuring Agreement A of the Kidnap and Ransom/Extortion Coverage Part:

a.      The **Insured Organization** shall have approved the payment of **Ransom Monies**. In the event of a **Kidnapping** or **Extortion** of an **Insured Person** or **Guest** during the **Policy Period**, and prior to the payment of **Ransom Monies**, the **Insured** shall make every reasonable effort to:

(i)     determine that the **Kidnapping** or **Extortion** has actually occurred;

(ii)    give immediate oral or written notice to the Company and Control Risks Group at the addresses provided in Item 3 of the Kidnap and Ransom/Extortion Coverage Part Declarations; and

(iii)    notify the Federal Bureau of Investigation or other law enforcement agency having jurisdiction thereover of the demand for Ransom Monies and comply with their recommendations and instructions.

b.    As additional conditions precedent to the Company's liability under the Kidnap and Ransom/Extortion Coverage Part, the Insured must:

(i)    use all due diligence and do all things reasonably practicable to avoid or diminish any loss(es) insured under the Kidnap and Ransom/Extortion Coverage Part;

(ii)    use all reasonable efforts not to disclose the existence of the Kidnap and Ransom Coverage Part;

(iii)    establish a procedure in writing and shall furnish a copy of that procedure to at least three senior officials, so as to enable those persons to comply with this subsection; and

(iv)    immediately notify the Company of any claim or suit potentially subject to coverage under the Kidnap and Ransom/Extortion Coverage Part, and shall not admit liability in any such claim or suit.

L.    ACTION AGAINST THE COMPANY.

1.    With regard to the Liability Coverage Parts only:

a.    No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial, or by written agreement of the Insured, the claimant and the Company.

b.    Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy, in a court of competent jurisdiction in the United States, its territories or possessions, or Canada, to the extent of the insurance afforded by this Policy. No person or organization shall have any right under this Policy to join the Company as a party to any action against the Insured to determine the Insured's liability, nor shall the Company be impleaded by an Insured or said Insured's legal representative. Bankruptcy or insolvency of any Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

2.    With regard to the Crime Coverage Parts only:

a.    Fidelity Coverage Part:  An Insured may not bring any legal action against the Company involving loss (1) unless it has complied with all the terms of this Policy; (2) until 90 days after it has filed proof of loss with the Company; and (3) unless brought within 2 years from the date the Insured Organization discovered the loss.

b.    Kidnap and Ransom/Extortion Coverage Part:  No suit, action or proceeding for recovery of any claim under this Coverage Part shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this Coverage Part shall have been compiled with and the same be commenced within twenty-four (24) months next after a claim for actual Loss or Expenses has been reported to the Company by the Insured.

M.    OTHER INSURANCE.

This Policy shall apply only as excess insurance over, and shall not contribute with, any other insurance (whether collectible or not), including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically in excess of this Policy.  This Policy will not be subject to the terms of any other insurance.

N.    CHANGES.

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or change in any part of this Policy, or estop the Company from asserting any right under the terms, conditions and limitations of this Policy, nor may the terms, conditions and limitations of this Policy be waived or changed, except by a written endorsement issued by the Company to form a part of this Policy.

O.    ASSIGNMENT.

Assignment of interest under this Policy shall not bind the Company, until its consent is endorsed hereon, except in the case of the death of individuals included as additional Insureds under the Fidelity Coverage Part. In that event, the deceased individual's rights and duties will be transferred to his legal representative but only while acting within the scope of duties as his legal representative. Until the legal representative is appointed, anyone having proper temporary custody of the deceased individual's property will have his rights and duties but only with respect to that property.

P.    REPRESENTATIONS.

By acceptance of this Policy, each Insured represents that the statements contained in The Wrap Application, any Coverage Part Application, or any other application completed for the proposed Policy, all of which are deemed to be attached to, incorporated into, and form a part of, this Policy, are said Insured's agreements and representations, that such representations are material to the Company's acceptance of this risk, that this Policy is issued in reliance upon the truth of such representations, and that this Policy embodies all agreements existing between said Insured and the Company or any of its agents relating to this insurance.

In the event that any statement or representation in The Wrap Application or Liability Coverage Part Application is untrue, the Policy or such Liability Coverage Part(s), respectively shall be void and of no effect whatsoever, but only with respect to:

   1.    any Insured Person who knew, as of the Policy Inception Date, that the statement or representation was untrue;

   2.    the Insured Organization, to the extent it indemnifies any such Insured Person under any Liability Coverage Part; and

   3.    the Insured Organization, under any Liability Coverage Part, if any Executive Officer knew, as of the Policy Inception Date, that the statement or representation was untrue.

Whether an Insured Person or Executive Officer had such knowledge shall be determined without regard to whether the Insured Person or Executive Officer actually knew The Wrap Application or applicable Coverage Part Application contained such untrue statement or representation.

With regard to the Crime Coverage Parts, this insurance is void in any case of fraud by the Insured Organization as it relates to this insurance at any time. It is also void if the Insured Organization or any other Insured, at any time, intentionally conceals or misrepresents a material fact concerning:

   a.    this insurance;

   b.    the Money, Securities or other property;

   c.    the Insured's interest in the Money, Securities or other property; or

   d.    a claim under this insurance.

Q.    CONTINUITY OF COVERAGE.

The Liability Coverage Parts shall not apply to any Claims based upon, alleging, arising out of, directly or indirectly resulting from, or in any way relating to any fact, circumstance, situation, transaction, event, Wrongful Act, or Wrongful Employment Practice about which an Insured under the Directors and Officers Liability and Fiduciary Coverage Parts or an Executive Officer under the Employment Practices Liability Coverage Part had knowledge prior to the Continuity Date set forth in ITEM 7 of the Declarations for each applicable Liability Coverage Part.

R.    **AUTHORIZATION.**

By acceptance of this **Policy**, the **Parent Corporation** agrees to act on behalf of all **Insureds** with respect to the payment of premiums, the receiving of any return premiums that may become due under the **Policy**, and the receiving of notices of cancellation, nonrenewal, or change of coverages, and the **Insureds** each agree that they have, individually and collectively, delegated such authority exclusively to the **Parent Corporation**; provided, however, that nothing herein shall relieve the **Insureds**, and each of them, from giving any notice to the Company that is required under Section III.F and III.K of the Common Terms and Conditions of this **Policy**.

S.    **LIBERALIZATION.**

If during the period that insurance is in force under this **Policy**, the Company shall be required, by law or by insurance supervisory authorities of the state in which the **Policy** was issued, to make any changes in the form of this **Policy**, by which the insurance afforded by this **Policy** could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the **Insured** hereunder as though such endorsement or substitution of form had been made.

T.    **ENTIRE AGREEMENT.**

The **Insureds** agree that this **Policy**, including any endorsements, **The Wrap Application**, and each **Coverage Part Application**, constitutes the entire agreement between them and the Company or any of its agents relating to this insurance.

U.    **HEADINGS.**

The descriptions in the headings and sub-headings of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage.

V.    **VALUATION.**

1.    **Money**

All premiums, Limits of Liability, Retentions, **Loss**, **Defense Expenses**, and other amounts under this **Policy** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement or invoice is denominated, or other element of **Loss** or **Defense Expenses** is stated in a currency other than United States of America dollars, payment under this **Policy** shall be made in United States dollars at the rate of exchange published in the Wall Street Journal on the date the final judgment is entered, the settlement agreement is executed, the invoice is dated, or the other element of **Loss** or **Defense Expenses** is due, respectively. The Company may, at its option, pay for loss of **Money** issued by any country other than the United States of America at face value in the **Money** issued by that country.

2.    **Securities**

Loss of Securities are expressed and payable by their value at the close of business on the day the loss was discovered. The Company may, at its option:

a.    pay the value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the Company all its rights, title and interest in and to those **Securities**; or

b.    pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the Securities. However, the Company will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the Securities at the close of business on the day the loss was discovered or any applicable remaining limit of liability.

3.    **Property**

a.    Loss of, or loss from damage to, other property or loss from damage to the Premises are expressed and payable by the:

(i)    actual cash value of the property on the day the loss was discovered;

(ii)    cost of repairing the property or Premises; or

(iii)    cost of replacing the property with property of like kind and quality.

The Company may, at its option, pay the actual cash value of the property or repair or replace it. If the Company cannot agree with the Insured upon the actual cash value or the cost of repair or replacement, the value or cost will be determined by arbitration.

b.    The Company may, at its option, pay for loss of, or loss from damage to, property other than Money:

(i)    in the Money of the country in which the loss occurred; or

(ii)    in the United States of America dollar equivalent of the Money of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered based on the New York foreign exchange selling rates as quoted at 3:00 PM Eastern Standard Time.

c.    Any property that the Company pays for or replaces becomes its property.

W.    **RECOVERIES.**

1.    All recoveries from third parties for payments made under this **Policy** shall be applied (after first deducting the costs and expenses incurred in obtaining such recovery) in the following order of priority:

a.    the Insureds shall first be reimbursed for the amount they have paid which would have been paid under the Policy but for the fact that it is in excess of the applicable Limit(s) of Liability under this **Policy**;

b.    the Company shall then be reimbursed for the amount paid under this **Policy**, and

c.    any remaining sum shall be applied towards reimbursement of the Retention borne by the Insured under this Policy.

2.    Recoveries do not include any recovery:

a.    from insurance, suretyship, reinsurance, security or indemnity of the Company; or

b.    with regard to the Fidelity Coverage Part, of original Securities after duplicates of them have been issued.

3.    The Insured must transfer to the Company all of its rights of recovery against any person or organization for any loss under the Fidelity Coverage Part sustained by the Insured and for which the Company has paid or settled. The Insured must also do everything necessary to secure those rights and do nothing after loss to impair them.

IN WITNESS WHEREOF, the Company has caused this Policy to be signed by its authorized Company officers at Hartford, CT.

Thomas M. Krunkel

Executive Vice President

Corporate Secretary

W-1001 3/99

Page 15 of 15



## IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND BROKER COMPENSATION

For information about how St. Paul Travelers compensates independent agents and brokers, please visit www.StPaulTravelers.com, or you may request a written copy from Marketing at One Tower Square, 2GSA, Hartford, Connecticut 06183.

ILT-1037 (04-05)

**TEXAS**
**IMPORTANT NOTICE**

To obtain information or make a complaint:

You may contact your agent, or

You may call us for information or to make a complaint at:

860-954-2382

You may also write to us at:

St. Paul Travelers
Consumer Affairs
One Tower Square 5GS
Hartford, CT 06183-9079

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

1-800-252-3439

You may write:

The Texas Department of Insurance
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

PREMIUM OR CLAIM DISPUTES: Should you have a dispute concerning your premium or about a claim, you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

ATTACH THIS NOTICE TO YOUR POLICY: This notice is for information only and does not become a part or condition of the attached document.

 **ST PAUL TRAVELERS**

**The Wrap** ®

Directors and Officers Liability Coverage Part Declarations                Policy No. 104468586

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED
IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.**

| | |
|---|---|
| ITEM 1 | **PARENT CORPORATION:**<br>JULIO INVESTORS, LLC<br><br>Principal Address:<br><br>1101 North Union Bower<br>Suite 160<br>IRVING, TX 75061 |
| ITEM 2 | **COVERAGE PART LIMIT OF LIABILITY** (inclusive of Defense Expenses):<br><br>(maximum limit of liability for all Claims under this Coverage Part.) |
| ITEM 3 | **RETENTIONS** (inclusive of Defense Expenses):<br>A.                              $0.00 under Insuring Agreement A. for each Insured Person for each Claim.<br>B. 1.          $50,000.00 under Insuring Agreement B.1. for each Claim.<br>B. 2.          $50,000.00 under Insuring Agreement B.2. for each Claim. |
| ITEM 4 | **EXTENDED REPORTING PERIOD:**<br>12 months for    150% of that part of the Policy Period Premium for the Directors and Officers Liability Coverage Part.<br>(If exercised, in accordance with Section III.I. of the Common Terms and Conditions.) |
| ITEM 5 | **NOTICE UNDER SECTIONS III.F. AND III.K. OF THE COMMON TERMS AND CONDITIONS MUST BE ADDRESSED TO:**<br>Travelers Property Casualty<br>Bond Claim Department<br>One Tower Square<br>Hartford, Connecticut 06183-9062 |
| ITEM 6 | **PRIOR AND PENDING PROCEEDING DATE:**<br>December 18, 2001<br>(If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |
| ITEM 7 | **CONTINUITY DATE:**<br>December 18, 2001<br>(If no Continuity Date is entered above, the Continuity Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |

WDO-1000 12/00

 ST PAUL TRAVELERS

The Wrap ®

## Directors and Officers Liability Coverage Part

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED
IN THE LIMIT OF LIABILITY. PLEASE READ IT CAREFULLY.**

I. **INSURING AGREEMENTS.**

A.  The Company shall pay on behalf of the **Insured Persons Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts**, including **Wrongful Employment Practices**, except for **Loss** which the **Insured Organization** pays to or on behalf of the **Insured Persons** as indemnification.

B.  The Company shall pay on behalf of the **Insured Organization**:

1.  **Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts**, including **Wrongful Employment Practices**, which the **Insured Organization** pays to or on behalf of the **Insured Persons** as indemnification; and

2.  **Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Organization** for **Wrongful Acts** other than **Wrongful Employment Practices**.

II. **DEFINITIONS.**

Whenever appearing in this **Coverage Part**, words and phrases appearing in **bold** type shall have the meanings set forth in this provision:

A.  "**Claim**" means:

1.  a written demand for monetary or non-monetary relief;

2.  a civil proceeding commenced by service of a complaint or similar pleading;

3.  a criminal proceeding commenced by return of an indictment;

4.  a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, including proceedings before the Equal Employment Opportunity Commission or similar state or federal agency; or

5.  an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

against an **Insured Person** for a **Wrongful Act**, including a **Wrongful Employment Practice**, or against the **Insured Organization** for a **Wrongful Act** other than a **Wrongful Employment Practice**.

B.  "**Insured**" means the **Insured Persons** and the **Insured Organization**.

C.  "**Insured Person(s)**," either in the singular or the plural, means any one or more past, present or future duly elected or appointed directors or officers or members of the Board of Managers of the **Insured Organization**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

D.      "Loss" means Defense Expenses incurred by the Company or by the Insureds in the defense of a Claim, and damages (including any punitive or exemplary damages, where insurable under applicable law), judgments, settlements, pre- judgment interest, post-judgment interest, or other amounts that an Insured is legally obligated to pay as a result of a Claim; provided, however, that Loss shall not include civil or criminal fines; sanctions; liquidated damages; payroll or other taxes; penalties; the multiplied portion of any multiplied damage award; or damages or types of relief deemed uninsurable under applicable law.

E.      "Outside Entity" means a corporation or organization, other than the Insured Organization, which is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, as amended.

F.      "Outside Position" means service by an Insured Person as a director, officer, trustee, regent, governor or equivalent position with an Outside Entity, but only during such time that such service is with the knowledge and consent and was at the specific written request of the Insured Organization.

G.      "Wrongful Act" means:

        1.      any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any Wrongful Employment Practice, by an Insured Person in his or her capacity as a director, officer or member of the Board of Managers of the Insured Organization;

        2.      any matter asserted against an Insured Person solely by reason of his or her status as a director, officer or member of the Board of Managers of the Insured Organization;

        3.      any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any Wrongful Employment Practice, by an Insured Person in his or her Outside Position; or

        4.      any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the Insured Organization other than Wrongful Employment Practices.

III.    **EXCLUSIONS.**

A.      This Coverage Part shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse Defense Expenses for, any Claim:

        1.      for damage to, or destruction of, loss of, or loss of use of, any tangible property; or for or arising out of any actual or alleged libel, slander, oral or written publication of defamatory or disparaging material, invasion of privacy, bodily injury, loss of consortium, sickness, emotional distress, loss of reputation, mental anguish, humiliation, disease or death of any person; provided, however, that this exclusion shall not apply to allegations of libel, slander, oral or written publication of defamatory or disparaging material, invasion of privacy, emotional distress, loss of reputation, mental anguish, humiliation, if and only to the extent that such allegations are made as part of a Claim against Insured Persons for a Wrongful Employment Practice;

        2.      based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged Pollution, including but not limited to any such Claim alleging damage to the Insured Organization or to its shareholders or creditors;

        3.      based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or Wrongful Act underlying or alleged in any prior and/or pending civil, criminal, administrative or regulatory proceeding as of the Prior and Pending Proceeding Date in ITEM 6 of the Declarations for this Coverage Part;

        4.      based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or Wrongful Act which, before the Inception Date in ITEM 2(a) of the Wrap Declarations, was the subject of any notice given by or on behalf of any Insured under any other policy of insurance;

WDO-1001 3/99                                                          Page 2 of 5

5.    for any actual or alleged violation of responsibilities, duties or obligations imposed upon an Insured under ERISA or any similar or related federal, state or local law; or for an Insured's failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an Employee or dependent in, any Employee Benefit Plan, fund or program, including contracts or agreements which are not subject to the provisions of ERISA;

6.    with respect to any Subsidiary, based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any Wrongful Act occurring at any time during which such entity was not a Subsidiary, or any Wrongful Act occurring at any time during which such entity is a Subsidiary which is based upon, arises out of, or in any way relates to, directly or indirectly, the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events occurring at any time during which such entity was not a Subsidiary;

7.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged nuclear reaction, nuclear radiation, nuclear waste, radioactive contamination, radioactive substance, or the hazardous properties of nuclear material or of any nuclear assembly or nuclear component thereof;

8.    by or on behalf of, or in the name or right of, any Insured; provided, however, that this exclusion shall not apply to:

    a.    any derivative action by or on behalf of, or in the name or right of, the Insured Organization brought by a security holder of the Insured Organization, and brought and maintained independently of, and without the assistance, participation or intervention of any Insured;

    b.    any Claim in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an Insured Person and which is part of or results directly from a Claim which is not otherwise excluded by the terms of this Coverage Part; or

    c.    any Claim brought or maintained by any Insured Person for any actual or alleged Wrongful Termination of an Insured Person;

9.    by or on behalf, or in the name or right of, any Outside Entity against an Insured Person for a Wrongful Act in his or her Outside Position with respect to such Outside Entity;

10.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly:

    a.    the public offer, sale, solicitation or distribution of securities issued by the Insured Organization or any Subsidiary; or

    b.    the actual or alleged violation of any federal, state, local or provincial statute relating to securities, including but not limited to the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder;

provided, however, that if at least thirty (30) days prior to the transaction described in (a) above, the Company receives notice of the proposed transaction and any additional information requested by the Company, the Company shall offer to the Insured Organization a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal;

11.    with respect to Insuring Agreement B.2 only:

    a.    for any actual or alleged violation of any law, rule or regulation relating to antitrust, or the prohibition of monopolies, activities in restraint of trade, unfair methods of competition or deceptive acts and practices in trade and commerce, including but not limited to any actual or alleged violation of the Sherman Act, the Clayton Act, the Robinson-Patman Act, the Federal Trade Commission Act, the Hart-Scott-Rodino Antitrust Improvements Act or any regulation or rule promulgated under any such Act;

      b.     for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, service mark, trade name, trade secret or any other intellectual property rights;

      c.     for any actual or alleged violation of responsibilities, duties or obligations imposed on an Insured under any law concerning workers' compensation, unemployment insurance, Social Security, or disability insurance, or any similar state, federal or local law or regulation, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the Workers' Adjustment and Retraining Notification Act (WARN), the Fair Labor Standards Act, the Occupational Safety and Health Act (OSHA), the National Labor Relations Act (NLRA), or amendments thereto or regulations promulgated thereunder, or any similar or related law;

      d.     consisting of a hearing, suit, proceeding, audit, investigation or survey by a governmental agency or entity regarding payroll practices, tax payments, wage and hour policies, overtime, vacation pay, payroll withholding, workplace safety or similar or related matters;

      e.     for or arising out of or in consequence of any actual or alleged liability of the Insured Organization under any express contract or agreement; for the purposes of this exclusion, an "express contract or agreement" is an actual agreement among the contracting parties, the terms of which are openly stated in distinct or explicit language, either orally or in writing, at the time of its making; or

      f.     based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture.

B.     The Company shall have no duty to pay Loss, other than Defense Expenses:

      1.     for any Claim based upon, arising out of, or in any way relating to, directly or indirectly, any Insured committing in fact any intentional dishonest or fraudulent act or omission or any willful violation of any statute, rule or law, or gaining in fact any profit, remuneration or advantage to which such Insured was not legally entitled;

      2.     which constitutes costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including but not limited to actual or anticipated costs and expenses associated with or arising from an Insured's obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations thereunder, or any related or similar law or regulation;

      3.     which constitutes employee benefits, except and to the extent that a judgment or settlement of a Claim includes a monetary component measured by the value of employee benefits as consequential damages for a Wrongful Act which is the basis for such judgment or settlement; and

      4.     which constitutes future compensation, including salary and benefits, for an individual who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a Claim; or that part of any judgment or settlement which constitutes front pay, future monetary losses including but not limited to pension and other benefits, or other future economic relief or the value or equivalent thereof, if the Insured Organization has been ordered, or has the option pursuant to a judgment, order or other award or disposition of a Claim, to promote, accommodate, reinstate, or hire the claimant to whom such sums are to be paid, but fails to do so.

## IV.    SEVERABILITY OF EXCLUSIONS.

No conduct of any Insured Person shall be imputed to any other Insured Person to determine the application of any of the Exclusions set forth in Section III above.

V.    **CONDITIONS.**

A.    **PRESUMPTION OF INDEMNIFICATION.**

      1.    Regardless of whether Loss resulting from any **Claim** against **Insured Persons** is actually indemnified, Insuring Agreement B, and the Retention set forth in ITEM 3.B.1 of this **Coverage Part** Declarations, shall apply to any **Loss** as to which indemnification by the **Insured Organization** or any **Outside Entity** is legally permissible, whether or not actual indemnification is made, unless such indemnification is not made by the **Insured Organization** or **Outside Entity** solely by reason of its **Financial Insolvency.**

      2.    The certificate of incorporation, charter, articles of association or other organizational documents of the **Parent Corporation** and each **Subsidiary** and each **Outside Entity**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

B.    **OUTSIDE POSITIONS – OTHER INSURANCE AND INDEMNIFICATION.**

      With respect to **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Positions**, this **Coverage Part** shall apply only as excess insurance over, and shall not contribute with, any other valid and collectible insurance available to such **Insured Persons** and any indemnification by any person or entity (including any **Outside Entity**, but not including the **Insured Organization**) available to such **Insured Persons** in connection with their service in **Outside Positions.**

C.    **COORDINATION WITH EMPLOYMENT PRACTICES LIABILITY COVERAGE PART.**

Any **Loss** covered by both this **Coverage Part** and the Employment Practices Liability Coverage Part of this **Policy** shall be covered first as provided in, and shall be subject to the Limit(s) of Liability and Retention applicable to, the Employment Practices Liability Coverage Part. Any remaining **Loss** otherwise covered by this **Coverage Part** which is not paid under the Employment Practices Liability Coverage Part shall be covered as provided in, and shall be subject to the Limit(s) of Liability and Retention(s) applicable to, this **Coverage Part**; provided the Limit(s) of Liability and Retention(s) applicable to such **Loss** under this **Coverage Part** shall be reduced by the amount of **Loss** otherwise covered by this **Coverage Part** which is paid by the Company or the Insureds, respectively, pursuant to the Employment Practices Liability Coverage Part.

 **ST PAUL TRAVELERS**

**The Wrap** ®

Employment Practices Liability Coverage Part Declarations          Policy No. 104468586

### THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.

| | |
|---|---|
| ITEM 1 | **PARENT CORPORATION:**<br><br>JULIO INVESTORS, LLC<br><br><br>Principal Address:<br><br>1101 North Union Bower<br>Suite 160<br>IRVING, TX 75061 |
| ITEM 2 | **COVERAGE PART LIMIT OF LIABILITY** (inclusive of Defense Expenses):<br><br>(maximum limit of liability for all **Claims** under this Coverage Part.) |
| ITEM 3 | **RETENTION** (inclusive of Defense Expenses):<br>            $250,000.00 for each **Claim.** |
| ITEM 4 | **EXTENDED REPORTING PERIOD:**<br>        12 months for    150% of that part of the Policy Period Premium for the Employment Practices Liability Coverage Part..<br>(If exercised, in accordance with Section III.I. of the Common Terms and Conditions.) |
| ITEM 5 | **NOTICE UNDER SECTIONS III.F. AND III.K. OF THE COMMON TERMS AND CONDITIONS MUST BE ADDRESSED TO:**<br>Travelers Property Casualty<br>Bond Claim Department<br>One Tower Square<br>Hartford, Connecticut 06183-9062 |
| ITEM 6 | **PRIOR AND PENDING PROCEEDING DATE:**<br>    December 18, 2001<br>(If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |
| ITEM 7 | **CONTINUITY DATE:**<br>    December 18, 2001<br>(If no Continuity Date is entered above, the Continuity Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |

WEP-1000 (12-00)

 **ST PAUL TRAVELERS**                                                 **The Wrap** ®

## Employment Practices Liability Coverage Part

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED
IN THE LIMIT OF LIABILITY. PLEASE READ IT CAREFULLY.**

I.    **INSURING AGREEMENT.**

The Company shall pay on behalf of the **Insured Loss** resulting from **Claims** first made during the **Policy Period** by a **Claimant** against the **Insured** for **Wrongful Employment Practices.**

II.    **DEFINITIONS.**

Whenever appearing in this **Coverage Part,** words and phrases appearing in **bold type** shall have the meanings set forth in this provision:

A.    "**Claim**" means:

    1.    a written demand for monetary or non-monetary relief;

    2.    a civil proceeding commenced by service of a complaint or similar pleading;

    3.    a criminal proceeding commenced by return of an indictment;

    4.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, including proceedings before the Equal Employment Opportunity Commission or similar state or federal agency; or

    5.    an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

by or on behalf of or for the benefit of a **Claimant,** seeking to hold an **Insured** liable for a **Wrongful Employment Practice** involving or arising from such **Claimant's** actual or potential employment with the **Insured Organization.**

**Claim** does not include a union grievance or demand for arbitration under a union contract, or any matter related to or arising out of any union contract, any labor negotiation, any labor dispute, any union organizing effort, or any unfair labor practice charge within the jurisdiction of the National Labor Relations Board.

B.    "**Claimant**" means (1) a present or former **Employee** of or applicant for employment with the **Insured Organization,** and (2) a governmental entity or agency, including but not limited to the Equal Employment Opportunity Commission or similar state or local agency, when acting on behalf of or for the benefit of present or former **Employees** or applicants for employment.

C.    "**Insured**" means the **Insured Persons** and the **Insured Organization.**

D.    "**Insured Person(s),**" either in the singular or the plural, means a present or former **Employee** or a duly elected director or member of the Board of Managers of the **Insured Organization** for alleged **Wrongful Employment Practices** committed in the discharge of his or her duties as such.

In the event of the death, incapacity or bankruptcy of an **Insured Person,** any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Employment Practice** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person.**

WEP-1001 3/99                                                                                 Page 1 of 3

E.    "Loss" means Defense Expenses incurred by the Company or by the Insureds in the defense of a Claim, and damages (including back pay and front pay, compensatory damages, and punitive damages if insurable under applicable law), judgments, settlements, pre-judgment interest, post-judgment interest, or other amounts that an Insured is legally obligated to pay as a result of a Claim; provided, however, that Loss shall not include civil or criminal fines; sanctions; liquidated damages; payroll or other taxes; the multiplied portion of any multiplied damage award (except multiple damages awarded under the Equal Pay Act or the Age Discrimination in Employment Act (ADEA)); or damages or types of relief deemed uninsurable under applicable law.

III.    **EXCLUSIONS.**

A.    This Coverage Part shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse Defense Expenses for, any Claim:

1.    for damage to, or destruction of, loss of, or loss of use of, any tangible property; or for or arising out of any actual or alleged bodily injury, loss of consortium, sickness, disease or death of any person; provided, however, that this exclusion shall not apply to Loss for emotional distress, loss of reputation, mental anguish, or humiliation caused by a **Wrongful Employment Practice.**

2.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged **Pollution,** including but not limited to any such Claim alleging damage to the Insured Organization or to its shareholders or creditors; provided, however, that this exclusion shall not apply to Claims for alleged **Retaliation** against an **Employee** with regard to such matters;

3.    for or arising out of or in consequence of the liability of others assumed by an Insured under any contract or agreement, whether oral or written, except to the extent that the Insured would have been liable in the absence of such contract or agreement;

4.    for any actual or alleged violation of responsibilities, duties or obligations imposed on an Insured under any law concerning workers' compensation, unemployment insurance, Social Security, or disability insurance, or any similar state, federal or local law or regulation, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the Workers' Adjustment and Retraining Notification Act (WARN), the Fair Labor Standards Act (FLSA) (except the Equal Pay Act), the Occupational Safety and Health Act (OSHA), or amendments thereto or regulations promulgated thereunder, or any similar or related law; provided, however, that this exclusion shall not apply to Claims for alleged **Retaliation** due to an **Employee's** exercise of rights under such laws;

5.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or **Wrongful Employment Practice** underlying or alleged in any prior and/or pending civil, criminal, administrative or regulatory proceeding as of the Prior and Pending Proceeding Date in ITEM 6 of the Declarations for this Coverage Part;

6.    for any actual or alleged violation of responsibilities, duties or obligations imposed upon an Insured under **ERISA** or any similar or related federal, state or local law; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Employee** or dependent in, any **Employee Benefit Plan,** fund or program, including contracts or agreements which are not subject to the provisions of ERISA;

7.    for or arising out of any alleged violation of Executive Order 11246 (Office of Federal Contract Compliance Programs) or the False Claims Act (FCA);

8.    consisting of a hearing, suit, proceeding, audit, investigation or survey by a governmental agency or entity regarding payroll practices, tax payments, wage and hour policies, overtime, vacation pay, payroll withholding, workplace safety or similar or related matters;

9.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged nuclear reaction, nuclear radiation, nuclear waste, radioactive contamination, radioactive substance, or the hazardous properties of nuclear material or of any nuclear assembly or nuclear component thereof; and

10.    with respect to any Subsidiary, based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any Wrongful Employment Practice occurring at any time during which such entity was not a Subsidiary, or any Wrongful Employment Practice occurring at any time during which such entity is a Subsidiary which is based upon, arises out of, or in any way relates to, directly or indirectly, the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events occurring at any time during which such entity was not a Subsidiary.

B.    The Company shall have no duty to pay Loss, other than Defense Expenses:

1.    for any Claim based upon, arising out of, or in any way relating to, directly or indirectly, any Insured committing in fact any intentional dishonest or fraudulent act or omission, or gaining in fact any profit, remuneration or advantage to which such Insured was not legally entitled;

2.    which constitutes costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including but not limited to actual or anticipated costs and expenses associated with or arising from an Insured's obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations thereunder, or any related or similar law or regulation;

3.    which constitutes severance pay or penalties under an employment contract, or any agreement, policy or procedure providing for payment in the event of separation from employment; or sums sought solely on the basis of a claim for unpaid services under an express or implied agreement;

4.    which constitutes medical, pension, disability, life insurance or other similar employee benefits, except and to the extent that a judgment or settlement of a Claim includes a monetary component measured by the value of pension, medical, disability, life insurance or other similar employee benefits as consequential damages for a Wrongful Employment Practice which is the basis for such judgment or settlement;

5.    which constitutes future compensation, including salary or benefits, for an individual who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a Claim; or that part of any judgment or settlement which constitutes front pay, future monetary losses including but not limited to pension and other benefits, or other future economic relief or the value or equivalent thereof, if the Insured has been ordered, or has the option pursuant to a judgment, order or other award or disposition of a Claim, to promote, accommodate, reinstate, or hire the Employee to whom such sums are to be paid, but fails to do so; and

6.    which constitutes that part of any judgment or settlement which is payable to, or which constitutes recovery for the benefit of, or which is in compensation for or measured by injury to, any person or entity other than a Claimant.

## IV.    SEVERABILITY OF EXCLUSIONS.

No conduct of any Insured Person shall be imputed to any other Insured Person to determine the application of any of the Exclusions set forth in Section III above.

## V.    COORDINATION WITH OTHER LIABILITY COVERAGE PARTS.

Any Loss covered by this Coverage Part and either the Directors and Officers Liability Coverage Part or the Fiduciary Liability Coverage Part of this Policy (if purchased) shall be first covered as provided in, and subject to the Limit(s) of Liability and Retention applicable to, this Liability Coverage Part.

WEP-1001 3/99                                                                                           Page 3 of 3

ISSUED BY: Travelers Casualty and Surety Company of America        POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**TEXAS AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**Common Terms and Conditions**

It is agreed that:

1.      With respect to the Common Terms and Conditions, Section III. <u>CONDITIONS</u> C. LIMITS OF LIABILITY Sub-section 4.a. is deleted in its entirety.

2.      With respect to the Common Terms and Conditions, Section III. <u>CONDITIONS</u> C. LIMITS OF LIABILITY Sub-section 4.b. is deleted in its entirety and replaced by the following:

C.      **LIMITS OF LIABILITY.**

      4.      <u>Other Provisions</u>

            b. With respect to the Liability Coverage Parts only: Defense Expenses incurred by the Company or by the Insureds in defense of a Claim are part of and not in addition to all applicable Limits(s) of Liability, and the payment by the Company or by the Insureds of Defense Expenses reduces all applicable Limit(s) of Liability.

3.      With respect to the Common Terms and Conditions, Section III. <u>CONDITIONS</u> V. VALUATION is amended by the addition of the following:

      4.      In the event arbitration is utilized, each party will select a competent and impartial arbitrator. The two arbitrators will select an umpire. If they cannot agree for 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The arbitrators will state separately the value of the property and amount of loss. If they fail to agree, they will submit their difference to the umpire. A decision agreed to by any two will be binding. Each party will:

            a.      Pay its chosen arbitrator; and

            b.      Bear the other expenses of the arbitration and umpire equally.

If the Company submits to an arbitration, the Company will still retain the right to deny the Claim.

4.      With respect to the Crime Coverage Parts:

      a.      Not later than 15 days after receipt of a written notice of claim, the Company agrees to 1) acknowledge receipt of the written notice of claim and 2) request information necessary to begin the investigation of the matter.

      b.      Except as provided in 5.c. below, not later than 15 business days after the Company receives all items, statements and forms required by the Company in order to secure final proof of loss, the Company agrees to notify the Insured in writing of the acceptance or rejection of the claim.

      c.      If the Company is unable to accept or reject the claim within the period specified in 5.b. above, the Company shall notify the Insured, not later than the date specified in 5.b. above, that the Company needs additional time, not to exceed 45 days from the date of said notification to the Insured.

      d.      If the Company rejects the claim, the notification provided to the Insured must state the reasons for the rejection.

      e.      If the Company notifies the Insured that it is willing to pay a claim or part of a claim, the Company shall pay the agreed amount not later than 5 business days after such notification. If the payment is conditioned on the performance of an act by the Insured, the Company shall pay the agreed amount not later than 5 business days after the date the act is performed.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above mentioned Policy, except as expressly stated herein. This endorsement is effective at the Inception Date stated in ITEM 2. of the Wrap Declarations and this endorsement is part of such Policy and incorporated therein.

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586
ISSUED TO: JULIO INVESTORS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMEND INSURED ORGANIZATION TO INCLUDE SCHEDULED ENTITY –
VICARIOUS LIABILITY ONLY**

This endorsement modifies insurance provided under the following **Coverage Parts** as indicated:

**Directors and Officers Liability Coverage Part**
**Employment Practices Liability Coverage Part**
**Fiduciary Liability Coverage Part**

In consideration of the payment of premium and solely with respect to the above indicated **Coverage Parts** only:

> Section II. **DEFINITIONS**. K. "**Insured Organization**" of the Common Terms and Conditions is amended to include
> **Maplewood Equity Partners, LP**
> (the "Additional Insured") but only to the extent the Additional Insured incurs **Loss** resulting from **Wrongful Acts** or
> **Wrongful Employment Practices** committed, or alleged to have been committed, by any **Insured Organization** or **Insured
> Persons** other than the Additional Insured or any past, present, or future, director, officer or employee of the Additional
> Insured.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the
above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on
 September 1, 2006, if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to
be effective on a date other than the Inception Date of the policy.

Accepted by:      _____
                  On behalf of the entity named in
                  ITEM 1 of the Declarations.

                  _____
                  Authorized Company Representative

W-1051 (02-00)

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BEST FOOT FORWARD ENDORSEMENT**
**(COMMON TERMS AND CONDITIONS)**

This endorsement modifies insurance provided under the following:

Common Terms and Conditions

In consideration of the payment of the premium:

1.  Section II. **DEFINITIONS.** E. "Discrimination" of the Common Terms and Conditions is deleted and replaced with the following:

    E.      "Discrimination" means any actual or alleged: (1) violation of any employment discrimination law; or (2) disparate treatment of, or the failure to hire a Claimant because he or she is or claims to be a member of a class which is or is alleged to be legally-protected.

2.  The first paragraph in Section II. **DEFINITIONS.** F. "Employee" of the Common Terms and Conditions is deleted and replaced with the following, but only with regard to the Liability Coverage Parts:

    F.      "Employee" means an individual whose labor or service is engaged by and directed by the Insured Organization (1) who is paid through the payroll of the Insured Organization, including part-time, seasonal and temporary workers, (2) who is a volunteer or (3) whose services have been leased by the Insured Organization. Independent contractors are not Employees. The status of an individual as an Employee shall be determined as of the date of the alleged Wrongful Employment Practice.

3.  Section II. **DEFINITIONS.** AA. "Wrongful Employment Practice" of the Common Terms and Conditions is amended to include any violation of the Family Medical Leave Act and any failure to create or enforce adequate workplace or employment policies and procedures occurring in the course of and arising out of the Claimant's employment or application for employment with the Insured Organization.

4.  Solely with respect to the Directors and Officers Liability and the Fiduciary Liability Coverage Parts, Section III. **CONDITIONS.** D. DEFENSE, INVESTIGATION AND SETTLEMENT. 4. of the Common Terms and Conditions is deleted and replaced with the following:

    4.      The Company may, with the written consent of the Insured, make such settlement or compromise of any Claim as the Company deems expedient, and if the Insured shall refuse to consent to the settlement of any Claim as recommended by the Company based upon a judgment or a bona fide offer of settlement, then the Insured thereafter shall negotiate or defend such Claim independently of the Company and on the Insured's own behalf. In such event the Insured shall be solely responsible for thirty percent (30%) of all Defense Expenses and other costs and expenses incurred or paid by the Insured after the date the Insured refused to consent to settlement as recommended by the Company, and the Insured shall also be responsible for thirty percent (30%) of all Damages in excess of the amount for which settlement could have been made as recommended by the Company, provided, however that the Company's liability under this Policy for such Claim will not exceed the remaining portion of the applicable Limit(s) of Liability.

W-1100 (01-03)                                                                                          Page 1 of 3

5.   Section III. **CONDITIONS.** H. **CHANGE OF EXPOSURE.** I. <u>Formation or Acquisition of Subsidiary, Premises or Pension Plan</u> a. of the Common Terms and Conditions is deleted and replaced with the following:

    1.   <u>Formation or Acquisition of Subsidiary, Premises or Pension Plan</u>

          a.   With regard to the **Liability Coverage Parts**, if, during the **Policy Period**, the **Insured Organization** forms or acquires a **Subsidiary** or **Pension Plan** (other than an employee stock ownership plan) that is then solely sponsored by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization exclusively for the benefit of the **Employees** of the **Insured Organization**, the **Policy** will provide coverage for that acquired or formed **Subsidiary** or **Pension Plan** and their respective **Insured Persons**, subject to all other terms and conditions of this **Policy**, but only for **Claims** for **Wrongful Acts** or **Wrongful Employment Practices** under the **Liability Coverage Parts** that occur wholly during the time that the **Insured Organization** is sole sponsor with regard to the **Pension Plan** or owns more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors, provided written notice of such formation or acquisition has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company's underwriters may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for the acquired or formed **Subsidiary** or **Pension Plan** shall not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Parent Corporation** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement shall not apply, however, if (1) the assets of the acquired or formed **Subsidiary** do not exceed twenty five percent (25%) of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent audited consolidated financial statements, (2) the total assets of the acquired or formed **Pension Plan**, as of the effective date of such acquisition or formation, do not exceed twenty five percent (25%)
    of the total plan assets shown on the most recent application submitted by the **Insured Organization**, or (3) the acquisition or formation occurs less than ninety (90) days prior to the end of the **Policy Period**.

    Notwithstanding the foregoing, no coverage shall be provided pursuant to this Subsection III.H.1. for any employee stock ownership plan or any natural person or **Insured Organization** with respect thereto unless the Company, by specific written endorsement hereto, agrees to provide such coverage. Any such coverage shall be at the terms and conditions set forth in the endorsement and for such additional premium as may be required by the Company.

6.   Section III. **CONDITIONS.** I. **EXTENDED REPORTING PERIOD.** 4. of the Common Terms and Conditions is deleted and replaced with the following:

    4.   The right to elect the Extended Reporting Period under this subsection III.I. shall terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within sixty (60) days of the effective date of nonrenewal or cancellation.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Wrap Declarations or effective at 12:01 A.M. on
  September 1, 2006, if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to
be effective on a date other than the Inception Date of the policy.

Accepted by:        _____
                    On behalf of the entity named in
                    ITEM 1 of the Declarations.


                    _____
                    Authorized Company Representative

ISSUED BY: Travelers Casualty and Surety Company of America        POLICY NO: 104468586
ISSUED TO: JULIO INVESTORS, LLC

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

MAJOR PARTY EXCLUSION
(OTHER THAN INSURED)

This endorsement modifies insurance provided under the following:

Directors and Officers Liability Coverage Part

In consideration of the payment of the premium, Section III. EXCLUSIONS. A. of the Directors and Officers Liability Coverage
Part is amended by adding the following:

> brought or maintained by or on behalf of, or in the name or right of, or as assignee of, or with the solicitation,
> assistance, participation or intervention of (a) any person or entity listed in the Schedule set forth below, (b) any
> subsidiary, affiliate or general or limited partner, if any, of any such entity, or (c) any director, officer, trustee,
> employee, security holder, receiver, conservator, liquidator or rehabilitator of such entity or of any of its
> subsidiaries, affiliates or general or limited partners; provided, however, that this exclusion shall not apply to any
> Insured.

> Maplewood Equity Partners, LP and Affiliated Companies

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the
above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on
September 1, 2006, if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to
be effective on a date other than the Inception Date of the policy.

Accepted by:     _____
                 On behalf of the entity named in
                 ITEM 1 of the Declarations.

                 _____
                 Authorized Company Representative

WDO-2116 (04-02)

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586
ISSUED TO: JULIO INVESTORS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BEST FOOT FORWARD ENDORSEMENT**
**(DIRECTORS AND OFFICERS LIABILITY COVERAGE PART)**

This endorsement modifies insurance provided under the following:

**Directors and Officers Liability Coverage Part**

In consideration of the payment of the premium:

1.    Section II. <u>DEFINITIONS.</u> A. "Claim" of the Directors and Officers Liability Coverage Part is amended by adding the following:

    6.    a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

2.    Section II. <u>DEFINITIONS.</u> C. "Insured Person(s)" of the Directors and Officers Liability Coverage Part is deleted and replaced with the following:

    C.    "Insured Person(s)," either in the singular or the plural, means any one or more past, present, or future:

        (1)    duly elected or appointed director, officer, or member of the board of managers, including any natural person serving in a comparable capacity outside of the United States;

        (2)    in-house legal counsel; or

        (3)    member of the staff, faculty or any duly constituted committee;

    of the Insured Organization.

    Insured Person(s), either in the singular or the plural, also means any one or more past, present, or future Employee serving the Insured Organization in a capacity other than one enumerated above but (a) only while acting within the scope of his or her employment and (b) only if such Employee is included as a co-defendant in such Claims contemporaneously with or subsequent to the naming of an Insured Person serving the Insured Organization in a capacity enumerated above.

    Subject to the foregoing, in the event of the death, incapacity or bankruptcy of an Insured Person, any Claim against the estate, heirs, legal representatives or assigns of such Insured Person for a Wrongful Act of such Insured Person will be deemed to be a Claim against such Insured Person.

3.    Section II. <u>DEFINITIONS.</u> D. "Loss" of the Directors and Officers Liability Coverage Part is amended to substitute the words "(including any punitive or exemplary damages where insurable under the applicable law most favorable to the insurability of punitive or exemplary damages)" for the words "(including any punitive or exemplary damages where insurable under applicable law)."

WDO-2125 (01-03)                                                                 Page 1 of 3

4.   Section III. **EXCLUSIONS.** A.2. of the Directors and Officers Liability Coverage Part is amended to replace the words "including but not limited to any such **Claim** alleging damage to the **Insured Organization** or to its shareholders or creditors" with the words "provided, that this exclusion shall not apply to any **Claim** brought directly or derivatively by a shareholder of the **Insured Organization** in his or her capacity as such."

5.   Section III. **EXCLUSIONS.** A.10. of the Directors and Officers Liability Coverage Part is deleted and replaced with the following:

   10.   based upon, alleging, arising out of or in any way relating to, directly or indirectly:

      (a)   the public offer, sale, solicitation or distribution of securities issued by the **Insured Organization** or any **Subsidiary**; or

      (b)   the actual or alleged violation of any federal, state, local or provincial statute relating to securities, including but not limited to the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder;

   provided, however, that this exclusion will not apply to any offer, purchase or sale of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933 (an "Exempt Transaction").

   If at least thirty (30) days prior to an offering of securities of the **Insured Organization** or any **Subsidiary**, other than pursuant to an Exempt Transaction, the Company receives notice of the proposed transaction and any additional information requested by the Company, the Company shall offer to the **Insured Organization** a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal.

6.   Section III. **EXCLUSIONS.** B.1. of the Directors and Officers Liability Coverage Part is deleted and replaced with the following:

   1.   for any **Claim** based upon, arising out of, or in any way relating to, directly or indirectly, any **Insured**:

      a.   committing any intentional, dishonest or fraudulent act or omission;

      b.   committing any willful violation of any statute, rule or law; provided, that this subparagraph b. will not apply to any **Claim** against **Insured Persons** for a **Wrongful Employment Practice**; or

      c.   gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled.

   Subparagraphs a. and b. above shall not apply unless a judgment or other final adjudication establishes that such **Insured** committed such intentional, dishonest or fraudulent act or willful violation;

7.   Section V. **CONDITIONS.** of the Directors and Officers Liability Coverage Part is amended by adding the following:

   **ORDER OF PAYMENT**

      1.   If Loss from any **Claim** exceeds the remaining available limit of liability applicable to this Coverage Part ("Excess Limit Claim"), then:

         a.   the Company first will pay Loss from such Excess Limit Claim under Section I. **INSURING AGREEMENTS.** A., and
         b.   to the extent that any amount of the applicable Limit of Liability shall remain available, the Company shall pay Loss from such Excess Limit Claim under Section I. **INSURING AGREEMENTS.** B.1. and B.2., as applicable; provided, that upon written request of the **Insured Organization**, the Company shall either pay or withhold payment of Loss from such Excess Limit Claim under Section I. **INSURING AGREEMENTS.** B.1. and B.2., as applicable.

2.     If the Insured Organization requests that the Company withhold payment of Loss, as provided in paragraph 1.b. above, the Company shall continue to withhold payment unless and until the **Insured Organization** shall request the Company to either release such payment to the **Insured Organization** on account of such Excess Limit Claim, or apply such payment to Loss from any future **Claim** under Section **I. INSURING AGREEMENTS. A.**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Wrap Declarations or effective at 12:01 A.M. on September 1, 2006, if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:      _____

           On behalf of the entity named in
           ITEM 1 of the Declarations.

           _____

           Authorized Company Representative

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BEST FOOT FORWARD ENDORSEMENT**
**(EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)**

This endorsement modifies insurance provided under the following:

Employment Practices Liability Coverage Part

In consideration of the payment of the premium:

1.      Section II. **DEFINITIONS.** A. "Claim" of the Employment Practices Liability Coverage Part is amended by adding the following:

> 6.      a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

2.      For purposes of this endorsement the term "Independent Contractor" means any natural person independent contractor who performs labor or service solely for the Insured on a full-time basis pursuant to a written contract or agreement, where such labor or service is under the exclusive direction of the Insured. The status of an individual as an Independent Contractor shall be determined as of the date of the alleged Wrongful Employment Practice.

3.      Section II. **DEFINITIONS.** B. "Claimant" of the Employment Practices Liability Coverage Part is amended to include any Independent Contractor.

4.      Section II. **DEFINITIONS.** E. "Loss" of the Employment Practices Liability Coverage Part is amended to substitute the words "punitive or exemplary damages if insurable under the applicable law most favorable to the insurability of punitive or exemplary damages" for the words "punitive or exemplary damages if insurable under applicable law."

5.      Section III. **EXCLUSIONS.** B.3. of the Employment Practices Liability Coverage Part is deleted and replaced with the following:

> 3.      that constitutes severance pay, damages or penalties under an employment contract, or any agreement, policy or procedure providing for payment in the event of separation from employment; or sums sought solely on the basis of a claim for unpaid services under an express or implied agreement;

6.      Section III. **EXCLUSIONS.** B.4. of the Employment Practices Liability Coverage Part is deleted and replaced with the following:

> 4.      that constitutes medical, pension, disability, life insurance, stock options or other similar employee benefits, except and to the extent that a judgment or settlement of a Claim includes a monetary component measured by the value of pension, medical, disability, life insurance, stock options or other similar employee benefits as consequential damages for a Wrongful Employment Practice which is the basis for such judgment or settlement;

WEP-1098 (01-03)                                                                                          Page 1 of 2

7.   Section III. <u>EXCLUSIONS.</u> A.7., B.1. and B.6. of the Employment Practices Liability Coverage Part are deleted.

8.   Section III. <u>EXCLUSIONS.</u> A. of the Employment Practices Liability Coverage Part is amended by adding the following:

for liability under any agreement governing the terms of the labor or service of an Independent Contractor, temporary worker or leased employee with the Insured Organization;

9.   Solely with respect to Claims for **Wrongful Employment Practices,** Section III. **CONDITIONS.** D. **DEFENSE, INVESTIGATION AND SETTLEMENT.** 4. of the Common Terms and Conditions is deleted and replaced with the following:

4.     The Company may, with the written consent of the Insured, make such settlement or compromise of any Claim as the Company deems expedient. In the event that the Company recommends a bona fide offer of settlement of any Claim that is acceptable to the Claimant (a "Settlement Offer"), and:

a.     the Insured consents to such Settlement Offer within thirty (30) days of being made aware of such offer by the Company; and

b.     the amount of such Settlement Offer:

(1)     is less than the limit of liability set forth in the Wrap Declarations that is applicable to the Employment Practices Liability Coverage Part and available at the time; and

(2)     combined with Defense Expenses incurred with respect to such Claim, exceeds the Retention set forth in ITEM 3 of the Declarations to the Employment Practices Liability Coverage Part;

then the Retention shall be retroactively reduced by ten percent (10%) with respect to such Claim.

If the Insured does not consent to a Settlement Offer within thirty (30) days of being made aware of such offer by the Company then:

a.     the Retention shall not be reduced as provided above even if consent is given to a subsequent Settlement Offer; and

b.     the Insured shall be solely responsible for thirty percent (30%) of all Defense Expenses incurred after the Insured refused to consent to such Settlement Offer, and the Insured shall also be responsible for thirty percent (30%) of all Loss in excess of the amount of such Settlement Offer; provided, that in no event shall the Company's liability under this Policy for such Claim exceed the remaining portion of the limit of liability set forth in the Wrap Declarations that is applicable to the Employment Practices Liability Coverage Part.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Wrap Declarations or effective at 12:01 A.M. on September 1, 2006, if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:      _____

On behalf of the entity named in
ITEM 1 of the Declarations.


_____

Authorized Company Representative

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

THIRD PARTY LIABILITY FOR SEXUAL HARASSMENT AND DISCRIMINATION
WITH SUBLIMIT AND SEPARATE RETENTION

This endorsement modifies insurance provided under the following:

Employment Practices Liability Coverage Part

In consideration of the payment of the premium:

1.    Section II. **DEFINITIONS.** A. "Claim" of the Employment Practices Liability Coverage Part is amended by adding the following:

"Claim" also includes a written demand or notice including an actual or proposed summons, pleading or other legal document (whether or not filed with a court or agency having jurisdiction) submitted to an Insured or an authorized agent for service of process on the Insured, by or on behalf of or for the benefit of any individual other than an Employee stating an intent to hold an Insured liable for Sexual Harassment or Discrimination.

2.    Section II. **DEFINITIONS.** B. "Claimant" of the Employment Practices Liability Coverage Part is deleted and replaced with the following:

B.        "Claimant" means (1) a present or former Employee of or applicant for employment with the Named Insured, (2) a governmental entity or agency, including but not limited to the Equal Employment Opportunity Commission or similar state or local agency, when acting on behalf of or for the benefit of present or former Employee or applicants for employment or (3) with respect to allegations of Sexual Harassment and Discrimination only, any natural person, including but not limited to, an Employee.

3.    Section II. **DEFINITIONS.** E. "Discrimination" of the Common Terms and Conditions is deleted and replaced with the following:

E.    "Discrimination" means actual or alleged:

1.    Failure or refusal to hire or employ an applicant for employment with the Named Insured,

2.    Termination or constructive termination of an employment relationship with the Named Insured,

3.    Refusal to train or promote, or demotion of, an Employee,

4.    Any other act or omission by which an Insured allegedly treats one Employee differently from another in compensation, terms, conditions, opportunities or privileges of employment, including acts or practices taken for the purpose of or which have the impact of distinguishing among, limiting, segregating or classifying Employees or applicants for employment with the Named Insured in their compensation terms, conditions, opportunities or privileges of employment, or

5.    unfair or disparate treatment of any natural person

on any of the following grounds: race, color, national origin, religion, creed, gender, sexual orientation, pregnancy, disability, medical condition, age, marital status, Vietnam Era Veteran status, military service, or any other legally protected category, status or characteristic established pursuant to federal, state or other law, regulation or ordinance pertaining to discrimination, including but not limited to Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, or the Americans With Disabilities Act.

4.    Section II. **DEFINITIONS.** U. "Sexual Harassment" of the Common Terms and Conditions is deleted and replaced with the following:

WEP-1106 (04-05)                                                                                                    Page 1 of 2

U.    "Sexual Harassment" means unwelcome sexual advances or requests for sexual favors and other verbal, physical or other conduct of a sexual nature (i) which is made a term or condition of a Claimant's employment or advancement, or (ii) submission to or rejection of which is used as a basis for decisions affecting the Claimant, or (iii) which has the purpose or effect of creating an intimidating, hostile or offensive work environment which unreasonably interferes with the job performance of a Claimant, or (iv) which violates the civil rights of any natural person other than an Employee.

5.    Section II. **DEFINITIONS.** AA. "**Wrongful Employment Practice**" of the Common Terms and Conditions is deleted and replaced with the following:

AA.    "**Wrongful Employment Practice**" means:

1.    any of the following occurring in the course of and arising out of an Employee's employment or an applicant's application for employment with the **Insured Organization**: (a) **Wrongful Termination**; (b) breach of oral, implied or written employment agreement; (c) employment-related misrepresentation; (d) wrongful failure to employ; (e) wrongful failure to promote; (f) wrongful discipline; (g) **Retaliation**; (h) wrongful denial of training; (i) wrongful deprivation of career opportunity; (j) wrongful denial or deprivation of seniority; (k) wrongful failure to grant tenure; (l) wrongful evaluation; (m) invasion of privacy; (n) employment-related defamation; (o) **Protected Status Harassment**; (p) employment-related infliction of emotional distress;

2.    any **Sexual Harassment** or

3.    any **Discrimination**.

6.    Solely with respect to Claims for Sexual Harassment or Discrimination by any natural person other than an Employee:

a.    Item 3 of the Employment Practices Liability Coverage Part Declarations is deleted and replaced with the following:

ITEM 3. RETENTION (inclusive of Defense Expenses):

$250,000.00  for each Claim.

b.    the Company's maximum aggregate limit of liability for all Loss, including Defense Expenses resulting from all such Claims shall be $1,000,000.00        which amount shall be part of and not in addition to any applicable Aggregate and Coverage Part Limit of Liability.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on September 1, 2006, if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:    _____
                On behalf of the entity named in
                ITEM 1 of the Declarations.

                _____
                Authorized Company Representative