**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  | x |  |
|---|---|---|
| JULIO & SONS COMPANY, | x | |
| | x | |
| Plaintiff, | x | |
| | x | 08 Civ. 03001 (RJH) |
| v. | x | ECF Case |
| | x | |
| TRAVELERS CASUALTY AND SURETY | x | |
| COMPANY OF AMERICA, | x | |
| | x | |
| Defendant. | x | |
| | x | |

## DECLARATION OF SHANNON W. CONWAY

Shannon W. Conway, of full age, hereby declares as follows:

1.     I am an attorney with the law firm of Patton Boggs LLP, and am admitted to this Court *pro hac vice* in the above-captioned matter, as counsel for Plaintiff Julio & Sons Company ("Julio & Sons"). I hereby submit this Declaration in support of Julio & Sons' Motion for Preliminary Injunction.

2.     Attached hereto as **Exhibit A** is a certified copy of the insurance policy entitled "Wrap Policy – Directors & Officers Liability Insurance and Employment Practices Liability Insurance," Policy No. 104468586 effective September 1, 2006 through September 1, 2007, issued by Travelers Casualty and Surety Company to Julio Investors, LLC.

3.     Attached hereto as **Exhibit B** is a true and correct copy of the Plaintiff's Original Petition filed on or about February 15, 2007 in *Retail and Restaurant Growth Capital, LP v. MapleWood Partners, L.P., et al.*, in the District Court for Dallas County, Texas.

4.     Attached hereto as **Exhibit C** is a true and correct copy of a letter dated March 7, 2007 from Michael Caldwell of Travelers to Mr. Steve Bratton of Julio Investors, LLC.

5.      Attached hereto as **Exhibit D** is a true and correct copy of a letter dated October 5, 2007 from Kelly A. Kihlmire-Caudill of Travelers to Beverly Godbey, Esq. of Gardere Wynne Sewell, LP, counsel for Julio Investors, LLC.

6.      Attached hereto as **Exhibit E** is a true and correct copy of the Plaintiff's Original Petition filed on June 19, 2007 in *Shashy v. MapleWood Partners, L.P., et al.* in the District Court for Dallas County, Texas.

7.      Attached hereto as **Exhibit F** is a true and correct copy of the unreported decision, *Finger Furniture Co., Inc. v. Travelers Indem. Co. of Connecticut*, No. Civ.A. H-01-2797, 2002 WL 32113755 (S.D. Tex. Aug. 19, 2002), as printed from the Westlaw database on July 17, 2008. This decision is cited in the accompanying Julio & Sons' Memorandum of Law in Support of its Motion for Preliminary Injunction, at pages 10 and 12.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

Shannon W. Conway

Executed on this 17th day of July 2008.

# EXHIBIT A



ONE TOWER SQUARE, 2S2B
HARTFORD, CT 06183

To the best of my information and belief, the attached constitute a true and accurate copy of policy documents for Policy No. 104468586 effective September 1, 2006 through September 1, 2007 as well as application and supporting documents. Please note that some font sizes and spacing may be different than in the original policy.

Kori M. Johanson
Assistant Secretary
Bond & Financial Products

Subscribed and sworn to before me
this 16ᵗʰ day of June, 2008.

**Anna P. Nowik Notary Public**
**My Commission Expires June 30, 2011**

My commission expires on _____

Notary Public

 **ST PAUL TRAVELERS**

September 19, 2006

HR Manager
JULIO INVESTORS, LLC
1101 North Union Bower
Suite 160
IRVING, TX 75061

**RE:** Risk Management PLUS+ SM Online from St. Paul Travelers Bond

Dear HR Manager

Thank you for choosing St. Paul Travelers Bond for your insurance needs. St. Paul Travelers Bond is pleased to provide you with Risk Management PLUS+ Online, the industry's most comprehensive program for mitigating your exposure to employment related lawsuits. Risk Management PLUS Online now includes management training on employee terminations that is exclusive to St Paul Travelers Bond.

Risk Management PLUS+ Online is a flexible, comprehensive loss prevention program specifically designed for St. Paul Travelers Bond insureds and is available to you at no additional cost. The program combines state of the art web-based delivery of training materials, sample employment policies, and searchable databases of employment related information with unlimited access to a toll free hotline staffed by attorneys from one of the country's premier employment law firms.

To access the hotline, simply dial 1-866-EPL-TRAV and you will be connected to an attorney from the national employment law firm of Jackson Lewis. From reviewing the proper steps for a sexual harassment investigation to discussing issues to be considered in making employment decisions, Jackson Lewis attorneys are available to assist you.

The enclosed Risk Management PLUS+ Online User's Guide contains easy step-by-step instructions to help you get the most out of this valuable tool as well as detailed descriptions of the program's features. To get started, simply call 1-800-205-5262 and ask to be connected with your St. Paul Travelers Bond account representative. It's that simple.

St. Paul Travelers Bond is committed to helping you reduce your exposure to costly employment litigation by helping you set up affirmative defenses to resolve employment issues quickly if they do arise. To that end, we have also negotiated preferred rates with THE AGOS GROUP, LLC and Jackson Lewis should you decide to augment your risk management program by purchasing additional services. St. Paul Travelers Bond will provide you with a credit on your next renewal premium of up to 10% of this year's Employment Practices Liability premium if you purchase certain additional services described on the website.

We strongly encourage you to take full advantage of this program. Once again, thank you for choosing St. Paul Travelers Bond.

Best Regards,

Brooke A Wyatt

St. Paul Travelers Bond, Jackson Lewis and THE AGOS GROUP, LLC are separate and unrelated entities. THE AGOS GROUP, LLC is solely responsible for Risk Management PLUS+ SM Online and Jackson Lewis is solely responsible for the hotline. St. Paul Travelers Bond does not administer the program, makes no representations as to the effectiveness of the program and specifically disclaims any liability for any claim that may arise as a result of the use of the program. Your implementation of Risk Management PLUS+ SM Online or use of the hotline in no way supersedes or changes the terms of your insurance policy with St. Paul Travelers Bond.

RM-LTR1 (12-02)


**ST PAUL TRAVELERS**

## IMPORTANT DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

On November 26, 2002, President Bush signed into law the Terrorism Risk Insurance Act of 2002 (the "Act"). The Act establishes a short-term program under which the Federal Government will share in the payment of covered losses caused by certain acts of international terrorism. We are providing you with this notice to inform you of the key features of the Act, and to let you know what effect, if any, the Act will have on your premium.

Under the Act, insurers are required to provide coverage for certain losses caused by international acts of terrorism as defined in the Act. The Act further provides that the Federal Government will pay a share of such losses. Specifically, the Federal Government will pay 90% of the amount of covered losses caused by certain acts of terrorism which is in excess of an insurer's statutorily established deductible for that year. The Act also caps the amount of terrorism-related losses for which the Federal Government or an insurer can be responsible at $100,000,000,000.00, provided that the insurer has met its deductible.

Please note that passage of the Act does not result in any change in coverage under the attached policy or bond (or the policy or bond being quoted). Please also note that no separate additional premium charge has been made for the terrorism coverage required by the Act. The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium, and is no more than one percent of your premium.

ILT-1018 (9/04)

| ST PAUL TRAVELERS | The Wrap® |
|---|---|

**The Wrap® Declarations**                                        Policy No. **104468586**

Travelers Casualty and Surety Company of America
Hartford, CT 06183
(A Stock Insurance Company, herein called the Company)

**NOTE: THE DIRECTORS AND OFFICERS LIABILITY, EMPLOYMENT PRACTICES LIABILITY AND FIDUCIARY LIABILITY COVERAGE PARTS ARE WRITTEN ON A CLAIMS-MADE BASIS. THOSE COVERAGE PARTS COVER ONLY CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF PURCHASED. THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM UNLESS DUTY-TO-DEFEND COVERAGE HAS BEEN SPECIFICALLY PROVIDED HEREIN.**

| ITEM 1 | **PARENT CORPORATION:**<br>JULIO INVESTORS, LLC<br><br>Principal Address<br>1101 North Union Bower<br>Suite 160<br>IRVING, TX 75061 |
|---|---|
| ITEM 2 | **POLICY PERIOD:**<br>(a) Inception Date: September 1, 2006    (b)    Expiration Date: September 1, 2007<br>12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |

| ITEM 3 | **COVERAGE PARTS INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:** |
|---|---|

|  | Aggregate<br>Limit(s) of Liability | Coverage Part<br>Limit(s) of Liability | Single Loss<br>Limit(s) of Liability |
|---|---|---|---|
| **Liability Coverage Parts** | | | |
| Directors and Officers Liability | ☒ | ☐ | NA |
| Employment Practices Liability | ☒ | ☐ | NA |
| Fiduciary Liability | ☐ | ☐ | NA |
| **Crime Coverage Parts** | | | |
| Fidelity | ☐ | ☐ | ☐ |
| Kidnap and Ransom/Extortion | ☐ | ☐ | ☐ |

Coverage is only available for those **Coverage Parts** where indicated by ☒.

For Coverage Part and Single Loss Limit(s) of Liability for each purchased **Coverage Part**, see each **Coverage Part** Declarations for the applicable Limit(s) of Liability.

| ITEM 4 | **AGGREGATE LIMIT(S) OF LIABILITY** (inclusive of **Defense Expenses**):<br>(a) Aggregate Limit of Liability for all purchased **Coverage Parts** combined:<br>Amount<br>(b) Aggregate Limit of Liability for all purchased **Liability Coverage Parts** combined:<br>Amount $3,000,000.00<br>(c) Aggregate Limit of Liability for all purchased **Crime Coverage Parts** combined:<br>Amount |
|---|---|

The Wrap® Declarations (continued)                                      Policy No. 104468586

| ITEM 5 | **TYPE OF LIABILITY COVERAGE**<br>Reimbursement |
|---|---|
| ITEM 6 | **PREMIUM FOR THE POLICY PERIOD:**<br>Amount $98,420.00 |
| ITEM 7 | **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE:**<br>ILT-1018 09-04, WEP-1000 12-00, WEP-1001 03-99, WDO-1001 03-99, PN-042 04-92, WDO-1000 12-00,<br>W-1537 03-99, WDO-2125 01-03, WEP-1098 01-03, WEP-1106 04-05, W-1051 02-00, W-1100 01-03,<br>WDO-2116 04-02 |

The Declaration Pages, the signed and completed Applications, the Common Terms and Conditions, each **Coverage Part** purchased, and any endorsements, constitute the entire agreement between the Company and the **Insureds**.

_____                    _____
Countersigned By                                   Authorized Company Representative

 **ST PAUL TRAVELERS**

**The Wrap** ®

## Common Terms and Conditions

**THE LIABILITY COVERAGE PARTS OF THIS POLICY ARE WRITTEN ON A CLAIMS-MADE BASIS, WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.**

**IN CONSIDERATION** of the payment of the premium stated in the Wrap Declarations, in reliance on the statements in **The Wrap Application** and each **Coverage Part Application** and subject to all Declarations for this **Policy** and for each **Coverage Part**, the Common Terms and Conditions, all of the terms, exclusions, conditions and limitations of all purchased **Coverage Parts**, and all endorsements, the Company and the **Insureds** agree as follows:

### I.    TERMS AND CONDITIONS.

The Common Terms and Conditions of this **Policy** apply to all **Coverage Parts**. Unless stated to the contrary in any **Coverage Part**, the terms and conditions of each **Coverage Part** of this **Policy** apply only to that **Coverage Part** and shall not apply to any other **Coverage Part** of this **Policy**. If any provision in the Common Terms and Conditions is inconsistent or in conflict with the terms and conditions of any **Coverage Part**, the terms and conditions of such **Coverage Part** shall control for purposes of that **Coverage Part**.

### II.    DEFINITIONS.

Whenever appearing in this **Policy**, words and phrases appearing in **bold type** shall have the meanings set forth in this provision:

A.    "**Coverage Part(s)**" means, individually or collectively, the Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability, Fidelity, and Kidnap and Ransom/Extortion Coverage Parts, if purchased.

B.    "**Coverage Part Application**" means the application completed for each **Coverage Part** and any materials submitted in connection therewith.

C.    "**Crime Coverage Part(s)**" means, individually or collectively, the Fidelity and Kidnap and Ransom/Extortion Coverage Parts, if purchased.

D.    "**Defense Expenses**" means reasonable and necessary legal fees and expenses incurred in the investigation, defense, settlement and appeal of a **Claim**, including the premium for appeal bonds regarding such **Claim**; but **Defense Expenses** shall not include salaries, wages, benefits or overhead of any **Insured** or any of the **Insured Organization's** directors, officers, members of the Board of Managers, trustees or **Employees**.

E.    "**Discrimination**" means:

1.    any actual or alleged failure or refusal to hire or employ an applicant for employment with the **Insured Organization**;

2.    any actual or alleged termination or constructive termination of an employment relationship with the **Insured Organization**;

3.    any actual or alleged refusal to train or promote, or demotion of, an **Employee**; or

4.    any other act or omission by which an **Insured** allegedly treats one **Employee** differently from another in compensation, terms, conditions, opportunities or privileges of employment, including acts or practices taken for the purpose of or which have the impact of distinguishing among, limiting, segregating or classifying **Employees** or applicants for employment with the **Insured Organization** in their compensation terms, conditions, opportunities or privileges of employment;

on any of the following grounds: race, color, national origin, religion, creed, gender, sexual orientation, pregnancy, disability, medical condition, age, marital status, Vietnam Era Veteran status, military service, or any other legally protected category, status or characteristic established pursuant to federal, state or other law, regulation or ordinance, including but not limited to Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Americans With Disabilities Act or the Family Medical Leave Act.

F.    "**Employee**" means any natural person whose labor or service is engaged by and directed by the **Insured Organization** and who is paid through the payroll of the **Insured Organization,** including part-time, seasonal and temporary workers.  Leased workers and independent contractors are not **Employees.**  The status of an individual as an **Employee** shall be determined as of the date of the alleged **Wrongful Act, Wrongful Employment Practice,** or act or event giving rise to loss under the **Crime Coverage Parts.**

With regard to the Fidelity Coverage Part only:

1.    "**Employee**" also means:

a.    any **Employee** for 60 days after termination of service;

b.    any natural person leased to the **Insured Organization**, under an agreement between the **Insured Organization** and a labor leasing firm, while that person is subject to the direction and control and performing services for the **Insured Organization;**

c.    any non-compensated natural person:

(i)    other than one who is a fund solicitor, while performing services for the **Insured Organization** that are usual to the duties of an **Employee** or officer; or

(ii)    while acting as a fund solicitor during fund raising campaigns;

d.    any natural person who is:

(i)    a trustee, officer, employee, administrator or manager, except an administrator or a manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan insured under the Fidelity Coverage Part , and

(ii)    a director, **Officer-shareholder** or trustee of the **Insured Organization** while that person is handling funds or other property of any **ERISA** Plan insured under the Fidelity Coverage Part.

2.    But "Employee" does not mean:

a.    any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character;

b.    any seasonal or temporary workers while having care and custody of the **Insured Organization's** property outside the **Premises**; or

c.    any director or trustee except while performing acts coming within the scope of the usual duties of an **Employee** or while acting as a member of any of the **Insured Organization's** elected or appointed committees to perform on its behalf specific, as distinguished from general, directorial acts.

G.    "**Employee Benefit Plan**" means:

1.    any **Welfare Plan** which was, is now, or becomes sponsored solely by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization exclusively for the benefit of **Employees** of the **Insured Organization;**

2.    any **Pension Plan** or other plan identified in the endorsements to this **Policy;**

3.    any **Pension Plan** for which coverage is provided pursuant to Section III.H (Changes in Exposure) of the Common Terms and Conditions.

H.    "**ERISA**" means the Employee Retirement Income Security Act of 1974, including amendments thereto and regulations promulgated thereunder.

I.    "**Executive Officer**" means the chairperson, chief executive officer, president, chief financial officer, in-house general counsel, chief information officer, managing director, and any equivalent executive officer of the **Insured Organization**. For purposes of the Employment Practices Liability Coverage Part only, **Executive Officer** shall also include the members of the staff of the human resources department and the staff of the corporate legal department or the staff of the general counsel's office of the **Insured Organization**.

J.    "**Financial Insolvency**" means, with respect to the **Parent Corporation** and each **Subsidiary**, the appointment of a receiver, conservator, liquidator, trustee, or similar official; or the inability of the **Insured Organization** financially or under applicable law to indemnify the **Insured Persons**.

K.    "**Insured Organization**" means the **Parent Corporation** and any **Subsidiary**.

L.    "**Liability Coverage Part(s)**" means, individually or collectively, the Directors and Officers Liability, Employment Practices Liability, and Fiduciary Liability Coverage Parts, if purchased.

M.    "**Parent Corporation**" means the entity named in ITEM 1 of the Declarations for this **Policy** and for each **Coverage Part**.

N.    "**Pension Plan**" means any plan so defined in Section 3(2) of **ERISA** or in any related or similar state, local or foreign law or regulation.

O.    "**Policy**" means, collectively, the Wrap Declarations, **The Wrap Application**, the Common Terms and Conditions, each purchased **Coverage Part**, each **Coverage Part Application**, each **Coverage Part** Declarations, and any endorsements thereto.

P.    "**Policy Period**" means the period from the Inception Date to the Expiration Date in ITEM 2 of the Wrap Declarations, or the dates set forth in the most recent Renewal Certificate with respect to the **Policy**, whichever period is later; in no event, however, shall the **Policy Period** continue past the effective date of cancellation or termination of the **Policy**.

Q.    "**Pollutants**" means any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants.

R.    "**Pollution**" means any actual, alleged or threatened exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, escape, treatment, removal or disposal of **Pollutants**; or any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any action taken in contemplation or anticipation of any such regulation, order, direction or request.

S.    "**Related Claims**" means all **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, events, **Wrongful Acts** or **Wrongful Employment Practices** or the same or related series of facts, circumstances, situations, transactions, events, **Wrongful Acts** or **Wrongful Employment Practices**.

T.    "**Retaliation**" means adverse employment action with regard to an **Employee** on account of such **Employee's** exercise or attempted exercise of rights protected by law, including but not limited to the Family Medical Leave Act, or on account of the **Employee** having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law.

U.    "**Sexual Harassment**" means unwelcome sexual advances or requests for sexual favors and other verbal, physical or other conduct of a sexual nature (i) which is made a term or condition of an **Employee's** employment or advancement, or (ii) submission to or rejection of which is used as a basis for decisions affecting an **Employee** or applicant for employment, or (iii) which has the purpose or effect of creating an intimidating, hostile or offensive work environment which unreasonably interferes with the job performance of an **Employee**.

W-1001 3/99

V.    "**Single Loss**" means all covered loss under the **Crime Coverage Parts**:

1.    caused by any **Employee(s)** or in which any **Employee(s)** is (are) concerned or implicated, either resulting from a single act or any number of such acts, regardless of when, during the period of the **Crime Coverage Part** such acts occurred;

2.    caused by **Forgery** or alteration committed by any person or in which such person is concerned or implicated, either resulting from a single act or any number of such acts, regardless of the number of **Covered Instruments** involved, or when, during the period of the **Crime Coverage Part**, such acts occurred; or

3.    resulting from an actual or attempted fraudulent or dishonest act or event or a series of related acts or events whether committed by one or more persons;

4.    resulting from any single act or series of related acts of **Kidnapping, Extortion**, or **Detention/Hijack** by one or more persons or collaborating persons; or

5.    resulting from any single casualty or event or series of related casualties or events not specified in subsections 1, 2, 3 or 4 preceding.

W.    "**Subsidiary**" means:

1.    any corporation in which, on or prior to the Inception Date in ITEM 2 of the Wrap Declarations, the **Parent Corporation** owns, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such corporation's directors;

2.    any limited liability company organized under the laws of any state, in which, on or prior to the Inception Date in ITEM 2 of the Wrap Declarations, the **Parent Corporation** owns, directly or through one or more **Subsidiaries**, the right to elect, appoint or designate more than fifty percent (50%) of the members of such limited liability company's Board of Managers; and

3.    subject to the terms of Section III.H, any entity that the **Insured Organization** forms or acquires during the **Policy Period** in which the **Parent Corporation** owns, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

X.    "**Welfare Plan**" means any plan so defined in Section 3(1) of **ERISA** or in any related or similar state, local or foreign law or regulation.

Y.    "**Workplace Harassment**" means harassment, other than **Sexual Harassment**, which actually or allegedly creates a work environment that interferes with job performance, or creates an intimidating, hostile, or offensive working environment.

Z.    "**The Wrap Application**" means the Wrap Application and any materials submitted in connection therewith.

AA.    "**Wrongful Employment Practice**" means any of the following actual or alleged matters occurring in the course of and arising out of an **Employee's** employment or an applicant's application for employment with the **Insured Organization**: (1) **Discrimination**, (2) **Sexual Harassment**, (3) **Wrongful Termination**, (4) **Retaliation**, (5) **Workplace Harassment**, (6) breach of oral, implied or written employment agreement, (7) negligent evaluation, (8) wrongful discipline, (9) wrongful deprivation of career opportunity, (10) wrongful denial of training, (11) wrongful deprivation or denial of seniority, (12) wrongful evaluation, (13) wrongful failure to grant tenure, (14) wrongful failure to employ or promote, (15) invasion of privacy, (16) employment-related misrepresentation, (17) employment-related defamation, and (18) employment-related infliction of emotional distress.

BB.    "**Wrongful Termination**" means actual or constructive termination of an employment relationship with the **Insured Organization** in a manner or for a reason which is contrary to applicable law or in violation of a written, oral or implied agreement, other than a collective bargaining agreement, for continued employment.

III.    **CONDITIONS.**

A.    **TERRITORY.**

This insurance applies to **Claims** or loss occurring anywhere in the world.

B.    **RETENTIONS.**

    1.    **Liability Coverage Parts**

        The Company's liability under any **Liability Coverage Part** with respect to **Loss** arising from any single **Claim** shall apply only to that part of such **Loss** which is excess of the applicable Retention set forth in the Declarations for such **Coverage Part**. If different parts of **Loss** arising from a single **Claim** are subject to different Retentions, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention. The **Insureds** shall bear uninsured at their own risk the amount of any applicable Retention. The Company shall have no obligation to pay **Loss**, including **Defense Expenses**, until the Retention amount has been paid by the **Insured**; however the Company may, at its sole discretion, pay all or part of the Retention amount on behalf of any **Insured**, in such event, the **Insureds** agree to repay the Company any amounts so paid.

    2.    Crime Coverage Parts

        The Company will not pay for any loss under any Insuring Agreement of the **Crime Coverage Parts** unless the amount of loss exceeds the Retention for the Insuring Agreements in ITEM 2 of the **Crime Coverage Part** Declarations. The Company will then pay for the amount of loss in excess of the Retention subject to any applicable Aggregate Limit(s) of Liability stated in ITEM 4 of the Wrap Declarations and/or the Coverage Part Limit(s) of Liability and Single Loss Limits of Liability stated in ITEM 2 of the **Crime Coverage Part** Declarations. This provision does not apply to legal expenses paid under Insuring Agreement B of the Fidelity Coverage Part. In the event more than one Retention could apply to the same loss, only the highest Retention may be applied.

C.    **LIMITS OF LIABILITY.**

    1.    <u>**Aggregate Limit(s) of Liability**</u>

        Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company:

        a.    If the Aggregate Limit of Liability for all purchased **Coverage Parts** is applicable as provided in ITEM 4(a) of the Wrap Declarations, the Company's maximum limit of liability in a single **Policy Period** for all **Claims**, including **Related Claims**,u nder all applicable **Liability Coverage Parts** and all loss under all applicable **Crime Coverage Parts** shall not exceed the Aggregate Limit of Liability for all purchased **Coverage Parts** stated in ITEM 4(a) of the Wrap Declarations.

        b.    If the Aggregate Limit of Liability for all purchased **Liability Coverage Parts** is applicable as provided in ITEM 4(b) of the Wrap Declarations, the Company's maximum limit of liability in a single **Policy Period** for all **Claims**, including **Related Claims**, under all applicable **Liability Coverage Parts** shall not exceed the Aggregate Limit of Liability for all purchased **Liability Coverage Parts** stated in ITEM 4(b) of the Wrap Declarations.

        c.    If the Aggregate Limit of Liability for all purchased **Crime Coverage Parts** is applicable as provided in ITEM 4(c) of the Wrap Declarations, the Company's maximum limit of liability in a single **Policy Period** for all loss under all applicable **Crime Coverage Parts** shall not exceed the Aggregate Limit of Liability for all purchased **Crime Coverage Parts** stated in ITEM 4(c) of the Wrap Declarations.

    2.    <u>**Coverage Part Limit(s) of Liability**</u>

        Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company; and further subject to any applicable Aggregate or Single Loss Limit(s) of Liability:

If Coverage Part Limit(s) of Liability are applicable for a **Coverage Part** as provided in ITEM 3 of the Wrap Declarations, the Company's maximum limit of liability for all **Claims**, including **Related Claims**, under each applicable **Liability Coverage Part** or all loss under each applicable **Crime Coverage Part** in a single **Policy Period** shall not exceed the Coverage Part Limit of Liability stated in the Declarations for each applicable **Coverage Part**. In the event that a **Claim** or loss triggers more than one **Coverage Part**, the Company's maximum limit of liability shall not exceed the highest available remaining Coverage Part Limit of Liability of the applicable **Coverage Parts**.

3.      **Single Loss Limit(s) of Liability**

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company; and further subject to any applicable Aggregate or Coverage Part Limit(s) of Liability:

If a Single Loss Limit of Liability for each Insuring Agreement is applicable for the **Crime Coverage Part(s)** as provided in ITEM 2.B. of the Declarations for the **Crime Coverage Parts**, the Company's maximum limit of liability for each **Single Loss** under the applicable Insuring Agreement shall not exceed the Single Loss Limit of Liability for the applicable Insuring Agreement. In the event that a loss triggers more than one Insuring Agreement in any of the **Crime Coverage Parts**, the Company's maximum limit of liability for each **Single Loss** shall not exceed the highest available Single Loss Limit of Liability for the applicable Insuring Agreements.

4.      **Other Provisions**

a.      If any **Claim** against the **Insureds** gives rise to coverage both under this **Policy** and under any other liability policy or similar insurance issued by the Company or any of its affiliates to any **Outside Entity**, the Company's maximum aggregate limit of liability under all such policies for all **Loss**, including **Defense Expenses**, from such **Claim** shall not exceed the largest single available limit of liability under such policy, including this **Policy**.

b.      **Defense Expenses** incurred by the Company or by the **Insureds** in defense of a **Claim** are part of and not in addition to all applicable Limit(s) of Liability. The payment by the Company or by the **Insureds** of **Defense Expenses** reduces all applicable Limit(s) of Liability.

c.      All Aggregate and Coverage Part Limit(s) of Liability applicable to this **Policy** or a **Coverage Part** shall be reduced by the amount of any payment made under the terms of each applicable **Coverage Part**. If the Aggregate or Coverage Part Limit(s) of Liability applicable to this **Policy** or a **Coverage Part** are exhausted by the payment of amounts covered under this **Policy** or the **Coverage Part**, the premium under the **Policy** or **Coverage Part** will be fully earned, all obligations of the Company under the **Policy** or **Coverage Part** will be completely fulfilled and exhausted, including any duty to defend, and the Company shall have no further obligations of any kind or nature whatsoever under this **Policy** or **Coverage Part**.

d.      The purchase of any Extended Reporting Period shall not increase or reinstate any applicable Limit(s) of Liability, and said Limit(s) of Liability shall be the Company's maximum liability for the **Policy Period** and Extended Reporting Period, combined.

e.      Regardless of the number of years any of the **Crime Coverage Parts** or similar insurance issued by the Company or its affiliates remains in force or the number of premiums paid, no Limit of Liability under any **Crime Coverage Part** or Insuring Agreement thereunder cumulates from year to year or period to period.

f.      In the event that any director of the **Insured Organization** who is not an **Employee** thereof is an **Insured Person** under any other similar policy issued by the Company and a loss, as respects such director, is reported under the Kidnap and Ransom/Extortion Coverage Part of this **Policy** and one or more such other policies, then the aggregate liability of the Company for each **Single Loss** shall not be cumulative and shall in no event exceed the highest Limits of Liability applicable to each **Single Loss** under the Kidnap and Ransom/Extortion Coverage Part or such other applicable policy.

**D.      DEFENSE, INVESTIGATION AND SETTLEMENT.**

1.      If duty-to-defend coverage is provided with respect to the Liability Coverage Parts as indicated in ITEM 5 of the Wrap Declarations:

a.    The Company shall have the right and duty to defend any **Claim** covered by such **Liability Coverage Part**, even if any of the allegations are groundless, false or fraudulent; provided however, that the Company shall not be obligated to defend or continue to defend any **Claim** after the applicable Limit of Liability for such **Coverage Part** has been exhausted by payment of **Loss**; and

b.    The **Insured** shall cooperate with the Company and, upon the Company's request, assist in making settlements and in defense of **Claims** and in enforcing rights of contribution or indemnity against any person or entity which may be liable to the **Insured** because of an act or omission covered under this **Policy**, shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

2.    If reimbursement coverage is provided with respect to the **Liability Coverage Parts** as indicated in ITEM 5 of the Wrap Declarations:

a.    The Company has no duty to defend any **Claim**. It shall be the duty of the **Insureds** to defend **Claims**. The Company shall have the right to associate with the **Insureds** in the investigation, defense and settlement, including but not limited to the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by this **Policy** and the selection of appropriate defense counsel;

b.    Upon written request, the Company will advance **Defense Expenses** for which such **Liability Coverage Part** provides coverage. Such advanced payments by the Company shall be repaid to the Company by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** shall not be entitled to payment of such **Loss** under the **Policy**. As a condition of any payment of **Defense Expenses** or other **Loss** under this subsection, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any **Defense Expenses** or other **Loss** paid to or on behalf of any **Insured** if it is finally determined that any such **Loss** incurred by such **Insured** is not covered under the **Policy**.

3.    The **Insureds** shall not settle or offer to settle any **Claim**, incur any **Defense Expenses**, assume or admit any liability, or otherwise assume any obligation without the Company's prior written consent, such consent not to be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

4.    The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient, and if the **Insured** shall refuse to consent to the settlement of any **Claim** as recommended by the Company based upon a judgment or a bona fide offer of settlement, then the **Insured** thereafter shall negotiate and/or defend such **Claim** independently of the Company and on the **Insured's** own behalf and solely at the expense of the **Insured**; in such event, all **Defense Expenses** and other costs and expenses incurred or paid by the **Insured** after the date the **Insured** refused to consent to settlement as recommended by the Company shall be the sole responsibility of the **Insured** and shall not be recoverable under this **Policy**, and the **Insured** also shall be solely responsible for all **Loss** in excess of the lower of the amount for which settlement could have been made as recommended by the Company or the remaining portion of the applicable Limit(s) of Liability.

5.    The **Insureds** will provide the Company with all information, assistance and cooperation that it reasonably requests, and will do nothing that may prejudice its position or potential or actual rights of recovery. The Company will be subrogated to the extent of any payment to all of the rights of recovery of the **Insureds**. The **Insureds** will execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Company effectively to bring suit in their name. The obligations of the **Insureds** under this subsection survive the **Policy**.

6.    With regard to the Kidnap and Ransom/Extortion Coverage Part, the Company shall have the right to investigate, negotiate or settle any claim or suit subject to coverage under that **Coverage Part**, or to take over the conduct of the defense thereof. The **Insured** shall cooperate with the Company to these ends and shall not admit liability in any such claim or suit. The **Insured** shall use due diligence and do all things reasonably practical to avoid or diminish any loss.

E.    **CLAIMS.**

1.    A **Claim** shall be deemed to have been made on the date of service upon or receipt of notice by any **Insured** of the written demand or proceeding, whichever occurs earlier.

2.    All **Related Claims** are a single **Claim** for purposes of all applicable **Liability Coverage Parts**, and all **Related Claims** shall be deemed to have been made at the time the first of such **Related Claims** was made, regardless of whether such date is before or during the **Policy Period**.

F.    **CLAIMS MADE EXTENSION CLAUSE.**

With respect to the **Liability Coverage Parts**, if, during the **Policy Period**, the **Insured** shall first become aware of any **Wrongful Act** or **Wrongful Employment Practice** which may subsequently give rise to a **Claim** under a purchased **Liability Coverage Part**, and shall, during such **Policy Period**, give written notice thereof as set forth herein to the Company, then any **Claim** which subsequently is made against the **Insured** with regard to such **Wrongful Act** or **Wrongful Employment Practice** shall be deemed to have been first made during such **Policy Period**. The written notice shall include the particulars of such **Wrongful Act** or **Wrongful Employment Practice**, including all facts constituting the alleged **Wrongful Act** or **Wrongful Employment Practice**, the identity of each person allegedly involved in or affected by the **Wrongful Act** or the **Wrongful Employment Practice**, and the dates of the alleged event(s), all of which shall be provided as soon as practicable, but in any event prior to the end of the **Policy Period**. All notices under this subsection must be sent by certified mail or prepaid overnight mail to the address set forth in ITEM 5 of the applicable **Liability Coverage Part** Declarations. Notice of any actual **Claim** which is subsequently made with respect to such **Wrongful Act** or **Wrongful Employment Practice** must be given in accordance with Section III.K of the Common Terms and Conditions.

G.    **SPOUSAL EXTENSION.**

1.    The coverage afforded under the **Liability Coverage Parts** will, subject to all of their terms, conditions, limitations and exclusions, be extended to apply to **Loss** resulting from a **Claim** made against a person who, at the time the **Claim** is made, is a lawful spouse of an **Insured Person**, but only if:

a.    the **Claim** against such spouse results from a **Wrongful Act** or **Wrongful Employment Practice** actually or allegedly committed by the **Insured Person**, to whom the spouse is married, and

b.    such **Insured Person** and his or her spouse are represented by the same counsel in connection with such **Claim**.

2.    No spouse of an **Insured Person** will, by reason of this subsection, have any greater right to coverage under any of the **Liability Coverage Parts** than the **Insured Person** to whom such spouse is married.

3.    The Company shall not be liable under this subsection to make any payment of **Loss** in connection with any **Claim** against a spouse of an **Insured Person** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse.

H.    **CHANGES IN EXPOSURE.**

1.    <u>Formation or Acquisition of Subsidiary, Premises or Pension Plan</u>

a.    With regard to the **Liability Coverage Parts**, if, during the **Policy Period**, the **Insured Organization** forms or acquires a **Subsidiary** or **Pension Plan** (other than an employee stock ownership plan) which is then solely sponsored by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization exclusively for the benefit of the **Employees** of the **Insured Organization**, the **Policy** will provide coverage for that acquired or formed **Subsidiary** or **Pension Plan** and their respective **Insured Persons**, subject to all other terms and conditions of this **Policy**, but only for **Claims** for **Wrongful Acts** or **Wrongful Employment Practices** under the **Liability Coverage Parts** which occur wholly during the time that the **Insured Organization** is sole sponsor with regard to the **Pension Plan** or owns more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors, provided written notice of such formation or acquisition has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company's underwriters may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for the acquired or formed **Subsidiary** or **Pension Plan** shall not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Parent Corporation** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement shall not apply, however, if (1) the assets of the acquired or formed **Subsidiary** do not exceed ten percent (10%) of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent audited consolidated financial statements, (2) the total assets of the acquired or formed **Pension Plan**, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the **Insured Organization**, or (3) the acquisition or formation occurs less than ninety (90) days prior to the end of the **Policy Period**.

Notwithstanding the foregoing, no coverage shall be provided pursuant to this Subsection III.H.1. for any employee stock ownership plan or any natural person or **Insured Organization** with respect thereto unless the Company, by specific written endorsement hereto, agrees to provide such coverage. Any such coverage shall be at the terms and conditions set forth in the endorsement and for such additional premium as may be required by the Company.

          b.     With regard to the **Crime Coverage Parts**, if through consolidation or merger with, or purchase of assets of, some other entity any additional persons become **Employees** or the **Insured Organization** acquires the use and control of any additional **Premises**, or if the **Insured Organization** acquires an additional **Subsidiary**, any insurance afforded for **Employees, Premises** or **Subsidiaries** also applies to those additional **Employees, Premises, or Subsidiaries**, provided that the **Insured** (1) gives the Company written notice within ninety (90) days thereafter; and (2) pays the Company an additional premium. Any **Pension Plan** or **Welfare Plan** acquired as above and sponsored exclusively by the **Insured Organization** shall be included as an **Insured(s)** under Insuring Agreement G of the Fidelity Coverage Part. The 90-day notice requirement shall not apply and the Company agrees to extend automatically such coverage under the **Crime Coverage Parts**, without payment of an additional premium, to any consolidatation or merger with, or purchase of assets of, some other entity or **Subsidiary** (1) the assets of which do not exceed ten percent (10%) of the **Insured Organization's** total assets, or (2) which occurs less than ninety (90) days prior to the end of the **Policy Period**, subject to all other terms and conditions of the Crime Coverage Parts and only for so long as the **Coverage Part(s)** remain in effect as to the **Insured Organization**.

     2.     **Merger of Plans**

If, during the **Policy Period**, a **Welfare Plan** or **Pension Plan** for which coverage is provided under the Fiduciary Liability Coverage Part is merged with another **Welfare Plan** or **Pension Plan** for which coverage is also provided under that **Coverage Part**, the Fiduciary Liability Coverage Part shall continue to provide coverage for both plans, subject to all other terms and conditions of that **Coverage Part** and only for so long as that **Coverage Part** remains in effect as to the **Parent Corporation**.

If, during the **Policy Period**, a **Welfare Plan** or **Pension Plan** for which coverage is provided under the Fiduciary Liability Coverage Part ("Covered Plan") is merged with another **Welfare Plan** or **Pension Plan** for which coverage is not provided under this **Coverage Part** ("Uncovered Plan"), the Fiduciary Liability Coverage Part shall continue to provide coverage for only the Covered Plan, subject to all other terms and conditions of the Fiduciary Liability Coverage Part and only for so long as that **Coverage Part** remains in effect as to the **Parent Corporation**, but only for **Claims** with regard to **Wrongful Acts** which occurred prior to the date of such merger.

     3.     **Sale or Termination of Plan**

If, prior to or during the **Policy Period**, any **Welfare Plan** or **Pension Plan**, other than an employee stock ownership plan not identified in the endorsement, is sold or terminated, the Fiduciary Liability Coverage Part shall provide coverage for such plan, subject to all other terms and conditions of the Fiduciary Liability Coverage Part and only for so long as the Fiduciary Liability Coverage Part remains in effect as to the **Parent Corporation**. The coverage provided pursuant to this Subsection III.H.3 shall apply only:

          a.     for **Claims** with regard to **Wrongful Acts** which occurred prior to the date of such sale or termination,

          b.     while such plan was sponsored solely by the **Parent Corporation** or jointly by the **Parent Corporation** and a labor organization exclusively for the benefit of employees of the **Parent Corporation**, and

          c.     if notice of such sale or termination is given to the Company prior to the end of such **Policy Period**.

     4.     **Change of Control**

If during the **Policy Period**, any of the following events occur:

a.    the acquisition of the **Parent Corporation**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Parent Corporation** into or with another entity such that the **Parent Corporation** is not the surviving entity;

b.    the appointment of a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official, for or with respect to the **Parent Corporation;** or

c.    the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least fifty percent (50%) of the directors of the **Parent Corporation**

(hereinafter "Change of Control"), coverage under the **Policy** shall continue in full force and effect, subject to all other terms and conditions of the **Policy**, but only with respect to **Claims** for **Wrongful Acts** or **Wrongful Employment Practices** or loss under the **Crime Coverage Parts** committed or incurred before such Change of Control, but coverage will cease with respect to **Claims** for **Wrongful Acts** and **Wrongful Employment Practices** or loss under the **Crime Coverage Parts** committed or incurred after such Change of Control, and further provided that any loss under the Kidnap and Ransom/Extortion Coverage Part must be discovered and reported to the Company within twelve months of the Change of Control. After a Change of Control, the **Liability Coverage Parts** may not be cancelled, regardless of Section III.J. of the Common Terms and Conditions, and the entire premium for the **Liability Coverage Parts** will be deemed fully earned.

I.    **EXTENDED REPORTING PERIOD.**

If the Company or the **Parent Corporation** fails or refuses to renew an applicable **Liability Coverage Part** or if the **Parent Corporation** cancels an applicable **Liability Coverage Part**, the **Parent Corporation** shall have the right, upon payment of the additional premium as determined by ITEM 4 of the applicable **Liability Coverage Part** Declarations, to the period of time set forth in ITEM 4 of that **Coverage Part** Declarations following the effective date of such nonrenewal or termination ("the Extended Reporting Period") in which to give the Company written notice of **Claims** first made during the Extended Reporting Period against persons or entities who at the effective date of nonrenewal or cancellation were **Insureds**, but only for **Wrongful Acts** or **Wrongful Employment Practices** occurring wholly prior to the effective date of the nonrenewal or cancellation and which otherwise would be covered by the applicable **Liability Coverage Part**, subject to the following conditions:

1.    The Extended Reporting Period shall not provide a new, additional or renewed limit(s) of liability. The Company's total liability for all **Claims** made during the Extended Reporting Period shall be limited to the remaining portion of the maximum aggregate limit of liability set forth in ITEM 4 of the Wrap Declarations and, if applicable, ITEM 2 of the applicable **Liability Coverage Part** Declarations as of the effective date of the nonrenewal or cancellation;

2.    The entire premium for the Extended Reporting Period, if purchased, shall be deemed to have been fully earned at the commencement of such Extended Reporting Period;

3.    Section III.F of the Common Terms and Conditions ("Claims Made Extension Clause") does not apply and may not be invoked during the Extended Reporting Period; and

4.    The right to elect the Extended Reporting Period under this subsection III.I shall terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days of the effective date of the nonrenewal or cancellation.

J.    **CANCELLATION.**

1.    The Company may cancel this **Policy** or any **Coverage Part** for failure to pay a premium when due, in which case twenty (20) days written notice shall be given to the **Parent Corporation,** unless however payment is made within (20) days of the **Parent Corporation's** receipt of such notice of cancellation. The Company shall have the right to the premium amount for the portion of the **Policy Period** during which the **Policy** or **Coverage Part** was in effect.

2.      The **Parent Corporation** may cancel this **Policy** or any **Coverage Part** by mailing the Company written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Wrap Declarations, such cancellation will be effective. In the event the **Parent Corporation** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

3.      The Company will not be required to renew this **Policy** or any **Coverage Part** upon its expiration. If the Company elects not to renew this **Policy** or any **Coverage Part**, it will deliver or mail to the **Parent Corporation** written notice to that effect at least sixty (60) days before the Expiration Date set forth in ITEM 2(b) of the Wrap Declarations.

K.      **INSURED'S DUTIES IN THE EVENT OF A CLAIM.**

1.      As to all **Liability Coverage Parts**, it is a condition precedent to all insurance provided thereunder that:

a.      In the event of a **Claim** made against any **Insured**, written notice concerning all particulars of such **Claim**, including all facts constituting the alleged **Wrongful Act** or **Wrongful Employment Practice**, the identity of each person allegedly involved in or affected by such **Wrongful Act** or **Wrongful Employment Practice**, and the date(s) of the alleged events, shall be provided to the Company as soon as practicable; and

b.      All notices under this subsection must be sent by certified mail or prepaid overnight mail to the address set forth in ITEM 5 of the applicable **Liability Coverage Part** Declarations.

2.      As to the Fidelity Coverage Part, it is a condition precedent to all insurance provided thereunder that:

a.      After discovery by the **Insured Organization** or any of its partners, officers or directors of a loss or a situation that may result in loss of, or loss from damage to, **Money**, **Sec urities** and other property that would be covered under the Fidelity Coverage Part, the **Insured Organization** must:

(i)      provide the Company with written notice as soon as possible and if the **Insured Organization** has reason to believe that any loss (except for loss under Insuring Agreements A or B of the Fidelity Coverage Part) involves a violation of law, the **Insured Organization** must also notify the police;

(ii)     submit to examination under oath at the Company's request and give the Company a signed statement of the **Insured Organization's** answers;

(iii)    give the Company a detailed, sworn proof of loss within 120 days. Proof of loss under Insuring Agreement B of the Fidelity Coverage Part must include an affidavit of forgery setting forth the amount and cause of loss and (1) the original instrument(s) or (2) a copy of the instrument(s) involved in that loss; and

(iv)     cooperate with the Company in the investigation and settlement of any claim.

b.      The Company waives the written notice requirement if the amount of loss does not exceed 25% of the Retention for the applicable Fidelity Coverage Part Insuring Agreement.

3.      As a condition precedent to the Company's liability under Insuring Agreement A of the Kidnap and Ransom/Extortion Coverage Part:

a.      The **Insured Organization** shall have approved the payment of **Ransom Monies**. In the event of a **Kidnapping** or **Extortion** of an **Insured Person** or **Guest** during the **Policy Period**, and prior to the payment of **Ransom Monies**, the **Insured** shall make every reasonable effort to:

(i)      determine that the **Kidnapping** or **Extortion** has actually occurred;

(ii)     give immediate oral or written notice to the Company and Control Risks Group at the addresses provided in Item 3 of the Kidnap and Ransom/Extortion Coverage Part Declarations; and

(iii)    notify the Federal Bureau of Investigation or other law enforcement agency having jurisdiction thereover of the demand for **Ransom Monies** and comply with their recommendations and instructions.

b.    As additional conditions precedent to the Company's liability under the Kidnap and Ransom/Extortion Coverage Part, the **Insured** must:

(i)    use all due diligence and do all things reasonably practicable to avoid or diminish any loss(es) insured under the Kidnap and Ransom/Extortion Coverage Part;

(ii)    use all reasonable efforts not to disclose the existence of the Kidnap and Ransom Coverage Part;

(iii)    establish a procedure in writing and shall furnish a copy of that procedure to at least three senior officials, so as to enable those persons to comply with this subsection; and

(iv)    immediately notify the Company of any claim or suit potentially subject to coverage under the Kidnap and Ransom/Extortion Coverage Part, and shall not admit liability in any such claim or suit.

L.    **ACTION AGAINST THE COMPANY**.

1.    With regard to the **Liability Coverage Parts** only:

a.    No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this **Policy**, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the Company.

b.    Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this **Policy**, in a court of competent jurisdiction in the United States, its territories or possessions, or Canada, to the extent of the insurance afforded by this **Policy**. No person or organization shall have any right under this **Policy** to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the Company be impleaded by an **Insured** or said **Insured's** legal representative. Bankruptcy or insolvency of any **Insured** or of the **Insured's** estate shall not relieve the Company of any of its obligations hereunder.

2.    With regard to the **Crime Coverage Parts** only:

a.    Fidelity Coverage Part: An **Insured** may not bring any legal action against the Company involving loss (1) unless it has complied with all the terms of this **Policy**; (2) until 90 days after it has filed proof of loss with the Company; and (3) unless brought within 2 years from the date the **Insured Organization** discovered the loss.

b.    Kidnap and Ransom/Extortion Coverage Part: No suit, action or proceeding for recovery of any claim under this **Coverage Part** shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this **Coverage Part** shall have been compiled with and the same be commenced within twenty-four (24) months next after a claim for actual **Loss** or **Expenses** has been reported to the Company by the **Insured**.

M.    **OTHER INSURANCE.**

This **Policy** shall apply only as excess insurance over, and shall not contribute with, any other insurance (whether collectible or not), including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically in excess of this **Policy**. This **Policy** will not be subject to the terms of any other insurance.

N.    **CHANGES.**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or change in any part of this **Policy**, or estop the Company from asserting any right under the terms, conditions and limitations of this **Policy**, nor may the terms, conditions and limitations of this **Policy** be waived or changed, except by a written endorsement issued by the Company to form a part of this **Policy**.

O.    **ASSIGNMENT.**

Assignment of interest under this **Policy** shall not bind the Company, until its consent is endorsed hereon, except in the case of the death of individuals included as additional **Insureds** under the Fidelity Coverage Part. In that event, the deceased individual's rights and duties will be transferred to his legal representative but only while acting within the scope of duties as his legal representative. Until the legal representative is appointed, anyone having proper temporary custody of the deceased individual's property will have his rights and duties but only with respect to that property.

P.    **REPRESENTATIONS.**

By acceptance of this **Policy**, each **Insured** represents that the statements contained in **The Wrap Application**, any **Coverage Part Application**, or any other application completed for the proposed **Policy**, all of which are deemed to be attached to, incorporated into, and form a part of, this **Policy**, are said **Insured's** agreements and representations, that such representations are material to the Company's acceptance of this risk, that this **Policy** is issued in reliance upon the truth of such representations, and that this **Policy** embodies all agreements existing between said **Insured** and the Company or any of its agents relating to this insurance.

In the event that any statement or representation in **The Wrap Application** or **Liability Coverage Part Application** is untrue, the **Policy** or such **Liability Coverage Part(s)**, respectively shall be void and of no effect whatsoever, but only with respect to:

1.    any **Insured Person** who knew, as of the **Policy** Inception Date, that the statement or representation was untrue;

2.    the **Insured Organization**, to the extent it indemnifies any such **Insured Person** under any **Liability Coverage Part**; and

3.    the **Insured Organization**, under any **Liability Coverage Part**, if any **Executive Officer** knew, as of the **Policy** Inception Date, that the statement or representation was untrue.

Whether an **Insured Person** or **Executive Officer** had such knowledge shall be determined without regard to whether the **Insured Person** or **Executive Officer** actually knew **The Wrap Application** or applicable **Coverage Part Application** contained such untrue statement or representation.

With regard to the **Crime Coverage Parts**, this insurance is void in any case of fraud by the **Insured Organization** as it relates to this insurance at any time. It is also void if the **Insured Organization** or any other **Insured**, at any time, intentionally conceals or misrepresents a material fact concerning:

a.    this insurance;

b.    the **Money,Sec urities** or other property;

c.    the **Insured's** interest in the **Money, Securities** or other property; or

d.    a claim under this insurance.

Q.    **CONTINUITY OF COVERAGE.**

The **Liability Coverage Parts** shall not apply to any **Claims** based upon, alleging, arising out of, directly or indirectly resulting from, or in any way relating to any fact, circumstance, situation, transaction, event, **Wrongful Act**, or **Wrongful Employment Practice** about which an **Insured** under the Directors and Officers Liability and Fiduciary Coverage Parts or an **Executive Officer** under the Employment Practices Liability Coverage Part had knowledge prior to the Continuity Date set forth in ITEM 7 of the Declarations for each applicable **Liability Coverage Part**.

R.    **AUTHORIZATION.**

By acceptance of this **Policy**, the **Parent Corporation** agrees to act on behalf of all **Insureds** with respect to the payment of premiums, the receiving of any return premiums that may become due under the **Policy**, and the receiving of notices of cancellation, nonrenewal, or change of coverages, and the **Insureds** each agree that they have, individually and collectively, delegated such authority exclusively to the **Parent Corporation**; provided, however, that nothing herein shall relieve the **Insureds**, and each of them, from giving any notice to the Company that is required under Section III.F and III.K of the Common Terms and Conditions of this **Policy**.

S.    **LIBERALIZATION.**

If during the period that insurance is in force under this **Policy**, the Company shall be required, by law or by insurance supervisory authorities of the state in which the **Policy** was issued, to make any changes in the form of this **Policy**, by which the insurance afforded by this **Policy** could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the **Insured** hereunder as though such endorsement or substitution of form had been made.

T.    **ENTIRE AGREEMENT.**

The **Insureds** agree that this **Policy**, including any endorsements, **The Wrap Application**, and each **Coverage Part Application**, constitutes the entire agreement between them and the Company or any of its agents relating to this insurance.

U.    **HEADINGS.**

The descriptions in the headings and sub-headings of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage.

V.    **VALUATION.**

    1.    **Money**

All premiums, Limits of Liability, Retentions, **Loss**, **Defense Expenses**, and other amounts under this **Policy** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement or invoice is denominated, or other element of **Loss** or **Defense Expenses** is stated in a currency other than United States of America dollars, payment under this **Policy** shall be made in United States dollars at the rate of exchange published in the <u>Wall Street Journal</u> on the date the final judgment is entered, the settlement agreement is executed, the invoice is dated, or the other element of **Loss** or **Defense Expenses** is due, respectively. The Company may, at its option, pay for loss of **Money** issued by any country other than the United States of America at face value in the **Money** issued by that country.

    2.    **Securities**

**Loss** of **Securities** are expressed and payable by their value at the close of business on the day the loss was discovered. The Company may, at its option:

        a.    pay the value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the Company all its rights, title and interest in and to those **Securities**; or

        b.    pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the Company will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the **Securities** at the close of business on the day the loss was discovered or any applicable remaining limit of liability.

3.    **Property**

a.    Loss of, or loss from damage to, other property or loss from damage to the **Premises** are expressed and payable by the:

(i)    actual cash value of the property on the day the loss was discovered;

(ii)    cost of repairing the property or **Premises**; or

(iii)    cost of replacing the property with property of like kind and quality.

The Company may, at its option, pay the actual cash value of the property or repair or replace it. If the Company cannot agree with the **Insured** upon the actual cash value or the cost of repair or replacement, the value or cost will be determined by arbitration.

b.    The Company may, at its option, pay for loss of, or loss from damage to, property other than **Money**:

(i)    in the **Money** of the country in which the loss occurred; or

(ii)    in the United States of America dollar equivalent of the **Money** of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered based on the New York foreign exchange selling rates as quoted at 3:00 PM Eastern Standard Time.

c.    Any property that the Company pays for or replaces becomes its property.

W.    **RECOVERIES.**

1.    All recoveries from third parties for payments made under this **Policy** shall be applied (after first deducting the costs and expenses incurred in obtaining such recovery) in the following order of priority:

a.    the **Insureds** shall first be reimbursed for the amount they have paid which would have been paid under the **Policy** but for the fact that it is in excess of the applicable Limit(s) of Liability under this **Policy**;

b.    the Company shall then be reimbursed for the amount paid under this **Policy**, and

c.    any remaining sum shall be applied towards reimbursement of the Retention borne by the **Insured** under this **Policy**.

2.    Recoveries do not include any recovery:

a.    from insurance, suretyship, reinsurance, security or indemnity of the Company; or

b.    with regard to the Fidelity Coverage Part, of original **Securities** after duplicates of them have been issued.

3.    The **Insured** must transfer to the Company all of its rights of recovery against any person or organization for any loss under the Fidelity Coverage Part sustained by the **Insured** and for which the Company has paid or settled. The **Insured** must also do everything necessary to secure those rights and do nothing after loss to impair them.

IN WITNESS WHEREOF, the Company has caused this Policy to be signed by its authorized Company officers at Hartford, CT.

Executive Vice President

Corporate Secretary

W-1001 3/99

Page 15 of 15



## IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND BROKER COMPENSATION

For information about how St. Paul Travelers compensates independent agents and brokers, please visit www.StPaulTravelers.com, or you may request a written copy from Marketing at One Tower Square, 2GSA, Hartford, Connecticut 06183.

ILT-1037 (04-05)

## TEXAS
## IMPORTANT NOTICE

To obtain information or make a complaint:

You may contact your agent, or

You may call us for information or to make a complaint at:

860-954-2382

You may also write to us at:

> St. Paul Travelers
> Consumer Affairs
> One Tower Square 5GS
> Hartford, CT  06183-9079

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

1-800-252-3439

You may write:

> The Texas Department of Insurance
> P.O. Box 149104
> Austin, TX  78714-9104
> FAX # (512) 475-1771

**PREMIUM OR CLAIM DISPUTES:**  Should you have a dispute concerning your premium or about a claim, you should contact the agent or the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:**  This notice is for information only and does not become a part or condition of the attached document.

PN-042 (04-92)                                                    PRINTED IN THE U.S.A


**ST PAUL TRAVELERS**

**The Wrap** ®

Directors and Officers Liability Coverage Part Declarations                    Policy No.104468586

## THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.  PLEASE READ THE POLICY CAREFULLY.

| | |
|---|---|
| **ITEM 1** | **PARENT CORPORATION:**<br>JULIO INVESTORS, LLC<br><br>Principal Address:<br><br>1101 North Union Bower<br>Suite 160<br>IRVING, TX 75061 |
| **ITEM 2** | **COVERAGE PART LIMIT OF LIABILITY** (inclusive of **Defense Expenses**):<br><br>(maximum limit of liability for all **Claims** under this **Coverage Part**.) |
| **ITEM 3** | **RETENTIONS** (inclusive of **Defense Expenses**):<br>A.                    $0.00 under Insuring Agreement A. for each **Insured Person** for each **Claim**.<br>B. 1.          $50,000.00 under Insuring Agreement B.1. for each **Claim**.<br>B. 2.          $50,000.00 under Insuring Agreement B.2. for each **Claim**. |
| **ITEM 4** | **EXTENDED REPORTING PERIOD:**<br>12 months for    150% of that part of the Policy Period Premium for the Directors and Officers Liability Coverage Part.<br>(If exercised, in accordance with Section III.I. of the Common Terms and Conditions.) |
| **ITEM 5** | **NOTICE UNDER SECTIONS III.F. AND III.K. OF THE COMMON TERMS AND CONDITIONS MUST BE ADDRESSED TO:**<br>Travelers Property Casualty<br>Bond Claim Department<br>One Tower Square<br>Hartford, Connecticut 06183-9062 |
| **ITEM 6** | **PRIOR AND PENDING PROCEEDING DATE:**<br>December 18, 2001<br>(If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |
| **ITEM 7** | **CONTINUITY DATE:**<br>December 18, 2001<br>(If no Continuity Date is entered above, the Continuity Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |

WDO-1000 12/00



**STPAUL
TRAVELERS**

The Wrap®

## Directors and Officers Liability Coverage Part

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED
IN THE LIMIT OF LIABILITY. PLEASE READ IT CAREFULLY.**

### I.    INSURING AGREEMENTS.

A.    The Company shall pay on behalf of the **Insured Persons Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts**, including **Wrongful Employment Practices**, except for **Loss** which the **Insured Organization** pays to or on behalf of the **Insured Persons** as indemnification.

B.    The Company shall pay on behalf of the **Insured Organization**:

    1.    **Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts**, including **Wrongful Employment Practices**, which the **Insured Organization** pays to or on behalf of the **Insured Persons** as indemnification; and

    2.    **Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Organization** for **Wrongful Acts** other than **Wrongful Employment Practices**.

### II.    DEFINITIONS.

Whenever appearing in this **Coverage Part,** words and phrases appearing in **bold type** shall have the meanings set forth in this provision:

A.    "Claim" means:

    1.    a written demand for monetary or non-monetary relief;

    2.    a civil proceeding commenced by service of a complaint or similar pleading;

    3.    a criminal proceeding commenced by return of an indictment;

    4.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, including proceedings before the Equal Employment Opportunity Commission or similar state or federal agency; or

    5.    an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

against an **Insured Person** for a **Wrongful Act**, including a **Wrongful Employment Practice**, or against the **Insured Organization** for a **Wrongful Act** other than a **Wrongful Employment Practice**.

B.    "Insured" means the **Insured Persons** and the **Insured Organization**.

C.    "Insured Person(s)," either in the singular or the plural, means any one or more past, present or future duly elected or appointed directors or officers or members of the Board of Managers of the **Insured Organization**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

WDO-1001 3/99

Page 1 of 5

D.    "**Loss**" means **Defense Expenses** incurred by the Company or by the **Insureds** in the defense of a **Claim**, and damages (including any punitive or exemplary damages, where insurable under applicable law), judgments, settlements, pre- judgment interest, post-judgment interest, or other amounts that an **Insured** is legally obligated to pay as a result of a **Claim**; provided, however, that **Loss** shall not include civil or criminal fines; sanctions; liquidated damages; payroll or other taxes; penalties; the multiplied portion of any multiplied damage award; or damages or types of relief deemed uninsurable under applicable law.

E.    "**Outside Entity**" means a corporation or organization, other than the **Insured Organization**, which is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, as amended.

F.    "**Outside Position**" means service by an **Insured Person** as a director, officer, trustee, regent, governor or equivalent position with an **Outside Entity**, but only during such time that such service is with the knowledge and consent and was at the specific written request of the **Insured Organization**.

G.    "**Wrongful Act**" means:

1.    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any **Wrongful Employment Practice,**b y an **Insured Person** in his or her capacity as a director, officer or member of the Board of Managers of the **Insured Organization**;

2.    any matter asserted against an **Insured Person** solely by reason of his or her status as a director, officer or member of the Board of Managers of the **Insured Organization**;

3.    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any **Wrongful Employment Practice**, by an **Insured Person** in his or her **Outside Position**; or

4.    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Insured Organization** other than **Wrongful Employment Practices**.

## III.    **EXCLUSIONS.**

A.    This **Coverage Part** shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse **Defense Expenses** for, any **Claim**:

1.    for damage to, or destruction of, loss of, or loss of use of, any tangible property; or for or arising out of any actual or alleged libel, slander, oral or written publication of defamatory or disparaging material, invasion of privacy, bodily injury, loss of consortium, sickness, emotional distress, loss of reputation, mental anguish, humiliation, disease or death of any person; provided, however, that this exclusion shall not apply to allegations of libel, slander, oral or written publication of defamatory or disparaging material, invasion of privacy, emotional distress, loss of reputation, mental anguish, humiliation, if and only to the extent that such allegations are made as part of a **Claim** against **Insured Persons** for a **Wrongful Employment Practice**;

2.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged **Pollution**, including but not limited to any such **Claim** alleging damage to the **Insured Organization** or to its shareholders or creditors;

3.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending civil, criminal, administrative or regulatory proceeding as of the Prior and Pending Proceeding Date in ITEM 6 of the Declarations for this **Coverage Part**;

4.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date in ITEM 2(a) of the Wrap Declarations, was the subject of any notice given by or on behalf of any **Insured** under any other policy of insurance;

WDO-1001 3/99

5.      for any actual or alleged violation of responsibilities, duties or obligations imposed upon an **Insured** under **ERISA** or any similar or related federal, state or local law; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Employee** or dependent in, any **Employee Benefit Plan**, fund or program, including contracts or agreements which are not subject to the provisions of **ERISA**;

6.      with respect to any **Subsidiary**, based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any **Wrongful Act** occurring at any time during which such entity was not a **Subsidiary**, or any **Wrongful Act** occurring at any time during which such entity is a **Subsidiary** which is based upon, arises out of, or in any way relates to, directly or indirectly, the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events occurring at any time during which such entity was not a **Subsidiary**;

7.      based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged nuclear reaction, nuclear radiation, nuclear waste, radioactive contamination, radioactive substance, or the hazardous properties of nuclear material or of any nuclear assembly or nuclear component thereof;

8.      by or on behalf of, or in the name or right of, any **Insured**; provided, however, that this exclusion shall not apply to:

a.      any derivative action by or on behalf of, or in the name or right of, the **Insured Organization** brought by a security holder of the **Insured Organization**, and brought and maintained independently of, and without the assistance, participation or intervention of any **Insured**;

b.      any **Claim** in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** and which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this **Coverage Part**; or

c.      any **Claim** brought or maintained by any **Insured Person** for any actual or alleged **Wrongful Termination** of an **Insured Person**;

9.      by or on behalf, or in the name or right of, any **Outside Entity** against an **Insured Person** for a **Wrongful Act** in his or her **Outside Position** with respect to such **Outside Entity**;

10.     based upon, alleging, arising out of, or in any way relating to, directly or indirectly:

a.      the public offer, sale, solicitation or distribution of securities issued by the **Insured Organization** or any **Subsidiary**; or

b.      the actual or alleged violation of any federal, state, local or provincial statute relating to securities, including but not limited to the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder;

provided, however, that if at least thirty (30) days prior to the transaction described in (a) above, the Company receives notice of the proposed transaction and any additional information requested by the Company, the Company shall offer to the **Insured Organization** a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal;

11.     with respect to Insuring Agreement B.2 only:

a.      for any actual or alleged violation of any law, rule or regulation relating to antitrust, or the prohibition of monopolies, activities in restraint of trade, unfair methods of competition or deceptive acts and practices in trade and commerce, including but not limited to any actual or alleged violation of the Sherman Act, the Clayton Act, the Robinson-Patman Act, the Federal Trade Commission Act, the Hart-Scott-Rodino Antitrust Improvements Act or any regulation or rule promulgated under any such Act;

b.        for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, service mark, trade name, trade secret or any other intellectual property rights;

c.        for any actual or alleged violation of responsibilities, duties or obligations imposed on an **Insured** under any law concerning workers' compensation, unemployment insurance, Social Security, or disability insurance, or any similar state, federal or local law or regulation, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the Workers' Adjustment and Retraining Notification Act (WARN), the Fair Labor Standards Act, the Occupational Safety and Health Act (OSHA), the National Labor Relations Act (NLRA), or amendments thereto or regulations promulgated thereunder, or any similar or related law;

d.        consisting of a hearing, suit, proceeding, audit, investigation or survey by a governmental agency or entity regarding payroll practices, tax payments, wage and hour policies, overtime, vacation pay, payroll withholding, workplace safety or similar or related matters;

e.        for or arising out of or in consequence of any actual or alleged liability of the **Insured Organization** under any express contract or agreement; for the purposes of this exclusion, an "express contract or agreement" is an actual agreement among the contracting parties, the terms of which are openly stated in distinct or explicit language, either orally or in writing, at the time of its making; or

f.        based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture.

B.        The Company shall have no duty to pay **Loss**, other than **Defense Expenses**:

1.        for any **Claim** based upon, arising out of, or in any way relating to, directly or indirectly, any **Insured** committing in fact any intentional dishonest or fraudulent act or omission or any willful violation of any statute, rule or law, or gaining in fact any profit, remuneration or advantage to which such **Insured** was not legally entitled;

2.        which constitutes costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including but not limited to actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations thereunder, or any related or similar law or regulation;

3.        which constitutes employee benefits, except and to the extent that a judgment or settlement of a **Claim** includes a monetary component measured by the value of employee benefits as consequential damages for a **Wrongful Act** which is the basis for such judgment or settlement; and

4.        which constitutes future compensation, including salary and benefits, for an individual who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a **Claim**; or that part of any judgment or settlement which constitutes front pay, future monetary losses including but not limited to pension and other benefits, or other future economic relief or the value or equivalent thereof, if the **Insured Organization** has been ordered, or has the option pursuant to a judgment, order or other award or disposition of a **Claim**, to promote, accommodate, reinstate, or hire the claimant to whom such sums are to be paid, but fails to do so.

## IV.    <u>SEVERABILITY OF EXCLUSIONS.</u>

No conduct of any **Insured Person** shall be imputed to any other **Insured Person** to determine the application of any of the Exclusions set forth in Section III above.

## V.    CONDITIONS.

### A.    PRESUMPTION OF INDEMNIFICATION.

1.    Regardless of whether **Loss** resulting from any **Claim** against **Insured Persons** is actually indemnified, Insuring Agreement B, and the Retention set forth in ITEM 3.B.1 of this **Coverage Part** Declarations, shall apply to any **Loss** as to which indemnification by the **Insured Organization** or any **Outside Entity** is legally permissible, whether or not actual indemnification is made, unless such indemnification is not made by the **Insured Organization** or **Outside Entity** solely by reason of its **Financial Insolvency**.

2.    The certificate of incorporation, charter, articles of association or other organizational documents of the **Parent Corporation** and each **Subsidiary** and each **Outside Entity**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

### B.    OUTSIDE POSITIONS – OTHER INSURANCE AND INDEMNIFICATION.

With respect to **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Positions**, this **Coverage Part** shall apply only as excess insurance over, and shall not contribute with, any other valid and collectible insurance available to such **Insured Persons** and any indemnification by any person or entity (including any **Outside Entity**, but not including the **Insured Organization**) available to such **Insured Persons** in connection with their service in **Outside Positions**.

### C.    COORDINATION WITH EMPLOYMENT PRACTICES LIABILITY COVERAGE PART.

Any **Loss** covered by both this **Coverage Part** and the Employment Practices Liability Coverage Part of this **Policy** shall be covered first as provided in, and shall be subject to the Limit(s) of Liability and Retention applicable to, the Employment Practices Liability Coverage Part.  Any remaining **Loss** otherwise covered by this **Coverage Part** which is not paid under the Employment Practices Liability Coverage Part shall be covered as provided in, and shall be subject to the Limit(s) of Liability and Retention(s) applicable to, this **Coverage Part**; provided the Limit(s) of Liability and Retention(s) applicable to such **Loss** under this **Coverage Part** shall be reduced by the amount of **Loss** otherwise covered by this **Coverage Part** which is paid by the Company or the **Insureds**, respectively, pursuant to the Employment Practices Liability Coverage Part.



The Wrap ®

Employment Practices Liability Coverage Part Declarations          Policy No. 104468586

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED
IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.**

| | |
|---|---|
| **ITEM 1** | **PARENT CORPORATION:**<br>JULIO INVESTORS, LLC<br><br><br>Principal Address:<br>1101 North Union Bower<br>Suite 160<br>IRVING, TX 75061 |
| **ITEM 2** | **COVERAGE PART LIMIT OF LIABILITY** (inclusive of **Defense Expenses**):<br><br>(maximum limit of liability for all **Claims** under this **Coverage Part**.) |
| **ITEM 3** | **RETENTION** (inclusive of **Defense Expenses**):<br>$250,000.00 for each **Claim**. |
| **ITEM 4** | **EXTENDED REPORTING PERIOD:**<br>12 months for    150% of that part of the Policy Period Premium for the Employment Practices Liability Coverage Part..<br>(If exercised, in accordance with Section III.I. of the Common Terms and Conditions.) |
| **ITEM 5** | **NOTICE UNDER SECTIONS III.F. AND III.K. OF THE COMMON TERMS AND CONDITIONS MUST BE ADDRESSED TO:**<br>Travelers Property Casualty<br>Bond Claim Department<br>One Tower Square<br>Hartford, Connecticut 06183-9062 |
| **ITEM 6** | **PRIOR AND PENDING PROCEEDING DATE:**<br>December 18, 2001<br>(If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |
| **ITEM 7** | **CONTINUITY DATE:**<br>December 18, 2001<br>(If no Continuity Date is entered above, the Continuity Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |

WEP-1000 (12-00)

ST PAUL
TRAVELERS

## Employment Practices Liability Coverage Part

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.  PLEASE READ IT CAREFULLY.**

### I.   INSURING AGREEMENT.

The Company shall pay on behalf of the **Insured Loss** resulting from **Claims** first made during the **Policy Period** by a **Claimant** against the **Insured** for **Wrongful Employment Practices**.

### II.   DEFINITIONS.

Whenever appearing in this **Coverage Part,** words and phrases appearing in **bold type** shall have the meanings set forth in this provision:

A.   "**Claim**" means:

    1.   a written demand for monetary or non-monetary relief;

    2.   a civil proceeding commenced by service of a complaint or similar pleading;

    3.   a criminal proceeding commenced by return of an indictment;

    4.   a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, including proceedings before the Equal Employment Opportunity Commission or similar state or federal agency; or

    5.   an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

by or on behalf of or for the benefit of a **Claimant**, seeking to hold an **Insured** liable for a **Wrongful Employment Practice** involving or arising from such **Claimant's** actual or potential employment with the **Insured Organization**.

**Claim** does not include a union grievance or demand for arbitration under a union contract, or any matter related to or arising out of any union contract, any labor negotiation, any labor dispute, any union organizing effort, or any unfair labor practice charge within the jurisdiction of the National Labor Relations Board.

B.   "**Claimant**" means (1) a present or former **Employee** of or applicant for employment with the **Insured Organization**, and (2) a governmental entity or agency, including but not limited to the Equal Employment Opportunity Commission or similar state or local agency, when acting on behalf of or for the benefit of present or former **Employees** or applicants for employment.

C.   "**Insured**" means the **Insured Persons** and the **Insured Organization**.

D.   "**Insured Person(s),**" either in the singular or the plural, means a present or former **Employee** or a duly elected director or member of the Board of Managers of the **Insured Organization** for alleged **Wrongful Employment Practices** committed in the discharge of his or her duties as such.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Employment Practice** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

WEP-1001 3/99

E.    "**Loss**" means **Defense Expenses** incurred by the Company or by the **Insureds** in the defense of a **Claim**, and damages (including back pay and front pay, compensatory damages, and punitive damages if insurable under applicable law), judgments, settlements, pre-judgment interest, post-judgment interest, or other amounts that an **Insured** is legally obligated to pay as a result of a **Claim**; provided, however, that **Loss** shall not include civil or criminal fines; sanctions; liquidated damages; payroll or other taxes; the multiplied portion of any multiplied damage award (except multiple damages awarded under the Equal Pay Act or the Age Discrimination in Employment Act (ADEA)); or damages or types of relief deemed uninsurable under applicable law.

## III.    EXCLUSIONS.

A.    This **Coverage Part** shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse **Defense Expenses** for, any **Claim**:

1.    for damage to, or destruction of, loss of, or loss of use of, any tangible property; or for or arising out of any actual or alleged bodily injury, loss of consortium, sickness, disease or death of any person; provided, however, that this exclusion shall not apply to **Loss** for emotional distress, loss of reputation, mental anguish, or humiliation caused by a **Wrongful Employment Practice**.

2.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged **Pollution**, including but not limited to any such **Claim** alleging damage to the **Insured Organization** or to its shareholders or creditors; provided, however, that this exclusion shall not apply to **Claims** for alleged **Retaliation** against an **Employee** with regard to such matters;

3.    for or arising out of or in consequence of the liability of others assumed by an **Insured** under any contract or agreement, whether oral or written, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement;

4.    for any actual or alleged violation of responsibilities, duties or obligations imposed on an **Insured** under any law concerning workers' compensation, unemployment insurance, Social Security, or disability insurance, or any similar state, federal or local law or regulation, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the Workers' Adjustment and Retraining Notification Act (WARN), the Fair Labor Standards Act (FLSA) (except the Equal Pay Act), the Occupational Safety and Health Act (OSHA), or amendments thereto or regulations promulgated thereunder, or any similar or related law; provided, however, that this exclusion shall not apply to **Claims** for alleged **Retaliation** due to an **Employee's** exercise of rights under such laws;

5.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or **Wrongful Employment Practice** underlying or alleged in any prior and/or pending civil, criminal, administrative or regulatory proceeding as of the Prior and Pending Proceeding Date in ITEM 6 of the Declarations for this **Coverage Part**;

6.    for any actual or alleged violation of responsibilities, duties or obligations imposed upon an **Insured** under **ERISA** or any similar or related federal, state or local law; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Employee** or dependent in, any **Employee Benefit Plan**, fund or program, including contracts or agreements which are not subject to the provisions of **ERISA**;

7.    for or arising out of any alleged violation of Executive Order 11246 (Office of Federal Contract Compliance Programs) or the False Claims Act (FCA);

8.    consisting of a hearing, suit, proceeding, audit, investigation or survey by a governmental agency or entity regarding payroll practices, tax payments, wage and hour policies, overtime, vacation pay, payroll withholding, workplace safety or similar or related matters;

9.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged nuclear reaction, nuclear radiation, nuclear waste, radioactive contamination, radioactive substance, or the hazardous properties of nuclear material or of any nuclear assembly or nuclear component thereof; and

10. with respect to any **Subsidiary**, based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any **Wrongful Employment Practice** occurring at any time during which such entity was not a **Subsidiary**, or any **Wrongful Employment Practice** occurring at any time during which such entity is a **Subsidiary** which is based upon, arises out of, or in any way relates to, directly or indirectly, the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events occurring at any time during which such entity was not a **Subsidiary**.

B.    The Company shall have no duty to pay **Loss**, other than **Defense Expenses**:

1. for any **Claim** based upon, arising out of, or in any way relating to, directly or indirectly, any **Insured** committing in fact any intentional dishonest or fraudulent act or omission, or gaining in fact any profit, remuneration or advantage to which such **Insured** was not legally entitled;

2. which constitutes costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including but not limited to actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations thereunder, or any related or similar law or regulation;

3. which constitutes severance pay or penalties under an employment contract, or any agreement, policy or procedure providing for payment in the event of separation from employment; or sums sought solely on the basis of a claim for unpaid services under an express or implied agreement;

4. which constitutes medical, pension, disability, life insurance or other similar employee benefits, except and to the extent that a judgment or settlement of a **Claim** includes a monetary component measured by the value of pension, medical, disability, life insurance or other similar employee benefits as consequential damages for a **Wrongful Employment Practice** which is the basis for such judgment or settlement;

5. which constitutes future compensation, including salary or benefits, for an individual who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a **Claim**; or that part of any judgment or settlement which constitutes front pay, future monetary losses including but not limited to pension and other benefits, or other future economic relief or the value or equivalent thereof, if the **Insured** has been ordered, or has the option pursuant to a judgment, order or other award or disposition of a **Claim**, to promote, accommodate, reinstate, or hire the **Employee** to whom such sums are to be paid, but fails to do so; and

6. which constitutes that part of any judgment or settlement which is payable to, or which constitutes recovery for the benefit of, or which is in compensation for or measured by injury to, any person or entity other than a **Claimant**.

## IV.    SEVERABILITY OF EXCLUSIONS.

No conduct of any **Insured Person** shall be imputed to any other **Insured Person** to determine the application of any of the Exclusions set forth in Section III above.

## V.    COORDINATION WITH OTHER LIABILITY COVERAGE PARTS.

Any **Loss** covered by this **Coverage Part** and either the Directors and Officers Liability Coverage Part or the Fiduciary Liability Coverage Part of this **Policy** (if purchased) shall be first covered as provided in, and subject to the Limit(s) of Liability and Retention applicable to, this **Liability Coverage Part**.

WEP-1001 3/99

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## TEXAS AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Common Terms and Conditions**

It is agreed that:

1.      With respect to the Common Terms and Conditions, Section III. **CONDITIONS** C. **LIMITS OF LIABILITY** Sub-section 4.a. is deleted in its entirety.

2.      With respect to the Common Terms and Conditions, Section III. **CONDITIONS** C. **LIMITS OF LIABILITY** Sub-section 4.b. is deleted in its entirety and replaced by the following:

C.      **LIMITS OF LIABILITY.**

    4.      **Other Provisions**

        b.  With respect to the **Liability Coverage Parts** only: **Defense Expenses** incurred by the Company or by the **Insureds** in defense of a **Claim** are part of and not in addition to all applicable Limits(s) of Liability, and the payment by the Company or by the **Insureds** of **Defense Expenses** reduces all applicable Limit(s) of Liability.

3.      With respect to the Common Terms and Conditions, Section III. **CONDITIONS** V. **VALUATION** is amended by the addition of the following:

    4.      In the event arbitration is utilized, each party will select a competent and impartial arbitrator. The two arbitrators will select an umpire. If they cannot agree for 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction. The arbitrators will state separately the value of the property and amount of loss. If they fail to agree, they will submit their difference to the umpire. A decision agreed to by any two will be binding. Each party will:

        a.      Pay its chosen arbitrator; and

        b.      Bear the other expenses of the arbitration and umpire equally.

If the Company submits to an arbitration, the Company will still retain the right to deny the **Claim**.

4.      With respect to the **Crime Coverage Parts**:

    a.      Not later than 15 days after receipt of a written notice of claim, the Company agrees to 1) acknowledge receipt of the written notice of claim and 2) request information necessary to begin the investigation of the matter.

    b.      Except as provided in 5.c. below, not later than 15 business days after the Company receives all items, statements and forms required by the Company in order to secure final proof of loss, the Company agrees to notify the **Insured** in writing of the acceptance or rejection of the claim.

    c.      If the Company is unable to accept or reject the claim within the period specified in 5.b. above, the Company shall notify the **Insured**, not later than the date specified in 5.b. above, that the Company needs additional time, not to exceed 45 days from the date of said notification to the **Insured**.

    d.      If the Company rejects the claim, the notification provided to the **Insured** must state the reasons for the rejection.

    e.      If the Company notifies the **Insured** that it is willing to pay a claim or part of a claim, the Company shall pay the agreed amount not later than 5 business days after such notification. If the payment is conditioned on the performance of an act by the **Insured**, the Company shall pay the agreed amount not later than 5 business days after the date the act is performed.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above mentioned **Policy**, except as expressly stated herein. This endorsement is effective at the Inception Date stated in ITEM 2. of the Wrap Declarations and this endorsement is part of such **Policy** and incorporated therein.

ISSUED BY: **Travelers Casualty and Surety Company of America**          POLICY NO:  104468586

ISSUED TO: **JULIO INVESTORS, LLC**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### AMEND INSURED ORGANIZATION TO INCLUDE SCHEDULED ENTITY – VICARIOUS LIABILITY ONLY

This endorsement modifies insurance provided under the following **Coverage Parts** as indicated:

**Directors and Officers Liability Coverage Part**
**Employment Practices Liability Coverage Part**
**Fiduciary Liability Coverage Part**

In consideration of the payment of premium and solely with respect to the above indicated **Coverage Parts** only:

Section **II. DEFINITIONS**. K. "**Insured Organization**" of the **Common Terms and Conditions** is amended to include **Maplewood Equity Partners, LP** (the "Additional Insured") but only to the extent the Additional Insured incurs **Loss** resulting from **Wrongful Acts** or **Wrongful Employment Practices** committed, or alleged to have been committed, by any **Insured Organization** or **Insured Persons** other than the Additional Insured or any past, present, or future, director, officer or employee of the Additional Insured.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on **September 1, 2006**, if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:    _____
                On behalf of the entity named in
                ITEM 1 of the Declarations.

                _____
                Authorized Company Representative

W-1051 (02-00)

ISSUED BY: Travelers Casualty and Surety Company of America      POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### BEST FOOT FORWARD ENDORSEMENT
### (COMMON TERMS AND CONDITIONS)

This endorsement modifies insurance provided under the following:

**Common Terms and Conditions**

In consideration of the payment of the premium:

1.     Section **II. DEFINITIONS.** E. "Discrimination" of the Common Terms and Conditions is deleted and replaced with the following:

   E.     "Discrimination" means any actual or alleged: (1) violation of any employment discrimination law; or (2) disparate treatment of, or the failure or refusal to hire a **Claimant** because he or she is or claims to be a member of a class which is or is alleged to be legally-protected.

2.     The first paragraph in Section **II. DEFINITIONS.** F. "Employee" of the Common Terms and Conditions is deleted and replaced with the following, but only with regard to the **Liability Coverage Parts**:

   F.     "Employee" means an individual whose labor or service is engaged by and directed by the **Insured Organization** (1) who is paid through the payroll of the **Insured Organization**, including part-time, seasonal and temporary workers, (2) who is a volunteer or (3) whose services have been leased by the **Insured Organization**. Independent contractors are not **Employees**. The status of an individual as an **Employee** shall be determined as of the date of the alleged **Wrongful Employment Practice**.

3.     Section **II. DEFINITIONS.** AA. "Wrongful Employment Practice" of the Common Terms and Conditions is amended to include any violation of the Family Medical Leave Act and any failure to create or enforce adequate workplace or employment policies and procedures occurring in the course of and arising out of the **Claimant's** employment or application for employment with the **Insured Organization**.

4.     Solely with respect to the Directors and Officers Liability and the Fiduciary Liability Coverage Parts, Section **III. CONDITIONS.** D. DEFENSE, INVESTIGATION AND SETTLEMENT. 4. of the Common Terms and Conditions is deleted and replaced with the following:

   4.     The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient, and if the **Insured** shall refuse to consent to the settlement of any **Claim** as recommended by the Company based upon a judgment or a bona fide offer of settlement, then the **Insured** thereafter shall negotiate or defend such **Claim** independently of the Company and on the **Insured's** own behalf. In such event the **Insured** shall be solely responsible for thirty percent (30%) of all **Defense Expenses** and other costs and expenses incurred or paid by the **Insured** after the date the **Insured** refused to consent to settlement as recommended by the Company, and the **Insured** shall also be responsible for thirty percent (30%) of all **Damages** in excess of the amount for which settlement could have been made as recommended by the Company, provided, however that the Company's liability under this Policy for such **Claim** will not exceed the remaining portion of the applicable Limit(s) of Liability.

5.    Section **III. CONDITIONS.** H. **CHANGE OF EXPOSURE.** 1. <u>**Formation or Acquisition of Subsidiary, Premises or Pension Plan**</u> a. of the Common Terms and Conditions is deleted and replaced with the following:

1. <u>**Formation or Acquisition of Subsidiary, Premises or Pension Plan**</u>

a.    With regard to the **Liability Coverage Parts**, if, during the **Policy Period**, the **Insured Organization** forms or acquires a **Subsidiary** or **Pension Plan** (other than an employee stock ownership plan) that is then solely sponsored by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization exclusively for the benefit of the **Employees** of the **Insured Organization**, the **Policy** will provide coverage for that acquired or formed **Subsidiary** or **Pension Plan** and their respective **Insured Persons**, subject to all other terms and conditions of this **Policy**, but only for **Claims** for **Wrongful Acts** or **Wrongful Employment Practices** under the **Liability Coverage Parts** that occur wholly during the time that the **Insured Organization** is sole sponsor with regard to the **Pension Plan** or owns more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors, provided written notice of such formation or acquisition has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company's underwriters may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for the acquired or formed **Subsidiary** or **Pension Plan** shall not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Parent Corporation** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement shall not apply, however, if (1) the assets of the acquired or formed **Subsidiary** do not exceed twenty five percent (25%) of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent audited consolidated financial statements, (2) the total assets of the acquired or formed **Pension Plan**, as of the effective date of such acquisition or formation, do not exceed twenty five percent (25%)

of the total plan assets shown on the most recent application submitted by the **Insured Organization**, or (3) the acquisition or formation occurs less than ninety (90) days prior to the end of the **Policy Period.**

Notwithstanding the foregoing, no coverage shall be provided pursuant to this Subsection III.H.1. for any employee stock ownership plan or any natural person or **Insured Organization** with respect thereto unless the Company, by specific written endorsement hereto, agrees to provide such coverage. Any such coverage shall be at the terms and conditions set forth in the endorsement and for such additional premium as may be required by the Company.

6.    Section **III. CONDITIONS.** I. **EXTENDED REPORTING PERIOD.** 4. of the Common Terms and Conditions is deleted and replaced with the following:

4.    The right to elect the Extended Reporting Period under this subsection III.I. shall terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within sixty (60) days of the effective date of nonrenewal or cancellation.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Wrap Declarations or effective at 12:01 A.M. on **September 1, 2006**, if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:    _____

On behalf of the entity named in
ITEM 1 of the Declarations.


_____

Authorized Company Representative

W-1100 (01-03)

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### MAJOR PARTY EXCLUSION
### (OTHER THAN INSURED)

This endorsement modifies insurance provided under the following:

**Directors and Officers Liability Coverage Part**

In consideration of the payment of the premium, Section III.  **EXCLUSIONS.**  A.  of the Directors and Officers Liability Coverage Part is amended by adding the following:

> brought or maintained by or on behalf of, or in the name or right of, or as assignee of, or with the solicitation, assistance, participation or intervention of (a) any person or entity listed in the Schedule set forth below, (b) any subsidiary, affiliate or general or limited partner, if any, of any such entity, or (c) any director, officer, trustee, employee, security holder, receiver, conservator, liquidator or rehabilitator of such entity or of any of its subsidiaries, affiliates or general or limited partners; provided, however, that this exclusion shall not apply to any **Insured.**

> **Maplewood Equity Partners, LP and Affiliated Companies**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on **September 1, 2006** , if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:          _____

                              On behalf of the entity named in
                              ITEM 1 of the Declarations.

                              _____

                              Authorized Company Representative

WDO-2116 (04-02)

ISSUED BY: Travelers Casualty and Surety Company of America        POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### BEST FOOT FORWARD ENDORSEMENT
### (DIRECTORS AND OFFICERS LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**Directors and Officers Liability Coverage Part**

In consideration of the payment of the premium:

1.  Section **II. DEFINITIONS.** A. "Claim" of the Directors and Officers Liability Coverage Part is amended by adding the following:

    6.  a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

2.  Section **II. DEFINITIONS.** C. "Insured Person(s)" of the Directors and Officers Liability Coverage Part is deleted and replaced with the following:

    C.  "**Insured Person(s),**" either in the singular or the plural, means any one or more past, present, or future:

       (1)  duly elected or appointed director, officer, or member of the board of managers, including any natural person serving in a comparable capacity outside of the United States;

       (2)  in-house legal counsel; or

       (3)  member of the staff, faculty or any duly constituted committee;

    of the **Insured Organization.**

    **Insured Person(s),** either in the singular or the plural, also means any one or more past, present, or future **Employee** serving the **Insured Organization** in a capacity other than one enumerated above but (a) only while acting within the scope of his or her employment and (b) only if such **Employee** is included as a co-defendant in such **Claims** contemporaneously with or subsequent to the naming of an **Insured Person** serving the **Insured Organization** in a capacity enumerated above.

    Subject to the foregoing, in the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person.**

3.  Section **II. DEFINITIONS.** D. "Loss" of the Directors and Officers Liability Coverage Part is amended to substitute the words "(including any punitive or exemplary damages where insurable under the applicable law most favorable to the insurability of punitive or exemplary damages)" for the words "(including any punitive or exemplary damages where insurable under applicable law)."

4.  Section **III.** **EXCLUSIONS.** A.2. of the Directors and Officers Liability Coverage Part is amended to replace the words "including but not limited to any such **Claim** alleging damage to the **Insured Organization** or to its shareholders or creditors" with the words "provided, that this exclusion shall not apply to any **Claim** brought directly or derivatively by a shareholder of the **Insured Organization** in his or her capacity as such."

5.  Section **III.** **EXCLUSIONS.** A.10. of the Directors and Officers Liability Coverage Part is deleted and replaced with the following:

> 10.  based upon, alleging, arising out of or in any way relating to, directly or indirectly:
>
> > (a)  the public offer, sale, solicitation or distribution of securities issued by the **Insured Organization** or any **Subsidiary**; or
> >
> > (b)  the actual or alleged violation of any federal, state, local or provincial statute relating to securities, including but not limited to the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder;
>
> provided, however, that this exclusion will not apply to any offer, purchase or sale of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933 (an "Exempt Transaction").
>
> If at least thirty (30) days prior to an offering of securities of the **Insured Organization** or any **Subsidiary**, other than pursuant to an Exempt Transaction, the Company receives notice of the proposed transaction and any additional information requested by the Company, the Company shall offer to the **Insured Organization** a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal.

6.  Section **III.** **EXCLUSIONS.** B.1. of the Directors and Officers Liability Coverage Part is deleted and replaced with the following:

> 1.  for any **Claim** based upon, arising out of, or in any way relating to, directly or indirectly, any **Insured**:
>
> > a.  committing any intentional, dishonest or fraudulent act or omission;
> >
> > b.  committing any willful violation of any statute, rule or law; provided, that this subparagraph b. will not apply to any **Claim** against **Insured Persons** for a **Wrongful Employment Practice**; or
> >
> > c.  gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled.
>
> Subparagraphs a. and b. above shall not apply unless a judgment or other final adjudication establishes that such **Insured** committed such intentional, dishonest or fraudulent act or willful violation;

7.  Section **V.** **CONDITIONS.** of the Directors and Officers Liability Coverage Part is amended by adding the following:

**ORDER OF PAYMENT**

> 1.  If **Loss** from any **Claim** exceeds the remaining available limit of liability applicable to this Coverage Part ("Excess Limit Claim"), then:
>
> > a.  the Company first will pay **Loss** from such Excess Limit Claim under Section **I.** **INSURING AGREEMENTS.** A., and
> >
> > b.  to the extent that any amount of the applicable Limit of Liability shall remain available, the Company shall pay **Loss** from such Excess Limit Claim under Section **I.** **INSURING AGREEMENTS.** B.1. and B.2., as applicable; provided, that upon written request of the **Insured Organization**, the Company shall either pay or withhold payment of **Loss** from such Excess Limit Claim under Section **I.** **INSURING AGREEMENTS.** B.1. and B.2., as applicable.

2.        If the **Insured Organization** requests that the Company withhold payment of **Loss**, as provided in paragraph 1.b. above, the Company shall continue to withhold payment unless and until the **Insured Organization** shall request the Company to either release such payment to the **Insured Organization** on account of such Excess Limit Claim, or apply such payment to **Loss** from any future **Claim** under Section **I. INSURING AGREEMENTS.** A.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Wrap Declarations or effective at 12:01 A.M. on **September 1, 2006**, if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:        _____
                    On behalf of the entity named in
                    ITEM 1 of the Declarations.

                    _____
                    Authorized Company Representative

ISSUED BY: Travelers Casualty and Surety Company of America       POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### BEST FOOT FORWARD ENDORSEMENT
### (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**Employment Practices Liability Coverage Part**

In consideration of the payment of the premium:

1.    Section **II. DEFINITIONS.** A. "**Claim**" of the Employment Practices Liability Coverage Part is amended by adding the following:

> 6.    a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

2.    For purposes of this endorsement the term "**Independent Contractor**" means any natural person independent contractor who performs labor or service solely for the **Insured** on a full-time basis pursuant to a written contract or agreement, where such labor or service is under the exclusive direction of the **Insured**. The status of an individual as an **Independent Contractor** shall be determined as of the date of the alleged **Wrongful Employment Practice**.

3.    Section **II. DEFINITIONS.** B. "**Claimant**" of the Employment Practices Liability Coverage Part is amended to include any **Independent Contractor**.

4.    Section **II. DEFINITIONS.** E. "**Loss**" of the Employment Practices Liability Coverage Part is amended to substitute the words "punitive or exemplary damages if insurable under the applicable law most favorable to the insurability of punitive or exemplary damages" for the words "punitive or exemplary damages if insurable under applicable law."

5.    Section **III. EXCLUSIONS.** B.3. of the Employment Practices Liability Coverage Part is deleted and replaced with the following:

> 3.    that constitutes severance pay, damages or penalties under an employment contract, or any agreement, policy or procedure providing for payment in the event of separation from employment; or sums sought solely on the basis of a claim for unpaid services under an express or implied agreement;

6.    Section **III. EXCLUSIONS.** B.4. of the Employment Practices Liability Coverage Part is deleted and replaced with the following:

> 4.    that constitutes medical, pension, disability, life insurance, stock options or other similar employee benefits, except and to the extent that a judgment or settlement of a **Claim** includes a monetary component measured by the value of pension, medical, disability, life insurance, stock options or other similar employee benefits as consequential damages for a **Wrongful Employment Practice** which is the basis for such judgment or settlement;

WEP-1098 (01-03)

7.    Section **III. EXCLUSIONS.** A.7., B.1. and B.6. of the Employment Practices Liability Coverage Part are deleted.

8.    Section **III. EXCLUSIONS.** A. of the Employment Practices Liability Coverage Part is amended by adding the following:

for liability under any agreement governing the terms of the labor or service of an **Independent Contractor**, temporary worker or leased employee with the **Insured Organization**;

9.    Solely with respect to **Claims** for **Wrongful Employment Practices**, Section **III. CONDITIONS.** D. **DEFENSE, INVESTIGATION AND SETTLEMENT.** 4. of the Common Terms and Conditions is deleted and replaced with the following:

4.    The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that the Company recommends a bona fide offer of settlement of any **Claim** that is acceptable to the **Claimant** (a "Settlement Offer"), and:

a.    the **Insured** consents to such Settlement Offer within thirty (30) days of being made aware of such offer by the Company; and

b.    the amount of such Settlement Offer:

(1)    is less than the limit of liability set forth in the Wrap Declarations that is applicable to the Employment Practices Liability Coverage Part and available at the time; and

(2)    combined with **Defense Expenses** incurred with respect to such **Claim**, exceeds the Retention set forth in ITEM 3 of the Declarations to the Employment Practices Liability Coverage Part;

then the Retention shall be retroactively reduced by ten percent (10%) with respect to such **Claim**.

If the **Insured** does not consent to a Settlement Offer within thirty (30) days of being made aware of such offer by the Company then:

a.    the Retention shall not be reduced as provided above even if consent is given to a subsequent Settlement Offer; and

b.    the **Insured** shall be solely responsible for thirty percent (30%) of all **Defense Expenses** incurred after the **Insured** refused to consent to such Settlement Offer, and the **Insured** shall also be responsible for thirty percent (30%) of all **Loss** in excess of the amount of such Settlement Offer; provided, that in no event shall the Company's liability under this Policy for such **Claim** exceed the remaining portion of the limit of liability set forth in the Wrap Declarations that is applicable to the Employment Practices Liability Coverage Part.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Wrap Declarations or effective at 12:01 A.M. on
**September 1, 2006**, if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:    _____
On behalf of the entity named in
ITEM 1 of the Declarations.


_____
Authorized Company Representative

WEP-1098 (01-03)                                                                                          Page 2 of 2

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### THIRD PARTY LIABILITY FOR SEXUAL HARASSMENT AND DISCRIMINATION WITH SUBLIMIT AND SEPARATE RETENTION

This endorsement modifies insurance provided under the following:

**Employment Practices Liability Coverage Part**

In consideration of the payment of the premium:

1.  Section **II. DEFINITIONS.** A. "Claim" of the Employment Practices Liability Coverage Part is amended by adding the following:

    "**Claim**" also includes a written demand or notice including an actual or proposed summons, pleading or other legal document (whether or not filed with a court or agency having jurisdiction) submitted to an **Insured** or an authorized agent for service of process on the **Insured**, by or on behalf of or for the benefit of any individual other than an **Employee** stating an intent to hold an **Insured** liable for **Sexual Harassment** or **Discrimination**.

2.  Section **II. DEFINITIONS.** B. "Claimant" of the Employment Practices Liability Coverage Part is deleted and replaced with the following:

    B.    "**Claimant**" means (1) a present or former **Employee** of or applicant for employment with the **Named Insured**, (2) a governmental entity or agency, including but not limited to the Equal Employment Opportunity Commission or similar state or local agency, when acting on behalf of or for the benefit of present or former **Employee** or applicants for employment or (3) with respect to allegations of **Sexual Harassment** and **Discrimination** only, any natural person, including but not limited to, an **Employee**.

3.  Section **II. DEFINITIONS.** E. "Discrimination" of the Common Terms and Conditions is deleted and replaced with the following:

    E.    "**Discrimination**" means actual or alleged:

    1.    Failure or refusal to hire or employ an applicant for employment with the **Named Insured**,

    2.    Termination or constructive termination of an employment relationship with the **Named Insured**,

    3.    Refusal to train or promote, or demotion of, an **Employee**,

    4.    Any other act or omission by which an **Insured** allegedly treats one **Employee** differently from another in compensation, terms, conditions, opportunities or privileges of employment, including acts or practices taken for the purpose of or which have the impact of distinguishing among, limiting, segregating or classifying **Employees** or applicants for employment with the **Named Insured** in their compensation terms, conditions, opportunities or privileges of employment, or

    5.    unfair or disparate treatment of any natural person

    on any of the following grounds: race, color, national origin, religion, creed, gender, sexual orientation, pregnancy, disability, medical condition, age, marital status, Vietnam Era Veteran status, military service, or any other legally protected category, status or characteristic established pursuant to federal, state or other law, regulation or ordinance pertaining to discrimination, including but not limited to Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, or the Americans With Disabilities Act.

4.  Section **II. DEFINITIONS.** U. "Sexual Harassment" of the Common Terms and Conditions is deleted and replaced with the following:

WEP-1106 (04-05)                                                                                          Page 1 of 2

U.    **"Sexual Harassment"** means unwelcome sexual advances or requests for sexual favors and other verbal, physical or other conduct of a sexual nature (i) which is made a term or condition of a **Claimant's** employment or advancement, or (ii) submission to or rejection of which is used as a basis for decisions affecting the **Claimant,** or (iii) which has the purpose or effect of creating an intimidating, hostile or offensive work environment which unreasonably interferes with the job performance of a **Claimant,** or (iv) which violates the civil rights of any natural person other than an **Employee.**

5.    Section **II. DEFINITIONS.** AA. **"Wrongful Employment Practice"** of the Common Terms and Conditions is deleted and replaced with the following:

AA.    **"Wrongful Employment Practice"** means:

1.    any of the following occurring in the course of and arising out of an **Employee's** employment or an applicant's application for employment with the **Insured Organization:** (a) **Wrongful Termination;** (b) breach of oral, implied or written employment agreement; (c) employment-related misrepresentation; (d) wrongful failure to employ; (e) wrongful failure to promote; (f) wrongful discipline; (g) **Retaliation;** (h) wrongful denial of training; (i) wrongful deprivation of career opportunity; (j) wrongful denial or deprivation of seniority; (k) wrongful failure to grant tenure; (l) wrongful evaluation; (m) invasion of privacy; (n) employment-related defamation; (o) **Protected Status Harassment;** (p) employment-related infliction of emotional distress;

2.    any **Sexual Harassment** or

3.    any Discrimination.

6.    Solely with respect to **Claims** for **Sexual Harassment** or **Discrimination** by any natural person other than an **Employee:**

a.    Item 3 of the Employment Practices Liability Coverage Part Declarations is deleted and replaced with the following:

ITEM 3. **RETENTION** (inclusive of **Defense Expenses**):

**$250,000.00** for each **Claim.**

b.    the Company's maximum aggregate limit of liability for all Loss, including **Defense Expenses** resulting from all such **Claims** shall be **$1,000,000.00** which amount shall be part of and not in addition to any applicable Aggregate and Coverage Part Limit of Liability.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on **September 1, 2006 ,** if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:    _____
On behalf of the entity named in
ITEM 1 of the Declarations.

_____
Authorized Company Representative

# EXHIBIT B

Cause No. _____

| | | |
|---|---|---|
| Retail and Restaurant Growth Capital, LP, | § | In the District Court |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Dallas County, Texas |
| | § | |
| MapleWood Partners, L.P., MapleWood | § | |
| Holdings, LLC, MapleWood Management, | § | |
| LP, Julio and Son's Company d/b/a | § | |
| Uncle Julio's, and Robert V. Glaser, | § | |
| | § | |
| Defendants. | § | _____ Judicial District |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff Retail and Restaurant Growth Capital L.P. ("Plaintiff" or "RRGC") files its Original Petition against Defendants Maplewood Partners, L.P., MapleWood Holdings, LLC, MapleWood Management, LP (collectively, the "Maplewood Entities"), Julio & Son's Company d/b/a Uncle Julio's ("Uncle Julio's"), and Robert V. Glaser ("Glaser") (collectively, "Defendants") and respectfully shows the Honorable Court the following:

### I.

### PRELIMINARY STATEMENT

This lawsuit is about a transaction where business partners—cloaked as friends and fiduciaries—misled and deceived Plaintiff to its detriment. Plaintiff is a federally licensed small business investment company that decided to invest in the Dallas-based Uncle Julio's mexican food restaurants. Plaintiff's investment was structured as a $3 million mezzanine loan, plus an equity kicker from stock warrants. The Defendants—who invested in Uncle Julio's at the same time and began operating the company—violated the terms of the parties' agreements and various duties owed to Plaintiff under tort law by (1) using Uncle Julio's to guarantee $17 million in leases without

Plaintiff's permission or consent for the purpose of acquiring a company called Tia's via a "sale/leaseback" transaction; (2) advancing Tia's and its subsidiaries over $6.25 million from Uncle Julio's operations; and (3) entering into transactions with affiliates that were not arms length transactions on reasonable business terms in the ordinary course of business. As a result, Plaintiff is suing Defendants for breach of contract, breach of fiduciary duty, fraud, and negligent misrepresentations. Plaintiff seeks economic damages of $10 million and punitive damages of $20.75 million, together with reasonable attorneys' fees, costs, and interest.

## II.

## DISCOVERY CONTROL PLAN

1.      Discovery is to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

## III.

## PARTIES

2.      Plaintiff Retail & Restaurant Growth Capital, L.P. is a Delaware partnership with its principal place of business in Dallas County, Texas.

3.      Defendant MapleWood Partners, L.P. is a Delaware limited partnership doing business in Dallas County, Texas and may be served through its registered against for service of process, Augustin Ronald, CFO, 12000 Biscayne Blvd., Suite 509, Miami, Florida 33181.

4.      Defendant MapleWood Holdings, LLC is a Delaware limited partnership doing business in Dallas County, Texas and may be served through it registered against for service of process, Augustin Ronald, CFO, 12000 Biscayne Blvd., Suite 509, Miami, Florida 33181.

5.      Defendant MapleWood Management, LP is a Delaware limited partnership doing business in Dallas County, Texas and may be served through it registered against for service of process, Augustin Ronald, CFO, 12000 Biscayne Blvd., Suite 509, Miami, Florida 33181.

6.     Defendant Julio & Son's Company d/b/a Uncle Julio's ("Uncle Julio's") is a Delaware corporation with its principal place of business in Dallas County and may be served through its registered agent for service of process, Joey Shashy, 1125 Union Bower, Suite 160, Irving, Texas 75061.

7.     Defendant Robert V. Glaser ("Glaser") is an individual doing business in Dallas County, Texas, and the Majority Shareholder of Uncle Julio's. Glaser may be served at his principal place of business, 255 Aragon Avenue, Suite 300, Coral Gables, Florida 33134.

## IV.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to, among other things, Texas Government Code Section 24 because the amount in controversy exceeds the minimum jurisdictional limit of this Court, exclusive of interest and costs.

9.     Pursuant to Section 15.001 *et seq.* of the Texas Civil Practice and Remedies Code, venue is proper in Dallas County, Texas because a substantial part of the events or omissions giving rise to Plaintiff's causes of action occurred in Dallas County, Texas and one or more of the Defendants resides in this County.

## V.

## FACTS APPLICABLE TO ALL COUNTS

A.     **RRGC's Business and its Representatives.**

10.     RRGC is a Dallas-based small business investment company licensed by the Federal Business Administration. RRGC focuses on providing capital and strategic counseling for businesses operating in the retail and restaurant industry, with a particular emphasis on those companies exhibiting the potential for accelerated growth and expansion.

11.     The four general partners of RRGC are Ray Hemmig, Eric Lawrence, Mark Manister, and Joseph Harberg. Together they have over 60 years of private investment, management, consulting, and operating experience in the retail and restaurant industries, having worked with numerous notable companies such as ACE Cash Express Inc., Hickory Farms, JC Penney, Grandy's, On The Border, Spaghetti Warehouse, Restoration Hardware, Elizabeth Arden, Quizno's, Eddie Bauer, Canyon Café, Sunglass Hut, Waterford-Wedgwood, Dick's Last Resort, Circuit City, and The Sharper Image.

12.     RRGC viewed the Uncle Julio's restaurant chain as a solid investment and RRGC believed that, with its funding, the management team could grow the business and bring value to the company.

**B.     RRGC's Relationship with Uncle Julio's.**

13.     On December 17, 2001, RRGC entered into a Note Purchase Agreement with Uncle Julio's, pursuant to which RRGC acquired a Promissory Note from Uncle Julio's f/k/a Lucky Boy Corporation (the "Company") in the amount of $3 million and a Warrant Agreement giving RRGC the right to purchase 3.835 shares of the Company's common stock for $0.01 a share with the right to "put" those shares back to the Company for the higher of (i) $155.615 per share or (ii) the fair market value of the stock.

14.     The Note Purchase Agreement was amended four times: on November 20, 2002 (the "First Amendment"), March 11, 2003 (the "Second Amendment"), July 16, 2003 (the "Third Amendment"), and August 19, 2005 (the "Fourth Amendment").

15.     The Warrant Agreement was amended and supplemented on August 19, 2005, in connection with the Fourth Amendment (the "Amended Warrant Agreement"), giving RRGC the

right to purchase a total of 6,702.5 shares of the Company's common stock for $0.01 a share with a right to "put" those shares back to the Company as in the original Warrant Agreement.

16.     The foregoing written instruments are interrelated and constitute one binding agreement between the parties (collectively, the "Agreement").

## C.     Defendants' Improper Conduct.

17.     Maplewood and Glaser engaged in unlawful and tortious conduct by causing Uncle Julio's to enter into undisclosed guarantees for "sale/leaseback" transactions to buy a company called Tia's Restaurant, Inc. ("Tia's") using Uncle Julio's to guaranty approximately $17 million in Tia's leases without RRGC's knowledge and consent. RRGC did not view the Tia's acquisition as good business decision and made it extremely clear that it did not want to participate in the Tia's investment and did not want Uncle Julio's involved in the Tia's transaction.

18.     Maplewood and Glaser proceeded to purchase Tia's and thereafter engaged in unlawful and tortious conduct by causing Uncle Julio's to enter into transactions with affiliated entities in violation of the Agreement, pursuant to which Uncle Julio's advanced Tia's more than $6.25 million without RRGC's knowledge or consent. These were not arms length transactions in the ordinary course of business made on reasonable business terms.

19.     Tia's filed for bankruptcy, and its lenders called the leases, causing a diminution in the value of RRGC's warrants.

20.     The foregoing conduct constitutes a breach of the Agreement, a breach of fiduciary duties owed to RRGC as a warrant holder, and fraud, among other things.

21.     Furthermore, when the parties entered into the Fourth Amendment and the Amended Warrant Agreement, Defendants had a duty to disclose that they had entered into guarantees relating to the sale/leaseback transactions and that they had entered into and were planning to enter into

affiliated entity transactions. However, Defendants failed and refused to provide RRGC with audited financial statements in a timely manner and intentionally concealed and/or failed to disclose material information, which constitutes fraud and negligent misrepresentation.

22.     As a result of the foregoing conduct, RRGC is seeking economic damages in the maximum amount of $10 million, punitive damages of $20.75 million, reasonable and necessary attorneys' fees, costs, and interest.

## VI.

## CAUSES OF ACTION

### Count One - Breach of Contract

23.     Plaintiff incorporates the foregoing paragraphs and allegations.

24.     RRGC and Uncle Julio's are parties to the Agreement, which is a valid and enforceable contract.

25.     RRGC is a proper party to bring this suit, and it performed, tendered performance, or was excused from performing its contractual obligations under the Agreement.

26.     Uncle Julio's breached the Agreement by entering into an undisclosed sale/leaseback transaction whereby it guaranteed $17 million in leasing obligations and engaged in affiliated entity transactions, without RRGC's knowledge or consent.

27.     As a result of Uncle Julio's breach of contract, RRGC has suffered economic damages relating to the diminution in value of its warrants.

28.     RRGC is entitled to recover economic damages proximately caused by Uncle Julio's breach of contract, reasonable attorneys' fees, costs, and interest.

## Count Two - Breach of Fiduciary Duty

29.    Plaintiff incorporates the foregoing paragraphs and allegations.

30.    Uncle Julio's, its officers, directors, and controlling shareholders owned fiduciary duties to RRGC by virtue of its status as a warrant holder.

31.    Defendants breached those fiduciary duties by, among other things, entering into sale/leaseback transactions whereby they caused Uncle Julio's to guarantee $17 million in leasing obligations and undisclosed affiliated entity transactions, without RRGC's knowledge or consent.

32.    As a proximate result of Defendants' breach of fiduciary duties, RRGC has suffered economic damages relating to the diminution in the value of its warrants and Defendants derived benefits.

33.    RRGC is entitled to (i) recover its economic damages resulting from Defendants' breach of fiduciary duties; (ii) disgorge any benefits to the Defendants resulting from their breach of fiduciary duties; and (iii) recover punitive damages because Defendants' conduct was intentional, malicious, and with total disregard for RRGC's rights.

34.    RRGC is also entitled to recover costs and interest.

## Count Three - Fraud

35.    Plaintiff incorporates the foregoing paragraphs and allegations.

36.    Defendants had a duty to disclose the sale/leaseback transactions, whereby they caused Uncle Julio's to guarantee $17 million in leasing obligations, and the affiliated entity transactions but failed to disclose and intentionally concealed these transactions from RRGC.

37.    The information withheld by Defendants was material, and it was withheld with the intention that RRGC would act in reliance upon the non-disclosure of said material transactions, and RRGC did in fact act in reliance on said non-disclosures.

38.    As a proximate result of Defendants' fraud, RRGC has suffered economic damages relating to the diminution in the value of its warrants and Defendants derived benefits.

39.    RRGC is entitled to (i) recover its economic damages resulting from Defendants' fraud; (ii) disgorge any benefits to the Defendants resulting from their fraud; and (iii) recover punitive damages because Defendants' conduct was intentional, malicious, and with total disregard for RRGC's rights.

40.    RRGC is also entitled to recover costs and interest.

### Count Four - Negligent Misrepresentation

41.    Plaintiff incorporates the foregoing paragraphs and allegations.

42.    Defendants made representations to RRGC in the course of the their business and/or in transactions in which they had an interest.

43.    Defendants supplied false information for the guidance of RRGC and intentionally withheld material information regarding the sale/leaseback transactions and the affiliated entity transactions.

44.    Defendants did not exercise reasonable care or competence in obtaining and communicating information to RRGC.

45.    RRGC relied on Defendants' misrepresentations and suffered economic damages relating to the diminution in the value of its warrants as a proximate result.

46.    RRGC is entitled to (i) recover its economic damages resulting from Defendants' negligent misrepresentations; (ii) disgorge any benefits to the Defendants resulting from their negligent misrepresentations; and (iii) recover punitive damages because Defendants' conduct was reckless and with total disregard for RRGC's rights.

47.    RRGC is also entitled to recover costs and interest.

## Count Five - Attorneys' Fees

48.    Plaintif incorporates the foregoing paragraphs and allegations.

49.    Pursuan: to the Agreement and Chapter 38 of the Texas Civil Practice and Remedies Code, RRGC seeks to recover an award of reasonable and necessary attorneys' fees for bringing this action in an amount to be proven at trial.

### VII.

### JURY DEMAND

50.    Plaintiff hereby demands trial by jury on all claims and issues so triable.

### VIII.

### REQUEST FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff RRGC respectfully requests that Defendants be cited to appear and answer herein and that this Court enter judgment against them awarding RRGC economic damages of up to $10 million, punitive damages of up to $20.75 million, reasonable attorneys' fees, cost, and interest, as well as such other and further relief the Court find appropriate in equity cr at law.

Respectfully submitted,

**FRIEDMAN & FEIGER, L.L.P.**

By:_____
    Michael L. Gaubert
    State Bar No. 00785903
    S. Wallace Dunwoody IV
    State Bar No. 24040838

5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
(972) 788-1400 – Phone
(972) 788-2667 – Fax

**ATTORNEYS FOR THE PLAINTIFF**

F:\7329.02\Petition - RRGC.wpd

<u>**PLAINTIFF'S ORIGINAL PETITION**</u>                              **PAGE 10**

# EXHIBIT C

**TRAVELERS**  4400 North Point Parkway
Alpharetta, GA 30022

Michael Caldwell
Bond Claim Manager
Travelers Bond Claim
Phone: (770) 521-4004
Fax: (888) 256-5417

March 7, 2007

FILE

Mr. Steve Bratton
Julio Investors, LLC
1125 N. Union Bower
Irving, TX 75061

Re:  Insured:       Julio Investors, LLC
     Policy No.:    011-LB-104468586
     Matter:        Retail and Restaurant Growth Capital, LP v. Maplewood Partners,
                    LLP, et al.
     Claim No.:     011-FRB-T0701608-NR

Dear Mr. Bratton:

The purpose of this letter is to acknowledge receipt of the above referenced matter and to advise that we require additional information in order to provide an evaluation of coverage.

As you know, Travelers issued the Policy to Julio Investors, LLC for the policy period from 09/01/2006 to 09/01/2007. The Policy is written on a claims made basis and the Insuring Agreement in Section I of the Policy states that Travelers will pay "on behalf of the insured organization loss resulting from claims first made during the policy period against the insured organization for wrongful acts other than wrongful employment practices". The Company's limit of liability, inclusive of defense expenses, is $5,000,000.00[1]. Defense expenses reduce and may exhaust the Company's limit of liability. Note further that the Policy specifies a $50,000 retention, which applies to defense expenses. Therefore, Julio Investors, LLC, not the Company, is responsible for payment of the first $50,000 of loss, including defense expenses.

The Plaintiff, Retail and Restaurant Growth Capital, LP, has alleged that the Defendants, Julio and Son's Company, d/b/a Uncle Julio's (Julio's) and Maple Wood Partners, L.P., MapleWood Holdings LLC, MapleWood Management, LP and Robert V. Glaser (MapleWood Defendants) misled and deceived the Plaintiff, violated the terms of the parties' agreement and breached various duties owed to the Plaintiff including fiduciary duties and duties to disclose information pertaining to financial transactions that they had entered into or were planning to enter into. It is alleged that the Plaintiff initially entered into an agreement with Julio's on December 17, 2001 and that their agreement was modified four times with the fourth amendment dated August 19, 2005. It is further alleged that the MapleWood Defendants engaged in unlawful and tortious conduct by causing Julio's to enter into undisclosed guarantees for transactions to buy Tia's Restaurant, Inc. (Tia's) even though the Plaintiff made it clear that it did not want Julio's

---

[1] The limit of liability was increased from $3,000,000 to $5,000,000 in January 2007, subject to specific warranties provided at the time.

March 26, 2007
Page 2

involved in the transactions. The Plaintiff's Petition includes claims of breach of contract, breach of fiduciary duty, fraud and negligent misrepresentation. The Plaintiff seeks economic damages of $10,000,000 and punitive damages of $20,750,000 along with attorneys' fees, costs and interest.

As you are aware, this Policy is written on a reimbursement basis as indicated in Item 5 of the Wrap Declarations. Therefore, it shall be the duty of the insureds and not Travelers to defend this claim. Travelers acknowledges notice of this matter and is continuing its investigation subject to a full and complete reservation of its rights and defenses. No action taken to date or in the future by Travelers should be construed to be a waiver of any of its rights or defenses. Travelers specifically reserves its right under the Policy to disclaim liability for loss and defense expenses should it be determined conclusively at a later date that there is no coverage.

To assist us with our investigation into coverage for this matter, please provide the following information:

1) Copies of all contracts and amendments referenced in the petition.
2) Copies of all correspondence, memorandum, notes, demands or other communications between the Plaintiff and Julio's and any related Julio's entities and/or the MapleWood Defendants regarding the acquisition of Tia's.
3) Please provide information on Tia's bankruptcy including but not limited to copies of the bankruptcy petition and copies of the discharge.
4) Please provide all correspondence, if any, received from the plaintiff concerning this dispute prior to the start of the lawsuit.
5) Please advise when and how you first became aware of this dispute.
6) Please explain the relationship between Uncle Julio's and the MapleWood entities which are also defendants in this matter. Please also explain the relationship between the MapleWood entities to each other, if you know.
7) Please advise if there are is any contractual relationship between the MapleWood entities and Uncle Julio's. Also, please advise whether you are aware if the MapleWood entities have an insurance carrier and if that carrier has been placed on notice.

Please contact me upon your receipt of this letter to let me know if there are any other insurance carriers that have been notified of this matter. Travelers reserves its right under the Policy to assert that the coverage afforded hereunder is excess of any other applicable insurance.

Travelers also reserves its right to raise additional terms, conditions and exclusions as defenses to coverage should they later be determined to apply. Neither this letter nor any actions by Travelers or any of its agents shall constitute or be deemed to be, a waiver, estoppel, admission of liability or prejudice of any kind to its rights and defenses under the Policy, by law, or otherwise.

CR-51

March 26, 2007
Page 3

Please do not hesitate to contact me if you have any questions or comments regarding this preliminary coverage evaluation.

Sincerely,


Michael Caldwell

cc:

Mr. Jason E. Wetmore
Executive Liability Advisors
Wachovia Insurance Services, Inc.
4401 Northside Parkway, Suite 400
Atlanta, GA  30327

# EXHIBIT D



One Tower Square
Mail Drop - 2S2
Hartford, CT 06183

Kelly A. Kihlmire-Caudill
Senior Claim Counsel
Bond & Financial Products Claim
Phone: (860) 277-0058
Fax: (888) 201-5587

October 5, 2007


Beverly Godbey, Esq.
Gardere Wynne Sewell, LP
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201

Re:    Insureds:        Insured(s) of Julio Investors, LLC
       Policy No.:      011-LB-104468586
       Reference No.:   011-FRB-T0701608-NR
       Subject:         Retail and Restaurant Growth Capital, L.P. v. Maplewood Partners,
                        L.P., et al.

Dear Ms. Godbey:

This letter further acknowledges Travelers Cas. & Surety Co. of America's ("Travelers") receipt of the above-captioned matter. We are providing you a copy of this letter as you have indicated you are Julio Investor's counsel for all insurance matters. If you are not the correct person to send this information to, please forward this letter to the appropriate party.

Based on our review of the materials provided to us, and for the reasons set forth below, Travelers must disclaim coverage for this matter under the above-referenced 011-LB-104468586 (the "Policy"). Please note that certain terms in this letter are defined terms under the Policy. Kindly refer to the Policy for the specific meanings of those terms.

Travelers issued the Policy to Julio Investors, LLC for the Policy Period from 9/1/2006 to 9/1/2007. The Policy provides coverage, subject to its terms, conditions, limitations and exclusions, for Claims first made during the Policy Period against the Insureds for Wrongful Acts. Coverage under the Policy is subject to a $5,000,000.00.[1] Payment of defense costs and expenses under the Policy reduces, and may exhaust, the Policy's Limit of Liability. Further, otherwise-covered Loss, including defense costs and expenses, is subject to a $100,000.00 retention.

We are in receipt of a lawsuit filed against Julio and Son's Company d/b/a Uncle Julio's (hereinafter "Uncle Julio's") and others in the Dallas County District Court. This complaint was filed on February 15, 2007. This matter arises from a original Note Purchase Agreement between the plaintiff, Retail and Restaurant Growth Capital, L.P., (hereinafter "RRG") and Lucky Boy Corporation. It appears from the documents that Lucky Boy Corporation became Julio & Sons Company at some point after the original Note. There were several amendments to the Note and based on the documents provided the last one was in August of 2005.

---

[1] The limit of liability was increased from $3,000,000 to $5,000,000 in January 2007, subject to specific warranties provided at the time. Given that it appears that the insured may have been aware of circumstances which may have given rise to a claim prior to the warranty letter signed by the insured on January 4, 2007, Travelers reserves rights with regard to this issue.

**Travelers**
October 5, 2007
Page 2

The original agreement was the purchase of a note for $3,000,000 from the company. In August of 2005, the Fourth Amendment to the Note Purchase Agreement the parties made changes to the terms of the original Note Purchase Agreement to obtain waiver of certain events of default that exist. Included in the Fourth Amendment to Note Purchase was a release of all directors and officers in the event of a default. In reviewing the document, it appears that RRG became aware of $6,250,000 which was advanced to Tia's by Uncle Julio's. Based on the information provided, Julio Investors, LLC owns both Uncle Julio's restaurants as well as Tia's restaurants. The Fourth Amendment to Note Purchase Agreement indicates that one of the circumstances which caused the default were the advances to Tia's done without notice to RRG. RRG provided a release for amounts already advanced but indicated that should additional money be advanced to Tia's or other affiliates they would have additional rights to bring a claim.

The complaint filed by RRG alleges that Julio and Son's Company violated the terms of the Note Purchase Agreement by 1) using Uncle Julio's money to guarantee $17 million in leases without permission of the plaintiff; 2) advancing more than $6.25 million to Tia's and its subsidiaries; 3) and entering into transactions which were not at arms length transactions based on reasonable business terms. The complaint contains causes of action for 1) breach of contract 2) breach of fiduciary duty 3) Fraud 4) Negligent Misrepresentation and 5) Attorneys' fees. Plaintiffs allege as a result that they have been damaged in an amount in excess of $10 million and have demanded punitive damages in the amount of $20.75 million. Plaintiffs have also demanded reasonable attorneys' fees and costs.

First, we would like to refer you to the Insuring Agreement of the Policy which states:

## INSURING AGREEMENTS.

A.    The Company shall pay on behalf of the **Insured Persons Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts**, including **Wrongful Employment Practices**, except for **Loss** which the **Insured Organization** pays to or on behalf of the **Insured Persons** as indemnification.

B.    The Company shall pay on behalf of the **Insured Organization**:

1.    **Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts**, including **Wrongful Employment Practices**, which the **Insured Organization** pays to or on behalf of the **Insured Persons** as indemnification; and

2.    **Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Organization** for **Wrongful Acts** other than **Wrongful Employment Practices**.

In addition, the Policy defines "**Wrongful Act**" as:

1.    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any **Wrongful Employment Practice**, by an **Insured Person** in his or her capacity as a director, officer or member of the Board of Managers of the **Insured Organization**;

Travelers
October 5, 2007
Page 3

     2.       any matter asserted against an **Insured Person** solely by reason of his or her status as a director, officer or member of the Board of Managers of the **Insured Organization**;

     3.       any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any **Wrongful Employment Practice**, by an **Insured Person** in his or her **Outside Position**; or

     4.       any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Insured Organization** other than **Wrongful Employment Practices**.

Based on our review of materials provided to our underwriting department, allegations in the complaint and materials provided from your office, it appears that the only Insured named in this litigation is Julio & Sons d/b/a Uncle Julio's. Maplewood Partners, Maplewood Holdings, and Maplewood Management (hereinafter "Maplewood entities") are not Insured Organizations under this Policy. Robert Glaser is the only individual named in this matter. Based on our review of all documents in this matter, Mr. Glaser does not meet the definition of Insured Person[2] under the Policy. However, we have received information through pleadings in the Shashy et al v. Julio Maplewood Partners, et al. that Mr. Glaser may have participated in Board proceedings for the Julio entities and it is asserted he was elected to the Board but we have been unable to confirm that allegation as true. Mr. Glaser is listed by the plaintiffs has a majority shareholder of Maplewood entities. To the extent he is or was a director or officer of any Insured Organization, he is not being sued in that capacity.

As Julio & Son's is the only defendant insured by this Policy, it appears that Insuring Agreement (B)(2) applies to this matter. As such, it appears that the following Exclusion precludes coverage for this matter:

### III.    EXCLUSIONS.

A.    This **Coverage Part** shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse **Defense Expenses** for, any **Claim**:

11.    with respect to Insuring Agreement B.2 only:

e.    for or arising out of or in consequence of any actual or alleged liability of the **Insured Organization** under any express contract or agreement; for the purposes of this exclusion, an "express contract or agreement" is an actual agreement among the contracting parties, the terms of which are openly stated in distinct or explicit language, either orally or in writing, at the time of its making;

---

[2] The Policy, as amended by Endorsement defines **Insured Person(s)**, as: either in the singular or the plural, means any one or more past, present or future:

    (1)  duly elected or appointed director, officer or member of the Board of Managers including any natural person serving in comparable capacity outside of the United States;
    (2)  in-house legal counsel; or
    (3)  member of the staff, faculty or any duly constituted committee.

**Travelers**
October 5, 2007
Page 4

As it appears that all obligations to the plaintiff arise from the Insured Organization's obligations to that entity under a contract, there is no coverage for this matter.

Further, as it is alleged that some of the acts were done intentionally and/or fraudulently, the following Policy provision, as amended by endorsement, may have also precluded coverage in whole or in part:

> B. The Company shall have no duty to pay **Loss**, other than **Defense Expenses**, for any **Claim**:

> 1. for any Claim based upon, arising out of, or in any way relating to, directly or indirectly, any **Insured**:

>> a. committing any intentionally dishonest or fraudulent act or omission;

>> b. committing any willful violation of any statute, rule or law; provided, that this subparagraph b. will not apply to any Claim against Insured Persons for a Wrongful Employment Practice; or

>> c. gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

>> Subparagraphs a. and b. above shall not apply unless a judgment or other final adjudication establishes that such **Insured** committed such intentional, dishonest or fraudulent act, or willful violation.

Because we view the foregoing as dispositive of coverage for this matter, we have not raised other Policy terms, conditions, limitations or exclusions that may further limit or exclude coverage for this matter. As I am sure you can appreciate, Travelers' attention to this matter is subject to a full and complete reservation of all rights, remedies and defenses under the Policy or otherwise including but not limited to the right to raise other Policy terms and conditions as defenses to coverage in the future as appropriate. Neither this letter, nor any actions by Travelers or any of its agents shall constitute or be deemed a waiver of any right or defense available to Travelers under the Policy or applicable law.

We regret we are unable to advise you more favorably regarding this matter and invite you to submit any other information you may have which may bear on our coverage decision. Of course, please do not hesitate to contact us if you have any questions regarding Travelers' position in this matter.

Sincerely,

Kelly A. Kihlmire-Caudill

cc:    Jason Wetmore
       Wachovia Insurance Services

**Travelers**
October 5, 2007
Page 5

4401 Northside Parkway, Suite 400
Atlanta, GA 30327

# EXHIBIT E

No. 07-05846



| | | |
|---|---|---|
| ABDO JOSEPH SHASHY and GERALD GREEN, Individually and on behalf of JULIO & SONS COMPANY, d/b/a UNCLE JULIO'S, | § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| vs. | § § | OF DALLAS COUNTY, TEXAS |
| MAPLEWOOD PARTNERS, L.P., JULIO INVESTORS LLC, MAPLEWOOD HOLDINGS, L.L.C., MAPLEWOOD MANAGEMENT, L.P., JULIO & SONS COMPANY, d/b/a UNCLE JULIO'S, ROBERT V. GLASER, RICK LEVITT, BUSTER GLOSSON, BILL TILLET, GREG MORRIS, and ROBERT REALE | § § § § § § § § § § § § | |
| Defendants. | § § | C-68th ____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

NOW COME Abdo Joseph Shashy and Gerald Green, Individually and on behalf of Julio & Son's Company, d/b/a Uncle Julio's, and file this Original Petition against Defendants Maplewood Partners, L.P., Julio Investors LLC, MapleWood Holdings, L.L.C., MapleWood Management, L.P. (the "MapleWood Entitites"), Julio & Sons Company, d/b/a Uncle Julio's ("Uncle Julio's"), Robert V. Glaser, Rick Levitt, Buster Glosson, Bill Tillet, Robert Reale, and Greg Morris, and would respectfully show the court as follows:

I.

### Introduction

1.01    Plaintiffs bring this suit as a Level Three suit under T.R.C.P. 190.4, and requests the

court to issue a scheduling order in conformity therewith.

1.02    Plaintiffs are minority shareholders in Julio & Sons Company, d/b/a Uncle Julio's ("Uncle Julio's"). Plaintiffs bring suit both individually as minority shareholders and on behalf of Uncle Julio's in a derivative suit for breaches of fiduciary duty, and further as set forth below.

II.

### Parties

2.01    Plaintiff Abdo Joseph ("Joey") Shashy is an individual residing at 717 Kessler Lake Dr., Dallas, TX 75208. Shashy is and has been a shareholder of Uncle Julio's or its predecessor since at least 2001. He currently owns 11,730.16 shares of the outstanding stock of Uncle Julio's, representing approximately 9.059% of the outstanding shares.

2.02    Plaintiff Gerald ("Jerry") Green is an individual residing at 5048 Sunscape Lane, S., Fort Worth, TX 76123. He is a former employee of Uncle Julio's, and is and has been a minority shareholder of Uncle Julio's or its predecessor since at least 2003, owning 642 shares of Uncle Julio's, representing approximately .496% of the company's outstanding stock.

2.03    Defendant MapleWood Partners, L.P. is a Delaware limited partnership doing business in Dallas County, Texas, and may be served through its registered agent for service of process, Augustin Ronald, CFO, 12000 Biscayne Boulevard, Suite 509, Miami, Florida 33181.

2.04    Defendant Julio Investors LLC is a Delaware limited liability company doing business in the State of Texas. It may be served through its registered agent for service of process, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Julio Investors LLC is the majority stockholder of Uncle Julio's.

2.05    Defendant MapleWood Holdings, L.L.C. is a Delaware limited partnership doing

**Plaintiffs' Original Petition**                                          Page **2**
**79314.1**

business in Dallas County, Texas, and may be served through its registered agent for service of process, Augustin Ronald, CFO, 12000 Biscayne Boulevard, Suite 509, Miami, Florida 33181. MapleWood Holdings, L.L.C. is the general partner of MapleWood Management, L.P.

2.06    Defendant MapleWood Management, L.P. is a Delaware limited partnership doing business in Dallas County, Texas and may be served through its registered agent for service of process, Augustin Ronald, CFO, 12000 Biscayne Boulevard, Suite 509, Miami, Florida 33181. Such entity is the Managing Member of Julio Investors LLC.

2.07    Nominal defendant Julio & Sons Company d/b/a Uncle Julio's ("Uncle Julio's"), and formerly known as Lucky Boy Corporation, is a Delaware corporation with is principal place of business in Dallas County, Texas, and may be served through its registered agent for service of process, Corporation Service Corporation d/b/a Lawyers Incorporating Service, 701 Brazos Street, #1050, Austin, Texas 78701.

2.08    Defendant Robert V. Glaser ("Glaser") is an individual doing business in Dallas County, Texas, and the principal controlling person of Uncle Julio's through the MapleWood Entities. Glaser may be served at his principal place of business, 255 Arygone Avenue, Suite 300, Coral Gables, Florida 33134. Glaser may also be served at his residence at 9800 W. Broadview Dr., Bay Harbor Islands, Florida 33154. Glaser is a currently serving board member of Uncle Julio's, and attended virtually all relevant board meetings even though he was not elected a director until approximately May 2005.

2.09    Defendant Buster Glosson ("Glosson") became a board member of Uncle Julio's in approximately 2004. He was also a board member of Tia's Restaurant, Inc. ("Tia's"), thereby creating a conflict of interest. Even though not officially a board member, he attended all relevant

board meetings at the request of Glaser. Glosson may be served with service of process at his residence at 6935 Baltusrol Lane, Charlotte, North Carolina 28210.

2.10    Defendant Rick Levitt ("Levitt") was and is a board member of Uncle Julio's at all material times alleged herein. He became acting CEO of Uncle Julios from November 2006 through April 2007. Levitt did the due diligence for the acquisition of Tias. He was also a board member of Tia's Restaurant, Inc. ("Tia's"), thereby creating a conflict of interest. Levitt may be served with process at his residence at 701 E. Camino Real #8A, Boca Raton, Florida 33432.

2.10    Bill Tillet ("Tillet") was and is a board member of Uncle Julio's, as well as a board member of Tia's at all material times alleged herein. Tillet was also an original partner of MapleWood, and a board member of Tia's, both of which created a conflict of interest on his behalf, as will be explained below.    Tillett may be served with process at his residence at 10905 Snapper Creek Road, Coral Gables, Florida 33136.

2.11    Greg Morris ("Morris") was an individual employed as the Chief Financial Officer of Uncle Julio's from 2003 through 2006. Prior to his employment by Uncle Julio's, he was employed at the MapleWood Entities. Morris may be served with process at his residence at 2100 Mossy Oak, Irving, Texas 75063.

2.12    Robert Reale ("Reale") was chairman of the board of directors of Uncle Julio's from 2001 through approximately May 2005. He presided over the alleged decisions to guarantee leases for Tias, as well as payments to Tias.    Reale may be served with process at his residence at 5105 NW 93rd, Doral Way, Doral, Florida 33178.

## III.

### Jurisdiction and Venue

3.01    This court has subject matter Jurisdiction over this action pursuant to, among other things, Texas Government Code §24 because the amount in controversy exceeds the minimum jurisdictional limits of this court, exclusive of interest and costs.

3.02    Pursuant to §15.001 *et seq.* of the Texas Civil Practice & Remedies Code, venue is proper in Dallas County, Texas because a substantial part of the events or omissions giving rise to Plaintiffs' causes of action occurred in Dallas County, Texas, and because one or more of the Defendants resides in this county.

## IV.

### Request for Disclosure

4.01    Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Plaintiffs hereby request Defendants to produce the information contained in Rule 194.2 (a)-(l) on or before fifty (50) days following receipt of this Petition and citation.

## V.

### Background Facts

5.01    Julio & Sons Company, d.b.a. Uncle Julio's started in Dallas, TX with its first store in 1986, and currently operates a chain of approximately a dozen Mexican restaurants over five states.  Plaintiff Shashy is the largest individual minority shareholder in Uncle Julio's.  He is also the former Chief Executive Officer of Uncle Julio's and was a member of the board of directors through approximately February 15, 2007, when he was replaced by Defendant Glazer.

5.02    Plaintiff Jerry Green is a former employee of Uncle Julio's, and an individual owning

**Plaintiffs' Original Petition**
79314.1

642 shares of Uncle Julio's, representing approximately .496% of the company's outstanding stock. Together with Shashy, the individual Plaintiffs currently own 9.56% of the total shares of Uncle Julio's, which constitutes approximately 94.4% of the shares not owned by the majority shareholder. As such, the individual Plaintiffs will fairly represent the interests of the corporation in this derivative action.

5.03    On or about December 17, 2001, the MapleWood Entities acquired Lucky Boy Corporation, now known as Uncle Julio's. The MapleWood Entities are the majority shareholder of Uncle Julio's, owning approximately 116,429 shares, or 89.920% of the outstanding common shares of Uncle Julio's. As the majority shareholder, the MapleWood Entities had the power to appoint the board of directors for Uncle Julio's. The sole limitation on their power to appoint directors was that the Stockholders' Agreement dated December 17, 2001 Uncle Julio's had with Plaintiff Shashy required them to vote their shares in favor of Shashy as a board member so long as Shashy continued to own at least five (5%) of the common shares of Uncle Julio's. Defendant MapleWood Entities have since violated this provision of the Stockholder's Agreement, and refused to re-elect Shashy to the board this February. Furthermore, they allowed Shashy's Executive Employment Agreement to expire by its terms on December 17, 2006, so that he is no longer the CEO of Uncle Julio's or a board member.

5.04    In approximately 2003, the MapleWood Entities decided to acquire an interest in a competing Mexican restaurant, Tia's Restaurant, Inc. ("Tia's") through an investment in its holding company, Julio Investors, Inc. The MapleWood Entities originally proposed the idea of Uncle Julios acquiring Tias to Plaintiff Shashy, who rejected the plan. The MapleWood Entities proceeded over Shashy's objections, and performed their own due diligence. They then used their position as

majority shareholder to try to force Uncle Julios to make the acquisition and merge the two companies. As part of the merger plan, they planned to have Uncle Julio's guarantee $17,000,000 in Tias lease obligations. However, mezzanine lender and warrant holder Retail Restaurant Growth Capital, LP ("RRGC") opposed this plan, so that the MapleWood Entities were forced to adjust their plans. They formed Tia's Holding, Inc., a wholly owned subsidiary of Julio Investors, Inc., for the purpose of making this acquisition, and the Tia's investment was made as a separate investment. However, despite the supposedly separate nature of the acquisition, the MapleWood Entities still wanted to use Uncle Julio's to guarantee the lease obligations. Shashy objected to the lease guarantees under the new deal, and thought the matter was dead. He did not discover otherwise until approximately early 2005, because the MapleWood Entities used Greg Morris to sign the documents. Plaintiff Green did not discover, and could not reasonably have discovered the lease guarantees until mid-2005 when he heard the guarantees mentioned in a board meeting, because the board made no disclosure of such matter to its shareholders.

     5.05    Unfortunately, the investment in Tia's was a disaster. Tia's was effectively bankrupt at the time of the acquisition in 2003. However, the MapleWood Entities attempted to salvage their disastrous investment in Tia's by diverting resources from Uncle Julio's.

     5.06    In particular, the MapleWood Entities diverted key talent in Uncle Julio's to try and salvage the Tia's investment. The MapleWood Entities pressured Plaintiff Shashy, as CEO of Uncle Julio's, to also serve on the Tia's board of directors and provide management services to Tia's. Shashy was informed that should he refuse to engage in such operations, then the MapleWood Entities would get a new CEO of both Tias and Uncle Julios, to whom he would have to report.

     5.07    The MapleWood Entities further required Plaintiff Green to become the President of

Tia's. Again, Green protested employment by a competitor, but was informed that he had no choice.

5.08    Former MapleWood Entities employee Defendant Greg Morris became the Chief Financial Officer of Uncle Julio's in December 2003 at approximately the same time as the Tias acquisition. Defendant Morris wilfully or negligently delayed reporting regular financial information regarding the operation of Uncle Julio's, making reasonable financial oversight impossible. Morris also instructed accounting, purchasing and IT employees not to talk to Shashy "because he was too busy."

5.09    Using the unique access of Defendant Morris to the books and records of Uncle Julio's, the MapleWood Entities caused Uncle Julio's to divert financial resources directly to Tia's. Starting in approximately Summer 2004 through 2006, Defendants diverted over $9,000,000 in cash and services from Uncle Julio's to Tia's. This investment was initially done without the effective consent of the board of directors of Uncle Julio's, because Morris concealed the transfer of payments from the board of directors by failing to provide the board with accurate accounting information until approximately November 2004, and could not have been discovered sooner with reasonable diligence.

5.10    Plaintiff Shashy also served on the board of Tias. In September 2004, Morris disclosed to the Tias board that he and Glaser had been providing them false accounting information under the guise of "purchase adjustment accounting," to make the financials look better than they really were. Upon this revelation, Shashy reinstated Lisa Banks as controller of Uncle Julios over the objections of Greg Morris. Banks then started to clean up the books, and discovered that large sums of money were being diverted from Uncle Julio's to Tias. The total amount diverted for 2004 was later determined to be approximately $1.8 Million.

5.11    In early 2005, Shashy and Green learned the MapleWood Entities caused Uncle Julio's to guarantee $17,000,000 in lease obligations for restaurant operations run by Tia's, it's competitor. The lease guarantees were signed by Greg Morris, using forged board consent minutes as justification. Morris apparently took signature pages from a consent to a guarantee signed by the Tias board and substituted the name Lucky Boy Corporation on the forged document. The forgery is apparent, because Buster Glosson is listed on the alleged signature page of the forged Written Consent, even though he did not become a director of Lucky Boy Corporation, n.k.a Uncle Julio's until March 2004 at the soonest. When Tia's went bankrupt in 2006, the landlords of Tia's various operations demanded payment from Uncle Julio's. To date, Uncle Julio's has paid $200,000 per month starting in approximately September 2006 to satisfy these claims, and expects additional charges for various other damages, including vandalism. Uncle Julio's received no appreciable business value for such lease guarantees to its competitor.

5.12    When Plaintiff Shashy discovered the diversion of money to Tia's, he immediately notified board member Rick Levitt, who advised him to contact Bob Glaser. Shashy complained to Bob Glaser that such actions were improper. However, Glaser informed him: "if you don't learn to work with Greg Morris, the Board will look unfavorably on you." Shashy understood this to be a threat that he would be terminated from his position as Chief Executive Officer of Uncle Julio's if he took any further action.

5.13    Upon further investigation, Shashy discovered that in addition to diverting large amounts of cash to Tia's, Morris had engaged in various subterfuges in order to delay payments to Uncle Julio's creditors. For example, Morris lied to vendors by claiming checks had been mailed, and even went so far as to destroy batches of checks in order to support these contentions, and claim

that checks had been lost in the mail. Plaintiff again complained to Glaser, who told him to keep his mouth shut.

5.14    Uncle Julio's received no appreciable business benefit from the disputed transactions. Tia's was essentially insolvent when the MapleWood Entities acquired it, and when they diverted money from Uncle Julio's to Tia's, a competitor of Uncle Julio's. Such action therefore resulted in a waste of corporate assets of Uncle Julio's. In fact, even after the discovered diversion of funds was brought to the attention of the board, more money was diverted to Tias despite the board's recognition that any further advances were unlikely to ever be repaid. (PX-35 - July 13, 2005 Minutes). Furthermore, such action amounts to minority oppression, inasmuch as it has depreciated the share value for Uncle Julio's minority shareholders, and injured the value of the company. The benefit of such efforts, had they been successful in rescuing Tia's, would have gone directly to Julio Investors, Inc., the majority shareholder and sole owner of Tia's.

## VI.

## Count One

## **Breach of Fiduciary Duty to Uncle Julio's**

### (Against All Defendants)

6.01    Plaintiffs incorporate the foregoing allegations as if set forth herein verbatim.

6.02    As the two largest minority shareholders, Plaintiffs are adequate representatives to bring this derivative action on behalf of Uncle Julio's for waste of corporate assets.

6.03    The individual defendants had a fiduciary duty to Uncle Julio's of loyalty, good faith and due care. *McMullin v. Beran,* 765 A.2d 910, 917 (Del. 1999). Under Delaware law, a parent company's directors on a subsidiary's board owe both the subsidiary and its shareholders an

uncompromising duty of loyalty, and there is no dilution of fiduciary duty to the corporation where a director holds dual or multiple directorships. *Winberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). Since there was no attempt to structure the disputed transactions on an arm's length basis, and since the individual directors Levitt, Glossen, and Tillet were also Tia's directors and beholden to the majority shareholder, Defendants were not entitled to any business judgment presumption, and have the burden of establishing the "entire fairness of the transaction, sufficient to pass the test of careful scrutiny of the courts." *Weinberger, supra.* Defendants Reale, Levitt, Tillet, and Glossen owed a fiduciary duty to Uncle Julio's as board member, and both Glazer and the MapleWood Entities owed the company a fiduciary duty as the controlling majority shareholder.

6.04    Defendants have diverted over $9,000,000 in cash from Uncle Julio's to Tia's, a competitor, without any realistic offsetting benefit to Uncle Julio's. Furthermore, Defendants caused Uncle Julio's to guarantee approximately $17,000,000 in lease operations for Tia's locations without any corresponding benefit to Uncle Julio's. Furthermore, the diversion of cash and lease guarantees to Tia's has injured Uncle Julio's ability to grow and thrive, thereby resulting in lost profits due to its limitations upon Uncle Julio's and its ability to expand and open new restaurant locations. The Defendants violated their duties of loyalty to the minority shareholders of Uncle Julio's by diverting company assets to an investment owned by the MapleWood Entities, but not owned by minority shareholders of Uncle Julio's.

6.05    Furthermore, Defendants have violated their duty of care to Uncle Julio's by making unsound business investments with Uncle Julio's funds. In particular, the initial transfer in assets was done without board approval, and in violation of the business judgment of at least two of Uncle Julio's directors. In particular, Shashy opposed any investment in Tia's from its inception.

Furthermore, Defendant Bill Tillet initially remarked that he looked at the Tia's deal, and put the prospectus down after only five minutes, concluding it was a bad deal. The provision of management services to Tia's was later done under the subterfuge of an alleged management agreement whereby Tia's was supposed to pay for the management services it received from Uncle Julio's, but such monies were severely delinquent, and not expected to be repaid.

6.06    Furthermore, Defendant Glaser and the MapleWood Entities interfered with the normal operation of Uncle Julio's board of directors by overtly threatening Plaintiff Shashy, thereby impairing the business judgment of Shashy and, it is believed, the other directors. Moreover, by requiring the directors to also be directors of Tia's, in some cases against their desires, the MapleWood Entities and Glaser created an inherent conflict of interest between the directors of Uncle Julio's and Tia's.

6.07    By virtue of the MapleWood Entities' controlling position in Uncle Julio's, and the inherent conflict of interest for the current board members, demand would be futile, so that Plaintiffs should be entitled to pursue this derivative action on behalf of Uncle Julio's.

6.08    By virtue of the foregoing, Plaintiffs on behalf of Uncle Julio's seek damages in the amount of $26,000,000, plus reasonable and necessary attorney's fees. Furthermore, because the violations were wilful and/or amounted to gross negligence, Plaintiffs seek exemplary damages in an amount to be determined by the trier of fact.

VII.

Second Count

**Breach of Fiduciary Duty to Minority Shareholders**

(Against all Defendants)

7.01    Plaintiffs incorporate the foregoing provisions as if set forth herein verbatim.

7.02    Under Delaware law, the Defendants as a majority shareholder and its controlled directors owed Plaintiffs Shashy and Green a fiduciary duty as minority shareholders. Defendants violated this duty as set forth in the previous count, for which Plaintiffs seek damages and reasonable and necessary attorney's fees, as well as exemplary damages.

VIII.

Third Count

**Conversion**

(Against the MapleWood Entities, Glaser and Morris)

8.01    Plaintiffs incorporate the foregoing provisions as if set forth herein verbatim.

8.02    Through their improper influence over the board of directors and over the employees of Uncle Julio's, the MapleWood Entities and Glaser effectively appropriated and diverted property belonging to Uncle Julio's in order to fund its other investments. This essentially amounted to theft or conversion of property, for which Plaintiffs seek redress.

8.03    As a result of such actions, Uncle Julio's has been damaged in an amount of $26,000,000.

8.04    Such actions were made with such wilful and wanton disregard for the rights of Uncle Julio's that exemplary damages are appropriate and sought.

IX.

Fourth Count

**Statutory Theft**

(Against the MapleWood Entities, Glaser and Morris)

9.01    Plaintiffs incorporate the foregoing provisions as if set forth herein verbatim.

9.02    Defendants Maple Wood Entities, Glaser and Morris respectively diverted and appropriated for their own use money and property belonging to Uncle Julio's in a sum of approximately $26,000,000. On behalf of Uncle Julio's, Plaintiffs seek return of such monies to Uncle Julio's as authorized by §134.001 *et seq.* of the Texas Civil Practice and Remedies Code.

9.03    In addition to the aforementioned relief, Plaintiffs seeks attorneys fees and statutory damages of $1,000.

## X.

### Fifth Count

### **Breach of the Duty of Due Care**

### (Against Defendants Glosson, Levitt and Tillet)

10.01    Plaintiffs incorporate the foregoing paragraphs as if set forth herein verbatim.

10.02    As the directors of Uncle Julio's, Defendants Glosson, Levitt and Tillet owed Uncle Julio's a duty of loyalty, good faith, and due care.

10.03    Defendants breached their duties of loyalty, good faith, and due care by failure to take prompt remedial action to stop the MapleWood Entities from pilfering the resources of Uncle Julio's. Defendants were consciously aware that the diversion of resources from Uncle Julio's to Tias was a poor business decision, and unlikely to result in any meaningful return to Uncle Julio's shareholders, yet failed to take remedial action.

10.04    Uncle Julio's has been damaged by Defendant directors' failure to take prompt remedial action, in that it has lost its entire $9,000,000 diverted to Tia's, and has had or will have to pay approximately $17,000,000 in lease guarantee obligations for lease locations for Tia's, its

competitor.

10.05   Defendants actions, at the direction of the Maple Wood Entities and Glaser, constitute such wanton disregard for the rights of Uncle Julio's as to amount to gross negligence, entitling Plaintiff Uncle Julio's to recover exemplary damages.

XI.

Sixth Count

**Appointment of Receiver**

11.01   Plaintiffs incorporate the foregoing paragraphs as if set forth herein verbatim.

11.02   Defendants' actions, both as directors, and as majority shareholders, are so egregious and contrary to the proper business entity interests of Uncle Julio's that the court should award the equitable relief of appointing a receiver to manage the affairs of Uncle Julio's and to protect the rights of Uncle Julio's minority shareholders and the company itself.

XII.

Seventh Count

**Conspiracy**

(Against all Defendants)

12.01   Plaintiffs incorporate the foregoing paragraphs as if set forth herein verbatim.

12.02   Defendants unlawfully conspired to divert money and resources unlawfully from Uncle Julio's to Tias, at the expense of Uncle Julio's minority shareholders, as set forth above.

12.03   As a result, Plaintiffs are entitled to recover from all such Defendants the damages to Uncle Julio's.

XIII.

**Plaintiffs' Original Petition**
**79314.1**

Page  15

### Jury Demand

13.01    Plaintiff hereby demands trial by jury on all claims and issues so triable herein.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request Defendants be cited to appear and answer herein, and that this court enter judgment against them awarding Plaintiffs, both individually and derivatively, the following relief:

1.    Economic damages to Uncle Julio's awarded to the company in the amount of $26,000,000 for monies illegally diverted to Tia's;

2.    Economic damages to Plaintiffs Shashy and Green for injury to the value of their shares as minority shareholders;

3.    Punitive damages in an amount to be determined by the trier of fact;

4.    Statutory damages for theft;

5.    Punitive damages as may be allowed by law;

6.    Reasonable and necessary attorney's fees;

7.    Prejudgment and postjudgment interest;

8.    Costs of court;

9.    Appointment of a receiver to manage the affairs of Uncle Julio's; and

10.    Such other and further relief to which the court may find the Plaintiffs to be entitled.

Respectfully submitted,

**KILGORE & KILGORE, PLLC**

By: _____

W. D. MASTERSON
State Bar No. 13184000
THEODORE C. ANDERSON
State Bar No. 012157000
JOHN H. CROUCH, IV
State Bar No. 00783906

3109 Carlisle, Suite 200
Dallas, Texas 75204
(214) 969-9099 - Telephone
(214) 953-0133 - Fax

ATTORNEYS FOR PLAINTIFFS

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

Page 1

**H**
Finger Furniture Co., Inc. v. Travelers Indem. Co.
of Connecticut
S.D.Tex.,2002.
Only the Westlaw citation is currently available.
United States District Court,S.D. Texas, Houston
Division.
FINGER FURNITURE COMPANY, INC., Plaintiff,
v.
TRAVELERS INDEMNITY COMPANY OF
CONNECTICUT, Defendant.
**No. Civ.A. H-01-2797.**

Aug. 19, 2002.

MEMORANDUM AND RECOMMENDATION
ON CROSS MOTIONS FOR SUMMARY JUDG-
MENT

MILLOY, Magistrate J.
*1 This matter was referred by United States Dis-
trict Judge Vanessa D. Gilmore for full pretrial
management, pursuant to 28 U.S.C. § 636(b)(1)(A)
and (B). (Docket Entry # 29). Plaintiff Finger Fur-
niture Company, Inc. ("Plaintiff," "Finger") has
filed a motion for partial summary judgment, under
Rule 56(a) of the Federal Rules of Civil Procedure.
(Plaintiff's Motion for Partial Summary Judgment
re Defendant's Duty to Defend and Supporting
Memorandum of Law ["Plaintiff's Motion"], Dock-
et Entry # 13). Finger asks the court to enter an or-
der on its insurer's duty to defend it in a prior law-
suit. That insurer, Travelers Indemnity Company of
Connecticut ("Defendant," "Travelers") has respon-
ded to this motion, and it has filed a cross-motion
for summary judgment of its own. (Memorandum
of Law of Travelers Indemnity Company of Con-
necticut in Opposition to Plaintiff's Motion for Par-
tial Summary Judgment and in Support of Cross-
Motion for Summary Judgment ["Defendant's Mo-
tion"], Docket Entry # 23). After a review of the
motions, the evidence provided, and the applicable

law, it is RECOMMENDED that Plaintiff's motion
be GRANTED and that Defendant's motion be
DENIED.

Background

This suit is based on Travelers' refusal to defend
Finger in a trademark infringement action filed
against it in 1997. (Complaint for Declaratory Re-
lief, Breach of Contract and Other Relief
["Plaintiff's Complaint"] ¶¶ 12, 21, Docket Entry #
1). Finger operates retail furniture and rental stores
in Texas, the state in which it is incorporated. (Id.
¶¶ 1, 10). Travelers is incorporated under the laws
of Connecticut, but it conducts insurance business
in Texas as well. (Id. ¶¶ 2, 3). On August 1, 1994,
Travelers issued Finger a one-year commercial gen-
eral liability insurance policy (the "Policy").(Id. ¶
14). In the Policy, Travelers agreed, among other
things, to provide a legal defense if Finger was sued
for "damages because of 'personal injury' or ad-
vertising injury.'" (Id. ¶ 16) (quoting Plaintiff's
Complaint Ex. 2: Policy No. EE-
SLS-521k971-A-94, 8/1/94-8-1/95, Commercial
General Liability Coverage Form § I.B.1.a
["Plaintiff's Ex. 2"] ). The Policy was renewed sev-
eral times, and Finger's coverage was ultimately ex-
tended through August 1, 1998. (Plaintiff's Com-
plaint ¶¶ 15-20). It is undisputed that the terms of
the Policy did not change, in any material way, dur-
ing this time. (See id.).

On November 4, 1997, TruServ Corporation
("TruServ") sued Finger in the United States Dis-
trict Court for the Southern District of Texas, Hous-
ton Division.(Id. ¶ 21). In its original complaint
(the "TruServ Complaint"), TruServ alleged that
Finger used its trade and service mark, "TRUE
VALUE," without authorization, "in connection
with its marketing, retail sale and rental of fur-
niture."(Complaint, TruServ Corp. v. Finger Fur-
niture Co., Case No. H-97-03641 ["TruServ Com-
plaint"], attached as Ex. 1 to Plaintiff's Complaint).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

TruServ claimed that these acts constituted trademark infringement, dilution, and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq.*, in addition to violating the laws of the state of Texas. (*Id.* ¶ 1).

*2 There is no question that, ten days after the TruServ suit was initiated, Finger's attorney contacted Travelers and requested the insurance company to defend the action. (Plaintiff's Complaint ¶ 23) (citing Plaintiff's Ex. 8: Letter from Richard L. Schwartz to Wisenberg Insurance + Risk Management, Nov. 14, 1997). Travelers acknowledged receipt of the request within one week, but it took no position in regard to its obligation to defend the furniture company at that time. (*Id.* ¶ 24) (citing Plaintiff's Ex. 9: Letter from David Moffatt to Richard L. Schwartz, Nov. 21, 1997). Two months later, on January 27, 1998, "Travelers denied any defense obligation to Finger," asserting that none of the allegations made by TruServ qualified as a "personal injury" or "advertising injury," under the Policy. (*Id.* ¶ 25) (citing Plaintiff's Ex. 10: Letter from Michael A. Brown to Richard L. Schwartz, Jan. 27, 1998). Travelers claimed further that coverage was barred under two exclusions to the policy, one, the "knowledge of falsity" provision and the other, the "violation of penal statute" provision. (*Id.*). Although Finger asked Travelers to reconsider its decision, the insurance company repeated its refusal to defend or indemnify Finger with respect to the TruServ litigation. (*Id.* ¶¶ 27, 28) (citing Plaintiff's Ex. 11: Letter from Richard L. Schwartz to Michael A. Brown, Feb. 5, 1998; Ex. 12: Letter from Michael A. Brown to Richard L. Schwartz, Feb. 6, 1998; Ex. 13: Letter from William T. Corbett, Jr. to Richard L. Schwartz, May 14, 1998). On August 31, 1998, Finger filed a counterclaim against TruServ alleging that it had suffered damages as well, from trademark infringement and unfair competition. (*Id.* ¶ 22). Apparently, Finger did not contact Travelers regarding the litigation for another two years. (*See* Plaintiff's Ex. 14: Letter from Tessa A. Millikan to Vince Marci, Sept. 7, 2000).

The TruServ litigation was scheduled for trial on June 19, 2000. (Civil Docket Sheet for *TruServ Corp. v. Finger Furniture Co.*, Case No. H-97-03641, Docket Entry # 68). Two weeks before the trial, however, the parties filed a joint motion for a continuance and requested an order for mediation. (*Id.* Docket Entry # 69). This motion was granted on June 8, 2000, and docket call was re-set for September 8, 2000. (*Id.* # 70).

On September 5, 2000, TruServ filed an unopposed motion for leave to file a first amended complaint against Finger. (*Id.*, Docket Entry # 5). TruServ's motion was granted. (*TruServ* Docket Entry ¶ 74). In its amended pleading (the "TruServ Amended Complaint"), TruServ did not allege any new causes of action, but merely clarified that its claims stemmed from Finger's "use of 'True Value' as a mark in its advertising."FN1(Plaintiff's Complaint ¶ 31). Two days later, in an attempt to persuade Travelers that the TruServ litigation involved an "advertising injury" that was covered under the Policy, Finger provided the insurance company with copies of its print and television advertisements, in which "the allegedly infringing 'true value' mark" was used, but apparently did not forward a copy of the proposed amended complaint. (*Id.* ¶ 29) (citing Plaintiff's Ex. 14). On September 8, 2000, Finger and TruServ appeared before the district court and announced that they had reached a settlement. (*TruServ* Docket Entry # 73). Three months later, on December 29, 2000, Finger and TruServ finalized their settlement agreement. (Plaintiff's Complaint ¶ 33). Plaintiff notes that "[t]his agreement did not call upon Finger Furniture to pay any monies to TruServ ... and thus no issue of indemnity regarding settlement payments is pertinent" to its claims against Travelers. (*Id.*). All claims and cross-claims in the TruServ litigation were dismissed, with prejudice, on January 11, 2001, and the case was closed. (*TruServ* Docket Entry # 78).

> FN1. It seems that Travelers did not receive a copy of the TruServ Amended

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

Complaint until January 24, 2001. (*See* Plaintiff's Ex. 16: Letter from Vincent T. Marci to Robert S. Finger, Jan. 17, 2001; Ex. 17: Letter from Tessa A. Millikan to Vince Marci, Jan. 24, 2001).

*3 On January 31, 2001, Travelers agreed, under a reservation of rights, to "pay all reasonable and necessary fees and costs incurred [by Fingers] from the filing of the amended pleading until the matter is completed."(Plaintiff's Ex. 18: Letter from Vincent T. Marci to Robert S. Finger, Jan. 31, 2001; *and see* Plaintiff's Complaint ¶ 36). Finger complains, however, that "Travelers has failed and/or refused, and continues to fail and/or refuse, to defend or to pay Finger Furniture's counsel in connection with the defense of the [TruServ] action from the outset."(Plaintiff's Complaint ¶ 39). Finger alleges that, by failing to "pay all reasonable defense fees and costs incurred by [it] with respect to the defense of the *TruServe* Action, [Travelers] has breached its duty to defend Finger Furniture's interests," and has also "breached its contract with Finger Furniture."(*Id.* ¶¶ 86, 88). Plaintiff claims that these breaches caused it harm, in that it "was obligated to retain attorneys and incur expenses in investigating, defending and settling the *TruServ* Action."(*Id.* ¶ 89). Finger asks the court to declare that Travelers breached its duty to defend it in the underlying action. (*Id.* ¶ 82). In addition, Finger wants reimbursement for the attorneys' fees and costs that it incurred in its own defense of that action, as well as "statutory interest and penalties for breach of the contract in violation of the Texas Insurance Code," and the fees and costs incurred in bringing suit before this court, under the Texas Deceptive Trade Practices Act and the Texas Insurance Code Art. 21.55, § 3. (*Id.* pp. 32-33).

In its pending motion, Plaintiff asks the court for summary judgment on the issue of Travelers' duty to defend it in the TruServ action. (Plaintiff's Motion at 1). If this motion is granted, the matter of damages will remain. Finger argues that "the allegations of the *TruServ* Complaint set forth a duty of

defense under Travelers' 'advertising injury' coverage."(*Id.* at 4). In the alternative, Plaintiff insists that the duty to defend was clearly triggered by the TruServ Amended Complaint, and that the claims recited in that pleading "relate[ ] back to the complaint." (*Id.* at 4). Finger also disputes the notion that any Policy exclusions defeat its right to a defense from Travelers. (*Id.* at 13). For its part, Defendant "seeks a declaration that it owes no duty to defend Finger ... in connection with the [TruServ action]." (Defendant's Motion at 1). Travelers argues that "none of the underlying claims asserted" by TruServ qualify as an "advertising injury," under the Policy.(*Id.* at 7). In the alternative, if the court determines that the TruServ Complaint did allege "advertising injury," then Defendant argues that coverage is, nonetheless, barred by Policy exclusions that were agreed upon by the parties. (*Id.* at 1). For the reasons set out below, it is RECOMMENDED that Plaintiff's motion for partial summary judgment, on Defendant's duty to defend, be GRANTED and that Defendant's motion be DENIED.

Standard of Review

*A. Declaratory Judgment*

*4 The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."28 U.S.C. § 2201(a) (1994). However, "[a] court need not provide declaratory judgment relief on request."*ODECO Oil & Gas Co., Drilling Div. v. Bonnette,* 4 F.3d 401, 404 (5th Cir.1993). The United States Supreme Court has repeatedly characterized the Declaratory Judgment Act as an "enabling" one, "which confers a discretion on the courts rather than an absolute right upon the litigant."*Wilton v. Seven Falls Co.,* 515 U.S. 277, 278 (1995) (quoting *Pub. Serv. Comm'n of Utah v. Wycoff Co.,* 344 U.S. 237, 241 (1952)). The Court

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

has also explained that "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power."*Id.* (quoting *Wycoff,* 344 U.S. at 241).

Disputes relating to insurance coverage are often resolved in an action for a declaratory judgment. *Harris v. United State Fidelity & Guaranty Co.,* 569 F.2d 850, 852 (5th Cir.1978). It is well established, however, that § 2201 is merely procedural, and so it extends only to those controversies which are within the jurisdiction of the federal courts. *Gaar v. Quirk,* 86 F.3d 451, 453-54 (5th Cir.1996); *Lowe v. Ingalls Shipbuilding,* 723 F.2d 1173, 1176-77 (5th Cir.1984). Federal courts, therefore, may not entertain declaratory judgment actions unless there is an independent basis for subject matter jurisdiction. *Lowe,* 723 F.2d at 1177. As the present action is based on diversity of citizenship, it does satisfy that independent jurisdiction requirement, and Plaintiff's motion for a declaratory judgment is properly considered here.

*B. Summary Judgment*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue for trial."*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Norman v. Apache Corp.,* 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the non-movant's case.*Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the non-movant's response. *Id.* When

the moving party has met its Rule 56 burden, the non-movant cannot survive a motion for summary judgment by resting merely on the allegations in it pleadings.*McCallum Highlands, Ltd. v. Washington Capital Dus, Inc .,* 66 F.3d 89, 92 (5th Cir.1995). If the movant does meet his burden, the non-movant must go beyond the pleadings and designate specific facts to show that there is a genuine issue for trial. *Little,* 37 F.3d at 1075. Further, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts."*Webb v. Cardiothoracic Surgery Assocs.,* 139 F.3d 532, 536 (5th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)).

**\*5** To meet its burden, the nonmoving party must present "significant probative" evidence indicating that there are issues of fact remaining for trial. *Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir.1994). If the evidence presented to rebut the summary judgment motion is only colorable or not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 249-250. (1986). But, in deciding a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."*Id.* at 248.However, "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of poof at trial."*Little,* 37 F.3d at 1075.

Discussion

The parties agree that "Texas law governs [the] insurance coverage dispute" in this diversity action.FN2(Defendant's Motion at 5 n. 2; *see also* Plaintiff's Motion at 1 n. 1). It is well settled, under Texas law, that an insurer owes a duty to defend its insured against allegations that are covered by the policy. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

*v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139, 141 (Tex.1997). Texas law is also well-settled that the duty to defend is a broader one than the duty to indemnify.*St. Paul Fire & Marine Ins. Co. v. Green Tree Financial Corp.-Tex.,* 249 F.3d 389, 391 (5th Cir.2001); *Gulf Chem. & Metallurgical Corp. v. Assoc. Metals & Minerals Corp.,* 1 F .3d 365, 369 (5th Cir.1993); *St. Paul Ins. Co. v. Texas Dept. of Transp.,* 999 S.W.2d 881, 884 (Tex.App.-Austin 1999, no pet.); *Colony Ins. Co. v. H.R.K., Inc.,* 728 S.W.2d 848 (Tex.App.-Dallas 1987, no writ). In addition, "an insurer is obligated to defend an insured as long as the complaint alleges at least one cause of action within the policy's coverage."*Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 99 F.3d 695, 701 (5th Cir.1996); *and see Rhodes v. Chicago Ins. Co.,* 719 F.2d 116, 119 (5th Cir.1983) (citing *Superior Ins. Co. v. Jenkins,* 358 S.W.2d 243, 244 (Tex.Civ.App.-Eastland 1962, writ ref'd n.r.e.); *Maryland Cas. Co. v. Moritz,* 138 S.W.2d 1095, 1097-98 (Tex.Civ.App.-Austin 1940, writ ref'd)); *American Eagle Ins. Co. v. Nettleton,* 932 S.W.2d 169, 173 (Tex.App.-El Paso 1996, writ denied). Indeed, the obligation to defend arises if there is even "potentially, a case under the complaint within the coverage of the policy."*Rhodes,* 719 F.2d at 119;*Merchants,* 939 S.W.2d at 141;*Heyden Newport Chem. Corp. v. Southern Gen'l Ins. Co.,* 387 S.W.2d 22, 26 (Tex.1965) (quoting 50 A.L.R.2d 458, 504). It is, however, the insured's burden to show "that the claim against it is potentially within the policy's coverage."*Canutillo,* 99 F.3d at 701;*and see Employers Cas. Co. v. Block,* 744 S.W.2d 940, 944 (Tex.1988), *overruled on other grounds by State Farm Fire and Cas. v. Gandy,* 925 S.W.2d 696 (Tex.1996). On the other hand, "the insurer bears the burden of establishing that an exclusion in the policy constitutes an avoidance of or affirmative defense to coverage."*Canutillo,* 99 F.3d at 701 (citing TEX. INS.CODE art. 21.58(b)).

> FN2. Although it is undisputed that this litigation is framed by Texas law, both Finger and Travelers have briefed extensively,

and submitted repeatedly for the court's review, the law of other jurisdictions. To the extent that the parties have raised arguments that are without support in the law of this state, those arguments have been ignored.

**\*6** To determine if a duty to defend exists, a district court must limit its review to the "four corners" of the insurance policy and the "four corners" of the allegations in the underlying complaint. *Merchants,* 939 S.W.2d at 140;*Providence Wash. Ins. Co. v. A & A Coating, Inc.,* 30 S.W.3d 554, 555 (Tex.App.-Texarkana 2000, pet. denied); *Tri-Coastal Contractors, Inc. v. Hartford Underwriters Ins. Co.,* 981 S.W.2d 861 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). This requirement, well known as the "eight corners" or "complaint allegation" rule, governs this dispute. *See Merchants,* 939 S.W.2d at 141;*Green Tree Financial,* 249 F.3d at 391;*Canutillo,* 99 F.3d at 701. Under this rule, a court must begin its consideration of the insurer's duty, if any, by examining the insurance policy at issue. *See, e.g., Canutillo,* 99 F.3d at 700. Texas law is clear that the interpretation of an insurance policy is a question of law subject to the same rules that apply to contracts generally. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991); *Barnett v.. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex.1987); *Coker v. Coker,* 650 S.W.2d 391, 393-94 (Tex.1983). The Texas Supreme Court has held that, in "construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent."*Forbau,* 876 S.W.2d at 133;*see also Balandran v. Safeco Ins. Co. of America,* 972 S.W.2d 738, 741 (Tex.1998); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). This intent is determined, first, by examining "the language of the contract itself."*Empire Fire and Marine Ins. Co. v. Brantley Trucking, Inc.,* 220 F.3d 679, 681 (5th Cir.2000) (citing *Puckett v. U.S. Fire Ins. Co .,* 678 S.W.2d 936, 938 (Tex.1984)). If the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

Page 6

policy language is susceptible to more than one reasonable interpretation then it is deemed ambiguous, and the court must "resolve the uncertainty by adopting the construction that most favors the insured."*Hudson Energy,* 811 S.W.2d at 555 (citing *Barnett,* 723 S.W.2d at 667;*Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344, 349 (Tex.1976); *Brown v. Palatine,* 89 Tex. 590, 35 S.W.1060, 1061 (1896)). But a policy is not ambiguous if it is worded so that it can be given only one reasonable construction. *Hudson Energy Co.,* 811 S .W.2d at 555;*Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936, 938 (Tex.1984). And, as the Texas high court has recognized several times:

Not every difference in the interpretation of ... an insurance policy amounts to an ambiguity. Both the insured and the insurer are likely to take conflicting views of coverage, but neither conflicting expectations nor disputation is sufficient to *create* an ambiguity.

*State Farm Life Ins. Co. v. Beaston,* 907 S.W.2d 430, 433 (Tex.1995); *Forbau,* 876 S.W.2d at 134. Here, although Finger and Travelers dispute whether coverage is provided under the Policy's terms, neither argues that the contract is ambiguous. Therefore, in order to effect the parties' intent, the court must give the words of the Policy "their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense."*See Heritage Resources, Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996). Further, no extrinsic evidence may be introduced "to contradict or vary the meaning of the explicit language of the parties' written agreement."*CBI Indus.,* 907 S.W.2d at 521.

*7 Here, Finger invokes Travelers's duty to defend it under the "advertising injury liability" provision of the Policy. The relevant part of this provision is set out below:

1. Insuring Agreement

a. We will pay those sums that the insured becomes

legally obligated to pay as damages because of ... "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages....

b. This is insurance applies to:

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

(Plaintiff's Ex. 5: Policy No. Y-660-521K971A-TCT-97, 8/1/97-8/01/98, Commercial General Liability Coverage Form ["CGL Form"] § I.B.1). The Policy then defines the term "advertising injury," as follows:
1. "Advertising injury" means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

(*Id.* § V.1). Because "advertising injury" is defined in the Policy, that definition must be deemed the "written expression of the parties' intent."*See Forbau,* 876 S.W.2d at 133. Any other Policy term, not defined by the written agreement, will be given its "plain, ordinary, and generally accepted meaning."*See Heritage Resources,* 939 S.W.2d at 121.

In its motion, Plaintiff argues that the TruServ Complaint sets out factual allegations that state claims under the definition of advertising injury, that is, "misappropriation of advertising ideas or style of doing business," and "infringement of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

copyright, title or slogan."(Plaintiff's Motion at 11). Defendant insists that no such claim was made, and makes two arguments in its behalf. (Defendant's Motion at 1). Travelers argues, first, that because the contractual definition of "advertising injury" does not, specifically, include "trademark infringement, false designation of origin, trademark dilution and unfair competition," TruServ's claims under those legal theories are not covered by the Policy. (*Id.* at 7). Second, Defendant claims that TruServ did not allege that the damages it suffered were "caused by the offending advertising." (*Id.* at 6). To determine whether TruServ did, in fact, allege that it suffered an "advertising injury," the "four corners" of the underlying complaint must be examined.

The Texas Supreme Court has made clear that "an insurer's contractual duty to defend must be determined solely from the face of the [third-party's] pleadings, without reference to any facts outside the pleadings."*Nat'l Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139, 141 (Tex.1997) (quoting *Houston Petroleum Co. v. Highlands Ins. Co.,* 830 S.W.2d 153, 155 (Tex.App.-Houston [1st Dist] 1990, writ denied)). Further, "in reviewing the underlying pleadings, the court must focus on the actual allegations that show the origin of the damages rather than on the legal theories alleged."*Id.* In other words, "it is not the cause of action alleged which determines coverage but the *facts* giving rise to the alleged actionable conduct."*Id.* (quoting *Adamo v. State Farm Lloyds Co.,* 853 S.W.2d 673, 676 (Tex.App.-Houston [14th Dist.] 1993, writ denied)). Therefore, "[i]f a petition alleges facts that, *prima facie,* exclude the insured from coverage, [then] the insurer has no duty to defend."*Taylor v. Travelers Ins. Co.,* 40 F.3d 79, 81 (5th Cir.1994) (quoting *Adamo,* 863 S.W.2d at 677);*and see Fidelity & Guar. Ins. Underwriters, Inc. v. McManus,* 633 S.W.2d 787, 788 (Tex.1982). On the other hand, if it is unclear whether the third party's factual allegations do, in fact, state a covered cause of action, then the underlying com-

plaint "must be liberally construed in favor of the insured."*St. Paul Fire & Marine Ins. Co. v. Green Tree Financial Corp.-Tex.,* 249 F.3d 389, 392 (5th Cir.2001) (citing *Terra Int'l v. Commonwealth Lloyd's Ins. Co.,* 829 S.W.2d 270, 272 (Tex.App.-Dallas 1992, writ denied); *and see Merchants,* 939 S.W.2d at 141;*Heyden,* 387 S.W.2d at 26. In addition, it should be noted that "[t]he duty to defend is determined by examining the latest ... pleading upon which the insurer based its refusal to defend the action."*Cornhill Ins. PLC v. Balsamis, Inc.,* 106 F.3d 80, 84 (5th Cir.1997); *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 99 F.3d 695, 701 (5th Cir.1996) (both citing *Rhodes v. Chicago Ins. Co.,* 719 F.2d 116, 120 (5th Cir.1983)). Here, Travelers refused to defend the original TruServ Complaint, but later agreed to defend Finger against the allegations stated in the amended complaint. In considering similar facts, under Texas law, the United States Court of Appeals for the Fifth Circuit held that "[i]f ... the duty to defend arose under the original ... complaint, the duty was clearly breached by the insurer's denial of coverage and failure to defend.... The subsequent filing of an amended complaint does not erase the breach or the penalties therefor."*Rhodes,* 719 F.2d at 120. It follows that, in this instance, if a duty to defend arose from the allegations in TruServ's original complaint, then that duty was breached by Travelers' refusal to defend Finger in January 1998. *See id.*

**\*8** Given this legal framework, then, it is clear that Travelers' duty to defend Finger is determined on the factual allegations that TruServ asserted in its original complaint. *See Merchants,* 939 S .W.2d at 141;*Cornhill,* 106 F.3d at 84;*Canutillo,* 99 F.3d at 701;*Rhodes,* 719 F.2d at 120. The legal appellation ascribed to TruServ's claims is irrelevant, as is Travelers' later agreement to provide a defense to the amended complaint. *See id.*And, again, it must be emphasized, that if TruServ's allegations, even "potentially," state a claim for "damages because of ... 'advertising injury,' " then Travelers was obligated to defend Finger against that claim. *See Mer-*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

chants, 939 S.W.2d at 141;*Heyden,* 387 S.W.2d at 26.

In its original complaint, TruServ made the following allegations, among others:

10. Commencing at a time subsequent to the first use of the TRUE VALUE mark by TruServ, Finger began using the identical mark TRUE VALUE *in connection with the marketing* and retail sale and rental *of furniture store goods and services....*

12. Finger's use of the infringing mark TRUE VALUE *in connection with the marketing* and retail sale and rental *of furniture store goods and services,* without the consent of TruServ, in markets including in Texas, in which TruServ offers similar services pursuant to its TRUE VALUE mark, infringes upon TruServ's trademark rights in the TRUE VALUE mark.

13. Upon information and belief, Finger's use of the infringing mark TRUE VALUE, without the consent of TruServ, *in connection with the marketing,* sale and rental of furniture, is likely to continue to cause confusion, or to cause mistake, or to deceive the public as to the origin, sponsorship or approval of the goods in connection with which Finger uses the TRUE VALUE mark.

17. [T]he distinctive TRUE VALUE mark is unique and *represents to the consuming public* the reputation and goodwill of TruServe....

19. By its infringing use of the mark TRUE VALUE *on its advertising,* Finger has unlawfully traded and capitalized on the goodwill and value of TruServ's TRUE VALUE mark.

20. Finger's aforesaid acts are likely to cause confusion or mistake or to deceive the public into believing that Finger's services emanate from TruServ, or are sponsored or authorized or otherwise associated with TruServ; and such acts have caused a likeli-

hood of confusion, mistake and deception, all to TruServ's irreparable injury and to Finger's benefit.

(TruServ Complaint) (emphasis added). Finally, in its prayer for relief, TruServ asked the court to "direct Finger to identify and destroy all infringing or diluting materials, including but not limited to printed material, packaging and *advertising* bearing the mark TRUE VALUE or any other word or words, or design or designs confusingly similar to TruServ's TRUE VALUE mark."(*Id.* at 9, ¶ E) (emphasis added).

*\*9* In its motion, Travelers argues that TruServ did not claim damages from "advertising injury," because it did not make any "allegation that Finger's infringement of [the] TRUE VALUE mark was committed in the course of its advertising."(Defendant's Motion at 14). This argument is wholly without merit. TruServe alleged plainly that, *"[b]y its infringing use of the mark TRUE VALUE on its advertising,* Finger has unlawfully traded and capitalized on the goodwill and value of TruServ's TRUE VALUE mark." (TruServ Complaint ¶ 19) (emphasis added). Further, TruServe claimed, several times, that this alleged infringement occurred "in connection with [Finger's] marketing ... of furniture store goods and services."(*Id.* ¶¶ 10, 12, 13).

To counter the obvious, Defendant argues that a distinction should be made between the use of the terms "marketing" and "advertising." (Defendant's Motion at 14-15). It contends that "when TruServ complains of Finger's 'marketing,' ... it refers to Finger's offers for sale" but not "to any advertising in which Finger is claimed to have engaged."(*Id.* at 15). Such an interpretation of the term "marketing" is not reasonable. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991). Courts commonly construe the term "advertising" to include any "widespread promotional activities directed to the public at large." 5 J. THOMAS MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION § 33:6 (4th ed.2002) (citing *Peerless Lighting Corp. v. Am. Motorists, Ins. Co.,* 98 Cal. Rptr .2d 753, 764

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

(Cal.Ct.App.2000); *Int'l Ins. Co. v. Florists' Mut. Ins. Co.,* 559 N.E.2d 7, 10 (Ill.App.Ct.1990); *see also ANR Prod. Co. v. Am. Guar. & Liab. Ins. Co.,* 981 S.W.2d 889, 891-91 (Tex.App.-Houston [1st Dist.] 1998, no pet.)(stating that "advertising" is designed to "call[ ] a matter to the public's attention"). Further, "one of the basic functions of a trademark is to *advertise* the product or services of the registrant." 5 MCCARTHY § 33:7 (quoting *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group,* 59 Cal.Rptr.2d 36, 38 (Cal.Ct.App.1996)). Here, TruServe alleged that, by using the TRUE VALUE mark, Finger "represent[ed] to the consuming public ... that Finger's services emanate from TruServ."(*See* TruServ Complaint ¶¶ 17, 19). It is easy to conclude, therefore, that TruServ's use of the term "marketing" included references to "advertising." Moreover, to the extent that the term might, in some context, be considered ambiguous, it "must be liberally construed in favor of [Finger]."*See St. Paul Fire & Marine Ins. Co. v. Green Tree Financial Corp.-Tex.,* 249 F.3d 389, 392 (5th Cir.2001); *Terra Int'l v. Commonwealth Lloyd's Ins. Co.,* 829 S.W.2d 270, 272 (Tex.App.-Dallas 1992, writ denied). It follows that the TruServ Complaint claimed "damages because of" trademark infringement that was "committed in the course of advertising [Finger's] goods, products or services."(*See* CGL Form § I.B.1.a, b(2); TruServ Complaint ¶¶ 10, 12, 13, 19, E).

**\*10** With that conclusion, the court must next determine whether a trademark infringement claim is covered under an "advertising injury," as defined in the Policy. *See Merchants,* 939 S.W.2d at 141;*Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994). It is true, as Defendant notes, that the standard commercial general liability form incorporated in the Policy does not list "[t]rademark infringement ... among the specified enumerated 'advertising injury' offenses." 5 MCCARTHY § 33:7 (*See also* CGL Form § V.1). However, it must be emphasized that the clear rule in Texas is to interpret insurance policies broadly, and a duty to defend exists so long as the underlying claim against

the insured has the "potential" for coverage. *Merchants,* 939 S.W.2d at 141;*Heyden Newport Chem. Corp. v. Southern Gen'l Ins. Co.,* 387 S.W.2d 22, 26 (Tex.1965). Here, Plaintiff argues that trademark infringement can be considered as either a "misappropriation of advertising ideas or style of doing business," or as an "infringement of copyright, title or slogan."(Plaintiff's Motion at 11) (citing CGL Policy § V.1.c, d). Because the phrases "advertising ideas" and "title or slogan" are not defined under the Policy, they must be given their plain meanings. *See Heritage Resources, Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996).

In its original complaint, TruServ alleges that it "creates and runs extensive national and regional advertising programs in print and on radio and television to promote the TRUE VALUE® name and, thereby, help its members sell products in their stores."(TruServ Complaint ¶ 6). Obviously, TruServ claimed that its "advertising idea," "TRUE VALUE" was used "extensive[ly]" to "sell products ." Further, as discussed earlier, the complaint alleged that Finger appropriated the TRUE VALUE mark to advertise its own goods, products, and services. (*Id.* ¶¶ 10, 12, 13). It is reasonable to conclude, then, that the TruServ Complaint stated a claim for the "misappropriation of advertising ideas," the third type of "advertising injury" under the disputed policy.[FN3](*See* CGL Policy § V.1.c). Moreover, "TRUE VALUE" could certainly be considered a "title or slogan," and an infringement of that mark potentially fits within the Policy, under the fourth definition of "advertising injury." [FN4](*See id.* § V.1.d).

> FN3. Courts in other jurisdictions have drawn the same conclusion. 5 MCCARTHY § 33:7 (citing *Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.,* 165 F.Supp.2d 1332, 1337 (S.D.Fla.2001); *CAT Internet Sys., Inc. v. Providence Wash. Ins. Co.,* 153 F.Supp.2d 755, 757 (E.D.Pa.2001); *U.S.A. Nutrasource, Inc. v. CNA Ins. Co.,* 140

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

F.Supp.2d 1049, 1052 (N.D.Cal.2001); *Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.,* 61 F.Supp.2d 611, 615 (S.D.Tex.1999); *Arnette Optic Illusions, Inc. v. ITT Hartford Group, Inc.,* 43 F.Supp.2d 1088, 1095 (C.D.Cal.1998); *Dogloo, Inc. v. Northern Ins. Co. of NY,* 907 F.Supp. 1383, 1391 (C.D.Cal.1995); *Poof Toy Prods., Inc. v. U.S. Fidel. & Guar. Co.,* 891 F.Supp. 1228, 1233 (E.D.Mich.1995); *Allou Health & Beauth Care, Inc. v. Aetna Cas. & Sur. Co.,* 703 N.Y.S.2d 253, 254 (N.Y.App.Div.2000); *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group,* 59 Cal.Rptr.2d 36, 38 (Cal.Ct.App.1996)).

FN4.*See* 5 MCCARTHY § 33:9.

As it must construe the Policy in the manner most favorable to Finger, this court finds that "advertising injury" includes an "injury arising out of [trademark infringement]." (*See id.* § V .1).*See also Hudson Energy,* 811 S.W.2d at 555. It follows then that TruServ's allegations triggered Travelers' duty to defend Finger against the 1998 claim for damages. (*See* CGL Policy § 1.a ., b).

In anticipating that finding, Travelers insists that, even if TruServ did state a claim for an "advertising injury," two Policy exclusions bar coverage for the underlying action. (Defendant's Motion at 1). The first provision Travelers cites is the so-called "prior publication" exclusion. (*Id.* at 15). This exclusion is specific in detailing that the Policy "does not apply to ... 'advertising injury' ... [a]rising out of oral or written publication of material whose first publication took place before the beginning of the policy period."(CGL Policy § I.B.2.a(2)). Defendant claims that Finger admitted, in its counterclaim against TruServ, that it "used the words 'True Value' in its print advertising, television and radio commercials, and/or in-store advertising and hang tags continuously since at least as early as 1959."(Defendant's Motion at 16) (quoting Travelers Indemnity Company of Connecticut's Appendix

of Exhibits to Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of Cross-Motion for Summary Judgment, TruServ Corp. v. Finger Furniture Co., Docket Entry # 24, Ex. B: Finger Furniture Company's Counterclaims Against TruServ Corporation, *TruServ Corp. v. Finger Furniture Co.,* Case No. H-97-03641 ["Defendant's Ex. B"] ). Travelers contends, therefore, that Finger's "first publication of 'True Value' occurred prior to the inception of the Travelers Policies in 1994," and so "the 'prior publication' exclusion bars coverage."(Defendant's Motion at 16).

**\*11** In its motion, Finger argues that Travelers failed to raise the prior publication exclusion "in its letter denying coverage of January 27, 1998," and so it waived the right to rely on that exclusion now. (Finger's Motion at 16). To support this argument, Plaintiff cites the Texas intermediate appellate court decision in *Lancon v. Employers Nat'l Life Ins. Co.,* 424 S.W.2d 321, 322-23 (Tex.Civ.App.-Houston [1st Dist.] 1968, writ ref'd n.r.e.), for the proposition that an "insurer denying liability on certain grounds is estopped to deny liability on grounds not asserted in [a] denial letter if [the] insurer had full knowledge of the facts of the claim."(*Id.* at 16 n. 50). That contention, however, misreads *Lancon.*Indeed, the Houston court expressly declined to reach the question of "whether the insurance company, by denying liability on one specific ground, is estopped to insist that the insured prove facts bringing himself within the coverage of the policy."424 S.W.2d at 323. Plaintiff's reliance on the holding of that case is clearly misplaced. Moreover, "[i]t has been generally held in Texas, as in most jurisdctions, that the doctrines of waiver and estoppel are not available to bring within an insurance policy's coverage, risks not covered by its terms or expressly excluded therefrom."*Gov't Employees Ins. Co. (Geico) v. Lichte,* 792 S.W .2d 546, 548 (Tex.App.-El Paso 1990), *writ denied per curiam,*825 S.W.2d 431 (Tex.1991). And, in this instance, Travelers advised Finger, specifically, that the January 1998 letter should not "be deemed or construed as a waiver of any of the rights and de-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

Page 11

fenses available to [it], including but not limited to those rights and defenses provided under the contract of insurance."(Plaintiff's Ex. 10, p. 2). It follows that Defendant has not waived its right to argue that the "prior publication" exclusion bars the coverage that Plaintiff seeks.

But it is important to emphasize, once again, that Travelers' duty to defend is determined though an examination of the Policy and the TruServ Complaint, and those documents only. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139, 140 (Tex.1997); *Cornhill Ins. PLC v. Balsamis, Inc.,* 106 F.3d 80, 84 (5th Cir.1997); *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 99 F.3d 695, 701;*Rhodes v. Chicago Ins. Co.,* 719 F.2d 116, 120 (5th Cir.1983). More importantly, it should be reiterated that if the duty to defend arose under the TruServ Complaint, then that duty was breached by Travelers' January 1998 letter denying coverage.[FN5]*See Cornhill,* 106 F.3d at 84;*Canutillo,* 99 F .3d at 701;*Rhodes,* 719 F.2d at 120. At that time, Finger's counterclaims against TruServ had not yet been filed. (*See* Plaintiff's Ex. 10; Defendant's Ex. B). The assertions in that counterclaim, therefore, are not a proper consideration here.[FN6]The only appropriate consideration is whether TruServ's original complaint made claims that implicate the "prior publication" exclusion.

> FN5. It also bears repeating that the duty to defend a broader one than the duty to indemnify. *St. Paul Fire & Marine Ins. Co. v. Green Tree Financial Corp.-Tex.,* 249 F.3d 389, 391 (5th Cir.2001); *Gulf Chem. & Metallurgical Corp. v. Assoc. Metals & Minerals Corp.,* 1 F.3d 365, 369 (5th Cir.1993); *St. Paul Ins. Co. v. Texas Dept. of Transp.,* 999 S.W.2d 881, 884 (Tex.App.-Austin 1999, no pet.); *Colony Ins. Co. v. H.R.K., Inc.,* 728 S.W.2d 848 (Tex.App.-Dallas 1987, no writ). Indeed, Travelers may not be obligated to indemnify Finger for any damage to TruServe, es-

pecially given the allegations in its counterclaim. However, this has no bearing on whether Travelers was required to defend the TruServ Complaint.

> FN6. Further, it is noteworthy that, on January 31, 2001, Travelers agreed to defend plaintiff against the TruServ claims in the Amended Complaint arguably, four months after it was aware of the allegations made in Finger's counterclaim. (*See* Plaintiff's Ex. 14; Plaintiff's Ex. 18; Defendant's Ex. B).

**\*12** In its original complaint, TruServ alleges that Finger infringed on twenty-three different trademarks. (TruServ Complaint ¶ 7). At least nine of those marks were registered after August 1, 1994, the date the Policy was issued.[FN7](*See id.,* Ex. A). Plaintiff argues that the complaint should be read so that an infringement of each mark is considered a separate cause of action. (Plaintiff's Opposition to Defendant's Motion for Summary Judgment re Defendant's Duty to Defend and Supporting Memorandum of Law ["Plaintiff's Response"] at 15, Docket Entry # 32). If so, then Finger contends that it could not have infringed on a trademark that was registered *after* August 1, 1994, with an advertisement that was published *before* that date.(*Id.*). It insists, therefore, that Travelers had a duty to defend to it based on those nine claims. (*Id.*). A similar argument, made with respect to identical policy language, was rejected by another court in this district and division. *Matagorda Ventures Inc. v. Travelers Lloyds Ins. Co.,* 203 F.Supp.2d 704, 718 (S.D.Tex.2000), *aff'd, slip op.*No. 01-20403 (5th Cir. May 14, 2002). In that decision, the court agreed that "if some of the causes of action alleged were not subject to the [prior publication] exclusion ... Travelers would have a duty to defend the entire lawsuit."*Id.* (citing *Canutillo,* 99 F.3d at 701;*Rhodes,* 719 F.2d at 119). The court concluded, however, that it was the date that the offending advertisements were published, and not the date of registration, that controlled whether the exclusion ap-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

plied. *Id.* at 717-18.That reasoning is persuasive. More importantly, though, in *Matagorda* the underlying pleadings were clear that the alleged harm stemmed from "written materials first published before the beginning of the policy period."*Id.* at 714.Here, then, the relevant question is whether TruServ alleges that its claims arose from material that Finger published before the beginning of the Policy period. *See id* .If the pleadings allege clearly that Finger infringed upon TruServ's mark before August 1, 1994, then the prior publication clause excuses Travelers from its duty to defend that allegation. On the other hand, if the pleadings are not explicit, and there is, even potentially, a claim within the Policy's coverage, then the relevant exclusion does not apply to obviate a duty to defend. *See St. Paul Fire & Marine Ins. Co. v. Green Tree Financial Corp.-Tex.,* 249 F.3d 389, 392 (5th Cir.2001); *Merchants,* 939 S.W.2d at 141;*Heyden Newport Chem. Corp. v. Southern Gen'l Ins. Co.,* 387 S.W.2d 22, 26 (Tex.1965).

> FN7. Reg. No. 1,882,703, registered March 7, 1995; Reg. No. 1,926,713, registered October 10, 1995; Reg. No. 1,971,101, registered April 30, 1996; Reg. No. 1,993,439, registered August 13, 1996; Reg. No. 2,015,085, registered Nov. 12, 1996; Reg. No. 2,038,165, registered February 18, 1997; Reg. No. 2,041,789, registered March 4, 1997; Reg. No. 2,057,479, registered April 29, 1997; Reg. No. 2,085,647, registered Aug. 5, 1997. (TruServ Complaint, App. A).

The TruServ Complaint alleges that, "[c]ommencing at a time subsequent to the first use of the TRUE VALUE mark by TruServ, Finger began using the identical mark TRUE VALUE."(TruServ Complaint ¶ 10). In fact, TruServ alleges that it first used the marks "approximately thirty-five years" ago. (*Id.* ¶ 8). The complaint does not specify, however, whether Finger's alleged publication began immediately "subsequent" to TruServ's first use, or many years

"subsequent." This factual allegation is unclear, but it is certainly possible to construe the TruServ Complaint to allege that Finger's first infringing publication occurred after the Policy period began. Because Travelers has a duty to defend Finger as long as the pleadings "potentially" allege a covered claim, the "prior publication" clause does not negate the insured's right to a defense against TruServ's original complaint. *See Green Tree Financial,* 249 F.3d at 392;*Merchants,* 939 S.W.2d at 141;*Heyden,* 387 S.W.2d at 26.

**\*13** Finally, Travelers argues that "coverage for the underlying action is barred by the 'knowledge of falsity' exclusion."(Defendant's Motion at 18). This clause provides that "insurance does not apply to ... 'advertising injury' ... [a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity."(CGL Policy § I.B.2.a(1)). Defendant contends that because "TruServ specifically alleges that 'Finger's unauthorized use of its infringing mark has been intentional and willful'... the application of this exclusion is required as a matter of law."(Defendant's Motion at 18) (quoting TruServ Complaint ¶ 14). Plaintiff argues that, on the contrary, the exclusion is "inapplicable because intent is not a required element of a trademark infringement claim" and liability can be premised on infringing action taken without "knowledge of falsity." (Plaintiff's Motion at 14).

It is well settled that in the absence of an express finding that the insured published an advertisement with "knowledge of [its] falsity," the exclusion "is unlikely to bar coverage except where the allegations of an underlying complaint are worded so that a finding of willfulness is necessary for the insured to be held liable." 5 J. THOMAS MCCARTHY, TRADEMARKS AND UNFAIR COMPETITION §§ 33:16 (4th ed.2002). Stated another way, "[w]here the underlying plaintiff's allegations leave open the possibility that the insured acted without knowledge of the falsity of its conduct, the exclusion does not apply."*Id.* Because "a party can be

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)
**2002 WL 32113755 (S.D.Tex.)**

held liable without regard to intent," under the Lanham Act, those courts that have considered the question have determined that the "knowledge of falsity" exclusion does not bar coverage for claims made under that Act. *Id.* (citing *Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.,* 61 F.Supp.2d 611, 619 (S.D.Tex.1999) (applying Texas law); *Elcom Techs. v. Hartford Ins. Co. of Midwest,* 991 F.Supp. 1294, 1298 (D.Utah 1997) (Pennsylvania law); *Union Ins. Co. v. Knife Co., Inc.,* 897 F.Supp. 1213, 1217 (W.D.Ark.1995) (Arkansas law)). That reasoning is persuasive, as it is consistent with the requirement, under Texas law, that the allegations in a complaint must be read broadly and in favor of the insured. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc.,* 939 S.W.2d 139, 141 (Tex.1997); *Heyden Newport Chem. Corp. v. Southern Gen'l Ins. Co.,* 387 S.W.2d 22, 26 (Tex.1965). Because Finger could have been found liable under the TruServ Complaint without any finding that it had knowledge of the alleged falsity, the cited exclusion does not bar coverage for the underlying suit. Accordingly, Travelers had a duty to defend Finger in the TruServ litigation from the outset. It is RECOMMENDED that Plaintiff's motion for partial summary judgment, on this matter, be GRANTED and that Defendant's motion be DENIED.

Conclusion

\*14 Based on the foregoing, it is RECOMMENDED that the motion for partial summary judgment by Finger Furniture Company, on the issue of Defendant's duty to defend, be GRANTED.

It is further RECOMMENDED that Defendant's motion for summary judgment be DENIED.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten (10) days from the receipt of it to file written objections thereto, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 80-5, S.D. Texas. Failure to file written objections

within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Vanessa D. Gilmore, Room 9513, and to the chambers of the undersigned, Room 7007.

The Clerk shall enter this Order and provide a true copy to all counsel of record.

S.D.Tex.,2002.
Finger Furniture Co., Inc. v. Travelers Indem. Co. of Connecticut
Not Reported in F.Supp.2d, 2002 WL 32113755 (S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.