**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JULIO & SONS COMPANY ,

                        Plaintiffs,

       -against-

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA,

                        Defendant.

08 CV 03001(RJH)(DCF)

ECF CASE

---

**AFFIDAVIT OF EVAN SHAPIRO, ESQ.**

STATE OF NEW YORK    )
                              ): ss.
COUNTY OF NEW YORK  )

       Evan Shapiro, being duly sworn, deposes and says:

       1.     I am a member of the bar of this Court and the law firm of Boundas, Skarzynski, Walsh & Black, LLC, attorneys for Travelers Casualty and Surety Company of America ("Travelers") in this action.  I submit this affidavit in support of Travelers' Opposition to Julio & Sons' Motion for a Preliminary Injunction.

       2.     Attached hereto as <u>Exhibit 1</u> is a true and accurate certified copy of policy documents for Travelers Policy No. 104468586 effective September 1, 2006 through September 1, 2007, as well as the application and supporting documents (the "Policy") with the addition of consecutive page numbering in the lower right-hand corner for ease of reference.

3.      Attached hereto as <u>Exhibit 2</u> is a true and accurate copy of Endorsements to the Policy effective January 4, 2007, with the addition of consecutive page numbering in the lower right-hand corner for ease of reference.

4.      Attached hereto as <u>Exhibit 3</u> is a true and correct copy of the Note Purchase Agreement between Retail & Restaurant Growth Capital, L.P. and Lucky Boy Corporation (now known as Julio & Sons Company), including amendments, as previously provided to Travelers by plaintiff Julio & Sons Company, with the addition of consecutive page numbering in the lower right-hand corner for ease of reference.

5.      Attached hereto as <u>Exhibit 4</u> is a true and accurate copy of the "Register of Actions" concerning the suit captioned *Retail and Restaurant Growth Capital LP vs. MapleWood Partners, L.P., et al.*, Case No. DC-07-01391, as maintained on the public website of the District Court for Dallas County, Texas, and printed on August 19, 2008.

_____
Evan Shapiro

Sworn to before me this
19 day of August, 2008

ARI R. MAGEDOFF
Notary Public, State of New York
No. 02MA6150477
Qualified in New York County
Commission Expires July 31, 20 10

2



ONE TOWER SQUARE, 2S2B
HARTFORD, CT 06183

To the best of my information and belief, the attached constitute a true and accurate copy of policy documents for Policy No. 104468586 effective September 1, 2006 through September 1, 2007 as well as application and supporting documents. Please note that some font sizes and spacing may be different than in the original policy.

_____

Kori M. Johanson
Assistant Secretary
Bond & Financial Products

Subscribed and sworn to before me
this 16th day of June, 2008.

Anna P. Nowik Notary Public
My Commission Expires June 30, 2011

My commission expires on _____

_____
Notary Public

1

 **ST PAUL TRAVELERS**

September 19, 2006

HR Manager
JULIO INVESTORS, LLC
1101 North Union Bower
Suite 160
IRVING, TX 75061

**RE:**  Risk Management PLUS+ SM  Online from St. Paul Travelers Bond

Dear  HR Manager

Thank you for choosing St. Paul Travelers Bondfor your insurance needs. St. Paul Travelers Bond is pleased to provide you with Risk Management PLUS+ Online, the industry's most comprehensive program for mitigating your exposure to employment related lawsuits. Risk Management PLUS Online now includes management training on employee terminations that is exclusive to St Paul Travelers Bond.

Risk Management PLUS+Online is a flexible, comprehensive loss prevention program specifically designed for St. Paul Travelers Bond insureds and is available to you at no additional cost. The program combines state of the art web-based delivery of training materials, sample employment policies, and searchable databases of employment related information with unlimited access to a toll free hotline staffed by attorneys from one of the country's premier employment law firms.

To access the hotline, simply dial 1-866-EPL-TRAV and you will be connected to an attorney from the national employment law firm of Jackson Lewis.  From reviewing the proper steps for a sexual harassment investigation to discussing issues to be considered in making employment decisions, Jackson Lewis attorneys are available to assist you.

The enclosed Risk Management PLUS+ Online User's Guide contains easy step-by-step instructions to help you get the most out of this valuable tool as well as detailed descriptions of the program's features. To get started, simply call 1-800-205-5262 and ask to be connected with your St. Paul Travelers Bond account representative.  It's that simple.

St. Paul Travelers Bond is committed to helping you reduce your exposure to costly employment litigation by helping you set up affirmative defenses to resolve employment issues quickly if they do arise. To that end, we have also negotiated preferred rates with THE AGOS GROUP, LLC and Jackson Lewis should you decide to augment your risk management program by purchasing additional services.  St. Paul Travelers Bond will provide you with a credit on your next renewal premium of up to 10% of this year's Employment Practices Liability premium if you purchase certain additional services described on the website.

We strongly encourage you to take full advantage of this program.  Once again, thank you for choosing St. Paul Travelers Bond.

Best Regards,

Brooke A Wyatt

St. Paul Travelers Bond, Jackson Lewis and THE AGOS GROUP, LLC are separate and unrelated entities.  THE AGOS GROUP, LLC is solely responsible for Risk Management PLUS+ SM Online and Jackson Lewis is solely responsible for the hotline. St. Paul Travelers Bond does not administer the program, makes no representations as to the effectiveness of the program and specifically disclaims any liability for any claim that may arise as a result of the use of the program.  Your implementation of Risk Management PLUS+ SM Online or use of the hotline in no way supersedes or changes the terms of your insurance policy with St. Paul Travelers Bond.

RM-LTR1 (12-02)

2


**ST PAUL TRAVELERS**

## IMPORTANT DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

On November 26, 2002, President Bush signed into law the Terrorism Risk Insurance Act of 2002 (the "Act"). The Act establishes a short-term program under which the Federal Government will share in the payment of covered losses caused by certain acts of international terrorism. We are providing you with this notice to inform you of the key features of the Act, and to let you know what effect, if any, the Act will have on your premium.

Under the Act, insurers are required to provide coverage for certain losses caused by international acts of terrorism as defined in the Act. The Act further provides that the Federal Government will pay a share of such losses. Specifically, the Federal Government will pay 90% of the amount of covered losses caused by certain acts of terrorism which is in excess of an insurer's statutorily established deductible for that year. The Act also caps the amount of terrorism-related losses for which the Federal Government or an insurer can be responsible at $100,000,000,000.00, provided that the insurer has met its deductible.

Please note that passage of the Act does not result in any change in coverage under the attached policy or bond (or the policy or bond being quoted). Please also note that no separate additional premium charge has been made for the terrorism coverage required by the Act. The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium, and is no more than one percent of your premium.

ILT-1018 (9/04)

3

**ST PAUL TRAVELERS**

**The Wrap®**

The Wrap® Declarations                                    Policy No. 104468586

Travelers Casualty and Surety Company of America
Hartford, CT 06183
(A Stock Insurance Company, herein called the Company)

**NOTE: THE DIRECTORS AND OFFICERS LIABILITY, EMPLOYMENT PRACTICES LIABILITY AND FIDUCIARY LIABILITY COVERAGE PARTS ARE WRITTEN ON A CLAIMS-MADE BASIS. THOSE COVERAGE PARTS COVER ONLY CLAIMS FIRST MADE AGAINST INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF PURCHASED. THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM UNLESS DUTY-TO-DEFEND COVERAGE HAS BEEN SPECIFICALLY PROVIDED HEREIN.**

| ITEM 1 | **PARENT CORPORATION:** |
|---|---|
| | JULIO INVESTORS, LLC |
| | Principal Address |
| | 1101 North Union Bower |
| | Suite 160 |
| | IRVING, TX 75061 |

| ITEM 2 | **POLICY PERIOD:** |
|---|---|
| | (a) Inception Date: September 1, 2006          (b)          Expiration Date: September 1, 2007 |
| | 12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |

ITEM 3 — **COVERAGE PARTS INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**

| Liability Coverage Parts | Aggregate Limit(s) of Liability | Coverage Part Limit(s) of Liability | Single Loss Limit(s) of Liability |
|---|---|---|---|
| Directors and Officers Liability | ☒ | ☐ | NA |
| Employment Practices Liability | ☒ | ☐ | NA |
| Fiduciary Liability | ☐ | ☐ | NA |
| **Crime Coverage Parts** | | | |
| Fidelity | ☐ | ☐ | ☐ |
| Kidnap and Ransom/Extortion | ☐ | ☐ | ☐ |

Coverage is only available for those **Coverage Parts** where indicated by ☒.

For Coverage Part and Single Loss Limit(s) of Liability for each purchased **Coverage Part**, see each **Coverage Part** Declarations for the applicable Limit(s) of Liability.

| ITEM 4 | **AGGREGATE LIMIT(S) OF LIABILITY** (inclusive of **Defense Expenses**): |
|---|---|
| | (a) Aggregate Limit of Liability for all purchased **Coverage Parts** combined: |
| | Amount |
| | (b) Aggregate Limit of Liability for all purchased **Liability Coverage Parts** combined: |
| | Amount $3,000,000.00 |
| | (c) Aggregate Limit of Liability for all purchased **Crime Coverage Parts** combined: |
| | Amount |

W-1000 3/99

The Wrap® Declarations (continued)                                      Policy No. 104468586

| ITEM 5 | **TYPE OF LIABILITY COVERAGE**<br>Reimbursement |
|--------|------------------------------------------------|
| ITEM 6 | **PREMIUM FOR THE POLICY PERIOD:**<br>    Amount $98,420.00 |
| ITEM 7 | **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE:**<br>ILT-1018 09-04, WEP-1000 12-00, WEP-1001 03-99, WDO-1001 03-99, PN-042 04-92, WDO-1000 12-00, W-1537 03-99, WDO-2125 01-03, WEP-1098 01-03, WEP-1106 04-05, W-1051 02-00, W-1100 01-03, WDO-2116 04-02 |

The Declaration Pages, the signed and completed Applications, the Common Terms and Conditions, each **Coverage Part** purchased, and any endorsements, constitute the entire agreement between the Company and the **Insureds**.

Countersigned By _____                    Authorized Company Representative _____

W-1000 3/99                                                            Page 2 of 2

 **ST. PAUL TRAVELERS**

**The Wrap** ®

## Common Terms and Conditions

**THE LIABILITY COVERAGE PARTS OF THIS POLICY ARE WRITTEN ON A CLAIMS-MADE BASIS, WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.**

**IN CONSIDERATION** of the payment of the premium stated in the Wrap Declarations, in reliance on the statements in **The Wrap Application** and each **Coverage Part Application** and subject to all Declarations for this **Policy** and for each **Coverage Part**, the Common Terms and Conditions, all of the terms, exclusions, conditions and limitations of all purchased **Coverage Parts**, and all endorsements, the Company and the **Insureds** agree as follows:

**I.**     **TERMS AND CONDITIONS**

The Common Terms and Conditions of this **Policy** apply to all **Coverage Parts**.  Unless stated to the contrary in any **Coverage Part**, the terms and conditions of each **Coverage Part** of this **Policy** apply only to that **Coverage Part** and shall not apply to any other **Coverage Part** of this **Policy**.  If any provision in the Common Terms and Conditions is inconsistent or in conflict with the terms and conditions of any **Coverage Part**, the terms and conditions of such **Coverage Part** shall control for purposes of that **Coverage Part**.

**II.**     **DEFINITIONS.**

Whenever appearing in this **Policy**, words and phrases appearing in **bold type** shall have the meanings set forth in this provision:

**A.**     "**Coverage Part(s)**" means, individually or collectively, the Directors and Officers Liability, Employment Practices Liability, Fiduciary Liability, Fidelity, and Kidnap and Ransom/Extortion Coverage Parts, if purchased.

**B.**     "**Coverage Part Application**" means the application completed for each **Coverage Part** and any materials submitted in connection therewith.

**C.**     "**Crime Coverage Part(s)**" means, individually or collectively, the Fidelity and Kidnap and Ransom/Extortion Coverage Parts, if purchased.

**D.**     "**Defense Expenses**" means reasonable and necessary legal fees and expenses incurred in the investigation, defense, settlement and appeal of a **Claim**, including the premium for appeal bonds regarding such **Claim**; but Defense Expenses shall not include salaries, wages, benefits or overhead of any **Insured** or any of the **Insured Organization's** directors, officers, members of the Board of Managers, trustees or **Employees**.

**E.**     "**Discrimination**" means:

   **1.**     any actual or alleged failure or refusal to hire or employ an applicant for employment with the **Insured Organization**;

   **2.**     any actual or alleged termination or constructive termination of an employment relationship with the **Insured Organization**;

   **3.**     any actual or alleged refusal to train or promote, or demotion of, an **Employee**; or

   **4.**     any other act or omission by which an **Insured** allegedly treats one **Employee** differently from another in compensation, terms, conditions, opportunities or privileges of employment, including acts or practices taken for the purpose of or which have the impact of distinguishing among, limiting, segregating or classifying **Employees** or applicants for employment with the **Insured Organization** in their compensation terms, conditions, opportunities or privileges of employment;

W-1001 3/99

Page 1 of 15

6

on any of the following grounds: race, color, national origin, religion, creed, gender, sexual orientation, pregnancy, disability, medical condition, age, marital status, Vietnam Era Veteran status, military service, or any other legally protected category, status or characteristic established pursuant to federal, state or other law, regulation or ordinance, including but not limited to Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Americans With Disabilities Act or the Family Medical Leave Act.

F.    "**Employee**" means any natural person whose labor or service is engaged by and directed by the **Insured Organization** and who is paid through the payroll of the **Insured Organization**, including part-time, seasonal and temporary workers.  Leased workers and independent contractors are not **Employees**.  The status of an individual as an **Employee** shall be determined as of the date of the alleged **Wrongful Act**, **Wrongful Employment Practice**, or act or event giving rise to loss under the **Crime Coverage Parts**.

With regard to the Fidelity Coverage Part only:

    1.    "**Employee**" also means:

        a.    any **Employee** for 60 days after termination of service;

        b.    any natural person leased to the **Insured Organization**, under an agreement between the **Insured Organization** and a labor leasing firm, while that person is subject to the direction and control and performing services for the **Insured Organization**;

        c.    any non-compensated natural person:

            (i)    other than one who is a fund solicitor, while performing services for the **Insured Organization** that are usual to the duties of an **Employee** or officer; or

            (ii)    while acting as a fund solicitor during fund raising campaigns;

        d.    any natural person who is:

            (i)    a trustee, officer, employee, administrator or manager, except an administrator or a manager who is an independent contractor, of any Employee Welfare or Pension Benefit Plan insured under the Fidelity Coverage Part , and

            (ii)    a director, **Officer-shareholder** or trustee of the **Insured Organization** while that person is handling funds or other property of any **ERISA** Plan insured under the Fidelity Coverage Part.

    2.    But "**Employee**" does not mean:

        a.    any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character;

        b.    any seasonal or temporary workers while having care and custody of the **Insured Organization's** property outside the **Premises**; or

        c.    any director or trustee except while performing acts coming within the scope of the usual duties of an **Employee** or while acting as a member of any of the **Insured Organization's** elected or appointed committees to perform on its behalf specific, as distinguished from general, directorial acts.

G.    "**Employee Benefit Plan**" means:

    1.    any **Welfare Plan** which was, is now, or becomes sponsored solely by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization exclusively for the benefit of **Employees** of the **Insured Organization**;

    2.    any **Pension Plan** or other plan identified in the endorsements to this **Policy**;

3.    any **Pension Plan** for which coverage is provided pursuant to Section III.H (Changes in Exposure) of the Common Terms and Conditions.

H.    **"ERISA"** means the Employee Retirement Income Security Act of 1974, including amendments thereto and regulations promulgated thereunder.

I.    **"Executive Officer"** means the chairperson, chief executive officer, president, chief financial officer, in-house general counsel, chief information officer, managing director, and any equivalent executive officer of the **Insured Organization**. For purposes of the Employment Practices Liability Coverage Part only, **Executive Officer** shall also include the members of the staff of the human resources department and the staff of the corporate legal department or the staff of the general counsel's office of the **Insured Organization**.

J.    **"Financial Insolvency"** means, with respect to the **Parent Corporation** and each **Subsidiary**, the appointment of a receiver, conservator, liquidator, trustee, or similar official; or the inability of the **Insured Organization** financially or under applicable law to indemnify the **Insured Persons**.

K.    **"Insured Organization"** means the **Parent Corporation** and any **Subsidiary**.

L.    **"Liability Coverage Part(s)"** means, individually or collectively, the Directors and Officers Liability, Employment Practices Liability,  and Fiduciary Liability Coverage Parts, if purchased.

M.    **"Parent Corporation"** means the entity named in ITEM 1 of the Declarations for this **Policy** and for each **Coverage Part**.

N.    **"Pension Plan"** means any plan so defined in Section 3(2) of **ERISA** or in any related or similar state, local or foreign law or regulation.

O.    **"Policy"** means, collectively, the Wrap Declarations, **The Wrap Application**, the Common Terms and Conditions, each purchased **Coverage Part**, each **Coverage Part Application**, each **Coverage Part** Declarations, and any endorsements thereto.

P.    **"Policy Period"** means the period from the Inception Date to the Expiration Date in ITEM 2 of the Wrap Declarations, or the dates set forth in the most recent Renewal Certificate with respect to the **Policy**, whichever period is later; in no event, however, shall the **Policy Period** continue past the effective date of cancellation or termination of the **Policy**.

Q.    **"Pollutants"** means any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants.

R.    **"Pollution"** means any actual, alleged or threatened exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, escape, treatment, removal or disposal of **Pollutants**; or any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any action taken in contemplation or anticipation of any such regulation, order, direction or request.

S.    **"Related Claims"** means all Claims based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, events, **Wrongful Acts** or **Wrongful Employment Practices** or the same or related series of facts, circumstances, situations, transactions, events, **Wrongful Acts** or **Wrongful Employment Practices**.

T.    **"Retaliation"** means adverse employment action with regard to an **Employee** on account of such **Employee's** exercise or attempted exercise of rights protected by law, including but not limited to the Family Medical Leave Act, or on account of the **Employee** having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law.

U.    **"Sexual Harassment"** means unwelcome sexual advances or requests for sexual favors and other verbal, physical or other conduct of a sexual nature (i) which is made a term or condition of an **Employee's** employment or advancement, or (ii) submission to or rejection of which is used as a basis for decisions affecting an **Employee** or applicant for employment, or (iii) which has the purpose or effect of creating an intimidating, hostile or offensive work environment which unreasonably interferes with the job performance of an **Employee**.

V.      "**Single Loss**" means all covered loss under the **Crime Coverage Parts**:

    1.      caused by any **Employee(s)** or in which any **Employee(s)** is (are) concerned or implicated, either resulting from a single act or any number of such acts, regardless of when, during the period of the **Crime Coverage Part** such acts occurred;

    2.      caused by **Forgery** or alteration committed by any person or in which such person is concerned or implicated, either resulting from a single act or any number of such acts, regardless of the number of **Covered Instruments** involved, or when, during the period of the **Crime Coverage Part**, such acts occurred; or

    3.      resulting from an actual or attempted fraudulent or dishonest act or event or a series of related acts or events whether committed by one or more persons;

    4.      resulting from any single act or series of related acts of **Kidnapping,E xtortion**, or **Detention/Hijack** by one or more persons or collaborating persons; or

    5.      resulting from any single casualty or event or series of related casualties or events not specified in subsections 1, 2, 3 or 4 preceding.

W.      "**Subsidiary**" means:

    1.      any corporation in which, on or prior to the Inception Date in ITEM 2 of the Wrap Declarations, the **Parent Corporation** owns, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such corporation's directors;

    2.      any limited liability company organized under the laws of any state, in which, on or prior to the Inception Date in ITEM 2 of the Wrap Declarations, the **Parent Corporation** owns, directly or through one or more **Subsidiaries**, the right to elect, appoint or designate more than fifty percent (50%) of the members of such limited liability company's Board of Managers; and

    3.      subject to the terms of Section III.H, any entity that the **Insured Organization** forms or acquires during the **Policy Period** in which the **Parent Corporation** owns, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

X.      "**Welfare Plan**" means any plan so defined in Section 3(1) of **ERISA** or in any related or similar state, local or foreign law or regulation.

Y.      "**Workplace Harassment**" means harassment, other than **Sexual Harassment**, which actually or allegedly creates a work environment that interferes with job performance, or creates an intimidating, hostile, or offensive working environment.

Z.      "**The Wrap Application**" means the Wrap Application and any materials submitted in connection therewith.

AA.      "**Wrongful Employment Practice**" means any of the following actual or alleged matters occurring in the course of and arising out of an **Employee's** employment or an applicant's application for employment with the **Insured Organization**: (1) **Discrimination**, (2) **Sexual Harassment**, (3) **Wrongful Termination**, (4) **Retaliation**, (5) **Workplace Harassment**, (6) breach of oral, implied or written employment agreement, (7) negligent evaluation, (8) wrongful discipline, (9) wrongful deprivation of career opportunity, (10) wrongful denial of training, (11) wrongful deprivation or denial of seniority, (12) wrongful evaluation, (13) wrongful failure to grant tenure, (14) wrongful failure to employ or promote, (15) invasion of privacy, (16) employment-related misrepresentation, (17) employment-related defamation, and (18) employment-related infliction of emotional distress.

BB.      "**Wrongful Termination**" means actual or constructive termination of an employment relationship with the **Insured Organization** in a manner or for a reason which is contrary to applicable law or in violation of a written, oral or implied agreement, other than a collective bargaining agreement, for continued employment.

III.      **CONDITIONS.**

A.      **TERRITORY.**

This insurance applies to **Claims** or loss occurring anywhere in the world.

B.   **RETENTIONS.**

   1.   **Liability Coverage Parts**

   The Company's liability under any **Liability Coverage Part** with respect to **Loss** arising from any single **Claim** shall apply only to that part of such **Loss** which is excess of the applicable Retention set forth in the Declarations for such **Coverage Part**. If different parts of **Loss** arising from a single **Claim** are subject to different Retentions, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention. The **Insureds** shall bear uninsured at their own risk the amount of any applicable Retention. The Company shall have no obligation to pay **Loss**, including **Defense Expenses**, until the Retention amount has been paid by the **Insured**; however the Company may, at its sole discretion, pay all or part of the Retention amount on behalf of any **Insured**, in such event, the **Insureds** agree to repay the Company any amounts so paid.

   2.   **Crime Coverage Parts**

   The Company will not pay for any loss under any Insuring Agreement of the **Crime Coverage Parts** unless the amount of loss exceeds the Retention for the Insuring Agreements in ITEM 2 of the **Crime Coverage Part** Declarations. The Company will then pay for the amount of loss in excess of the Retention subject to any applicable Aggregate Limit(s) of Liability stated in ITEM 4 of the Wrap Declarations and/or the Coverage Part Limit(s) of Liability and Single Loss Limits of Liability stated in ITEM 2 of the **Crime Coverage Part** Declarations. This provision does not apply to legal expenses paid under Insuring Agreement B of the Fidelity Coverage Part. In the event more than one Retention could apply to the same loss, only the highest Retention may be applied.

C.   **LIMITS OF LIABILITY.**

   1.   **Aggregate Limit(s) of Liability**

   Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company:

      a.   If the Aggregate Limit of Liability for all purchased **Coverage Parts** is applicable as provided in ITEM 4(a) of the Wrap Declarations, the Company's maximum limit of liability in a single **Policy Period** for all **Claims**, including **Related Claims**, under all applicable **Liability Coverage Parts** and all loss under all applicable **Crime Coverage Parts** shall not exceed the Aggregate Limit of Liability for all purchased **Coverage Parts** stated in ITEM 4(a) of the Wrap Declarations.

      b.   If the Aggregate Limit of Liability for all purchased **Liability Coverage Parts** is applicable as provided in ITEM 4(b) of the Wrap Declarations, the Company's maximum limit of liability in a single **Policy Period** for all **Claims**, including **Related Claims**, under all applicable **Liability Coverage Parts** shall not exceed the Aggregate Limit of Liability for all purchased **Liability Coverage Parts** stated in ITEM 4(b) of the Wrap Declarations.

      c.   If the Aggregate Limit of Liability for all purchased **Crime Coverage Parts** is applicable as provided in ITEM 4(c) of the Wrap Declarations, the Company's maximum limit of liability in a single **Policy Period** for all loss under all applicable **Crime Coverage Parts** shall not exceed the Aggregate Limit of Liability for all purchased **Crime Coverage Parts** stated in ITEM 4(c) of the Wrap Declarations.

   2.   **Coverage Part Limit(s) of Liability**

   Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company; and further subject to any applicable Aggregate or Single Loss Limit(s) of Liability:

If Coverage Part Limit(s) of Liability are applicable for a **Coverage Part** as provided in ITEM 3 of the Wrap Declarations, the Company's maximum limit of liability for all **Claims**, including **Related Claims**, under each applicable **Liability Coverage Part** or all loss under each applicable **Crime Coverage Part** in a single **Policy Period** shall not exceed the Coverage Part Limit of Liability stated in the Declarations for each applicable **Coverage Part**. In the event that a **Claim** or loss triggers more than one **Coverage Part**, the Company's maximum limit of liability shall not exceed the highest available remaining Coverage Part Limit of Liability of the applicable **Coverage Parts**.

3. **Single Loss Limit(s) of Liability**

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company; and further subject to any applicable Aggregate or Coverage Part Limit(s) of Liability:

If a Single Loss Limit of Liability for each Insuring Agreement is applicable for the **Crime Coverage Part(s)** as provided in ITEM 2.B. of the Declarations for the **Crime Coverage Parts**, the Company's maximum limit of liability for each **Single Loss** under the applicable Insuring Agreement shall not exceed the Single Loss Limit of Liability for the applicable Insuring Agreement. In the event that a loss triggers more than one Insuring Agreement in any of the **Crime Coverage Parts**, the Company's maximum limit of liability for each **Single Loss** shall not exceed the highest available Single Loss Limit of Liability for the applicable Insuring Agreements.

4. **Other Provisions**

a.   If any **Claim** against the **Insureds** gives rise to coverage both under this **Policy** and under any other liability policy or similar insurance issued by the Company or any of its affiliates to any **Outside Entity**, the Company's maximum aggregate limit of liability under all such policies for all such **Claims**, including **Defense Expenses**, from such **Claim** shall not exceed the largest single available limit of liability under such policy, including this **Policy**.

b.   **Defense Expenses** incurred by the Company or by the **Insureds** in defense of a **Claim** are part of and not in addition to all applicable Limit(s) of Liability. The payment by the Company or by the **Insureds** of **Defense Expenses** reduces all applicable Limit(s) of Liability.

c.   All Aggregate and Coverage Part Limit(s) of Liability applicable to this **Policy** or a **Coverage Part** shall be reduced by the amount of any payment made under the terms of each applicable **Coverage Part**. If the Aggregate or Coverage Part Limit(s) of Liability applicable to this **Policy** or a **Coverage Part** are exhausted by the payment of amounts covered under this **Policy** or the **Coverage Part**, the premium under the **Policy** or **Coverage Part** will be fully earned, all obligations of the Company under the **Policy** or **Coverage Part** will be completely fulfilled and exhausted, including any duty to defend, and the Company shall have no further obligations of any kind or nature whatsoever under this **Policy** or **Coverage Part**.

d.   The purchase of any Extended Reporting Period shall not increase or reinstate any applicable Limit(s) of Liability, and said Limit(s) of Liability shall be the Company's maximum liability for the **Policy Period** and Extended Reporting Period, combined.

e.   Regardless of the number of years any of the **Crime Coverage Parts** or similar insurance issued by the Company or its affiliates remains in force or the number of premiums paid, no Limit of Liability under any **Crime Coverage Part** or Insuring Agreement thereunder cumulates from year to year or period to period.

f.   In the event that any director of the **Insured Organization** who is not an **Employee** thereof is an **Insured Person** under any other similar policy issued by the Company and a loss, as respects such director, is reported under the Kidnap and Ransom/Extortion Coverage Part of this **Policy** and one or more such other policies, then the aggregate liability of the Company for each **Single Loss** shall not be cumulative and shall in no event exceed the highest Limits of Liability applicable to each **Single Loss** under the Kidnap and Ransom/Extortion Coverage Part or such other applicable policy.

**D.   DEFENSE, INVESTIGATION AND SETTLEMENT.**

1.   If duty-to-defend coverage is provided with respect to the Liability Coverage Parts as indicated in ITEM 5 of the Wrap Declarations:

a. The Company shall have the right and duty to defend any **Claim** covered by such **Liability Coverage Part**, even if any of the allegations are groundless, false or fraudulent; provided however, that the Company shall not be obligated to defend or continue to defend any **Claim** after the applicable Limit of Liability for such **Coverage Part** has been exhausted by payment of **Loss**; and

b. The **Insured** shall cooperate with the Company and, upon the Company's request, assist in making settlements and in defense of **Claims** and in enforcing rights of contribution or indemnity against any person or entity which may be liable to the **Insured** because of an act or omission covered under this **Policy**, shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

2. If reimbursement coverage is provided with respect to the **Liability Coverage Parts** as indicated in ITEM 5 of the Wrap Declarations:

a. The Company has no duty to defend any **Claim**. It shall be the duty of the **Insureds** to defend **Claims**. The Company shall have the right to associate with the **Insureds** in the investigation, defense and settlement, including but not limited to the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by this **Policy** and the selection of appropriate defense counsel;

b. Upon written request, the Company will advance **Defense Expenses** for which such **Liability Coverage Part** provides coverage. Such advanced payments by the Company shall be repaid to the Company by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** shall not be entitled to payment of such **Loss** under the **Policy**. As a condition of any payment of **Defense Expenses** or other **Loss** under this subsection, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any **Defense Expenses** or other **Loss** paid to or on behalf of any **Insured** if it is finally determined that any such **Loss** incurred by such **Insured** is not covered under the **Policy**.

3. The **Insureds** shall not settle or offer to settle any **Claim**, incur any **Defense Expenses**, assume or admit any liability, or otherwise assume any obligation without the Company's prior written consent, such consent not to be unreasonably withheld. The Company shall not be liable for any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

4. The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient, and if the **Insured** shall refuse to consent to the settlement of any **Claim** as recommended by the Company based upon a judgment or a bona fide offer of settlement, then the **Insured** thereafter shall negotiate and/or defend such **Claim** independently of the Company and on the **Insured's** own behalf and solely at the expense of the **Insured**; in such event, all **Defense Expenses** and other costs and expenses incurred or paid by the **Insured** after the date the **Insured** refused to consent to settlement as recommended by the Company shall be the sole responsibility of the **Insured** and shall not be recoverable under this **Policy**, and the **Insured** also shall be solely responsible for all **Loss** in excess of the lower of the amount for which settlement could have been made as recommended by the Company or the remaining portion of the applicable Limit(s) of Liability.

5. The **Insureds** will provide the Company with all information, assistance and cooperation that it reasonably requests, and will do nothing that may prejudice its position or potential or actual rights of recovery. The Company will be subrogated to the extent of any payment to all of the rights of recovery of the **Insureds**. The **Insureds** will execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Company effectively to bring suit in their name. The obligations of the **Insureds** under this subsection survive the **Policy**.

6. With regard to the Kidnap and Ransom/Extortion Coverage Part, the Company shall have the right to investigate, negotiate or settle any claim or suit subject to coverage under that **Coverage Part**, or to take over the conduct of the defense thereof. The **Insured** shall cooperate with the Company to these ends and shall not admit liability in any such claim or suit. The **Insured** shall use due diligence and do all things reasonably practical to avoid or diminish any loss.

E. **CLAIMS.**

1. A **Claim** shall be deemed to have been made on the date of service upon or receipt of notice by any **Insured** of the written demand or proceeding, whichever occurs earlier.

12

2.      All **Related Claims** are a single **Claim** for purposes of all applicable **Liability Coverage Parts**, and all **Related Claims** shall be deemed to have been made at the time the first of such **Related Claims** was made, regardless of whether such date is before or during the **Policy Period**.

F.     **CLAIMS MADE EXTENSION CLAUSE.**

With respect to the **Liability Coverage Parts**, if, during the **Policy Period**, the **Insured** shall first become aware of any **Wrongful Act** or **Wrongful Employment Practice** which may subsequently give rise to a **Claim** under a purchased **Liability Coverage Part**, and shall, during such **Policy Period**, give written notice thereof as set forth herein to the Company, then any **Claim** which subsequently is made against the **Insured** with regard to such **Wrongful Act** or **Wrongful Employment Practice** shall be deemed to have been first made during such **Policy Period**. The written notice shall include the particulars of such **Wrongful Act** or **Wrongful Employment Practice**, including all facts constituting the alleged **Wrongful Act** or **Wrongful Employment Practice**, the identity of each person allegedly involved in or affected by the **Wrongful Act** or the **Wrongful Employment Practice**, and the dates of the alleged event(s), all of which shall be provided as soon as practicable, but in any event prior to the end of the **Policy Period**. All notices under this subsection must be sent by certified mail or prepaid overnight mail to the address set forth in ITEM 5 of the applicable **Liability Coverage Part** Declarations. Notice of any actual **Claim** which is subsequently made with respect to such **Wrongful Act** or **Wrongful Employment Practice** must be given in accordance with Section III.K of the Common Terms and Conditions.

G.     **SPOUSAL EXTENSION.**

1.      The coverage afforded under the **Liability Coverage Parts** will, subject to all of their terms, conditions, limitations and exclusions, be extended to apply to **Loss** resulting from a **Claim** made against a person who, at the time the **Claim** is made, is a lawful spouse of an **Insured Person**, but only if:

    a.     the **Claim** against such spouse results from a **Wrongful Act** or **Wrongful Employment Practice** actually or allegedly committed by the **Insured Person**, to whom the spouse is married, and

    b.     such **Insured Person** and his or her spouse are represented by the same counsel in connection with such **Claim**.

2.      No spouse of an **Insured Person** will, by reason of this subsection, have any greater right to coverage under any of the **Liability Coverage Parts** than the **Insured Person** to whom such spouse is married.

3.      The Company shall not be liable under this subsection to make any payment of **Loss** in connection with any **Claim** against a spouse of an **Insured Person** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse.

H.     **CHANGES IN EXPOSURE.**

1.      <u>Formation or Acquisition of Subsidiary, Premises or Pension Plan</u>

    a.     With regard to the **Liability Coverage Parts**, if, during the **Policy Period**, the **Insured Organization** forms or acquires a **Subsidiary** or **Pension Plan** (other than an employee stock ownership plan) which is then solely sponsored by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization exclusively for the benefit of the **Employees** of the **Insured Organization**, the **Policy** will provide coverage for that acquired or formed **Subsidiary** or **Pension Plan** and their respective **Insured Persons**, subject to all other terms and conditions of this **Policy**, but only for **Claims** for **Wrongful Acts** or **Wrongful Employment Practices** under the **Liability Coverage Parts** which occur wholly during the time that the **Insured Organization** is sole sponsor with regard to the **Pension Plan** or owns more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors, provided written notice of such formation or acquisition has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company's underwriters may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for the acquired or formed **Subsidiary** or **Pension Plan** shall not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Parent Corporation** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement shall not apply, however, if (1) the assets of the acquired or formed **Subsidiary** do not exceed ten percent (10%) of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent audited consolidated financial statements, (2) the total assets of the acquired or formed **Pension Plan**, as of the effective date of such acquisition or formation, do not exceed ten percent (10%) of the total plan assets shown on the most recent application submitted by the **Insured Organization**, or (3) the acquisition or formation occurs less than ninety (90) days prior to the end of the **Policy Period**.

Notwithstanding the foregoing, no coverage shall be provided pursuant to this Subsection III.H.1. for any employee stock ownership plan or any natural person or **Insured Organization** with respect thereto unless the Company, by specific written endorsement hereto, agrees to provide such coverage. Any such coverage shall be at the terms and conditions set forth in the endorsement and for such additional premium as may be required by the Company.

        b.      With regard to the **Crime Coverage Parts**, if through consolidation or merger with, or purchase of assets of, some other entity any additional persons become **Employees** or the **Insured Organization** acquires the use and control of any additional **Premises**, or if the **Insured Organization** acquires an additional **Subsidiary**, any insurance afforded for **Employees**, **Premises** or **Subsidiaries** also applies to those additional **Employees**, **Premises**, or **Subsidiaries**, provided that the **Insured** (1) gives the Company written notice within ninety (90) days thereafter; and (2) pays the Company an additional premium. Any **Pension Plan** or **Welfare Plan** acquired as above and sponsored exclusively by the **Insured Organization** shall be included as an **Insured(s)** under Insuring Agreement G of the Fidelity Coverage Part. The 90-day notice requirement shall not apply and the Company agrees to extend automatically such coverage under the **Crime Coverage Parts**, without payment of an additional premium, to any consolidatation or merger with, or purchase of assets of, some other entity or **Subsidiary** (1) the assets of which do not exceed ten percent (10%) of the **Insured Organization's** total assets, or (2) which occurs less than ninety (90) days prior to the end of the **Policy Period**, subject to all other terms and conditions of the Crime Coverage Parts and only for so long as the **Coverage Part(s)** remain in effect as to the **Insured Organization**.

      2.      **Merger of Plans**

If, during the **Policy Period**, a **Welfare Plan** or **Pension Plan** for which coverage is provided under the Fiduciary Liability Coverage Part is merged with another **Welfare Plan** or **Pension Plan** for which coverage is also provided under that **Coverage Part**, the Fiduciary Liability Coverage Part shall continue to provide coverage for both plans, subject to all other terms and conditions of that **Coverage Part** and only for so long as that **Coverage Part** remains in effect as to the **Parent Corporation**.

If, during the **Policy Period**, a **Welfare Plan** or **Pension Plan** for which coverage is provided under the Fiduciary Liability Coverage Part ("Covered Plan") is merged with another **Welfare Plan** or **Pension Plan** for which coverage is not provided under this **Coverage Part** ("Uncovered Plan"), the Fiduciary Liability Coverage Part shall continue to provide coverage for only the Covered Plan, subject to all other terms and conditions of the Fiduciary Liability Coverage Part and only for so long as that **Coverage Part** remains in effect as to the **Parent Corporation**, but only for **Claims** with regard to **Wrongful Acts** which occurred prior to the date of such merger.

      3.      **Sale or Termination of Plan**

If, prior to or during the **Policy Period**, any **Welfare Plan** or **Pension Plan**, other than an employee stock ownership plan not identified in the endorsement, is sold or terminated, the Fiduciary Liability Coverage Part shall provide coverage for such plan, subject to all other terms and conditions of the Fiduciary Liability Coverage Part and only for so long as the Fiduciary Liability Coverage Part remains in effect as to the **Parent Corporation**. The coverage provided pursuant to this Subsection III.H.3 shall apply only:

        a.      for **Claims** with regard to **Wrongful Acts** which occurred prior to the date of such sale or termination,

        b.      while such plan was sponsored solely by the **Parent Corporation** or jointly by the **Parent Corporation** and a labor organization exclusively for the benefit of employees of the **Parent Corporation**, and

        c.      if notice of such sale or termination is given to the Company prior to the end of such **Policy Period**.

      4.      **Change of Control**

If during the **Policy Period**, any of the following events occur:

a.      the acquisition of the **Parent Corporation**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Parent Corporation** into or with another entity such that the **Parent Corporation** is not the surviving entity;

b.      the appointment of a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official, for or with respect to the **Parent Corporation**; or

c.      the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least fifty percent (50%) of the directors of the **Parent Corporation**

(hereinafter "Change of Control"), coverage under the **Policy** shall continue in full force and effect, subject to all other terms and conditions of the **Policy**, but only with respect to **Claims** for **Wrongful Acts** or **Wrongful Employment Practices** or loss under the **Crime Coverage Parts** committed or incurred before such Change of Control, but coverage will cease with respect to **Claims** for **Wrongful Acts and Wrongful Employment Practices** or loss under the **Crime Coverage Parts** committed or incurred after such Change of Control, and further provided that any loss under the Kidnap and Ransom/Extortion Coverage Part must be discovered and reported to the Company within twelve months of the Change of Control. After a Change of Control, the **Liability Coverage Parts** may not be cancelled, regardless of Section III.J. of the Common Terms and Conditions, and the entire premium for the **Liability Coverage Parts** will be deemed fully earned.

I.      **EXTENDED REPORTING PERIOD.**

If the Company or the **Parent Corporation** fails or refuses to renew an applicable **Liability Coverage Part** or if the **Parent Corporation** cancels an applicable **Liability Coverage Part**, the **Parent Corporation** shall have the right, upon payment of the additional premium as determined by ITEM 4 of the applicable **Liability Coverage Part** Declarations, to the period of time set forth in ITEM 4 of that **Coverage Part** Declarations following the effective date of such nonrenewal or termination ("the Extended Reporting Period") in which to give the Company written notice of **Claims** first made during the Extended Reporting Period against persons or entities who at the effective date of nonrenewal or cancellation were **Insureds**, but only for **Wrongful Acts** or **Wrongful Employment Practices** occurring wholly prior to the effective date of the nonrenewal or cancellation and which otherwise would be covered by the applicable **Liability Coverage Part**, subject to the following conditions:

1.      The Extended Reporting Period shall not provide a new, additional or renewed limit(s) of liability. The Company's total liability for all **Claims** made during the Extended Reporting Period shall be limited to the remaining portion of the maximum aggregate limit of liability set forth in ITEM 4 of the Wrap Declarations and, if applicable, ITEM 2 of the applicable **Liability Coverage Part** Declarations as of the effective date of the nonrenewal or cancellation;

2.      The entire premium for the Extended Reporting Period, if purchased, shall be deemed to have been fully earned at the commencement of such Extended Reporting Period;

3.      Section III.F of the Common Terms and Conditions ("Claims Made Extension Clause") does not apply and may not be invoked during the Extended Reporting Period; and

4.      The right to elect the Extended Reporting Period under this subsection III.I shall terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days of the effective date of the nonrenewal or cancellation.

J.      **CANCELLATION.**

1.      The Company may cancel this **Policy** or any **Coverage Part** for failure to pay a premium when due, in which case twenty (20) days written notice shall be given to the **Parent Corporation**, unless however payment is made within (20) days of the **Parent Corporation's** receipt of such notice of cancellation. The Company shall have the right to the premium amount for the portion of the **Policy Period** during which the **Policy** or **Coverage Part** was in effect.

2.      The **Parent Corporation** may cancel this **Policy** or any **Coverage Part** by mailing the Company written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Wrap Declarations, such cancellation will be effective. In the event the **Parent Corporation** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure.  Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

3.      The Company will not be required to renew this **Policy** or any **Coverage Part** upon its expiration.  If the Company elects not to renew this **Policy** or any **Coverage Part**, it will deliver or mail to the **Parent Corporation** written notice to that effect at least sixty (60) days before the Expiration Date set forth in ITEM 2(b) of the Wrap Declarations.

K.      **INSURED'S DUTIES IN THE EVENT OF A CLAIM.**

1.      As to all **Liability Coverage Parts**, it is a condition precedent to all insurance provided thereunder that:

a.      In the event of a **Claim** made against any **Insured**, written notice concerning all particulars of such **Claim**, including all facts constituting the alleged **Wrongful Act** or **Wrongful Employment Practice**, the identity of each person allegedly involved in or affected by such **Wrongful Act** or **Wrongful Employment Practice**, and the date(s) of the alleged events, shall be provided to the Company as soon as practicable; and

b.      All notices under this subsection must be sent by certified mail or prepaid overnight mail to the address set forth in ITEM 5 of the applicable **Liability Coverage Part** Declarations.

2.      As to the Fidelity Coverage Part, it is a condition precedent to all insurance provided thereunder that:

a.      After discovery by the **Insured Organization** or any of its partners, officers or directors of a loss or a situation that may result in loss of, or loss from damage to, **Money**, **Securities** and other property that would be covered under the Fidelity Coverage Part, the **Insured Organization** must:

(i)      provide the Company with written notice as soon as possible and if the **Insured Organization** has reason to believe that any loss (except for loss under Insuring Agreements A or B of the Fidelity Coverage Part) involves a violation of law, the **Insured Organization** must also notify the police;

(ii)      submit to examination under oath at the Company's request and give the Company a signed statement of the **Insured Organization's** answers;

(iii)      give the Company a detailed, sworn proof of loss within 120 days.  Proof of loss under Insuring Agreement B of the Fidelity Coverage Part must include an affidavit of forgery setting forth the amount and cause of loss and (1) the original instrument(s) or (2) a copy of the instrument(s) involved in that loss; and

(iv)      cooperate with the Company in the investigation and settlement of any claim.

b.      The Company waives the written notice requirement if the amount of loss does not exceed 25% of the Retention for the applicable Fidelity Coverage Part Insuring Agreement.

3.      As a condition precedent to the Company's liability under Insuring Agreement A of the Kidnap and Ransom/Extortion Coverage Part:

a.      The **Insured Organization** shall have approved the payment of **Ransom Monies**.  In the event of a **Kidnapping** or **Extortion** of an **Insured Person** or **Guest** during the **Policy Period**, and prior to the payment of **Ransom Monies**, the **Insured** shall make every reasonable effort to:

(i)      determine that the **Kidnapping** or **Extortion** has actually occurred;

(ii)      give immediate oral or written notice to the Company and Control Risks Group at the addresses provided in Item 3 of the Kidnap and Ransom/Extortion Coverage Part Declarations; and

(iii)    notify the Federal Bureau of Investigation or other law enforcement agency having jurisdiction thereover of the demand for **Ransom Monies** and comply with their recommendations and instructions.

b.    As additional conditions precedent to the Company's liability under the Kidnap and Ransom/Extortion Coverage Part, the **Insured** must:

(i)    use all due diligence and do all things reasonably practicable to avoid or diminish any loss(es) insured under the Kidnap and Ransom/Extortion Coverage Part;

(ii)    use all reasonable efforts not to disclose the existence of the Kidnap and Ransom Coverage Part;

(iii)    establish a procedure in writing and shall furnish a copy of that procedure to at least three senior officials, so as to enable those persons to comply with this subsection; and

(iv)    immediately notify the Company of any claim or suit potentially subject to coverage under the Kidnap and Ransom/Extortion Coverage Part, and shall not admit liability in any such claim or suit.

L.    **ACTION AGAINST THE COMPANY.**

1.    With regard to the **Liability Coverage Parts** only:

a.    No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this **Policy**, nor until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial, or by written agreement of the Insured, the claimant and the Company.

b.    Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this **Policy**, in a court of competent jurisdiction in the United States, its territories or possessions, or Canada, to the extent of the insurance afforded by this **Policy**. No person or organization shall have any right under this **Policy** to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the Company be impleaded by an **Insured** or said **Insured's** legal representative. Bankruptcy or insolvency of any **Insured** or of the **Insured's** estate shall not relieve the Company of any of its obligations hereunder.

2.    With regard to the **Crime Coverage Parts** only:

a.    Fidelity Coverage Part: An **Insured** may not bring any legal action against the Company involving loss (1) unless it has complied with all the terms of this **Policy**; (2) until 90 days after it has filed proof of loss with the Company; and (3) unless brought within 2 years from the date the **Insured Organization** discovered the loss.

b.    Kidnap and Ransom/Extortion Coverage Part: No suit, action or proceeding for recovery of any claim under this **Coverage Part** shall be sustainable in any court of law, equity or other tribunal unless all the requirements of this **Coverage Part** shall have been complied with and the same be commenced within twenty-four (24) months next after a claim for actual **Loss** or **Expenses** has been reported to the Company by the **Insured.**

M.    **OTHER INSURANCE.**

This **Policy** shall apply only as excess insurance over, and shall not contribute with, any other insurance (whether collectible or not), including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically in excess of this **Policy**. This **Policy** will not be subject to the terms of any other insurance.

N.    **CHANGES.**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or change in any part of this **Policy**, or estop the Company from asserting any right under the terms, conditions and limitations of this **Policy**, nor may the terms, conditions and limitations of this **Policy** be waived or changed, except by a written endorsement issued by the Company to form a part of this **Policy**.

O.    **ASSIGNMENT.**

Assignment of interest under this **Policy** shall not bind the Company, until its consent is endorsed hereon, except in the case of the death of individuals included as additional **Insureds** under the Fidelity Coverage Part. In that event, the deceased individual's rights and duties will be transferred to his legal representative but only while acting within the scope of duties as his legal representative. Until the legal representative is appointed, anyone having proper temporary custody of the deceased individual's property will have his rights and duties but only with respect to that property.

P.    **REPRESENTATIONS.**

By acceptance of this **Policy**, each **Insured** represents that the statements contained in **The Wrap Application**, any **Coverage Part Application**, or any other application completed for the proposed **Policy**, all of which are deemed to be attached to, incorporated into, and form a part of, this **Policy**, are said **Insured's** agreements and representations, that such representations are material to the Company's acceptance of this risk, that this **Policy** is issued in reliance upon the truth of such representations, and that this **Policy** embodies all agreements existing between said **Insured** and the Company or any of its agents relating to this insurance.

In the event that any statement or representation in **The Wrap Application** or **Liability Coverage Part Application** is untrue, the **Policy** or such **Liability Coverage Part(s)**, respectively shall be void and of no effect whatsoever, but only with respect to:

       1.    any **Insured Person** who knew, as of the **Policy** Inception Date, that the statement or representation was untrue;

       2.    the **Insured Organization**, to the extent it indemnifies any such **Insured Person** under any **Liability Coverage Part**; and

       3.    the **Insured Organization**, under any **Liability Coverage Part**, if any **Executive Officer** knew, as of the **Policy** Inception Date, that the statement or representation was untrue.

Whether an **Insured Person** or **Executive Officer** had such knowledge shall be determined without regard to whether the **Insured Person** or **Executive Officer** actually knew **The Wrap Application** or applicable **Coverage Part Application** contained such untrue statement or representation.

With regard to the **Crime Coverage Parts**, this insurance is void in any case of fraud by the **Insured Organization** as it relates to this insurance at any time. It is also void if the **Insured Organization** or any other **Insured**, at any time, intentionally conceals or misrepresents a material fact concerning:

       a.    this insurance;

       b.    the **Money,Sec urities** or other property;

       c.    the **Insured's** interest in the **Money, Securities** or other property; or

       d.    a claim under this insurance.

Q.    **CONTINUITY OF COVERAGE.**

The **Liability Coverage Parts** shall not apply to any **Claims** based upon, alleging, arising out of, directly or indirectly resulting from, or in any way relating to any fact, circumstance, situation, transaction, event, **Wrongful Act**, or **Wrongful Employment Practice** about which an **Insured** under the Directors and Officers Liability and Fiduciary Coverage Parts or an **Executive Officer** under the Employment Practices Liability Coverage Part had knowledge prior to the Continuity Date set forth in ITEM 7 of the Declarations for each applicable **Liability Coverage Part**.

R.     **AUTHORIZATION.**

By acceptance of this **Policy**, the **Parent Corporation** agrees to act on behalf of all **Insureds** with respect to the payment of premiums, the receiving of any return premiums that may become due under the **Policy**, and the receiving of notices of cancellation, nonrenewal, or change of coverages, and the **Insureds** each agree that they have, individually and collectively, delegated such authority exclusively to the **Parent Corporation**; provided, however, that nothing herein shall relieve the **Insureds**, and each of them, from giving any notice to the Company that is required under Section III.F and III.K of the Common Terms and Conditions of this **Policy**.

S.     **LIBERALIZATION.**

If during the period that insurance is in force under this **Policy**, the Company shall be required, by law or by insurance supervisory authorities of the state in which the **Policy** was issued, to make any changes in the form of this **Policy**, by which the insurance afforded by this **Policy** could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance shall inure to the benefit of the **Insured** hereunder as though such endorsement or substitution of form had been made.

T.     **ENTIRE AGREEMENT.**

The **Insureds** agree that this **Policy**, including any endorsements, **The Wrap Application**, and each **Coverage Part Application**, constitutes the entire agreement between them and the Company or any of its agents relating to this insurance.

U.     **HEADINGS.**

The descriptions in the headings and sub-headings of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage.

V.     **VALUATION.**

1.     <u>**Money**</u>

All premiums, Limits of Liability, Retentions, **Loss**, **Defense Expenses**, and other amounts under this **Policy** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement or invoice is denominated, or other element of **Loss** or **Defense Expenses** is stated in a currency other than United States of America dollars, payment under this **Policy** shall be made in United States dollars at the rate of exchange published in the <u>Wall Street Journal</u> on the date the final judgment is entered, the settlement agreement is executed, the invoice is dated, or the other element of **Loss** or **Defense Expenses** is due, respectively. The Company may, at its option, pay for loss of **Money** issued by any country other than the United States of America at face value in the **Money** issued by that country.

2.     <u>**Securities**</u>

**Loss** of **Securities** are expressed and payable by their value at the close of business on the day the loss was discovered. The Company may, at its option:

        a.     pay the value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the Company all its rights, title and interest in and to those **Securities**; or

        b.     pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**. However, the Company will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the **Securities** at the close of business on the day the loss was discovered or any applicable remaining limit of liability.

3.    **Property**

    a.    Loss of, or loss from damage to, other property or loss from damage to the **Premises** are expressed and payable by the:

        (i)    actual cash value of the property on the day the loss was discovered;

        (ii)    cost of repairing the property or **Premises**; or

        (iii)    cost of replacing the property with property of like kind and quality.

The Company may, at its option, pay the actual cash value of the property or repair or replace it. If the Company cannot agree with the **Insured** upon the actual cash value or the cost of repair or replacement, the value or cost will be determined by arbitration.

    b.    The Company may, at its option, pay for loss of, or loss from damage to, property other than **Money**:

        (i)    in the **Money** of the country in which the loss occurred; or

        (ii)    in the United States of America dollar equivalent of the **Money** of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered based on the New York foreign exchange selling rates as quoted at 3:00 PM Eastern Standard Time.

    c.    Any property that the Company pays for or replaces becomes its property.

W.    **RECOVERIES.**

    1.    All recoveries from third parties for payments made under this **Policy** shall be applied (after first deducting the costs and expenses incurred in obtaining such recovery) in the following order of priority:

    a.    the **Insureds** shall first be reimbursed for the amount they have paid which would have been paid under the **Policy** but for the fact that it is in excess of the applicable Limit(s) of Liability under this **Policy**;

    b.    the Company shall then be reimbursed for the amount paid under this **Policy**, and

    c.    any remaining sum shall be applied towards reimbursement of the Retention borne by the **Insured** under this **Policy**.

    2.    Recoveries do not include any recovery:

    a.    from insurance, suretyship, reinsurance, security or indemnity of the Company; or

    b.    with regard to the Fidelity Coverage Part, of original **Securities** after duplicates of them have been issued.

    3.    The **Insured** must transfer to the Company all of its rights of recovery against any person or organization for any loss under the Fidelity Coverage Part sustained by the **Insured** and for which the Company has paid or settled. The **Insured** must also do everything necessary to secure those rights and do nothing after loss to impair them.

IN WITNESS WHEREOF, the Company has caused this Policy to be signed by its authorized Company officers at Hartford, CT.

*Thomas M. Hunkel*

Executive Vice President

*[signature]*

Corporate Secretary


**ST PAUL TRAVELERS**

**IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND
BROKER COMPENSATION**

For information about how St. Paul Travelers compensates independent
agents and brokers, please visit www.StPaulTravelers.com, or you may
request a written copy from Marketing at One Tower Square, 2GSA,
Hartford, Connecticut 06183.

ILT-1037 (04-05)

21

**TEXAS**
**IMPORTANT NOTICE**

To obtain information or make a complaint:

You may contact your agent, or

You may call us for information or to make a complaint at:

860-954-2382

You may also write to us at:

> St. Paul Travelers
> Consumer Affairs
> One Tower Square 5GS
> Hartford, CT  06183-9079

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

1-800-252-3439

You may write:

> The Texas Department of Insurance
> P.O. Box 149104
> Austin, TX  78714-9104
> FAX # (512) 475-1771

PREMIUM OR CLAIM DISPUTES:  Should you have a dispute concerning your premium or about a claim, you should contact the agent or the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

ATTACH THIS NOTICE TO YOUR POLICY:  This notice is for information only and does not become a part or condition of the attached document.

 **ST PAUL TRAVELERS**

**The Wrap** ®

Directors and Officers Liability Coverage Part Declarations                Policy No.104468586

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.  PLEASE READ THE POLICY CAREFULLY.**

| ITEM 1 | **PARENT CORPORATION:**<br>JULIO INVESTORS, LLC<br><br>Principal Address:<br><br>1101 North Union Bower<br>Suite 160<br>IRVING, TX 75061 |
|---|---|
| ITEM 2 | **COVERAGE PART LIMIT OF LIABILITY** (inclusive of **Defense Expenses**):<br><br>(maximum limit of liability for all **Claims** under this **Coverage Part**.) |
| ITEM 3 | **RETENTIONS** (inclusive of **Defense Expenses**):<br>A.                          $0.00  under Insuring Agreement A. for each **Insured Person** for each **Claim**.<br>B. 1.        $50,000.00  under Insuring Agreement B.1. for each **Claim**.<br>B. 2.        $50,000.00  under Insuring Agreement B.2. for each **Claim**. |
| ITEM 4 | **EXTENDED REPORTING PERIOD:**<br>12 months for    150 % of that part of the Policy Period Premium for the Directors and Officers Liability Coverage Part.<br>(If exercised, in accordance with Section III.I. of the Common Terms and Conditions.) |
| ITEM 5 | **NOTICE UNDER SECTIONS III.F. AND III.K. OF THE COMMON TERMS AND CONDITIONS MUST BE ADDRESSED TO:**<br>Travelers Property Casualty<br>Bond Claim Department<br>One Tower Square<br>Hartford, Connecticut 06183-9062 |
| ITEM 6 | **PRIOR AND PENDING PROCEEDING DATE:**<br>December 18, 2001<br>(If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |
| ITEM 7 | **CONTINUITY DATE:**<br>December 18, 2001<br>(If no Continuity Date is entered above, the Continuity Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |

WDO-1000 12/00

 **ST.PAUL TRAVELERS**                                         **The Wrap** ®

**Directors and Officers Liability Coverage Part**

### THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ IT CAREFULLY.

**I.    INSURING AGREEMENTS.**

A.    The Company shall pay on behalf of the **Insured Persons Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts**, including **Wrongful Employment Practices**, except for **Loss** which the **Insured Organization** pays to or on behalf of the **Insured Persons** as indemnification.

B.    The Company shall pay on behalf of the **Insured Organization**:

1.    **Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts**, including **Wrongful Employment Practices**, which the **Insured Organization** pays to or on behalf of the **Insured Persons** as indemnification; and

2.    **Loss** resulting from **Claims** first made during the **Policy Period** against the **Insured Organization** for **Wrongful Acts** other than **Wrongful Employment Practices**.

**II.    DEFINITIONS.**

Whenever appearing in this **Coverage Part**, words and phrases appearing in **bold type** shall have the meanings set forth in this provision:

A.    **"Claim"** means:

1.    a written demand for monetary or non-monetary relief;

2.    a civil proceeding commenced by service of a complaint or similar pleading;

3.    a criminal proceeding commenced by return of an indictment;

4.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, including proceedings before the Equal Employment Opportunity Commission or similar state or federal agency; or

5.    an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

against an **Insured Person** for a **Wrongful Act**, including a **Wrongful Employment Practice**, or against the **Insured Organization** for a **Wrongful Act** other than a **Wrongful Employment Practice**.

B.    **"Insured"** means the **Insured Persons** and the **Insured Organization**.

C.    **"Insured Person(s),"** either in the singular or the plural, means any one or more past, present or future duly elected or appointed directors or officers or members of the Board of Managers of the **Insured Organization**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

WDO-1001 3/99                                                          Page 1 of 5

24

D.    "**Loss**" means **Defense Expenses** incurred by the Company or by the **Insureds** in the defense of a **Claim**, and damages (including any punitive or exemplary damages, where insurable under applicable law), judgments, settlements, pre- judgment interest, post-judgment interest, or other amounts that an **Insured** is legally obligated to pay as a result of a **Claim**; provided, however, that **Loss** shall not include civil or criminal fines; sanctions; liquidated damages; payroll or other taxes; penalties; the multiplied portion of any multiplied damage award; or damages or types of relief deemed uninsurable under applicable law.

E.    "**Outside Entity**" means a corporation or organization, other than the **Insured Organization**, which is exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, as amended.

F.    "**Outside Position**" means service by an **Insured Person** as a director, officer, trustee, regent, governor or equivalent position with an **Outside Entity**, but only during such time that such service is with the knowledge and consent and was at the specific written request of the **Insured Organization**.

G.    "**Wrongful Act**" means:

    1.    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any **Wrongful Employment Practice**, by an **Insured Person** in his or her capacity as a director, officer or member of the Board of Managers of the **Insured Organization**;

    2.    any matter asserted against an **Insured Person** solely by reason of his or her status as a director, officer or member of the Board of Managers of the **Insured Organization**;

    3.    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty, including any **Wrongful Employment Practice**, by an **Insured Person** in his or her **Outside Position**; or

    4.    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Insured Organization** other than **Wrongful Employment Practices**.

## III.    EXCLUSIONS.

A.    This **Coverage Part** shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse **Defense Expenses** for, any **Claim**:

    1.    for damage to, or destruction of, loss of, or loss of use of, any tangible property; or for or arising out of any actual or alleged libel, slander, oral or written publication of defamatory or disparaging material, invasion of privacy, bodily injury, loss of consortium, sickness, emotional distress, loss of reputation, mental anguish, humiliation, disease or death of any person; provided, however, that this exclusion shall not apply to allegations of libel, slander, oral or written publication of defamatory or disparaging material, invasion of privacy, emotional distress, loss of reputation, mental anguish, humiliation, if and only to the extent that such allegations are made as part of a **Claim** against **Insured Persons** for a **Wrongful Employment Practice**;

    2.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged **Pollution**, including but not limited to any such **Claim** alleging damage to the **Insured Organization** or to its shareholders or creditors;

    3.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending civil, criminal, administrative or regulatory proceeding as of the Prior and Pending Proceeding Date in ITEM 6 of the Declarations for this **Coverage Part**;

    4.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date in ITEM 2(a) of the Wrap Declarations, was the subject of any notice given by or on behalf of any **Insured** under any other policy of insurance;

5.     for any actual or alleged violation of responsibilities, duties or obligations imposed upon an **Insured** under **ERISA** or any similar or related federal, state or local law; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Employee** or dependent in, any **Employee Benefit Plan**, fund or program, including contracts or agreements which are not subject to the provisions of **ERISA**;

6.     with respect to any **Subsidiary**, based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any **Wrongful Act** occurring at any time during which such entity was not a **Subsidiary**, or any **Wrongful Act** occurring at any time during which such entity is a **Subsidiary** which is based upon, arises out of, or in any way relates to, directly or indirectly, the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events occurring at any time during which such entity was not a **Subsidiary**;

7.     based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged nuclear reaction, nuclear radiation, nuclear waste, radioactive contamination, radioactive substance, or the hazardous properties of nuclear material or of any nuclear assembly or nuclear component thereof;

8.     by or on behalf of, or in the name or right of, any **Insured**; provided, however, that this exclusion shall not apply to:

a.     any derivative action by or on behalf of, or in the name or right of, the **Insured Organization** brought by a security holder of the **Insured Organization**, and brought and maintained independently of, and without the assistance, participation or intervention of any **Insured**;

b.     any **Claim** in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** and which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this **Coverage Part**; or

c.     any **Claim** brought or maintained by any **Insured Person** for any actual or alleged **Wrongful Termination** of an **Insured Person**;

9.     by or on behalf, or in the name or right of, any **Outside Entity** against an **Insured Person** for a **Wrongful Act** in his or her **Outside Position** with respect to such **Outside Entity**;

10.     based upon, alleging, arising out of, or in any way relating to, directly or indirectly:

a.     the public offer, sale, solicitation or distribution of securities issued by the **Insured Organization** or any **Subsidiary**; or

b.     the actual or alleged violation of any federal, state, local or provincial statute relating to securities, including but not limited to the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder;

provided, however, that if at least thirty (30) days prior to the transaction described in (a) above, the Company receives notice of the proposed transaction and any additional information requested by the Company, the Company shall offer to the **Insured Organization** a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal;

11.     with respect to Insuring Agreement B.2 only:

a.     for any actual or alleged violation of any law, rule or regulation relating to antitrust, or the prohibition of monopolies, activities in restraint of trade, unfair methods of competition or deceptive acts and practices in trade and commerce, including but not limited to any actual or alleged violation of the Sherman Act, the Clayton Act, the Robinson-Patman Act, the Federal Trade Commission Act, the Hart-Scott-Rodino Antitrust Improvements Act or any regulation or rule promulgated under any such Act;

WDO-1001 3/99

Page 3 of 5

26

      b.     for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, service mark, trade name, trade secret or any other intellectual property rights;

      c.     for any actual or alleged violation of responsibilities, duties or obligations imposed on an **Insured** under any law concerning workers' compensation, unemployment insurance, Social Security, or disability insurance, or any similar state, federal or local law or regulation, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the Workers' Adjustment and Retraining Notification Act (WARN), the Fair Labor Standards Act, the Occupational Safety and Health Act (OSHA), the National Labor Relations Act (NLRA), or amendments thereto or regulations promulgated thereunder, or any similar or related law;

      d.     consisting of a hearing, suit, proceeding, audit, investigation or survey by a governmental agency or entity regarding payroll practices, tax payments, wage and hour policies, overtime, vacation pay, payroll withholding, workplace safety or similar or related matters;

      e.     for or arising out of or in consequence of any actual or alleged liability of the **Insured Organization** under any express contract or agreement; for the purposes of this exclusion, an "express contract or agreement" is an actual agreement among the contracting parties, the terms of which are openly stated in distinct or explicit language, either orally or in writing, at the time of its making; or

      f.     based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture.

B.     The Company shall have no duty to pay **Loss**, other than **Defense Expenses**:

     1.     for any **Claim** based upon, arising out of, or in any way relating to, directly or indirectly, any **Insured** committing in fact any intentional dishonest or fraudulent act or omission or any willful violation of any statute, rule or law, or gaining in fact any profit, remuneration or advantage to which such **Insured** was not legally entitled;

     2.     which constitutes costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including but not limited to actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations thereunder, or any related or similar law or regulation;

     3.     which constitutes employee benefits, except and to the extent that a judgment or settlement of a **Claim** includes a monetary component measured by the value of employee benefits as consequential damages for a **Wrongful Act** which is the basis for such judgment or settlement; and

     4.     which constitutes future compensation, including salary and benefits, for an individual who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a **Claim**; or that part of any judgment or settlement which constitutes front pay, future monetary losses including but not limited to pension and other benefits, or other future economic relief or the value or equivalent thereof, if the **Insured Organization** has been ordered, or has the option pursuant to a judgment, order or other award or disposition of a **Claim**, to promote, accommodate, reinstate, or hire the claimant to whom such sums are to be paid, but fails to do so.

**IV.**    **SEVERABILITY OF EXCLUSIONS.**

No conduct of any **Insured Person** shall be imputed to any other **Insured Person** to determine the application of any of the Exclusions set forth in Section III above.

V.    **CONDITIONS.**

A.    **PRESUMPTION OF INDEMNIFICATION.**

     1.    Regardless of whether **Loss** resulting from any **Claim** against **Insured Persons** is actually indemnified, Insuring Agreement B, and the Retention set forth in ITEM 3.B.1 of this **Coverage Part** Declarations, shall apply to any **Loss** as to which indemnification by the **Insured Organization** or any **Outside Entity** is legally permissible, whether or not actual indemnification is made, unless such indemnification is not made by the **Insured Organization** or **Outside Entity** solely by reason of its **Financial Insolvency**.

     2.    The certificate of incorporation, charter, articles of association or other organizational documents of the **Parent Corporation** and each **Subsidiary** and each **Outside Entity**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

B.    **OUTSIDE POSITIONS – OTHER INSURANCE AND INDEMNIFICATION.**

     With respect to **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Positions**, this **Coverage Part** shall apply only as excess insurance over, and shall not contribute with, any other valid and collectible insurance available to such **Insured Persons** and any indemnification by any person or entity (including any **Outside Entity**, but not including the **Insured Organization**) available to such **Insured Persons** in connection with their service in **Outside Positions**.

C.    **COORDINATION WITH EMPLOYMENT PRACTICES LIABILITY COVERAGE PART.**

Any **Loss** covered by both this **Coverage Part** and the Employment Practices Liability Coverage Part of this **Policy** shall be covered first as provided in, and shall be subject to the Limit(s) of Liability and Retention applicable to, the Employment Practices Liability Coverage Part.  Any remaining **Loss** otherwise covered by this **Coverage Part** which is not paid under the Employment Practices Liability Coverage Part shall be covered as provided in, and shall be subject to the Limit(s) of Liability and Retention(s) applicable to, this **Coverage Part**; provided the Limit(s) of Liability and Retention(s) applicable to such **Loss** under this **Coverage Part** shall be reduced by the amount of **Loss** otherwise covered by this **Coverage Part** which is paid by the Company or the **Insureds**, respectively, pursuant to the Employment Practices Liability Coverage Part.



**ST PAUL TRAVELERS**

**The Wrap**®

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.  PLEASE READ THE POLICY CAREFULLY.**

| | |
|---|---|
| ITEM 1 | **PARENT CORPORATION:**<br><br>JULIO INVESTORS, LLC<br><br><br>Principal Address:<br><br>1101 North Union Bower<br>Suite 160<br>IRVING, TX 75061 |
| ITEM 2 | **COVERAGE PART LIMIT OF LIABILITY** (inclusive of **Defense Expenses**):<br><br>(maximum limit of liability for all **Claims** under this **Coverage Part**.) |
| ITEM 3 | **RETENTION** (inclusive of **Defense Expenses**):<br>            $250,000.00  for each **Claim**. |
| ITEM 4 | **EXTENDED REPORTING PERIOD:**<br>            12 months for     150% of that part of the Policy Period Premium for the Employment Practices Liability Coverage Part..<br><br>(If exercised, in accordance with Section III.I. of the Common Terms and Conditions.) |
| ITEM 5 | **NOTICE UNDER SECTIONS III.F. AND III.K. OF THE COMMON TERMS AND CONDITIONS MUST BE ADDRESSED TO:**<br>Travelers Property Casualty<br>Bond Claim Department<br>One Tower Square<br>Hartford, Connecticut 06183-9062 |
| ITEM 6 | **PRIOR AND PENDING PROCEEDING DATE:**<br>            December 18, 2001<br><br>(If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |
| ITEM 7 | **CONTINUITY DATE:**<br>            December 18, 2001<br><br>(If no Continuity Date is entered above, the Continuity Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.) |

WEP-1000 (12-00)

29

 **ST PAUL TRAVELERS**

**The Wrap** ®

## Employment Practices Liability Coverage Part

**THIS IS A CLAIMS MADE COVERAGE PART WITH DEFENSE EXPENSES INCLUDED
IN THE LIMIT OF LIABILITY.  PLEASE READ IT CAREFULLY.**

### I.  INSURING AGREEMENT.

The Company shall pay on behalf of the **Insured Loss** resulting from **Claims** first made during the **Policy Period** by a **Claimant** against the **Insured** for **Wrongful Employment Practices**.

### II.  DEFINITIONS.

Whenever appearing in this **Coverage Part,** words and phrases appearing in **bold type** shall have the meanings set forth in this provision:

A.    "**Claim**" means:

      1.    a written demand for monetary or non-monetary relief;

      2.    a civil proceeding commenced by service of a complaint or similar pleading;

      3.    a criminal proceeding commenced by return of an indictment;

      4.    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document, including proceedings before the Equal Employment Opportunity Commission or similar state or federal agency; or

      5.    an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

by or on behalf of or for the benefit of a **Claimant,** seeking to hold an **Insured** liable for a **Wrongful Employment Practice** involving or arising from such **Claimant's** actual or potential employment with the **Insured Organization**.

**Claim** does not include a union grievance or demand for arbitration under a union contract, or any matter related to or arising out of any union contract, any labor negotiation, any labor dispute, any union organizing effort, or any unfair labor practice charge within the jurisdiction of the National Labor Relations Board.

B.    "**Claimant**" means (1) a present or former **Employee** of or applicant for employment with the **Insured Organization,** and (2) a governmental entity or agency, including but not limited to the Equal Employment Opportunity Commission or similar state or local agency, when acting on behalf of or for the benefit of present or former **Employees** or applicants for employment.

C.    "**Insured**" means the **Insured Persons** and the **Insured Organization.**

D.    "**Insured Person(s),**" either in the singular or the plural, means a present or former **Employee** or a duly elected director or member of the Board of Managers of the **Insured Organization** for alleged **Wrongful Employment Practices** committed in the discharge of his or her duties as such.

In the event of the death, incapacity or bankruptcy of an **Insured Person,** any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Employment Practice** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person.**

WEP-1001 3/99                                                                                                    Page 1 of 3

30

E.    "**Loss**" means **Defense Expenses** incurred by the Company or by the **Insureds** in the defense of a **Claim**, and damages (including back pay and front pay, compensatory damages, and punitive damages if insurable under applicable law), judgments, settlements, pre-judgment interest, post-judgment interest, or other amounts that an **Insured** is legally obligated to pay as a result of a **Claim**;  provided, however, that **Loss** shall not include civil or criminal fines; sanctions; liquidated damages; payroll or other taxes; the multiplied portion of any multiplied damage award (except multiple damages awarded under the Equal Pay Act or the Age Discrimination in Employment Act (ADEA)); or damages or types of relief deemed uninsurable under applicable law.

## III.    EXCLUSIONS.

A.    This **Coverage Part** shall not apply to, and the Company shall have no duty to defend or to pay, advance or reimburse **Defense Expenses** for, any **Claim**:

1.    for damage to, or destruction of, loss of, or loss of use of, any tangible property; or for or arising out of any actual or alleged bodily injury, loss of consortium, sickness, disease or death of any person; provided, however, that this exclusion shall not apply to **Loss** for emotional distress, loss of reputation, mental anguish, or humiliation caused by a **Wrongful Employment Practice**.

2.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged **Pollution**, including but not limited to any such **Claim** alleging damage to the **Insured Organization** or to its shareholders or creditors; provided, however, that this exclusion shall not apply to **Claims** for alleged **Retaliation** against an **Employee** with regard to such matters;

3.    for or arising out of or in consequence of the liability of others assumed by an **Insured** under any contract or agreement, whether oral or written, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement;

4.    for any actual or alleged violation of responsibilities, duties or obligations imposed on an **Insured** under any law concerning workers' compensation, unemployment insurance, Social Security, or disability insurance, or any similar state, federal or local law or regulation, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the Workers' Adjustment and Retraining Notification Act (WARN), the Fair Labor Standards Act (FLSA) (except the Equal Pay Act), the Occupational Safety and Health Act (OSHA), or amendments thereto or regulations promulgated thereunder, or any similar or related law; provided, however, that this exclusion shall not apply to **Claims** for alleged **Retaliation** due to an **Employee's** exercise of rights under such laws;

5.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any fact, circumstance, situation, transaction, event or **Wrongful Employment Practice** underlying or alleged in any prior and/or pending civil, criminal, administrative or regulatory proceeding as of the Prior and Pending Proceeding Date in ITEM 6 of the Declarations for this **Coverage Part**;

6.    for any actual or alleged violation of responsibilities, duties or obligations imposed upon an **Insured** under **ERISA** or any similar or related federal, state or local law; or for an **Insured's** failure to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an **Employee** or dependent in, any **Employee Benefit Plan**, fund or program, including contracts or agreements which are not subject to the provisions of **ERISA**;

7.    for or arising out of any alleged violation of Executive Order 11246 (Office of Federal Contract Compliance Programs) or the False Claims Act (FCA);

8.    consisting of a hearing, suit, proceeding, audit, investigation or survey by a governmental agency or entity regarding payroll practices, tax payments, wage and hour policies, overtime, vacation pay, payroll withholding, workplace safety or similar or related matters;

9.    based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any actual or alleged nuclear reaction, nuclear radiation, nuclear waste, radioactive contamination, radioactive substance, or the hazardous properties of nuclear material or of any nuclear assembly or nuclear component thereof; and

10.    with respect to any **Subsidiary**, based upon, alleging, arising out of, or in any way relating to, directly or indirectly, any **Wrongful Employment Practice** occurring at any time during which such entity was not a **Subsidiary**, or any **Wrongful Employment Practice** occurring at any time during which such entity is a **Subsidiary** which is based upon, arises out of, or in any way relates to, directly or indirectly, the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events occurring at any time during which such entity was not a **Subsidiary**.

B.    The Company shall have no duty to pay **Loss**, other than **Defense Expenses**:

1.    for any **Claim** based upon, arising out of, or in any way relating to, directly or indirectly, any **Insured** committing in fact any intentional dishonest or fraudulent act or omission, or gaining in fact any profit, remuneration or advantage to which such **Insured** was not legally entitled;

2.    which constitutes costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including but not limited to actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations thereunder, or any related or similar law or regulation;

3.    which constitutes severance pay or penalties under an employment contract, or any agreement, policy or procedure providing for payment in the event of separation from employment; or sums sought solely on the basis of a claim for unpaid services under an express or implied agreement;

4.    which constitutes medical, pension, disability, life insurance or other similar employee benefits, except and to the extent that a judgment or settlement of a **Claim** includes a monetary component measured by the value of pension, medical, disability, life insurance or other similar employee benefits as consequential damages for a **Wrongful Employment Practice** which is the basis for such judgment or settlement;

5.    which constitutes future compensation, including salary or benefits, for an individual who has been or will be hired, promoted or reinstated to employment pursuant to a settlement, court order, judgment, award or other resolution of a **Claim**; or that part of any judgment or settlement which constitutes front pay, future monetary losses including but not limited to pension and other benefits, or other future economic relief or the value or equivalent thereof, if the **Insured** has been ordered, or has the option pursuant to a judgment, order or other award or disposition of a **Claim**, to promote, accommodate, reinstate, or hire the **Employee** to whom such sums are to be paid, but fails to do so; and

6.    which constitutes that part of any judgment or settlement which is payable to, or which constitutes recovery for the benefit of, or which is in compensation for or measured by injury to, any person or entity other than a **Claimant**.

## IV.    SEVERABILITY OF EXCLUSIONS.

No conduct of any **Insured Person** shall be imputed to any other **Insured Person** to determine the application of any of the Exclusions set forth in Section III above.

## V.    COORDINATION WITH OTHER LIABILITY COVERAGE PARTS.

Any **Loss** covered by this **Coverage Part** and either the Directors and Officers Liability Coverage Part or the Fiduciary Liability Coverage Part of this **Policy** (if purchased) shall be first covered as provided in, and subject to the Limit(s) of Liability and Retention applicable to, this **Liability Coverage Part**.

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**TEXAS AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**Common Terms and Conditions**

It is agreed that:

1.      With respect to the Common Terms and Conditions, Section III. **CONDITIONS** C. LIMITS OF LIABILITY Sub-section 4.a. is deleted in its entirety.

2.      With respect to the Common Terms and Conditions, Section III. **CONDITIONS** C. LIMITS OF LIABILITY Sub-section 4.b. is deleted in its entirety and replaced by the following:

C.      **LIMITS OF LIABILITY.**

    4.      **Other Provisions**

        b.  With respect to the **Liability Coverage Parts** only: **Defense Expenses** incurred by the Company or by the **Insureds** in defense of a **Claim** are part of and not in addition to all applicable Limits(s) of Liability, and the payment by the Company or by the **Insureds** of **Defense Expenses** reduces all applicable Limit(s) of Liability.

3.      With respect to the Common Terms and Conditions, Section III. **CONDITIONS** V. VALUATION is amended by the addition of the following:

    4.      In the event arbitration is utilized, each party will select a competent and impartial arbitrator.  The two arbitrators will select an umpire.  If they cannot agree for 15 days upon such umpire, either may request that selection be made by a judge of a court having jurisdiction.  The arbitrators will state separately the value of the property and amount of loss.  If they fail to agree, they will submit their difference to the umpire.  A decision agreed to by any two will be binding.  Each party will:

        a.      Pay its chosen arbitrator; and

        b.      Bear the other expenses of the arbitration and umpire equally.

If the Company submits to an arbitration, the Company will still retain the right to deny the **Claim**.

4.      With respect to the **Crime Coverage Parts:**

    a.      Not later than 15 days after receipt of a written notice of claim, the Company agrees to 1) acknowledge receipt of the written notice of claim and 2) request information necessary to begin the investigation of the matter.

    b.      Except as provided in 5.c. below, not later than 15 business days after the Company receives all items, statements and forms required by the Company in order to secure final proof of loss, the Company agrees to notify the **Insured** in writing of the acceptance or rejection of the claim.

    c.      If the Company is unable to accept or reject the claim within the period specified in 5.b. above, the Company shall notify the **Insured**, not later than the date specified in 5.b. above, that the Company needs additional time, not to exceed 45 days from the date of said notification to the **Insured**.

    d.      If the Company rejects the claim, the notification provided to the **Insured** must state the reasons for the rejection.

    e.      If the Company notifies the **Insured** that it is willing to pay a claim or part of a claim, the Company shall pay the agreed amount not later than 5 business days after such notification.  If the payment is conditioned on the performance of an act by the **Insured**, the Company shall pay the agreed amount not later than 5 business days after the date the act is performed.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above mentioned **Policy**, except as expressly stated herein. This endorsement is effective at the Inception Date stated in ITEM 2. of the Wrap Declarations and this endorsement is part of such **Policy** and incorporated therein.

W-1537 (03-99)

Page 2 of 2

34

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO:  104468586

ISSUED TO: JULIO INVESTORS, LLC

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### AMEND INSURED ORGANIZATION TO INCLUDE SCHEDULED ENTITY –
### VICARIOUS LIABILITY ONLY

This endorsement modifies insurance provided under the following **Coverage Parts** as indicated:

**Directors and Officers Liability Coverage Part**
**Employment Practices Liability Coverage Part**
**Fiduciary Liability Coverage Part**

In consideration of the payment of premium and solely with respect to the above indicated **Coverage Parts** only:

Section **II. DEFINITIONS**. K. "**Insured Organization**" of the **Common Terms and Conditions** is amended to include **Maplewood Equity Partners, LP**
(the "Additional Insured") but only to the extent the Additional Insured incurs **Loss** resulting from **Wrongful Acts** or **Wrongful Employment Practices** committed, or alleged to have been committed, by any **Insured Organization** or **Insured Persons** other than the Additional Insured or any past, present, or future, director, officer or employee of the Additional Insured.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on
  **September 1, 2006**, if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:      _____
                  On behalf of the entity named in
                  ITEM 1 of the Declarations.

                  _____
                  Authorized Company Representative

W-1051 (02-00)

35

ISSUED BY: **Travelers Casualty and Surety Company of America**    POLICY NO: 104468586

ISSUED TO: **JULIO INVESTORS, LLC**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**BEST FOOT FORWARD ENDORSEMENT**
**(COMMON TERMS AND CONDITIONS)**

This endorsement modifies insurance provided under the following:

**Common Terms and Conditions**

In consideration of the payment of the premium:

1.    Section **II. DEFINITIONS.** E. **"Discrimination"** of the Common Terms and Conditions is deleted and replaced with the following:

E.    **"Discrimination"** means any actual or alleged: (1) violation of any employment discrimination law; or (2) disparate treatment of, or the failure or refusal to hire a **Claimant** because he or she is or claims to be a member of a class which is or is alleged to be legally-protected.

2.    The first paragraph in Section **II. DEFINITIONS.** F. **"Employee"** of the Common Terms and Conditions is deleted and replaced with the following, but only with regard to the **Liability Coverage Parts**:

F.    **"Employee"** means an individual whose labor or service is engaged by and directed by the **Insured Organization** (1) who is paid through the payroll of the **Insured Organization**, including part-time, seasonal and temporary workers, (2) who is a volunteer or (3) whose services have been leased by the **Insured Organization**. Independent contractors are not **Employees**. The status of an individual as an **Employee** shall be determined as of the date of the alleged **Wrongful Employment Practice**.

3.    Section **II. DEFINITIONS.** AA. **"Wrongful Employment Practice"** of the Common Terms and Conditions is amended to include any violation of the Family Medical Leave Act and any failure to create or enforce adequate workplace or employment policies and procedures occurring in the course of and arising out of the **Claimant's** employment or application for employment with the **Insured Organization**.

4.    Solely with respect to the Directors and Officers Liability and the Fiduciary Liability Coverage Parts, Section **III. CONDITIONS.** D. **DEFENSE, INVESTIGATION AND SETTLEMENT.** 4. of the Common Terms and Conditions is deleted and replaced with the following:

4.    The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient, and if the **Insured** shall refuse to consent to the settlement of any **Claim** as recommended by the Company based upon a judgment or a bona fide offer of settlement, then the **Insured** thereafter shall negotiate or defend such **Claim** independently of the Company and on the **Insured's** own behalf. In such event the **Insured** shall be solely responsible for thirty percent (30%) of all **Defense Expenses** and other costs and expenses incurred or paid by the **Insured** after the date the **Insured** refused to consent to settlement as recommended by the Company, and the **Insured** shall also be responsible for thirty percent (30%) of all **Damages** in excess of the amount for which settlement could have been made as recommended by the Company, provided, however that the Company's liability under this Policy for such **Claim** will not exceed the remaining portion of the applicable Limit(s) of Liability.

W-1100 (01-03)                                                                                                                                Page 1 of 3

36

5.    Section **III.** **CONDITIONS.** H. **CHANGE OF EXPOSURE.** 1. <u>Formation or Acquisition of Subsidiary, Premises or Pension Plan</u> a. of the Common Terms and Conditions is deleted and replaced with the following:

    1.    <u>Formation or Acquisition of Subsidiary, Premises or Pension Plan</u>

        a.    With regard to the **Liability Coverage Parts**, if, during the **Policy Period**, the **Insured Organization** forms or acquires a **Subsidiary** or **Pension Plan** (other than an employee stock ownership plan) that is then solely sponsored by the **Insured Organization** or jointly by the **Insured Organization** and a labor organization exclusively for the benefit of the **Employees** of the **Insured Organization**, the **Policy** will provide coverage for that acquired or formed **Subsidiary** or **Pension Plan** and their respective **Insured Persons**, subject to all other terms and conditions of this **Policy**, but only for **Claims** for **Wrongful Acts** or **Wrongful Employment Practices** under the **Liability Coverage Parts** that occur wholly during the time that the **Insured Organization** is sole sponsor with regard to the **Pension Plan** or owns more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors, provided written notice of such formation or acquisition has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company's underwriters may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for the acquired or formed **Subsidiary** or **Pension Plan** shall not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Parent Corporation** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement shall not apply, however, if (1) the assets of the acquired or formed **Subsidiary** do not exceed twenty five percent (25%) of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent audited consolidated financial statements, (2) the total assets of the acquired or formed **Pension Plan**, as of the effective date of such acquisition or formation, do not exceed twenty five percent (25%)
    of the total plan assets shown on the most recent application submitted by the **Insured Organization**, or (3) the acquisition or formation occurs less than ninety (90) days prior to the end of the **Policy Period.**

    Notwithstanding the foregoing, no coverage shall be provided pursuant to this Subsection III.H.1. for any employee stock ownership plan or any natural person or **Insured Organization** with respect thereto unless the Company, by specific written endorsement hereto, agrees to provide such coverage. Any such coverage shall be at the terms and conditions set forth in the endorsement and for such additional premium as may be required by the Company.

6.    Section **III.** **CONDITIONS.** I. **EXTENDED REPORTING PERIOD.** 4. of the Common Terms and Conditions is deleted and replaced with the following:

    4.    The right to elect the Extended Reporting Period under this subsection III.I. shall terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within sixty (60) days of the effective date of nonrenewal or cancellation.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

W-1100 (01-03)                                                                 Page 2 of 3

This endorsement is effective at the Inception Date stated in ITEM 2 of the Wrap Declarations or effective at 12:01 A.M. on **September 1, 2006**, if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:      _____

On behalf of the entity named in
ITEM 1 of the Declarations.


_____

Authorized Company Representative

**ISSUED BY:** Travelers Casualty and Surety Company of America          **POLICY NO:** 104468586

**ISSUED TO:** JULIO INVESTORS, LLC

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### MAJOR PARTY EXCLUSION
### (OTHER THAN INSURED)

This endorsement modifies insurance provided under the following:

**Directors and Officers Liability Coverage Part**

In consideration of the payment of the premium, Section III.  **EXCLUSIONS.**   A.  of the Directors and Officers Liability Coverage Part is amended by adding the following:

> brought or maintained by or on behalf of, or in the name or right of, or as assignee of, or with the solicitation, assistance, participation or intervention of (a) any person or entity listed in the Schedule set forth below, (b) any subsidiary, affiliate or general or limited partner, if any, of any such entity, or (c) any director, officer, trustee, employee, security holder, receiver, conservator, liquidator or rehabilitator of such entity or of any of its subsidiaries, affiliates or general or limited partners; provided, however, that this exclusion shall not apply to any **Insured.**

> **Maplewood Equity Partners, LP and Affiliated Companies**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on
 **September 1, 2006** , if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:          _____
                           On behalf of the entity named in
                           ITEM 1 of the Declarations.

                           _____
                           Authorized Company Representative

WDO-2116 (04-02)

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586
ISSUED TO: JULIO INVESTORS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**BEST FOOT FORWARD ENDORSEMENT**
**(DIRECTORS AND OFFICERS LIABILITY COVERAGE PART)**

This endorsement modifies insurance provided under the following:

**Directors and Officers Liability Coverage Part**

In consideration of the payment of the premium:

1.   Section **II.  DEFINITIONS.**  A.  "**Claim**" of the Directors and Officers Liability Coverage Part is amended by adding the following:

     6.     a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

2.   Section **II.  DEFINITIONS.**  C.  "**Insured Person(s)**" of the Directors and Officers Liability Coverage Part is deleted and replaced with the following:

     C.     "**Insured Person(s),**" either in the singular or the plural, means any one or more past, present, or future:

          (1)     duly elected or appointed director, officer, or member of the board of managers, including any natural person serving in a comparable capacity outside of the United States;

          (2)     in-house legal counsel; or

          (3)     member of the staff, faculty or any duly constituted committee;

     of the Insured Organization.

     **Insured Person(s)**, either in the singular or the plural, also means any one or more past, present, or future **Employee** serving the **Insured Organization** in a capacity other than one enumerated above but (a) only while acting within the scope of his or her employment and (b) only if such **Employee** is included as a co-defendant in such **Claims** contemporaneously with or subsequent to the naming of an **Insured Person** serving the **Insured Organization** in a capacity enumerated above.

     Subject to the foregoing, in the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

3.   Section **II.  DEFINITIONS.**  D.  "**Loss**" of the Directors and Officers Liability Coverage Part is amended to substitute the words "(including any punitive or exemplary damages where insurable under the applicable law most favorable to the insurability of punitive or exemplary damages)" for the words "(including any punitive or exemplary damages where insurable under applicable law)."

40

4.      Section III. **EXCLUSIONS.** A.2. of the Directors and Officers Liability Coverage Part is amended to replace the words "including but not limited to any such **Claim** alleging damage to the **Insured Organization** or to its shareholders or creditors" with the words "provided, that this exclusion shall not apply to any **Claim** brought directly or derivatively by a shareholder of the **Insured Organization** in his or her capacity as such."

5.      Section III. **EXCLUSIONS.** A.10. of the Directors and Officers Liability Coverage Part is deleted and replaced with the following:

    10.     based upon, alleging, arising out of or in any way relating to, directly or indirectly:

        (a)      the public offer, sale, solicitation or distribution of securities issued by the **Insured Organization** or any **Subsidiary**; or

        (b)      the actual or alleged violation of any federal, state, local or provincial statute relating to securities, including but not limited to the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder;

provided, however, that this exclusion will not apply to any offer, purchase or sale of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933 (an "Exempt Transaction").

If at least thirty (30) days prior to an offering of securities of the **Insured Organization** or any **Subsidiary**, other than pursuant to an Exempt Transaction, the Company receives notice of the proposed transaction and any additional information requested by the Company, the Company shall offer to the **Insured Organization** a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal.

6.      Section III. **EXCLUSIONS.** B.1. of the Directors and Officers Liability Coverage Part is deleted and replaced with the following:

    1.      for any **Claim** based upon, arising out of, or in any way relating to, directly or indirectly, any **Insured**:

        a.      committing any intentional, dishonest or fraudulent act or omission;

        b.      committing any willful violation of any statute, rule or law; provided, that this subparagraph b. will not apply to any **Claim** against **Insured Persons** for a **Wrongful Employment Practice**; or

        c.      gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled.

Subparagraphs a. and b. above shall not apply unless a judgment or other final adjudication establishes that such **Insured** committed such intentional, dishonest or fraudulent act or willful violation;

7.      Section V. **CONDITIONS.** of the Directors and Officers Liability Coverage Part is amended by adding the following:

**ORDER OF PAYMENT**

    1.      If **Loss** from any **Claim** exceeds the remaining available limit of liability applicable to this **Coverage Part** ("Excess Limit Claim"), then:

        a.      the Company first will pay **Loss** from such Excess Limit Claim under Section **I. INSURING AGREEMENTS.** A., and
        b.      to the extent that any amount of the applicable Limit of Liability shall remain available, the Company shall pay **Loss** from such Excess Limit Claim under Section **I. INSURING AGREEMENTS.** B.1. and B.2., as applicable; provided, that upon written request of the **Insured Organization**, the Company shall either pay or withhold payment of **Loss** from such Excess Limit Claim under Section **I. INSURING AGREEMENTS.** B.1. and B.2., as applicable.

2.      If the **Insured Organization** requests that the Company withhold payment of **Loss**, as provided in paragraph 1.b. above, the Company shall continue to withhold payment unless and until the **Insured Organization** shall request the Company to either release such payment to the **Insured Organization** on account of such Excess Limit Claim, or apply such payment to **Loss** from any future **Claim** under Section **I. INSURING AGREEMENTS.** A.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Wrap Declarations or effective at 12:01 A.M. on **September 1, 2006** , if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:      _____
                        On behalf of the entity named in
                        ITEM 1 of the Declarations.

                        _____
                        Authorized Company Representative

WDO-2125 (01-03)                                                                                    Page 3 of 3

42

ISSUED BY: **Travelers Casualty and Surety Company of America**          POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### BEST FOOT FORWARD ENDORSEMENT
### (EMPLOYMENT PRACTICES LIABILITY COVERAGE PART)

This endorsement modifies insurance provided under the following:

**Employment Practices Liability Coverage Part**

In consideration of the payment of the premium:

1.  Section **II. DEFINITIONS.** A. **"Claim"** of the Employment Practices Liability Coverage Part is amended by adding the following:

    6.  a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

2.  For purposes of this endorsement the term **"Independent Contractor"** means any natural person independent contractor who performs labor or service solely for the **Insured** on a full-time basis pursuant to a written contract or agreement, where such labor or service is under the exclusive direction of the **Insured**. The status of an individual as an **Independent Contractor** shall be determined as of the date of the alleged **Wrongful Employment Practice.**

3.  Section **II. DEFINITIONS.** B. **"Claimant"** of the Employment Practices Liability Coverage Part is amended to include any **Independent Contractor.**

4.  Section **II. DEFINITIONS.** E. **"Loss"** of the Employment Practices Liability Coverage Part is amended to substitute the words "punitive or exemplary damages if insurable under the applicable law most favorable to the insurability of punitive or exemplary damages" for the words "punitive or exemplary damages if insurable under applicable law."

5.  Section **III. EXCLUSIONS.** B.3. of the Employment Practices Liability Coverage Part is deleted and replaced with the following:

    3.  that constitutes severance pay, damages or penalties under an employment contract, or any agreement, policy or procedure providing for payment in the event of separation from employment; or sums sought solely on the basis of a claim for unpaid services under an express or implied agreement;

6.  Section **III. EXCLUSIONS.** B.4. of the Employment Practices Liability Coverage Part is deleted and replaced with the following:

    4.  that constitutes medical, pension, disability, life insurance, stock options or other similar employee benefits, except and to the extent that a judgment or settlement of a **Claim** includes a monetary component measured by the value of pension, medical, disability, life insurance, stock options or other similar employee benefits as consequential damages for a **Wrongful Employment Practice** which is the basis for such judgment or settlement;

WEP-1098 (01-03)                                                          Page 1 of 2

43

7.    Section **III.** **EXCLUSIONS.** A.7., B.1. and B.6. of the Employment Practices Liability Coverage Part are deleted.

8.    Section **III.** **EXCLUSIONS.** A. of the Employment Practices Liability Coverage Part is amended by adding the following:

for liability under any agreement governing the terms of the labor or service of an **Independent Contractor**, temporary worker or leased employee with the **Insured Organization**;

9.    Solely with respect to **Claims** for **Wrongful Employment Practices**, Section **III.** **CONDITIONS.** D. **DEFENSE, INVESTIGATION AND SETTLEMENT.** 4. of the Common Terms and Conditions is deleted and replaced with the following:

4.    The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that the Company recommends a bona fide offer of settlement of any **Claim** that is acceptable to the **Claimant** (a "Settlement Offer"), and:

a.    the **Insured** consents to such Settlement Offer within thirty (30) days of being made aware of such offer by the Company; and

b.    the amount of such Settlement Offer:

(1)    is less than the limit of liability set forth in the Wrap Declarations that is applicable to the Employment Practices Liability Coverage Part and available at the time; and

(2)    combined with **Defense Expenses** incurred with respect to such **Claim**, exceeds the Retention set forth in ITEM 3 of the Declarations to the Employment Practices Liability Coverage Part;

then the Retention shall be retroactively reduced by ten percent (10%) with respect to such **Claim**.

If the **Insured** does not consent to a Settlement Offer within thirty (30) days of being made aware of such offer by the Company then:

a.    the Retention shall not be reduced as provided above even if consent is given to a subsequent Settlement Offer; and

b.    the **Insured** shall be solely responsible for thirty percent (30%) of all **Defense Expenses** incurred after the **Insured** refused to consent to such Settlement Offer, and the **Insured** shall also be responsible for thirty percent (30%) of all **Loss** in excess of the amount of such Settlement Offer; provided, that in no event shall the Company's liability under this Policy for such **Claim** exceed the remaining portion of the limit of liability set forth in the Wrap Declarations that is applicable to the Employment Practices Liability Coverage Part.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Wrap Declarations or effective at 12:01 A.M. on **September 1, 2006**, if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:    _____
On behalf of the entity named in
ITEM 1 of the Declarations.


_____
Authorized Company Representative

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104468586

ISSUED TO: JULIO INVESTORS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**THIRD PARTY LIABILITY FOR SEXUAL HARASSMENT AND DISCRIMINATION
WITH SUBLIMIT AND SEPARATE RETENTION**

This endorsement modifies insurance provided under the following:

**Employment Practices Liability Coverage Part**

In consideration of the payment of the premium:

1.    Section II. **DEFINITIONS.** A. "**Claim**" of the Employment Practices Liability Coverage Part is amended by adding the following:

"**Claim**" also includes a written demand or notice including an actual or proposed summons, pleading or other legal document (whether or not filed with a court or agency having jurisdiction) submitted to an **Insured** or an authorized agent for service of process on the **Insured**, by or on behalf of or for the benefit of any individual other than an **Employee** stating an intent to hold an **Insured** liable for **Sexual Harassment** or **Discrimination**.

2.    Section II. **DEFINITIONS.** B. "**Claimant**" of the Employment Practices Liability Coverage Part is deleted and replaced with the following:

B.       "**Claimant**" means (1) a present or former **Employee** of or applicant for employment with the **Named Insured**, (2) a governmental entity or agency, including but not limited to the Equal Employment Opportunity Commission or similar state or local agency, when acting on behalf of or for the benefit of present or former **Employee** or applicants for employment or (3) with respect to allegations of **Sexual Harassment** and **Discrimination** only, any natural person, including but not limited to, an **Employee**.

3.    Section II. **DEFINITIONS.** E. "**Discrimination**" of the Common Terms and Conditions is deleted and replaced with the following:

E.       "**Discrimination**" means actual or alleged:

1.       Failure or refusal to hire or employ an applicant for employment with the **Named Insured**,

2.       Termination or constructive termination of an employment relationship with the **Named Insured**,

3.       Refusal to train or promote, or demotion of, an **Employee**,

4.       Any other act or omission by which an **Insured** allegedly treats one **Employee** differently from another in compensation, terms, conditions, opportunities or privileges of employment, including acts or practices taken for the purpose of or which have the impact of distinguishing among, limiting, segregating or classifying **Employees** or applicants for employment with the **Named Insured** in their compensation terms, conditions, opportunities or privileges of employment, or

5.       unfair or disparate treatment of any natural person

on any of the following grounds: race, color, national origin, religion, creed, gender, sexual orientation, pregnancy, disability, medical condition, age, marital status, Vietnam Era Veteran status, military service, or any other legally protected category, status or characteristic established pursuant to federal, state or other law, regulation or ordinance pertaining to discrimination, including but not limited to Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, or the Americans With Disabilities Act.

4.    Section II. **DEFINITIONS.** U. "**Sexual Harassment**" of the Common Terms and Conditions is deleted and replaced with the following:

WEP-1106 (04-05)                                                                                    Page 1 of 2

45

U.    **"Sexual Harassment"** means unwelcome sexual advances or requests for sexual favors and other verbal, physical or other conduct of a sexual nature (i) which is made a term or condition of a **Claimant's** employment or advancement, or (ii) submission to or rejection of which is used as a basis for decisions affecting the **Claimant,** or (iii) which has the purpose or effect of creating an intimidating, hostile or offensive work environment which unreasonably interferes with the job performance of a **Claimant,** or (iv) which violates the civil rights of any natural person other than an **Employee.**

5.    Section **II. DEFINITIONS.   AA. "Wrongful Employment Practice"** of the Common Terms and Conditions is deleted and replaced with the following:

AA.    **"Wrongful Employment Practice"** means:

1.    any of the following occurring in the course of and arising out of an **Employee's** employment or an applicant's application for employment with the **Insured Organization:** (a) **Wrongful Termination;** (b) breach of oral, implied or written employment agreement; (c) employment-related misrepresentation; (d) wrongful failure to employ; (e) wrongful failure to promote; (f) wrongful discipline; (g) **Retaliation;** (h) wrongful denial of training; (i) wrongful deprivation of career opportunity; (j) wrongful denial or deprivation of seniority; (k) wrongful failure to grant tenure; (l) wrongful evaluation; (m) invasion of privacy; (n) employment-related defamation; (o) **Protected Status Harassment;** (p) employment-related infliction of emotional distress;

2.    any **Sexual Harassment** or

3.    any Discrimination.

6.    Solely with respect to **Claims** for **Sexual Harassment** or **Discrimination** by any natural person other than an **Employee;**

a.    Item 3 of the Employment Practices Liability Coverage Part Declarations is deleted and replaced with the following:

ITEM 3. **RETENTION** (inclusive of **Defense Expenses):**

$250,000.00   for each **Claim.**

b.    the Company's maximum aggregate limit of liability for all Loss, including **Defense Expenses** resulting from all such **Claims** shall be **$1,000,000.00**         which amount shall be part of and not in addition to any applicable Aggregate and Coverage Part Limit of Liability.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on   **September 1, 2006** , if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:    _____
On behalf of the entity named in
ITEM 1 of the Declarations.

_____
Authorized Company Representative



**UNCLE JULIO'S**
C O R P O R A T I O N

January 4, 2007

Travelers Casualty and Surety Company
One Tower Square, Bond, 3PB
Hartford, CT 06183

Re:   The Wrap Policy -- Directors & Officers Liability Insurance and Employment Practices
Liability Insurance        Policy # 104468586

     $2,000,000 Excess of $3,000,000 for the Directors & Officers, Fiduciary and
Employment Practices  Liability Coverage
     Policy No.

As part of the Application for the Policy referenced above (the "Policy"), the undersigned
hereby represents and warrants on behalf of the Insureds, as defined in the Policy, that as of
the date of this letter:

(a)     no Insureds has knowledge of any act, error, omission, fact, circumstance or
        situation which might give rise to a claim under the policy. (Exceptions must be
        disclosed.)

(b)     there are no pending claims against the Insureds. (Exceptions must be disclosed.)

(c)     no claims have been made against any Insureds in their capacity as a director or
        officer of the Parent Corporation. (Exceptions must be disclosed.)

It is agreed that, without prejudice to any other rights and remedies of the Underwriter, any
claim arising from any act, error, omission, fact circumstance or situation disclosed, or
required to be disclosed above, is excluded from coverage under the Policy.

It is agreed that this warranty letter forms part of the Application and that the Underwriter
relied upon the representations contained therein and that the Policy is issued in reliance
upon the truth of such representations.

Acknowledged and Agreed:

By: _____   Print Name: _Richard Levitt_

Title: _CEO_

Date: _Jan 4, 2007_

UNCLE JULIO'S • HACIENDA • RIO GRANDE CAFE • CASA GRANDE
     1101 N Union Bower  Suite 160
           Irving Texas 75061
    t 972 554 6886   f 972 554 6888

47



**Employment Practices Liability PLUS+® Policy**

SUPPLEMENTAL APPLICATION FOR DOWNSIZING EXPOSURE

1. How many employees have (or will be) effected by the reduction in force?    __640_____
   Of those employees, how many hold (or held) management positions?    ___

2. What are the business reasons for the reduction in force?  (Attach a separate sheet if necessary)  _There was not a reduction in force.  Rather, we closed 8 Tia's restaurants.  Each restaurant employs approximately 80 part time employees and 4 management._____

   Has (or will) the Applicant articulated the business reasons for the reduction in force, documented those reasons and communicated them to management?    X Yes ☐No

3. Does the Applicant have a written plan outlining the criteria to be used in selecting employees to be laid off?    X Yes ☐No
   If yes, has that plan been reviewed by counsel?    ☐Yes X No
   If yes, when was that plan last updated?    _Not necessary____
   _____

4. Has (or will) the Applicant conducted an analysis to determine the impact the reduction in force will have on members of any protected class?    ☐Yes ☐No

5. Have (or will) laid off employees be asked to sign waivers or releases?    ☐Yes ☐No
   If yes, have the waivers or releases been reviewed by counsel?    ☐Yes ☐No

6. Does (or will) the Applicant provide outplacement services to laid off employees?    ☐Yes ☐No

7. Does (or will) the Applicant provide severance packages to laid off employees?    ☐Yes ☐No

Please attach copies of the most recent annual report or the most recent audited financial statements.

EPL-3041 (12-01)

48



# fax

**To:** Jason Wetmore

**Company:** Wachovia

**Number:** ~~404-487-7216~~  *770 - 850 - 9375*

**Date:** 9-11-06

**From:** Steve Bratton

**# of Pages:** 9 including cover

---

Message:

Provider of advisory services for:

UNCLE JULIO'S • HACIENDA • RIO GRANDE CAFE • CASA GRANDE • EDDIE P's
MEXICAN KITCHEN • TIA'S TEX MEX

1101 N Union Bower    Suite 160
Irving Texas 75061
t 972.554.6886    f 972.554.6888
www.unclejulios.com • www.tiastexmex.com

**Travelers** Property Casualty
*A member of citigroup*

**The Wrap℠ Renewal Application**

**Policy Number:** _____

NOTE: THE DIRECTORS AND OFFICERS LIABILITY, EMPLOYMENT PRACTICES LIABILITY AND FIDUCIARY LIABILITY COVERAGE PARTS FOR WHICH APPLICATION IS MADE APPLY, SUBJECT TO THEIR TERMS, ONLY TO "CLAIMS" FIRST MADE OR DEEMED MADE AGAINST INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF PURCHASED. THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSSES WILL BE REDUCED BY THE AMOUNTS INCURRED AS "DEFENSE EXPENSES", AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION AMOUNT. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM UNLESS DUTY-TO-DEFEND COVERAGE HAS BEEN SPECIFICALLY PROVIDED HEREIN.

Wherever used in this Application, the term "Applicant" shall mean the Parent Corporation and all Subsidiaries.

| Agency | Producer Name | Agency Account Manager |
|--------|---------------|------------------------|
| Wachovia Patriot Bay | | Jason Wetmore |

| | |
|---|---|
| **Applicant Name:** | |
| **Principal Address:** | 1101 N. Union Bower |
| **Primary SIC Code:** | |

**I. Requested Coverage Parts**

| Coverage Part Requested | Limit | Deductible |
|-------------------------|-------|-----------|
| Directors and Officers Liability | 3,000,000 | 50,000 |
| Employment Practices Liability | Shared | 75,000 |
| Fiduciary Liability | | |
| Fidelity | | |
| Kidnap and Ransom/Extortion | | |

**II. Aggregate Limit of Liability:** If desired, please check appropriate box and indicate limit desired.

| | Limit |
|---|---|
| ☐ Aggregate Limit of Liability for all desired Coverage Parts combined: | |
| ☐ Aggregate Limit of Liability for all desired Liability Coverage Parts combined: | |
| ☐ Aggregate Limit of Liability for all desired Crime Coverage Parts combined | |

**III. What Type Of Liability Coverage Do You Desire?**  ☒ Duty to Defend    ☐ Reimbursement

**IV. Additional Information**

1. Total number of current employees

| | |
|---|---|
| Full Time | ~~1,55~~ 624 |
| Part Time | ~~1,100~~ 1,231 |
| Total | ~~2,780~~ 1,855 |

2. Number of workers in the following classifications in the previous 12 months:

| | | |
|---|---|---|
| Temporary | Seasonal | |
| Labor Unions | Leased | |
| Independent Contractors | | |

3. Locations of Applicant by state or country (if foreign) and number of employees for each (attach schedule if necessary):

| State or Country | # of Employees | # of Locations | State or Country | # of Employees | # of Locations |
|------------------|----------------|----------------|------------------|----------------|----------------|
| Texas | 556 | 7 | Maryland | 286 | 4 |
| Florida | 242 | 5 | Virginia | 380 | 4 |
| Arkansas | 100 | 2 | Illinois | 208 | 2 |
| | | | Georgia | 83 | 1 |

4. In the past year has the Applicant:
   a. Formed or acquired a Subsidiary or Pension Plan?    ☐ Yes  ☒ No
   b. Consolidated, merged, or purchased assets of some other entity?    ☐ Yes  ☒ No

W-1553 (09-00)

50

c. Created any new business, division, Premises, or location? ☐ Yes ☒ No
d. Merged, sold or terminated any Pension Plan or Welfare Plan? ☐ Yes ☒ No
e. Sold, closed, consolidated, or spun-off any corporation, partnership, entity, plant, office, subsidiary, or division? ☒ Yes ☐ No

If Yes, to any of the above, provide details on a separate attachment and include the number of employees who were effected and in what manner. *Eddie P's & Omaune fig's*

5. Does the **Applicant** anticipate any of the following in the next 12 months:
   a. Sales, distribution or divestiture of any assets or stock other than in the ordinary course of business in an amount exceeding ten percent (10%) of the **Applicant's** consolidated assets? ☐ Yes ☒ No
   b. Downsizing, rightsizing, layoffs, or any other reduction in number of employees? ☐ Yes ☒ No
   c. Merger, acquisition or consolidation with another entity whose consolidated assets exceed ten percent (10%) of the **Applicant's** consolidated assets? ☐ Yes ☒ No
   d. Create or acquire any new business, subsidiary, division, or location or plan? ☐ Yes ☒ No
   e. Any registration for a public offering or any private placement of securities? ☐ Yes ☒ No
   f. Reorganization or arrangement with creditors under federal or state law? ☐ Yes ☒ No
   If Yes to any of the above, provide details on a separate attachment.

6. Have there been any claims made or losses sustained under any of the requested **Coverage Parts** in the past year? ☐ Yes ☒ No
   If Yes, please provide details in an attachment.

## DIRECTORS AND OFFICERS LIABILITY COVERAGE PART
### Complete Only If Renewing This Coverage

1. Stock Ownership:
   a. Total Number of voting shares outstanding *135,000*   Total number of voting shareholders *6*
   b. Total Number of voting shares owned by the **Applicant's** directors and officers (direct and beneficial)
   c. Does any shareholder own five percent (5%) or more of the voting shares directly or beneficially? ☒ Yes ☐ No
      If Yes, designate names and percentages of holdings. *Markwood 76%*

2. a. Have there been any changes in the Board of Directors or Senior Management of the **Applicant** within the past year for reasons other than death or retirement?  If Yes, please explain. ☐ Yes ☒ No

   b. Has the **Applicant** changed outside auditors in the past year?  If Yes, please explain. ☐ Yes ☒ No

   c. Have the outside auditors stated there are no material weaknesses in the **Applicant's** system of internal controls?  If no, please provide the CPA letter to management and management's response. ☐ Yes ☒ No

3. Have you reorganized or entered into an arrangement with creditors under federal or state law? ☐ Yes ☒ No

## KIDNAP RANSOM
### Complete Only If Renewing This Coverage

1. Have there been any significant changes to the **Applicant's** foreign travel or foreign locations since last renewal? ☐ Yes ☒ No
   If yes, please explain. _____

## EMPLOYMENT PRACTICES LIABILITY
### Complete Only If Renewing This Coverage

1. Number of employees that are in the following salary ranges    2. Employee turnover for the last year

W-1553 (09-00)

(salary includes bonuses and commissions):

$30,000 or less: _1,662_

$30,001 to $100,000: _167_

Over $100,000: _26_

Year: _2006_

Terminated _948_

Resigned _6721_

Retired _0_

Layoffs _88_

## 3. EMPLOYMENT PRACTICES/LOSS CONTROL SERVICES

In the past 12 months, has the Applicant conducted, instituted, implemented, changed, corrected, improved or modified an employment practice or procedure listed below? If Yes to any question 3. a-e below, please describe which practice or procedure was implemented or changed and whether Travelers Risk Management PLUS+ loss control program was used.

a. Has the Applicant conducted supervisory or manager training on human resource issues? ☑Yes ☐No

b. Has the Applicant amended or created an employee handbook or human resource policies? ☑Yes ☐No

c. Has the Applicant purchased any human resource related products or services? ☑Yes ☐No

d. Has the Applicant instituted any other employment practices loss control services? ☑Yes ☐No

e. Has the Applicant prepared written performance evaluations for its employees? ☑Yes ☐No

| FIDUCIARY LIABILITY |
| --- |
| Complete Only If Renewing This Coverage |

1. Complete the chart below for all plans for which coverage is requested. For each plan listed, indicate in the corresponding column the applicable letter(s) and number.

| Plan Type (Column 2) | Fund Status (Column 4) | Plan Status (Column 8) |
| --- | --- | --- |
| Defined Benefit (DB) <br> Defined Contribution (DC) <br> Welfare Benefit Plan (W) <br> Other (O) - Attach Explanation | 1. Trust <br> 2. Trust and Insurance <br> 3. Insurance <br> 4. Funded exclusively from general assets of the Sponsor (unfunded) <br> 5. Funded partially from insurance and partially from assets of the Sponsor | A – Active <br> F – Frozen <br> M – Merged <br> T – Terminated <br> S – Sold (Spun-off) <br> If any plan has been merged, terminated or sold, indicate date of transaction. |

| 1. Full Plan Name | 2. Plan Type | 3. Report Year | 4. Fund Status | 5. Asset Value (000) | 6. Annual Contributions | 7. No. of Participants | 8. Plan Status |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

\* List any additional plans on attachment

Total assets of all plans to be covered under this **Coverage Part**: $ _____

2. Premium to be paid by: ☐ Employer or Union ☐ Trust or Plan

(Endorsement will be issued to eliminate recourse on Insureds who are fiduciaries if the premium is paid by the Employee Benefit Plan. Premium for this endorsement must be paid from funds other than the assets of the Employee Benefit Plan.)

Total number of plan trustees and other employees who act in a fiduciary capacity: _____

3. Does the plan conform to the standards of eligibility, participation, vesting and other provisions of Employee Retirement Income Security Act (ERISA) or similar foreign law? If No, explain. ............... ☐Yes ☐No

4. Do any plans hold assets invested in employer securities or employer real property?:................. ☐Yes ☐No

5. Is each plan reviewed periodically to assure there are no violations of prohibited transactions or party-in-interest rules of ERISA? If No, attach explanation. ......................................................... ☐Yes ☐No

6. Has any plan filed for an exemption from a prohibited transaction? If Yes, attach copy of filing and DOL response. ☐Yes ☐No

7. Has the following occurred in any plan:

    a. The IRS withdrawn or threatened to withdraw the tax exempt status of any plan? If yes, explain. ☐Yes ☐No

    b. Any plan experienced an event reportable to the PBGC within the past three years? If Yes, explain. ☐Yes ☐No

    c. Any plan been the subject of an investigation by the DOL, IRS or similar foreign regulatory agency in the last three years? If Yes, explain. ☐Yes ☐No

8. Are there any outstanding delinquent plan contributions? If Yes, explain. ☐Yes ☐No

W-1553 (09-00)

Page 3 of 5

9.  In the past two years have there been any plan amendments or do you anticipate any plan amendments that will result in a reduction in benefits? If Yes, explain.  ☐Yes ☐No

10. Has any plan been merged with another plan, terminated or sold within the past two years or anticipated in the next 12 months? If yes, attach details  ☐Yes ☐No

11. Does the Applicant sponsor any Cash Balance Plans or does Applicant anticipate the creation or conversion to a Cash Balance Plan? If yes, attach details.  ☐Yes ☐No

12. Does the employer, committee of employer representatives or union board of trustees have final say over determination of whether benefits will be paid under any welfare plan sponsored by this Insured?  ☐Yes ☐No

13. Do all plan use outside professional investment advisors? Please name. If None, please attach a schedule of plan's investments.  ☐Yes ☐No

14. Has any plan, entity or person proposed for this insurance been accused or found guilty or held liable for a breach of fiduciary duty, a criminal act, or a violation of ERISA or any similar state local or foreign law?  ☐Yes ☐No

---

## FIDELITY COVERAGE PART
### Complete Only If Renewing This Coverage

**Requested Coverage**

A.  Coverage Part Limit of Liability (optional)  **Limit of Liability**  $ _____

B.  Single Loss Limit of Liability for each insuring agreement (required)
- Insuring Agreement A.  Employee Dishonesty  $ _____
- Insuring Agreement B.  Forgery or Alteration  $ _____
- Insuring Agreement C.  On Premises (Money, Securities, and Other Property)  $ _____
- Insuring Agreement D.  In Transit (Money, Securities, and Other Property)  $ _____
- Insuring Agreement E.  Money Orders and Counterfeit Paper Currency  $ _____
- Insuring Agreement F.  Computer Fraud and Funds Transfer Fraud  $ _____
- Insuring Agreement G.  ERISA Fidelity.  $ _____

Retention: $ _____

Have there been any changes to the Applicant's system of internal controls since last renewal?  ☐Yes ☐No
If yes, please explain. _____

Please indicate maximum exposure for each location:

| Locations | Cash | Credit Card Receipts Retail Checks | Is there a Safe? and Non-retail Checks** | (Yes or No) |
|---|---|---|---|---|
|  |  |  |  |  |

** A non-retail check is a check presented to you and immediately endorsed "for deposit only" and then recorded in your accounting process so that it could be recreated if it were stolen, lost or destroyed.

---

**Required attachments:**

**As part of this Application, submit the following documents with respect to the Applicant:**
1.  Most recent year-end financial statement.

**If Director and Officer Coverage is requested:**
1.  Any registration statements filed with the SEC or any private placement memorandums within the last twelve (12) months.

*N/A*

**If Employment Practices Liability Coverage is requested:**
1.  Employee Handbook (only if edits made or a new edition created in the past 12 months)
2.  EEO-1 Report (if required by EEOC)

**If Fiduciary Liability Coverage is requested:**
1.  Most recent Form 5500's and applicable schedules and plan audits on covered pension plans

W-1553 (09-00)

THE UNDERSIGNED AUTHORIZED AGENT OF THE APPLICANT DECLARES THAT TO THE BEST OF HIS/HER KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS SET FORTH HEREIN ARE TRUE AND COMPLETE. IF THE INFORMATION IN THIS APPLICATION CHANGES PRIOR TO THE INCEPTION DATE OF THE POLICY, THE APPLICANT WILL NOTIFY THE COMPANY OF SUCH CHANGES, AND THE COMPANY MAY MODIFY OR WITHDRAW ANY OUTSTANDING QUOTATION. THE COMPANY IS AUTHORIZED TO MAKE INQUIRY IN CONNECTION WITH THIS APPLICATION.

THE SIGNING OF THIS APPLICATION DOES NOT BIND THE COMPANY TO OFFER, NOR THE APPLICANT TO PURCHASE, THE INSURANCE. IT IS AGREED THAT THIS APPLICATION, INCLUDING ANY MATERIAL SUBMITTED THEREWITH, SHALL BE THE BASIS OF THE INSURANCE AND SHALL BE CONSIDERED PHYSICALLY ATTACHED TO AND PART OF THE POLICY, IF ISSUED. THE COMPANY WILL HAVE RELIED UPON THIS APPLICATION, INCLUDING ANY MATERIAL SUBMITTED THEREWITH, IN ISSUING THE POLICY.

| Signature Of President or Corporate Officer: | *Steve Bratton* | Date: | 9-11-06 |
| Printed Name of Individual Signing Application: | *Steve* | Title: | CFO |

NOTE: This Application must be signed by the PRESIDENT and/or CEO of the Applicant acting as the authorized agent of the person(s) and entity(ies) proposed for this insurance.

*Preliminary - Unaudited*

**Uncle Julio's Corporation - Consolidated Julio & Sons Company**
**Summary Balance Sheet**
**As of the Period Ending October 30, 2005**

| | Prior Year 10/31/04 | Budget 10/30/05 | Current Year 10/30/05 |
|---|---|---|---|
| **Assets** | | | |
| **Current Assets:** | | | |
| Total Cash & Restricted Cash | (365,833) | 2,413,099 | 294,380 |
| Accounts Receivable - Trade | 335,208 | 500,000 | 77,894 |
| Due (To) / From Tia's Restaurant, Inc. | 0 | 3,910,000 | 0 |
| Accounts Receivable - Employees | 48,378 | 50,000 | 47,176 |
| Food & Bar Inventories | 251,878 | 250,000 | 271,520 |
| Prepaid Expenses & Supplies | 196,883 | 235,000 | 196,291 |
| **Total Current Assets** | 446,515 | 7,358,099 | 887,262 |
| Property & Equipment, Net | 26,184,512 | 26,086,236 | 24,649,996 |
| Other Intangibles, Net | 1,475,288 | 1,500,000 | 1,227,859 |
| Eddie P's Development | 0 | 0 | 2,054,883 |
| Goodwill | 9,214,663 | 9,200,000 | 9,214,663 |
| Debt Issuance Costs | 288,181 | 380,000 | 828,257 |
| Deferred Income Taxes | 1,240,802 | 100,825 | 1,779,223 |
| Other Assets | 831,869 | 850,000 | 861,883 |
| **Total Assets** | 39,681,831 | 45,475,160 | 41,504,025 |
| **Liabilities and Stockholders' Equity** | | | |
| **Current Liabilities:** | | | |
| Current Maturities of First American Note | 1,444,444 | 1,000,000 | 0 |
| Current Maturities of Pinero Note | 93,762 | 103,580 | 103,580 |
| Current Maturities of Boutillers Note | 912,033 | 175,066 | 0 |
| Current Maturities of Wells Fargo Foothill Note | 0 | 0 | 5,278,499 |
| Current Maturities of Capital Lease Obligations | 186,134 | 242,266 | 243,620 |
| Accounts Payable, Trade | 4,131,346 | 4,150,180 | 2,911,670 |
| Federal Income Taxes Payable | 0 | 100,000 | 728,239 |
| Total Accrued Expenses | 2,498,698 | 2,397,250 | 2,641,659 |
| **Total Current Liabilities** | 9,266,418 | 8,168,342 | 11,907,268 |
| L-T Debt, Less Curr. Maturities-First American | 0 | 3,333,333 | 0 |
| L-T Debt, Less Curr. Maturities-RRGC | 2,744,245 | 2,872,123 | 0 |
| L-T Debt, Less Curr. Maturities-Pinero | 1,558,407 | 1,454,827 | 1,454,827 |
| L-T Debt, Less Curr. Maturities-Boutillers | 1,087,967 | 1,000,000 | 0 |
| L-T Debt, Less Curr. Maturities-Wells Fargo Foothill | 0 | 0 | 6,000,000 |
| Capital Lease Obligations, Less Current Maturities | 1,383,598 | 1,149,535 | 1,182,446 |
| Deferred Rent | 4,739,447 | 5,166,289 | 4,684,968 |
| **Total Liabilities** | 20,780,082 | 23,144,450 | 25,229,508 |
| **Stockholders' Equity:** | | | |
| Common Stock | 1,287 | 1,300 | 1,287 |
| Preferred Stock | 46 | 0 | 46 |
| Additional Paid-in Capital | 22,595,164 | 22,600,000 | 22,595,184 |
| Retained Earnings | (1,726,376) | (2,241,900) | (3,694,769) |
| Current Earnings | (1,968,393) | 1,971,309 | (2,627,231) |
| **Total Stockholders' Equity** | 18,901,748 | 22,330,709 | 16,274,517 |
| **Total Liabilities & Stockholders' Equity** | 39,681,831 | 45,475,159 | 41,504,025 |

*Preliminary - unaudited*

**JULIO & SONS COMPANY**
**CONSOLIDATED CASH FLOW STATEMENT**
**October 30, 2005**

|  | 2005 Full Year |
|---|---|
| NET INCOME/(LOSS) | (2,627.2) |
| DEPRECIATION and AMORTIZATION | 3,291.2 |
| DEFERRED INCOME TAXES | (538.4) |
| LOSS ON DISPOSITION OF PROPERTY | 18.8 |
| AMORTIZATION OF DISCOUNT ON L/T DEBT | 255.8 |
| DEFERRED RENT | (54.5) |
| A/R TRADE | 258.5 |
| FOOD & BAR INVENTORIES | (19.6) |
| PREPAID EXPENSES & SUPPLIES | 0.8 |
| OTHER ASSETS | (30.0) |
| DUE FROM TRI |  |
| EDDIE P'S DEVELOPMENT | (2,054.9) |
| LOAN ORIGINATION FEE | (540.1) |
| A/P TRADE | (1,219.7) |
| ACCRUED LIABILITIES | 58.3 |
| INCOME TAX PAYABLE | 812.9 |
| NET CASH USED IN OPERATING ACTIVITIES | (2,388.4) |
| PURCHASES OF PROPERTY & EQUIPMENT | (1,528.0) |
| PROCEEDS FROM DISPOSAL OF PROPERTY | - |
| NET CASH USED IN INVESTING ACTIVITIES | (1,528.0) |
| PROCEEDS FROM STOCK ISSUANCE | - |
| PAYMENTS ON STOCK SALE |  |
| PROCEEDS FROM LONG-TERM BORROWINGS | 11,342.0 |
| PRINCIPAL PAYMENTS ON LONG-TERM DEBT | (6,538.2) |
| PRINCIPAL PAYMENTS ON CAPITAL LEASES | (207.2) |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | 4,596.6 |
| NET INCREASE IN CASH & CASH EQUIVALENTS | 680.2 |
| CASH & CASH EQUIVALENTS, BEGINNING OF YEAR | (385.8) |
| CASH & CASH EQUIVALENTS, END OF YEAR | 294.4 |

Preliminary - Unaudited

## Income Statement
### Julio & Sons Company - Consolidated

GROSS SALES
- Food Sales
- Bar Sales
- Other Sales

COST OF GOODS SOLD
- FOOD COST
  - Seafood Cost
  - Produce Cost
  - Dairy Cost
  - Meat Cost
  - Poultry Cost
  - Misc. Dry Goods Cost
- BAR COST
  - Liquor Cost
  - Beer Cost
  - Wine Cost
  - Bar Grocery Cost
- Food Freight & Delivery

INDIRECT OPER. EXPENSES
- DIRECT OPER. EXPENSES
- LABOR COSTS

OTHER OPER. EXP.
- EBITDAR - All Restaurant
- EBITDAR - Closing
- EBITDAR - Julio & Sons
- Building Rent

P&E Expense
- Interest Expense

OTHER (INCOME)/EXPENSE
- CAPITAL EXPENSES
- PRETAX NET INCOME/(LOSS)
- INCOME TAX EXPENSE

TOTAL P.09

SEP-13-2006  14:25    Julio and Sons    972 554 6888    P.09

Flat: Income-Budget/CON

**TRAVELERS**

Brooke A Wyatt
4400 North Point Parkway
ALPHARETTA, GA 30022

Phone:(770) 521-4024
Fax:(770) 521-3551
Email:BWYATT@travelers.com

January 4, 2007

Jason Wetmore

WACHOVIA INS SVC-ATLA (0FU159)
4401 NORTHSIDE PARKWAY NW
SUITE 400
ATLANTA, GA 30327

**This is an Agency Billed Policy.**

This is the  Policy Change for:

**JULIO INVESTORS, LLC**
**1101 North Union Bower**
**Suite 160**
**IRVING, TX 75061**

Product Type: WRAP
Policy Number: 104468586
Total Policy Premium: $37,000.00

Policy Period: September 1, 2006    to   September 1, 2007
Billing Period: September 1, 2006    to   September 1, 2007
Trans Effective Date: January 4, 2007
Commission-Percentage: 16%
Special Commission: $0.00

Countersignature Commission: $0.00
Countersignature Rate: 0%

| | | | | Premium Years | |
| Coverage | Liability | Retention | Year 1 | Year 2 | Year 3 |
| --- | --- | --- | --- | --- | --- |
| D & O | $5,000,000 | $100,000 | | | |
| EPL | $5,000,000 | $250,000 | | | |
| Surcharge: | | | $0.00 | $0.00 | $0.00 |
| Tax: | | | $0.00 | $0.00 | $0.00 |
| Combined Premium: | | | $37,000.00 | $0.00 | $0.00 |

Comments:

Thank you for placing your business with us.

PE-007 (10-98)

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO:  104468586

ISSUED TO: JULIO INVESTORS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**Mid-Term/Renewal Change Endorsement**

This endorsement modifies insurance provided under the following:
**The WRAP Policy**

It is agreed that the **Policy** and all applicable **Coverage Parts** are amended as indicated by [ X ]:

☐ 1.  The **PARENT CORPORATION** as shown in ITEM 1 of the Wrap Declarations and all applicable **Coverage Part** Declarations is deleted and replaced by the following:


☐ 2.  The Principal Address as shown in ITEM 1 of the Wrap Declarations and all applicable **Coverage Part** Declarations is deleted and replaced by the following:


☐ 3.  The **POLICY PERIOD** as shown in ITEM 2 of the Wrap Declarations is deleted and replaced by the following:

**POLICY PERIOD:**
Inception Date:                              (b)  Expiration Date:
12:01 A.M. standard time both dates at the Principal Address in ITEM 1

☑ 4.  **FORMS AND ENDORSEMENTS ADDED AND DELETED** (as indicated by ☒):

    ☑ Added to the Policy
       **WDO-1004 (07-01);  W-1116 (09-04)**

    ☐ Deleted from the Policy

    ☑ Amended form
       **W-1037 (03-99)**

☐ 5.  **OTHER:** Aggregate Limit of Liability for all Purchased Liability Coverage Parts combined - $5,000,000



Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above mentioned **Policy**, except as expressly stated herein. This endorsement is part of such **Policy** and incorporated therein. This endorsement is effective at 12:01 A.M. on **January 4, 2007**    (the "Effective Date") and applies to all **Claims**, including **Related Claims**, made under all applicable **Liability Coverage Parts** and all loss which occurs under all applicable **Crime Coverage Parts** on or after such Effective Date.

Accepted by:

On Behalf of the **Parent Corporation**


_____
Authorized Company Representative


_____
Title

W-1037 (03-99)

2

ISSUED BY: **Travelers Casualty and Surety Company of America**        POLICY NO: **104468586**

ISSUED TO: **JULIO INVESTORS, LLC**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**SEPARATE PRIOR AND PENDING/CONTINUITY DATES
FOR INCREASED LIMITS**

This endorsement modifies insurance provided under the following, if purchased:
**Directors and Officers Liability Coverage Part**
**Employment Practices Liability Coverage Part**
**Fiduciary Liability Coverage Part**

In consideration of the payment of the premium:

1.    Solely with respect to that portion of the Coverage Part Limit of Liability shown in ITEM 2 of the Directors and Officers Liability Coverage Part Declarations **$2,000,000.00** excess of **$3,000,000.00** ITEM 6, **PRIOR AND PENDING PROCEEDING DATE,** of the Directors and Officers Liability Coverage Part Declarations is deleted and replaced with the following:

      ITEM 6. **PRIOR AND PENDING PROCEEDING DATE: January 4, 2007**

            (If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.)

2.    Solely with respect to that portion of the Coverage Part Limit of Liability shown in ITEM 2 of the Directors and Officers Liability Coverage Part Declarations        **$2,000,000.00** excess of **$3,000,000.00** ITEM 7, **CONTINUITY DATE,** of the Directors and Officers Liability Coverage Part Declarations is deleted and replaced with the following:

      ITEM 7. **CONTINUITY DATE: January 4, 2007**

            (If no Continuity Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.)

3.    Solely with respect to that portion of the Coverage Part Limit of Liability shown in ITEM 2 of the Employment Practices Liability Coverage Part Declarations        **$2,000,000.00** excess of **$3,000,000.00** ITEM 6, **PRIOR AND PENDING PROCEEDING DATE,** of the Employment Practices Liability Coverage Part Declarations is deleted and replaced with the following:

      ITEM 6. **PRIOR AND PENDING PROCEEDING DATE:  January 4, 2007**

            (If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.)

4.    Solely with respect to that portion of the Coverage Part Limit of Liability shown in ITEM 2 of the Employment Practices Liability Coverage Part Declarations        **$2,000,000.00** excess of **$3,000,000.00** ITEM 7, **CONTINUITY DATE,** of the Employment Practices Liability Coverage Part Declarations is deleted and replaced with the following:

      ITEM 7. **CONTINUITY DATE: January 4, 2007**

            (If no Continuity Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.)

5.    Solely with respect to that portion of the Coverage Part Limit of Liability shown in ITEM 2 of the Fiduciary Liability Coverage Part Declarations                            excess of ITEM 6, **PRIOR AND PENDING PROCEEDING DATE,** of the Fiduciary Liability Coverage Part Declarations is deleted and replaced with the following:

W-1116 (09-04)                                                                                          Page 1 of 2

ITEM 6. **PRIOR AND PENDING PROCEEDING DATE:**

> (If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.)

6.    Solely with respect to that portion of the Coverage Part Limit of Liability shown in ITEM 2 of the Fiduciary Liability Coverage Part Declarations                              excess of ITEM 7, **CONTINUITY DATE,** of the Fiduciary Liability Coverage Part Declarations is deleted and replaced with the following:

ITEM 7. **CONTINUITY DATE:**

> (If no Continuity Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations.)

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on **January 4, 2007** , if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:    _____
                On behalf of the entity named in
                ITEM 1 of the Declarations.

                _____
                Authorized Company Representative

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO:  104468586

ISSUED TO: JULIO INVESTORS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**CORRECTION / CHANGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**Directors and Officers Liability Coverage Part**

It is agreed that the Declarations for the Directors and Officers Liability Coverage Part are amended as indicated below by ☒:

☐    ITEM 2 is deleted and replaced with the following:

ITEM 2.          **COVERAGE PART LIMIT OF LIABILITY** (inclusive **of Defense Expenses**):

(maximum limit of liability for all **Claims** under this **Coverage Part**)

☑    ITEM 3 is deleted and replaced with the following:

ITEM 3.          **RETENTION** (inclusive of **Defense Expenses**):

A.                              under Insuring Agreement A. for each **Insured Person** for each **Claim**.

B.1.          **$100,000.00**  under Insuring Agreement B.1. for each **Claim**.

B.2.          **$100,000.00**  under Insuring Agreement B.2. for each **Claim**.

☐    ITEM 4 is deleted and replaced with the following:

ITEM 4.          **EXTENDED REPORTING PERIOD**:

months for        % of that part of the Policy Period Premium for the Directors and Officers Liability Coverage Part.
(If exercised, in accordance with Section III.I. of the Common Terms and Conditions)

☐    ITEM 6 is deleted and replaced with the following:

ITEM 6.          **PRIOR AND PENDING PROCEEDING DATE:**
(If no Prior and Pending Proceeding Date is entered above, the Prior and Pending Proceeding Date shall be the Inception Date shown in ITEM 2 of the Wrap Declarations)

WDO-1004 (07-01)                                                                                      Page 1 of 2

5

☐    ITEM 7 is deleted and replaced with the following:

ITEM 7.            **CONTINUITY DATE:**
                   (If no Continuity Date is entered above, the Continuity Date shall be the
                   Inception Date shown in ITEM 2 of the Wrap Declarations)

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Wrap Declarations or effective at 12:01 A.M. on **January 4, 2007** , if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:        _____
                    On behalf of the entity named in
                    ITEM 1 of the Declarations.

                    _____
                    Authorized Company Representative

WDO-1004 (07-01)                                                          Page 2 of 2

6

NOTE PURCHASE AGREEMENT

BETWEEN

RETAIL & RESTAURANT GROWTH CAPITAL, L.P.

AND

LUCKY BOY CORPORATION

December 17, 2001

# TABLE OF CONTENTS

Page No.

ARTICLE I. TERMS DEFINED ........................................................
Section 1.1.    Definitions ............................................................................... 1
Section 1.2.    Accounting Terms and Determinations ................................. 1
Section 1.3.    Gender and Number .............................................................. 12
Section 1.4.    References to Agreement ....................................................... 13
ARTICLE II. NOTE PURCHASE; TERMS OF NOTE ............................ 13
Section 2.1.    Note Purchase ........................................................................ 13
Section 2.2.    Closing ................................................................................... 13
Section 2.3.    Interest; Interest Payments .................................................... 13
Section 2.4.    Principal Payments; Maturity ............................................... 13
Section 2.5.    Optional Prepayments ........................................................... 13
Section 2.6.    Mandatory Prepayment .......................................................... 13
Section 2.7.    Computation of Interest; Recapture ...................................... 14
Section 2.8.    Time and Place of Payment ................................................... 14
Section 2.9.    Application of Payments After Default .................................. 14
Section 2.10.   Taxes ...................................................................................... 14
Section 2.11.   Ratable Payments .................................................................. 14
Section 2.12.   Processing Fee ....................................................................... 15
ARTICLE III. TRANSFER OF THE NOTE .......................................... 15
Section 3.1.    Restrictions on Transfer ........................................................ 15
Section 3.2.    Registration, Transfer and Exchange of Notes ...................... 15
Section 3.3.    Mutilated or Missing Notes ................................................... 15
ARTICLE IV. CONDITIONS ............................................................. 16
Section 4.1.    Closing Conditions ................................................................ 16
ARTICLE V. REPRESENTATIONS AND WARRANTIES ..................... 16
Section 5.1.    Corporate Existence and Power ............................................ 18
Section 5.2.    Corporate and Governmental Authorization; Contravention .. 18
Section 5.3.    Binding Effect ....................................................................... 19
Section 5.4.    Capitalization ........................................................................ 19
Section 5.5.    Financial Information ............................................................ 19
Section 5.6.    Material Agreements .............................................................. 19
Section 5.7.    Ancillary Agreements ............................................................ 21
Section 5.8.    Investments ............................................................................ 21
Section 5.9.    Outstanding Debt ................................................................... 21
Section 5.10    Transactions with Affiliates .................................................. 21
Section 5.11.   Employment Matters .............................................................. 21
Section 5.12.   Operating Leases ................................................................... 21
Section 5.13.   Litigation ............................................................................... 22
Section 5.14.   ERISA .................................................................................... 22
Section 5.15.   Taxes and Filing of Tax Returns ........................................... 22
Section 5.16.   Ownership of Properties; Liens ............................................. 23
Section 5.17.   Licenses, Permits, Etc ........................................................... 23
Section 5.18.   Proprietary Rights ................................................................. 23
                                                                                              23

i

Section 5.19.    Compliance with Law ..................................................
Section 5.20.    Environmental Matters .............................................
Section 5.21.    Burdensome Obligations ........................................... 24
Section 5.22.    Fiscal Year ................................................................ 24
Section 5.23.    No Default ................................................................ 24
Section 5.24.    Insurance .................................................................. 24
Section 5.25.    Government Regulation ............................................ 25
Section 5.26.    Casualties ................................................................. 25
Section 5.27.    Investment Company Act ......................................... 25
Section 5.28.    Securities Laws ....................................................... 25
Section 5.29.    Brokers and Finders ................................................ 25
Section 5.30.    Full Disclosure ........................................................ 25
Section 5.31.    Small Business Concern .......................................... 25

ARTICLE VI. REPRESENTATIONS AND WARRANTIES OF RRGC ........... 26
Section 6.1.     Due Authorization .................................................... 26
Section 6.2.     Securities Representations ...................................... 26
Section 6.3.     Existence .................................................................. 26
Section 6.4.     Enforceability .......................................................... 26

ARTICLE VII. AFFIRMATIVE COVENANTS ........................................ 27
Section 7.1.     Information ............................................................... 27
Section 7.2.     Right of Inspection .................................................. 27
Section 7.3.     Maintenance of Insurance ....................................... 29
Section 7.4.     Payment of Taxes and Claims .................................. 29
Section 7.5.     Compliance with Laws and Documents ................... 29
Section 7.6.     Operation of Properties and Equipment .................. 29
Section 7.7.     Additional Documents .............................................. 29
Section 7.8.     ERISA ...................................................................... 29
Section 7.9.     Maintenance of Books and Records ......................... 30
Section 7.10.    Environmental Matters ............................................ 30
Section 7.11.    Subsequent Equity Purchase .................................. 30

ARTICLE VIII. NEGATIVE COVENANTS ............................................. 30
Section 8.1.     Distributions ............................................................ 30
Section 8.2.     Business of the Company ......................................... 30
Section 8.3.     Liens ........................................................................ 31
Section 8.4.     Incurrence of Debt and Guarantees ........................ 31
Section 8.5.     Modification of Capitalization Documents; Ancillary Agreements .... 31
Section 8.6.     Existence and Qualification ..................................... 31
Section 8.7.     Use of Proceeds ...................................................... 31
Section 8.8.     Investments ............................................................. 31
Section 8.9.     Transactions with Affiliates ..................................... 32
Section 8.10.    ERISA ...................................................................... 32
Section 8.11.    [Intentionally Omitted] ............................................ 32
Section 8.12.    Capital Expenditures ............................................... 32
Section 8.13.    Lease Obligations .................................................... 32
Section 8.14.    Payment of Subordinate Obligations ....................... 32
Section 8.15.    Acquisitions ............................................................. 32
                 ................................................................................. 33

548774_8.DOC

-ii-

3

Section 8.16.    Compensation of Officers ....................................................................

ARTICLE IX. FINANCIAL COVENANTS ......................................................... 33
Section 9.1.    Consolidated Adjusted Tangible Net Worth .................................. 33
Section 9.2.    Consolidated EBITDA ................................................................. 33
Section 9.3.    Leverage Ratio ............................................................................ 33

ARTICLE X. DEFAULTS .................................................................................... 33
Section 10.1.    Events of Default ........................................................................ 33

ARTICLE XI. MISCELLANEOUS ....................................................................... 33
Section 11.1.    Notices ........................................................................................ 35
Section 11.2.    No Waivers .................................................................................. 35
Section 11.3.    Expenses; Indemnification .......................................................... 36
Section 11.4.    Amendments and Waivers; Sale of Interest ................................ 36
Section 11.5.    Survival ...................................................................................... 36
Section 11.6.    Limitation on Interest ................................................................. 37
Section 11.7.    Invalid Provisions ....................................................................... 37
Section 11.8.    Successors and Assigns ............................................................... 37
Section 11.9.    GOVERNING LAW .................................................................... 37
Section 11.10.    Counterparts; Effectiveness ...................................................... 37
Section 11.11.    No Third Party Beneficiaries .................................................... 38
Section 11.12.    FINAL AGREEMENT ............................................................... 38
Section 11.13.    SUBMISSION TO JURISDICTION; WAIVER OF SERVICE AND VENUE ......... 38
Section 11.14.    WAIVER OF RIGHT TO TRIAL BY JURY .............................. 38
Section 11.15.    Fair Market Value of Note and Warrants ................................... 38

# EXHIBITS

Exhibit A          Form of Note

Exhibit B          Form of Senior Subordination Agreement

# SCHEDULES

Schedule 1.1       Pro Forma Opening Balance Sheet

Schedule 5.1       Jurisdictions

Schedule 5.4       Capitalization

Schedule 5.5       Projections

Schedule 5.6       Material Agreements

Schedule 5.7       Ancillary Agreements

Schedule 5.9       Outstanding Debt

Schedule 5.10      Transactions with Affiliates

Schedule 5.11      Employment Matters

Schedule 5.12      Operating Leases

Schedule 5.14      ERISA

Schedule 5.16      Ownership of Properties; Liens

Schedule 5.17      Licenses and Permits

Schedule 5.18      Proprietary Rights

Schedule 5.24      Insurance

Schedule 5.29      Brokers

548774_8.DOC

## NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT is entered into effective this 17th day of December 2001, by and between Retail & Restaurant Growth Capital, L.P., a Delaware limited partnership and a federal licensee under the Small Business Investment Act of 1958 ("RRGC"), and Lucky Boy Corporation, a Delaware corporation (the "Company").

### W I T N E S S E T H :

WHEREAS, the Company has requested that RRGC purchase a note from the Company in the principal amount of $3,000,000 for the purposes set forth herein; and

WHEREAS, the RRGC has agreed to purchase such Note on the terms and conditions herein contained.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, and intending to be legally bound hereby, the parties hereto agree as follows:

### ARTICLE I.
### TERMS DEFINED

Section 1.1.    Definitions.    The following terms, as used herein, have the following meanings:

"Adjusted Funded Debt" means, as of any date, (a) the Funded Debt of the Company and its Subsidiaries as of such date minus (b) all cash and cash equivalents of the Company and its Subsidiaries as of such date in excess of $1,000,000.

"Affiliate" means, as to any Person, any Subsidiary of such Person, or any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person and, with respect to the Company, any executive officer or director of the Company or of any Subsidiary of the Company and any Person who holds five percent (5%) or more of the voting stock of the Company or any Subsidiary of the Company. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or partnership interests, or by contract or otherwise. RRGC shall not be an Affiliate of the Company for purposes of this Agreement or the other Transaction Documents.

"Agreement" means this Note Purchase Agreement.

"Ancillary Agreements" means (a) the Lucky Acquisition Documents, (b) the Senior Debt Documents, and (c) the Wells Debt Documents.

"Authorized Officer" means, as to any Person, its Chairman, its Chief Executive Officer, its President, its Chief Operating Officer, its Financial Officer and any Vice President.

548774_8.DOC

1

"Business Day" means any day other than a Saturday, Sunday or other day on which national banks in Dallas, Texas are authorized by law to close.

"Capital Expenditure" means any expenditure by a Person for an asset which will be used in a year or years subsequent to the year in which the expenditure is made and which asset is properly classified in relevant financial statements of such Person as equipment, real property or improvements, fixed assets or a similar type of capitalized asset in accordance with GAAP.

"Capital Lease" means, for any Person as of any date, any lease of property, real or personal, which would be capitalized on a balance sheet of the lessee prepared as of such date in accordance with GAAP.

"Change of Control" means any of the following (a) the sale, lease, transfer or other disposition, in one transaction or a series of transactions, of all or substantially all the assets of the Company or any of its Subsidiaries, (b) the stockholders of the Company as of the Closing Date shall cease for any reason to own more than fifty percent (50%) or more of (i) the Voting Stock of the Company and (ii) the Common Stock on a Fully Diluted Basis, and (c) a merger or consolidation (in a single transaction or series of transaction) in which the Company is not the surviving entity.

"Charter Documents" means, with respect to any Person, its certificate of incorporation, articles of incorporation, bylaws, partnership agreement, regulations, operating agreement and all other comparable charter documents.

"Closing Date" means December 17, 2001.

"Closing Transactions" means the transactions which have occurred or will occur on the Closing Date pursuant to the Transaction Documents.

"COBRA" has the meaning given such term in Section 5.14 hereof.

"Commission" means the Securities and Exchange Commission or any entity succeeding to any or all of its functions under the Securities Act.

"Common Stock" means the Company's common stock, $0.01 par value.

"Company" has the meaning set forth in the first paragraph of the Agreement.

"Consolidated Adjusted Net Income" means, with respect to any Person for any period, the consolidated net income of such Person and its Consolidated Subsidiaries for such period (after income Taxes), but excluding (a) any gain arising from the sale of capital assets, (b) any gain arising from any write-up of assets, (c) earnings of any other Person, substantially all of the assets of which have been acquired by such Person or its Consolidated Subsidiaries in any manner, to the extent that such earnings were realized by such other Person prior to the date of such acquisition, (d) earnings of any Person in which the Person or its Consolidated Subsidiaries has an ownership interest (other than wholly owned Subsidiaries of such Person), unless such earnings have actually been received by the Person or its Consolidated Subsidiaries in the form of cash distributions, (e) earnings of any Person to which assets of the Person or its Consolidated

Subsidiaries shall have been sold, transferred or disposed of, or into which the Person shall have merged, to the extent that such earnings arise prior to the date of such transaction, (f) any gain arising from the acquisition of any securities of such Person or any of its Consolidated Subsidiaries, (g) any extraordinary gain realized by such Person or any of its Consolidated Subsidiaries during such period, (h) any non-cash compensation expense, (i) any purchase accounting adjustments arising as a result of the consummation of the Lucky Boy Acquisition, and (j) each of the following which are added back to Consolidated Adjusted Net Income for all periods in which the Company's results include Financial Periods prior to the Closing Date: management fees of $293,000; shareholder payroll and benefits of $162,000; excess former shareholder costs of $147,000; conversion of facilities group costs of $150,000; growth based employee additions costs of $135,000; alcohol formula costs of $87,000; new staging policy costs of $128,000; and transaction related expenses of $42,000; provided, that, each of the items set forth in the clause (j) shall no longer be added back to Consolidated Adjusted Net Income to the extent such costs or expenses relate to a Financial Period which is no longer included in the calculation of Consolidated Adjusted Net Income.

"Consolidated Adjusted Tangible Assets" means all assets of a Person and its Consolidated Subsidiaries except: (a) deferred assets, other than prepaid insurance and prepaid taxes; (b) patents, copyrights, trademarks, trade names, non-compete agreements, franchises and other similar intangibles; (c) goodwill, including any amounts, however designated on a consolidated balance sheet of a Person, representing the excess of the purchase price paid for assets or stock over the value assigned thereto on the books of such Person; and (d) unamortized debt discount and expense.

"Consolidated Adjusted Tangible Net Worth" means, at any date, a sum equal to:

(a)    the net book value (after deducting related depreciation, obsolescence, amortization, valuation, and other proper reserves) at which the Consolidated Adjusted Tangible Assets of a Person would be shown on a consolidated balance sheet at such date in accordance with GAAP, minus

(b)    the amount at which such Person's and its Consolidated Subsidiaries' liabilities (other than capital stock and surplus) would be shown on such balance sheet in accordance with GAAP, and including as liabilities all reserves for contingencies and other potential liabilities.

Provided that, in calculating Consolidated Adjusted Tangible Net Worth (i) $4,000,000 of the principal amount of the Senior Debt shall be deemed to have been converted into equity of the Company until such time as the Subsequent Equity Purchase has been consummated, and (ii) the effects of each of the following shall be excluded (x) any non-cash compensation expenses and (y) any purchase accounting adjustments arising as a result of the consummation of the Lucky Boy Acquisition.

"Consolidated EBITDA" means, for any Person for any period, the Consolidated Adjusted Net Income for such period, plus the following, but only in each case to the extent incurred by the Company and its Consolidated Subsidiaries during such period and deducted in the determination of Consolidated Adjusted Net Income for such period, (a) all income and franchise Taxes, (b) all Interest Expense, (c) all depreciation expense, (d) all amortization

expense, and (e) all expenditures incurred prior to the opening of a new restaurant location in connection with the construction and development of such new restaurant location.

"Consolidated Subsidiary" or "Consolidated Subsidiaries" means, for any Person, any Subsidiary or other entity the accounts of which would be consolidated with those of such Person in its consolidated financial statements as of such date in accordance with GAAP.

"Debt" means, for any Person, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all indebtedness of such Person on which interest charges are customarily paid or accrued, (d) all Guarantees by such Person, (e) the unfunded or unreimbursed portion of all letters of credit issued for the account of such Person, (f) any obligation of such Person representing the deferred purchase price of property or services purchased by such Person other than trade payables incurred in the ordinary course of business and which are not more than ninety (90) days past invoice date, (g) all obligations secured by a Lien on any property or asset owned or held by such Person regardless of whether such obligation shall have been assumed by that Person or is nonrecourse credit of that Person, (h) the present value determined in accordance with GAAP of all obligations in respect of Capitalized Leases of such Person and (i) all liability of such Person as a general partner or joint venturer for obligations of the nature described in (a) through (h) preceding.

"Default" means any condition or event which constitutes an Event of Default or which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Distribution" by any Person means (a) with respect to any stock issued by such Person or any partnership, joint venture or limited liability company interest of such Person, the retirement, redemption, purchase, or other acquisition for value of any such stock, partnership, joint venture or limited liability company interest, (b) the declaration or payment of any dividend or other distribution on or with respect to any stock, partnership, joint venture or limited liability company interest of any Person, (c) any other payment by such Person with respect to such stock, partnership, joint venture or limited liability company interest of such Person, or (d) any payment, loan or advance of any type to any officer, director, stockholder, partner or member of such Person or any of its Affiliates; provided, that, Distributions shall not include, in the case of the Company or any of its Subsidiaries, (i) payment of compensation to officers and employees in the ordinary course of business which is not in violation of Section 8.16 hereof, and (ii) reimbursement of, and advances for, reasonable travel, entertainment and similar expenses incurred in the ordinary course of business.

"Environmental Complaint" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, proceeding, judgment, letter or other communication from any federal, state, municipal or other Governmental Authority or any other party involving a Hazardous Discharge, Environmental Contamination or any violation of any order, permit or Environmental Law and Laws.

"Environmental Contamination" means the presence of any Hazardous Substances, which presence results from a Hazardous Discharge.

"Environmental Law and Laws" means any law, common law, ordinance, regulation or policy of any Governmental Authority, as well as any order, decree, permit, judgment or injunction issued, promulgated, approved, or entered thereunder, relating to the environment, Hazardous Substances (including, without limitation, the use, handling, transportation, production, disposal, discharge or storage thereof), industrial hygiene, the environmental conditions on, under, or about any real property owned, leased or operated at any time by the Company or any of its Subsidiaries or any real property owned, leased or operated by any other party, including, without limitation, soil, and groundwater conditions or the reporting or remediation of Environmental Contamination. Environmental Law and Laws include, without limitation, the Clean Air Act, as amended, the Federal Water Pollution Control Act, as amended, the Rivers and Harbors Act of 1899, as amended, the Safe Drinking Water Act, as amended, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as amended, the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), as amended, the Resource Conservation and Recovery Act of 1976 ("RCRA"), as amended, the Hazardous and Solid Waste Amendments Act of 1984, as amended, the Toxic Substances Control Act, as amended, the Occupational Safety and Health Act ("OSHA"), as amended, the Hazardous Materials Transportation Act, as amended, and any other federal, state and local law whose purpose is to conserve or protect health, the environment, wildlife or natural resources.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any regulation promulgated thereunder.

"ERISA Affiliate" means the Company or any of its Subsidiaries and any other corporation or trade or business under common control with the Company or any of its Subsidiaries or treated as a single employer with the Company or any of its Subsidiaries as determined under sections 414(b), (c), (m) or (o) of the IRC.

"Event of Default" has the meaning set forth in Section 10.1.

"Exhibit" refers to an exhibit attached to this Agreement and incorporated herein by reference, unless specifically provided otherwise.

"Financial Officer" means, as to any Person, its Chief Financial Officer, or if no Person serves in such capacity, the highest ranking executive officer of such Person with responsibility for accounting, financial reporting, financial compliance and similar functions.

"Financial Period" means a financial period of the Company's fiscal year. There are 13 Financial Periods in the Company's fiscal year.

"Fixed Rate" means twelve and three-quarter percent (12.75%) per annum.

"Fully Diluted Basis" means, with reference to outstanding Common Stock, the shares of Common Stock that would be outstanding assuming that all outstanding options, warrants and other rights to acquire Common Stock had been exercised (regardless of whether such rights are then exercisable) and all securities convertible into Common Stock had then been converted (regardless of whether such securities are then convertible) and had been issued. Any reference in this Agreement or any of the other Transaction Documents to "holder(s) of outstanding Common Stock on a Fully Diluted Basis" or words of similar import shall be deemed to include

holder(s) of outstanding options, warrants or similar rights to acquire Common Stock or securities convertible into Common Stock.

"Funded Debt" of any Person as of any date, means (a) all Debt of such Person for borrowed money, (b) all Debt of such Person representing the deferred purchase price of property or services and which is evidenced by a note, bond, debenture or similar instrument, and (c) all Capital Leases of such Person (other than leases of real property which are treated for purposes of GAAP as Capital Leases).

"GAAP" means generally accepted accounting principles, applied on a consistent basis, set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants and/or in statements of the Financial Accounting Standards Board and/or their successors which are applicable in the circumstances as of the date in question; and the requirement that such principles be applied on a consistent basis means that the accounting principles observed in a current period are comparable in all material respects to those applied in a preceding period.

"Governmental Authority" means any government, any state or other political subdivision thereof, or any Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guaranty" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions, by "comfort letter" or other similar undertaking of support of otherwise), or (b) entered into for the purpose of assuring in any other manner the obligee of such Debt (in whole or in part); provided, that, the term "Guaranty" shall not include endorsements for collection or deposit in the ordinary course of business. For purposes of this Agreement, the amount of any Guaranty shall be the maximum amount that the guarantor could be legally required to pay under such Guaranty.

"Guaranty Agreement" means that certain Guaranty Agreement of even date herewith executed by each Subsidiary of the Company.

"Hazardous Discharge" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping of a Hazardous Substance at, from, onto, under or within any real property owned, leased or operated at any time by the Company or any of its Subsidiaries or any real property owned, leased or operated by any other Person.

"Hazardous Substance" means any pollutant, toxic substance, hazardous waste, compound, element or chemical that is defined as hazardous, toxic, noxious, dangerous or infectious pursuant to any Environmental Law and Laws or which is otherwise regulated by any Environmental Law and Laws.

"Interest Expense" means for any Person for any period the interest expense incurred for such period as determined in accordance with GAAP.

"Investment" in any Person means any investment, whether by means of securities purchase (whether by direct purchase from such Person or from an existing holder of securities of such Person), loan, advance, extension of credit, capital contribution or otherwise, in or to such Person, the Guaranty of any Debt or other obligation of such Person, or the subordination of any claim against such Person to other Debt or other obligation of such Person; provided, that, "Investments" shall not include advances made to employees of such Person for reasonable travel, entertainment and similar expenses incurred in the ordinary course of business.

"IRC" means the Internal Revenue Code of 1986, as amended from time to time, and any regulation promulgated thereunder.

"Laws" means all applicable statutes, laws, ordinances, regulations, orders, writs, injunctions, or decrees of any state, commonwealth, nation, territory, possession, county, township, parish, municipality, or Governmental Authority.

"Leverage Ratio" means, on any day, the ratio of (a) the Adjusted Funded Debt of the Company and its Consolidated Subsidiaries as of such date to (b) the Consolidated EBITDA for the 13 Financial Periods ending on such date.

"Lien" means any lien, mortgage, pledge, security interest, or other encumbrance of any kind, whether voluntary or involuntary (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest).

"Lucky Acquisition" means the business combination and recapitalization involving the Company as contemplated by the Lucky Purchase Agreement.

"Lucky Agreement" means that certain Agreement and Plan of Merger dated as of December 12, 2001 by and among the Company, Julio Acquisition Corp., the Senior Lender and the stockholders of the Company, pursuant to which the Lucky Acquisition will be consummated.

"Lucky Documents" means Lucky Agreement, the Seller Notes and all other documents, instruments and agreements now or hereafter executed by or among the Company, any of its Subsidiaries, any stockholders of the Company, the Senior Lender or Julio Acquisition Corp. pertaining to Lucky Acquisition.

"Majority Noteholder" means a Noteholder or Noteholders holding more than fifty percent (50%) of the aggregate principal balance of the Note.

"Material Adverse Effect" means, with respect to a Person, a material adverse effect on the business, financial condition, operations, assets or prospects of such Person and its Subsidiaries, taken as a whole, and shall also mean, with respect to the Company and its Subsidiaries, a material adverse effect on such Person's ability to pay and perform its obligations under the Transaction Documents.

"Material Agreement" means any written or oral agreement, contract, commitment, or understanding to which a Person is a party, by which such Person is directly or indirectly bound, or to which any assets of such Person may be subject (a) pursuant to which such Person acquires any material portion of the raw materials, supplies or services used or consumed by such Person in the operation of its business (unless such raw materials, supplies or services are readily available to such Person from other sources on comparable terms), (b) pursuant to which such Person derives any material part of its revenues, or (c) pursuant to which the Company is required to make annual expenditures in excess of $100,000, and without limiting the foregoing, Material Agreement shall include each of the Ancillary Agreements.

"Maximum Lawful Rate" means the maximum rate (or, if the context so permits or requires, an amount calculated at such rate) of interest which, at the time in question would not cause the interest charged on the Note at such time to exceed the maximum amount which the Noteholder would be allowed to contract for, charge, take, reserve, or receive under applicable Law (including the "Cost of Money" limitations pursuant to Section 107.855 of Title 13 of the United States Code of Federal Regulations) after taking into account, to the extent required by applicable Law, any and all relevant payments or charges under the Transaction Documents.

"Note" means one or more promissory notes in the aggregate principal amount of $3,000,000.00 in the form of Exhibit "A" attached hereto and incorporated herein by reference for all purposes, to be executed by the Company, payable to the order of one or more Noteholders evidencing the Note and all renewals, extensions and restatements thereof.

"Note Register" means a register maintained by the Company setting forth the name and address of each Noteholder and the principal amount of the Note held by such Noteholder.

"Noteholder" means any Person in whose name the Note is registered on the Note Register.

"Obligations" means all present and future indebtedness, obligations and liabilities, and all renewals and extensions thereof, or any part thereof, of the Company and its Subsidiaries arising pursuant to the Transaction Documents, and all interest accrued thereon and costs, expenses, and attorneys' fees incurred in the enforcement or collection thereof, regardless of whether such indebtedness, obligations and liabilities are direct, indirect, fixed, contingent, liquidated, unliquidated, joint, several or joint and several.

"Operating Lease" means any lease, sublease, license or similar arrangement (other than a Capital Lease), pursuant to which a Person leases, subleases or otherwise is granted the right to occupy, take possession of, or use property whether real, personal or mixed.

"Other Permitted Debt" means a principal amount of Debt, when combined with the outstanding principal amount of Funded Debt as of such date, is equal to the applicable Leverage Multiplier times the Company's Consolidated EBITDA for the period of 13 consecutive Financial Periods most recently ended to such determination date. All Other Permitted Debt shall be unsecured and subordinated to the Obligations on terms and conditions acceptable to RRGC except the Wells Debt which shall be permitted to be secured and senior to the Obligations. As used in this definition, the Leverage Multiplier shall be (a) 4.2 for all Financial

Periods ending on or prior to June 30, 3002, (b) 4.0 for all Financial Periods ending on or prior to December 31, 2002, and (c) 3.5 for all Financial Periods ending thereafter.

"Pension Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA maintained by the Company, any Subsidiary of the Company or any ERISA Affiliate that is or was previously covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the IRC, including a "multiemployer plan" as such term is defined in Section 3(37) of ERISA.

"Permitted Encumbrances" means with respect to any asset:

(a)    Liens securing the Obligations;

(b)    zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of real property, or other minor irregularities in title to properties, whether real or personal, which do not secure the payment of Debt or other liability or obligation and do not materially impair the use of such property for the purposes for which the same is held by the owner thereof;

(c)    mechanics', materialmen's, warehousemen's, journeymen's, vendor's, landlord's and carrier's Liens and other similar Liens arising by operation of law or statute in the ordinary course of business and are not delinquent and which in any event cover a billing period not exceeding ninety (90) days unless such Lien is being contested in good faith in compliance with Section 7.4 herein;

(d)    Liens for Taxes or assessments not yet due or not yet delinquent, or, if delinquent, that are being contested in good faith in the normal course of business by appropriate action, as permitted by Section 7.4 hereof;

(e)    Liens securing the Senior Debt and the Wells Debt; and

(f)    Liens securing Debt for the payment of all or any part of the purchase price of any fixed assets; provided, that such Lien is confined solely to the fixed assets purchased with the proceeds of such Debt and the purchase of such fixed asset is permitted by Section 8.4 and Section 8.12 hereof.

"Permitted Investments" means (a) readily marketable direct obligations of the United States of America, (b) fully insured time deposits and certificates of deposit with maturities of one year or less of any commercial bank operating in the United States having capital and surplus in excess of $100,000,000, (c) commercial paper of a domestic issuer if at the time of purchase such paper is rated in one of the two highest ratings categories of Standard and Poor's Corporation or Moody's Investors Service, and (d) other cash equivalents.

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof and shall also mean the Company.

"Plan" means an employee benefit plan within the meaning of Section 3(3) of ERISA, under which the Company or any Subsidiary of the Company has any current or future obligation or liability and under which any present or former employee of the Company or any Subsidiary of the Company, or such present or former employee's dependents or beneficiaries, has any current or future right to benefits.

"Pro Forma Opening Balance Sheet" means a consolidated balance sheet of the Company which shall consist of the Company's actual consolidated balance sheet as of November 25, 2001, adjusted to give effect to the Closing Transactions and is attached hereto as Schedule 1.1.

"Projections" means the projections of the Company's future financial condition and results of operations attached hereto as Schedule 5.5 and incorporated herein by reference for all purposes.

"Property" means all types of real, personal, tangible, intangible, or mixed property, whether owned or hereafter acquired in fee simple or leased by the Company or its Subsidiaries.

"Qualified Public Offering" means the first underwritten public offering pursuant to an effective registration statement under the Securities Act covering the offering and sale of Common Stock for the account of the Company on a firm commitment basis in which the aggregate net proceeds payable by the Company at the public offering price is at least $20,000,000.

"Redemption Date" means the date on which the entire balance of the Note, including, without limitation, all accrued but unpaid interest thereon and all fees payable by the Company or its Subsidiaries in connection therewith, have been paid in full.

"Registration Rights Agreement" means that certain Registration Rights Agreement of even date herewith by and between the Company and RRGC.

"Rentals" means amounts payable by a lessee under an Operating Lease.

"RRGC" has the meaning set forth in the first paragraph of this Agreement.

"Schedule" means a "schedule" attached to this Agreement and incorporated herein by reference, unless specifically indicated otherwise.

"Section" refers to a "section" or "subsection" of this Agreement unless specifically indicated otherwise.

"Securities Act" means the Securities Act of 1933, as amended, or any successor federal statute.

"Seller Notes" means, together, (a) that certain Junior Subordinated Promissory Note made by the Company payable to Maureen S. Boutilier in the original principal amount of $1,000,000, (b) that certain Junior Subordinated Promissory Note made by the Company payable to Guy M. Boutilier in the original principal amount of $1,000,000, and (c) that certain Amended

and Restated Subordinated Note made by the Company payable to James Pinero in the original principal amount of $1,872,304.24.

"Senior Subordination Agreement" means that certain Intercreditor and Subordination Agreement of even date herewith between RRGC, the Senior Lender, Wells and the holders of the Seller Notes.

"Senior Credit Agreement" means that certain Senior Convertible Promissory Note dated as of December 17, 2001, made by the Company and its subsidiaries payable to Senior Lender, together with all amendments, renewals, extensions, replacements or refinancings thereof.

"Senior Debt" means all Debt of the Company outstanding under the Senior Credit Agreement, including all amendments, renewals, extensions, replacements or refinancings thereof; the outstanding principal amount of the Senior Debt shall not at any time exceed $6,000,000.

"Senior Debt Documents" means the Senior Credit Agreement and all promissory notes, security agreements, mortgages, deeds of trust, assignments, guarantees and other documents, instruments and agreements executed and delivered pursuant to the Senior Credit Agreement evidencing, securing, guaranteeing or otherwise pertaining to the Senior Debt and other obligations arising under the Senior Credit Agreement, as the foregoing may be amended, renewed, extended, supplemented, increased or otherwise modified from time to time to the extent permitted hereunder.

"Senior Lender" means Julio Investors LLC and its successors and assigns.

"Stockholders Agreement" means that certain Mezzanine Holder Rights Agreement among the Company, RRGC, and the Senior Lender.

"Subsequent Equity Purchase" means the purchase by Maplewood Partners, LP or one or more of its Affiliates from the Company of at least $4,000,000 of preferred stock or Common stock of the Company at a price per share and on terms and conditions no less favorable to the Company than the price and terms by which Mapplewood Partners, LP or one or more of its Affiliates purchased Common Stock and/or preferred stock from the Company at or prior to the Closing Date; provided, however, the Subsequent Equity Purchase can be consummated by the conversion of $4,000,000 of Senior Debt into shares of Common Stock pursuant to the terms of Senior Debt Documents as of the date hereof (and not as may be subsequently amended).

"Subsidiary" means, for any Person, any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions (including that of a general partner) are at the time directly or indirectly owned, collectively, by such Person and any Subsidiaries of such Person. The term Subsidiary shall include Subsidiaries of Subsidiaries (and so on).

"Taxes" means all taxes, assessments, filing or other fees, levies, imposts, duties, deductions, withholdings, stamp taxes, interest equalization taxes, capital transaction taxes, foreign exchange taxes or other charges of any nature whatsoever, from time to time or at any

time imposed by law or any federal, state or local governmental agency. "Tax" means any one of the foregoing.

"Transaction Documents" means this Agreement, the Note, the Warrant Agreement, the Registration Rights Agreement, the Stockholders Agreement and all other agreements, certificates, documents or instruments now or at any time hereafter delivered in connection with this Agreement, as the foregoing may be renewed, extended, modified, amended or restated from time to time.

"Voting Stock" of any Person shall mean capital stock of such Person which ordinarily has voting power for the election of directors (or persons performing similar functions) of such Person, whether at all times or only so long as no senior class of securities has such voting power by reason of any contingency.

"Warrant Agreement" means a Warrant Agreement of even date herewith between the Company and RRGC pursuant to which the Company shall issue and sell and RRGC shall purchase the Warrants.

"Warrants" mean the warrants issued pursuant to the Warrant Agreement entitling the record holder thereof to purchase from the Company one share of the Company's Common Stock (subject to adjustment as provided in Warrant Agreement) at the Warrant Exercise Price (as defined in the Warrant Agreement).

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

"Wells Credit Agreement" means that certain Amended and Restated Loan Agreement dated as of September 24, 1999, by and between Uncle Julio's Company and Wells, together with all amendments, renewals, extensions, replacements or refinancings thereof.

"Wells Debt" means all Debt of the Uncle Julio's Company outstanding under the Wells Credit Agreement, including all amendments, renewals, extensions, replacements or refinancings thereof; the outstanding principal amount of the Wells Debt shall not at any time exceed $1,525,460, however, such amount can be increased to the extent the increase in such additional principal would be Other Permitted Debt hereunder.

"Wells Debt Documents" means the Wells Credit Agreement and all promissory notes, security agreements, mortgages, deeds of trust, assignments, guarantees and other documents, instruments and agreements executed and delivered pursuant to the Wells Credit Agreement evidencing, securing, guaranteeing or otherwise pertaining to the Wells Debt and other obligations arising under the Wells Credit Agreement, as the foregoing may be amended, renewed, extended, supplemented, increased or otherwise modified from time to time to the extent permitted hereunder.

"Wells" means Wells Fargo Bank (Texas), N.A. and its successors and assigns.

Section 1.2.    Accounting Terms and Determinations.    Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations

hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP as in effect from time to time, applied on a basis consistent with the most recent annual audited, consolidated financial statements of the Company delivered to RRGC prior to the date hereof.

Section 1.3.    Gender and Number.  Words of any gender used in this Agreement shall be held and construed to include any other gender and words in the singular number shall be held to include the plural, and vice versa, unless the context requires otherwise.

Section 1.4.    References to Agreement.    Use of the words "herein", "hereof", "hereinabove", and the like are and shall be construed as references to this Agreement.

ARTICLE II.
NOTE PURCHASE; TERMS OF NOTE

Section 2.1.    Note Purchase.  Subject to the satisfaction or waiver of each condition contained in Article IV hereof, and the other terms and conditions of this Agreement, the Company agrees to issue and sell to RRGC and RRGC agrees on the Closing Date to purchase from the Company a Note in the principal amount of $3,000,000.00.  At the Closing, the Company shall deliver to RRGC and RRGC shall pay to the Company, by wire transfer of immediately available funds in accordance with the instructions delivered to RRGC prior to Closing, the principal amount of the Note and the Company shall deliver to RRGC the Note purchased by it.

Section 2.2.    Closing.  Closing of the purchase and sale of the Note (the "Closing") shall take place at the offices of Vinson & Elkins L.L.P., 2001 Ross Avenue, Suite 3700, Dallas, Texas 75201 at 10:00 a.m. on the Closing Date, or at such other time, date and place as may be agreed upon in writing by the Company and RRGC.

Section 2.3.    Interest; Interest Payments.  Interest shall accrue on the principal balance of the Note prior to the occurrence of an Event of Default at the Fixed Rate.  Interest shall be payable on the Note as it accrues commencing January 2, 2002 and the first Business Day of each month thereafter until maturity.  After the occurrence and during the continuance of an Event of Default, interest shall accrue on the outstanding principal balance of the Note and, to the extent permitted by applicable law, on accrued but unpaid interest, at the lesser of fifteen percent (15%) per annum or the Maximum Lawful Rate.

Section 2.4.    Principal Payments; Maturity.  The entire outstanding principal balance of the Note and all accrued interest thereon shall be due and payable in full on December 17, 2006.

Section 2.5.    Optional Prepayments.  The Note may be prepaid in whole or in part prior to maturity at the option of the Company in amounts not less than $300,000; provided that the Company shall also pay to the Noteholder simultaneously with each such prepayment a prepayment penalty equal to a percentage of the outstanding principal amount of the Note being prepaid in accordance with the following schedule:

| Time of Prepayment | Penalty as a Percentage of Principal Amount Being Prepaid |
| --- | --- |

| On or prior to December 17, 2002 | |
|---|---|
| After December 17, 2002 but on or before December 17, 2003 | 3% |
| | 2% |
| After December 17, 2003 but on or before December 17, 2004 | 1% |
| Thereafter | None |

Notwithstanding the foregoing, the Company shall be permitted to repay the entire outstanding principal amount of the Note, without prepayment penalty, concurrently with the closing of a Qualified Public Offering. The prepayment penalty shall be due and payable in connection with any other prepayment of the Note, including without limitation, with acceleration of the Obligations following the occurrence of an Event of Default.

Section 2.6.    Mandatory Prepayment.   The entire outstanding principal balance of the Note and all accrued but unpaid interest thereon shall be immediately due and payable in full upon the occurrence of any of the following events:  (a) the sale, lease, transfer or other disposition, in one transaction or a series of related transactions, of assets of the Company and its Subsidiaries which represent more than thirty-three percent (33%) or more of the fair market value of all of the assets of the Company and its Subsidiaries, taken as a whole; (b) a Qualified Public Offering; or (c) any Change of Control.

Section 2.7.    Computation of Interest; Recapture.   Interest which accrues on the Note under Section 2.3 shall be computed based on the number of actual days elapsed, but assuming a calendar year of 360 days.

Section 2.8.    Time and Place of Payment.   The Company shall make each payment of principal of, and interest on, the Note not later than 2:00 p.m. (Dallas, Texas time) on the date when due, in Federal or other funds immediately available to the Noteholder.  Whenever any payment of principal of, or interest on, the Note shall be due on a day which is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day.  If the date for any payment of principal is extended by operation of law or otherwise, interest thereon shall be payable for such extended time.

Section 2.9.    Application of Payments After Default.   After the occurrence of an Event of Default, all amounts collected or received by any Noteholder in respect of the Note shall be applied, first, to the payment of all proper costs incurred by such Noteholder in connection with the collection thereof (including reasonable fees, expenses and disbursements of counsel for such Noteholder), second, to the reimbursement of any advances made by such Noteholder to effect performance of any unperformed covenants of any the Company under any of the Transaction Documents, third, to the payment of all accrued but unpaid interest on the Note held by such Noteholder, fourth, to unpaid principal on the Note held by such Noteholder, and fifth to the Company or any other Person entitled to such proceeds under applicable law.

Section 2.10.    Taxes.   All amounts payable by the Company or any of its Subsidiaries under the Transaction Documents (whether principal, interest, fees, expenses, or otherwise) to or

for the account of the Noteholder shall, to the maximum extent permitted under applicable Law, be paid in full, free of any deductions or withholdings for or on account of any Taxes.

Section 2.11.  <u>Ratable Payments</u>.    The Company, RRGC and each subsequent Noteholder agree that all payments made on the Note (whether principal, interest or prepayment penalties, and whether voluntary prepayments, mandatory prepayments or regularly scheduled prepayments and further including payments deemed made via right of setoff or otherwise) shall be made to all Noteholders ratably based on the outstanding principal balance of the Note held by each Noteholder.  If, notwithstanding the foregoing, any Noteholder shall ever receive any payment in respect of the Note in an amount greater than its ratable percentage of the aggregate of all payments made simultaneously to all Noteholders, such Noteholder shall purchase for cash (and the other Noteholders shall sell for cash) non-recourse participations in each such other Noteholder's share of the outstanding balance of the Note as would be necessary to cause such Noteholder to share such excess with all other Noteholders ratably.

Section 2.12.  <u>Processing Fee</u>.   The Company shall also pay to RRGC a non-refundable processing fee of $60,000.

ARTICLE III.<br>TRANSFER OF THE NOTE

Section 3.1.   <u>Restrictions on Transfer</u>.  RRGC understands and agrees that the Note has not been registered under the Securities Act or any state securities Laws, and that accordingly, it will not be fully transferable except as permitted under various exemptions contained in the Securities Act and applicable state securities Laws, or upon satisfaction of the registration and prospectus delivery requirements of the Securities Act and applicable state securities Laws. RRGC acknowledges that it must bear the economic risk of its investment in the Note for an indefinite period of time (subject, however, to the payment terms of the Note) since it has have not been registered under the Securities Act and applicable state securities Laws and therefore cannot be sold unless it is subsequently registered or an exemption from registration is available. RRGC will not sell, transfer, assign, pledge, hypothecate or otherwise dispose of any or all of the principal amount of the Note unless (i) either (a) an effective registration statement under the Securities Act and applicable state securities Laws exists and covers the disposition of the Note or (b) a valid exemption from the registration and prospectus delivery requirements of the Securities Act and the registration or qualification requirements of any applicable state securities Laws then exists and (ii) it has obtained the prior written consent to such transfer of the Company, such consent not to be unreasonably withheld, conditioned or delayed; provided, however, such consent shall not be required (x) during the existence of Event of Default pursuant to Sections 10.1(a), (b) or (c) which continues for more than 15 days or (y) in connection with transfers by RRGC to its partners or its Affiliates.

Section 3.2.   <u>Registration, Transfer and Exchange of Notes</u>.

(a)    The Company shall maintain at the offices of the Company as set forth on the signature pages of this Agreement, the Note Register for registration of the Note and transfers thereof.  On the Closing Date, the Company shall register the outstanding Note issued to RRGC. The Company may deem and treat the registered Noteholder as the absolute owner of the Note

registered to such holder and (notwithstanding any notation of ownership or other writing on the Note made by any person) for the purpose of any exercise thereof or any distribution to the Noteholder, and for all other purposes.

(b)    Upon satisfaction of each condition set forth in the last sentence of Section 3.1 hereof, the Company shall register the transfer of any outstanding Note in the Note Register upon surrender of such Note to the Company at the offices of the Company as set forth on the signature pages of this Agreement, accompanied (if so required by it) by a written instrument or instruments of transfer in form satisfactory to it, duly executed by the registered Noteholder or by the duly appointed legal representative thereof. Upon any such registration of transfer, a new Note evidencing such transferred Note shall be issued to the transferee and the surrendered Note shall be canceled. If less than all of the principal amount of a Note surrendered for transfer is to be transferred, a new Note shall be issued to the Noteholder surrendering such Note evidencing such remaining principal balance.

(c)    Notes may be exchanged at the option of the Noteholders thereof, when surrendered to the Company at the offices of the Company as set forth on the signature pages of this Agreement, for other Notes of like tenor and representing in the aggregate a like number of Notes. Notes surrendered for exchange shall be canceled.

(d)    No charge shall be made for any such transfer or exchange except for any Tax or other governmental charge imposed in connection therewith.

Section 3.3.    Mutilated or Missing Notes. If any Note shall be mutilated, lost, stolen or destroyed, the Company shall issue, in exchange and substitution for and upon cancellation of the mutilated Note, or in lieu of and substitution for the Note lost, stolen or destroyed, a new Note or Notes of like tenor and representing in the aggregate the same outstanding principal, but only upon receipt of evidence satisfactory to the Company of such loss, theft or destruction of such Note and, if requested, indemnity satisfactory to it. No service charge shall be made for any such substitution, but all expenses and reasonable charges associated with procuring such indemnity and all stamp, Tax and other governmental duties that may be imposed in relation thereto shall be borne by the holder of such Note.

ARTICLE IV.
CONDITIONS

Section 4.1.    Closing Conditions.    The obligation of RRGC to purchase the Note hereunder is subject to the satisfaction of each of the conditions precedent set forth in this Section 4.1 on the Closing Date. In the event all of the conditions precedent set forth in this Article IV are not satisfied or waived by such time, RRGC may, at its option, terminate this Agreement and all of its obligations under this Agreement and the other Transaction Documents.

(a)    Closing Deliveries. The Company shall have delivered to RRGC in form and substance satisfactory to RRGC each of the following:

(i)    the Note executed and delivered by the Company and payable to RRGC;

548774_8.DOC                    16

22

(ii)     the Warrant Agreement duly executed and delivered by the Company and RRGC;

(iii)     a Warrant Certificate evidencing the Warrants to be issued to RRGC pursuant to the Warrant Agreement;

(iv)     the Registration Rights Agreement duly executed and delivered by the Company and RRGC;

(v)     the Stockholders Agreement duly executed and delivered by the Company and the other parties thereto;

(vi)     each of the Ancillary Agreements, accompanied by a certificate from an Authorized Officer stating that (i) except as expressly disclosed therein, none of such Ancillary Agreements have been amended or modified in any respect and no rights of any party thereunder have been waived, (ii) no party to any of the Ancillary Agreements is in default of its obligations thereunder, and (iii) the Ancillary Agreements are valid, binding and enforceable obligations of the Company, and, to the knowledge of the Company, each other party thereto in accordance with the terms and are in full force and effect;

(vii)     a favorable opinion of Akerman, Senterfitt & Edison, P.A., counsel the Company, in form and substance satisfactory to RRGC;

(viii)     all resolutions, certificates and documents RRGC may reasonably request in advance relating to (A) the organization, existence, good standing and foreign qualification of the Company and each of its Subsidiaries, (B) the corporate authority for the execution, delivery and enforceability of this Agreement and, the other Transaction Documents, and the consummation of the Closing Transactions, (C) the stock ownership of the Company and each of its Subsidiaries, and (D) such other matters relevant to the foregoing as RRGC shall reasonably request in advance, all of which shall be in form and substance reasonably satisfactory to RRGC;

(ix)     the Pro Forma Opening Balance Sheet in form and substance satisfactory to RRGC;

(x)     complete and accurate Assurance of Compliance and Size Status Declaration Forms promulgated by the Small Business Administration duly executed by the Company and the information necessary to complete the Small Business Administration Portfolio Financing Report (Form 1031);

(xi)     evidence satisfactory to RRGC that all Closing Transactions have been consummated;

(xii)     a certificate from an Authorized Officer of the Company certifying that (A) neither a Default nor an Event of Default has occurred, (B) each and every representation and warranty of the Company in the Transaction Documents is true and correct in all material respects, and (C) all conditions precedent have been satisfied or waived in all respects;

23

(xiii)   the Guaranty Agreement executed by each Subsidiary of the Company; and

(xiv)  ·  such other documents, instruments and agreements as RRGC shall reasonably request in advance.

The documents, certificates and opinions referred to in this Section 4.1(a) shall be delivered to RRGC no later than the Closing Date and shall, except as expressly provided otherwise, be dated the Closing Date.

(b)   Legal Matters.   All legal matters with respect to the Company, the Transaction Documents, and the Closing Transactions shall be acceptable to RRGC in its reasonable discretion.

(c)   Absence of Default.   No Default or Event of Default shall have occurred which is continuing.

(d)   Representations and Warranties.   The representations and warranties contained in this Agreement and in the other Transaction Documents shall be true and correct in all material respects.

(e)   No Material Adverse Change.  Since October 29, 2000, no event has occurred or condition exists which could reasonably be expected to have a Material Adverse Effect on the Company except for changes affecting the restaurant industry generally or restaurants that operate in the same geographical area in which the Company and its Subsidiaries operate.

(f)   Payment of Expenses.  The Company shall have paid in full all reasonable out of pocket fees, expenses and disbursements incurred by RRGC in connection with their investigation, underwriting, negotiation and closing of the transactions contemplated hereby, including, without limitation, all fees and expenses of Vinson & Elkins L.L.P., counsel to RRGC, to the extent incurred through the Closing Date, subject to a final bill after the Closing Date in connection with the preparation and negotiation of the Transaction Documents and closing of the transactions contemplated hereby.

ARTICLE V.
REPRESENTATIONS AND WARRANTIES

In order to induce RRGC to purchase the Note hereunder, the Company hereby represents and warrants to RRGC that each of the following statements (a) is true and correct on the date hereof and (b) will be true and correct after giving effect to the Closing Transactions (unless the representation or warranty specifically references another date, in which case the representation or warranty shall be true and correct in all respects as of such other date).

Section 5.1.   Corporate Existence and Power.   Each of the Company and each of its Subsidiaries (a) is a corporation, duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation set forth on Schedule 5.1 attached hereto, (b) has all corporate power and authority necessary to carry on its business as now conducted and (c) is

duly qualified as a foreign corporation in each jurisdiction set forth on Schedule 5.1 which as of the Closing Date constitutes all jurisdictions where a failure to be so qualified could have a Material Adverse Effect on the Company or such Subsidiary.

Section 5.2.    Corporate and Governmental Authorization; Contravention.    The execution, delivery and performance of this Agreement and the other Transaction Documents by each of the Company and each of its Subsidiaries are within their respective corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any Governmental Authority, and, except for matters which have been waived in writing by the appropriate Person, do not contravene, or constitute a default under, any provision of applicable material Law or of the Charter Documents or of any material judgment, injunction, order, decree or Material Agreement binding upon the Company or any of its Subsidiaries or its respective assets, or result in the creation or imposition of any Lien on any asset of the Company or any of its Subsidiaries other than Permitted Encumbrances.

Section 5.3.    Binding Effect.    This Agreement constitutes the valid and binding agreement of the Company; each other Transaction Document when executed and delivered in accordance with this Agreement by the Company or any of its Subsidiaries, will constitute the valid and binding obligation of the Company or such Subsidiary enforceable in accordance with its terms, except as (i) the enforceability thereof may be limited by bankruptcy, insolvency or similar Laws affecting creditors rights generally, and (ii) may be limited by equitable principles of general applicability.

Section 5.4.    Capitalization.    Schedule 5.4 attached hereto accurately and completely sets forth for each of the Company and its Subsidiaries (a) its authorized, issued and outstanding capital stock of every class and (b) the names of the record, and to the knowledge of the Company, beneficial owner, of its capital stock of every class, including the number and class of shares held by each such stockholder.  Except as set forth on Schedule 5.4 hereto and except for the Warrants, and preemptive rights expressly set forth in the Stockholders Agreement and registration rights provided in the Registration Rights Agreement, (x) there are not outstanding any options, warrants or other rights to acquire capital stock of any class of the Company or any of its Subsidiaries or securities convertible into capital stock of the Company or any of its Subsidiaries of any class, (y) no Person has any preemptive or similar rights with respect to any subsequent issue of stock by the Company or any of its Subsidiaries, and (z) no Person has any right to require the Company or any of its Subsidiaries to register any securities of the Company or any of its Subsidiaries under the Securities Act.

Section 5.5.    Financial Information.

(a)    The consolidated balance sheets of the Company as of October 31, 1998, October 25, 1999 and October 28, 2000, and the related consolidated statements of income and changes in financial position for the Company's three fiscal years then ended, audited by Arthur Andersen LLP, fairly present, in conformity with GAAP, the consolidated financial position of the Company as of such date and its consolidated results of operations and changes in financial position for the fiscal year then ended.

(b)     The consolidated balance sheet of the Company as of October 28, 2001, and the related consolidated statement of income and cash flow for the portion of the Company's fiscal year then ended fairly presents, in conformity with GAAP, the consolidated financial position of the Company as of such date and its consolidated results of operations and changes in financial position for the portion of the Company's fiscal year then ended.

(c)     (i)     The fair value of the property of the Company and each of its Subsidiaries is greater than the total amount of liabilities, including, without limitation, contingent liabilities, of the Company and each such Subsidiary, (ii) the present fair market value of the assets of the Company and each of its Subsidiaries is not less than the amount that will be required to pay its liability on its debts as they become absolute and matured, (iii) the Company and each of its Subsidiaries is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (iv) neither the Company or any of its Subsidiaries intends to, nor does the Company or any of its Subsidiaries believe that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature, and (v) neither the Company nor any of its Subsidiaries is engaged in a business or transaction, or is about to engage in business or a transaction for which its property would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which such Person is engaged. For purposes of this Section 5.5(c), "contingent liabilities" shall be computed at the amount which, in light of all relevant facts and circumstances, represents the amount that can reasonably be expected to become an actual or matured liability.

(d)     Neither the Company nor any of its Subsidiaries has incurred, and with respect to the Company or any of its Subsidiaries, there is not outstanding any Debt, material liability or material obligation (whether accrued, absolute, contingent, liquidated or otherwise) other than (i) obligations under Material Agreements described in Schedule 5.6 attached hereto, (ii) trade payables incurred in the ordinary course of business, none of which are more than ninety (90) days past the invoice date unless not yet due under applicable terms, (iii) obligations under the Operating Leases described on Schedule 5.12 attached hereto, (iv) the Obligations, and (v) other liabilities set forth in the Pro Forma Opening Balance Sheet.

(e)     Since October 28, 2000, no event has occurred or condition exists which could have a Material Adverse Effect on the Company other than events affecting the restaurant industry generally or restaurants that operate in the same geographic area in which the Company and its Subsidiaries operate.

(f)     The Pro Forma Opening Balance Sheet fairly presents what the consolidated financial position of the Company and its Subsidiaries will be immediately after giving effect to the Closing Transactions.

(g)     The Projections set forth the Company's commercially reasonable estimate as of the date hereof of the Company's consolidated financial condition and results of operations for the dates and periods covered thereby. The Projections were based on assumptions in the Projections which the Company believes were reasonable when the Projections were prepared and continue to be reasonable on the date hereof.

Section 5.6.    <u>Material Agreements</u>.    <u>Schedule 5.6</u> attached hereto contains as of the Closing Date a complete and accurate description of every Material Agreement to which the Company or any of its Subsidiaries is a party (other than the Transaction Documents and the Ancillary Agreements) or by which the Company or any of its Subsidiaries or any of their respective assets are bound (including all amendments and modifications thereto).    The Company has provided RRGC with a true and correct copy of all such Material Agreements, including all amendments and modifications thereof.  Except as set forth in Section 5.7, no rights or obligations of any party to any of such Material Agreements has been waived, and the Company and, to the knowledge of the Company, no other party to any of such Material Agreements is in default of its obligations thereunder.  Each of such Material Agreements is a valid, binding and enforceable obligation of the Company, and to the knowledge of the Company, all other parties thereto in accordance with its terms and is in full force and effect.

Section 5.7.    <u>Ancillary Agreements</u>.  The Company has provided RRGC with a true and correct copy of all of the Ancillary Agreements including all amendments and modifications thereto.  Except as set forth on Schedule 5.7, no rights or obligations of any party to any of such Ancillary Agreements have been waived, and the Company and, to the knowledge of the Company, no other party to any of such Ancillary Agreements is in default of its obligations thereunder.  Each of such Ancillary Agreements is a valid, binding and enforceable obligation of the Company, and to the knowledge of the Company, the other parties thereto in accordance with its terms and is in full force and affect.

Section 5.8.    <u>Investments</u>.  Neither the Company nor any of its Subsidiaries has made any Investments other than Permitted Investments.

Section 5.9.    <u>Outstanding Debt</u>.  <u>Schedule 5.9</u> attached hereto contains as of the Closing Date a complete and accurate description of all Debt of the Company and each of its Subsidiaries outstanding on the date hereof.  Neither the Company nor any of its Subsidiaries is in default in payment of any Debt with respect to which it is an obligor or in default of any covenant, agreement, representation, warranty or other term of any document, instrument or agreement evidencing, securing or otherwise pertaining to any such Debt that could reasonably be expected to have a Material Adverse Effect.

Section 5.10.    <u>Transactions with Affiliates</u>.  <u>Schedule 5.10</u> attached hereto contains as of the Closing Date a complete and accurate description of all contracts, agreements and other arrangements (whether written, oral, express or implied) between the Company or any of its Subsidiaries and any Affiliate of the Company and its Subsidiaries in existence on the date hereof other than the transactions contemplated in the Ancillary Agreements.

Section 5.11.    <u>Employment Matters</u>.  <u>Schedule 5.11</u> attached hereto contains as of the Closing Date a complete and accurate list of all employees of the Company and each of its Subsidiaries who either (a) have been paid cash compensation in the twelve-month period ending December 31, 2000, of $150,000 or more, or (b) are projected to earn in cash compensation $150,000 or more in the twelve (12) month period ending December 31, 2001.  Such schedule also sets forth for the current fiscal year the annual salary (including projected bonuses and other cash compensation) of all such employees and all benefits (other than health insurance benefits and other similar benefits which are both customary in the industry in which the Company or any

of its Subsidiaries is engaged. Schedule 5.11 also contains as of the Closing Date a complete and accurate description of all employment contracts, consulting agreements, management agreements, non-compete and similar agreements to which the Company or any of its Subsidiaries is a party on the date hereof.

Section 5.12. Operating Leases. Schedule 5.12 attached hereto contains as of the Closing Date a complete and accurate description of all Operating Leases to which the Company or any of its Subsidiaries is a party as of the date hereof which require Rental payments of $300,000 or more per year. The aggregate amount of all Rental payments under all Operating Leases to which the Company and its Subsidiaries are parties on the date hereof does not exceed $3,500,000 per year.

Section 5.13. Litigation. There is no action, suit or proceeding pending against, or to the knowledge of the Company, threatened against or affecting the Company or any of its Subsidiaries before any court or arbitrator or any Governmental Authority except such actions, suits or proceedings which if determined adversely against the Company or such Subsidiary which are not reasonably expected to have a Material Adverse Effect.

Section 5.14. ERISA. Neither the Company nor any of its Subsidiaries nor any ERISA Affiliate maintains or contributes to any Plan or any Pension Plan other than those disclosed on Schedule 5.14 attached hereto. Each such Plan is in compliance in all material respects with its terms and the applicable provisions of ERISA and the IRC. Except as required by law, neither the Company nor any of its Subsidiaries nor any ERISA Affiliate has any commitment to create any Additional Plan. Neither the Company nor any of its Subsidiaries nor any ERISA Affiliate has ever sponsored, adopted, maintained or been obligated to contribute to, or had any liability under, any Pension Plan. There is no material violation of ERISA with respect to the filing of applicable reports, documents and notices regarding the Plans with the Secretary of the Treasury or the furnishing of such documents to the participants and beneficiaries of the Plans, and, to the knowledge of the Company, with respect to each Plan all other reports required under ERISA or the IRC to be filed with any Governmental Authority have been duly filed and all such reports are true and correct in all material respects as of the dates given. Each Plan that is intended to be "qualified" within the meaning of Section 401(a) of the IRC is, and has been during the period from its adoption to date, so qualified, both as to form and, to the knowledge of the Company, has been qualified operation, and all necessary governmental approvals, including a favorable determination as to the qualification under the IRC of each of such Plans and each amendment thereto, have been timely obtained or application for a favorable determination will be filed prior to the applicable filing deadlines. Except as disclosed on Schedule 5.14 attached hereto, each trust created under any such Plan intended to be qualified within the meaning of Section 401(a) of the IRC and each trust described in Section 501(c)(9) of the IRC is exempt from federal income taxation under Section 501(a) of the IRC and has been so exempt during the period from creation to date. The Company has no pending or, to the knowledge of the Company, threatened claims, lawsuits or actions (other than routine claims for benefits in the ordinary course) asserted or instituted against, and to the knowledge of the Company, of any threatened litigation or claims against, the assets of any Plan or its related trust or against any fiduciary of a Plan with respect to the operation of such Plan. Neither the Company nor any of its Subsidiaries has received notice of any pending investigations, inquires or audits with respect to any Plan by any regulatory agency. Neither the Company nor any of its Subsidiaries has engaged in any prohibited

28

transactions, within the meaning of Section 406 of ERISA or Section 4975 of the IRC, in connection with any Plan. Neither the Company nor any of its Subsidiaries maintains or has established any Plan which is a welfare benefit plan within the meaning of Section 3(1) of ERISA which provides for retiree medical liabilities or continuing benefits or coverage for any participant or any beneficiary of any participant after such participant's termination of employment except as may be required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), and the regulations thereunder, and at the expense of the participant or the beneficiary of the participant. The Company and each of its Subsidiaries that maintains a Plan that is a welfare benefit plan within the meaning of Section 3(1) of ERISA has complied with any applicable notice and continuation requirements of COBRA and the regulations thereunder. To the knowledge of the Company, none of the Company or any of its Subsidiaries maintains, has established, or has ever participated in, a multiple employer welfare benefit arrangement within the meaning of Section 3(40)(A) of ERISA.

Section 5.15. <u>Taxes and Filing of Tax Returns</u>. The Company and each of its Subsidiaries has filed all Tax returns required to have been filed by it and has paid all Taxes shown to be due and payable on such returns, including interest and penalties, and all other Taxes which are payable by the Company or any of its Subsidiaries. The Company does not know of any proposed Tax assessment against the Company or any of its Subsidiaries and all Tax liabilities of the Company and each of its Subsidiaries are adequately provided for and no Tax liability of the Company or any of its Subsidiaries has been asserted by the Internal Revenue Service or any other Governmental Authority for Taxes in excess of those already paid.

Section 5.16. <u>Ownership of Properties; Liens</u>. The Company and each of its Subsidiaries has good and marketable fee simple or leasehold title to their respective properties and assets, real and personal, including, without limitation, all assets reflected in the Pro Forma Opening Balance Sheet and all assets which are used by the Company and its Subsidiaries in the operation of their respective businesses, and none of such properties or assets is subject to any Lien of any kind, other than Permitted Encumbrances. <u>Schedule 5.16</u> attached hereto contains as of the Closing Date an accurate description of all real property owned, leased or otherwise utilized by the Company or any of its Subsidiaries, including the name of the owner or lessee of such real property and an accurate description of leases related thereto.

Section 5.17. <u>Licenses, Permits, Etc.</u> Except as set forth on Schedule 5.17 hereto, the Company and each of its Subsidiaries possess all franchises, certificates, licenses, permits, consents, authorizations, exemptions and orders of Governmental Authorities as are necessary to carry on their respective businesses as now being conducted and as proposed to be conducted, except to the extent a failure to have such franchises, certificates, licenses, permits, consents, authorizations, exemptions and orders could not have a Material Adverse Effect.

Section 5.18. <u>Proprietary Rights</u>. Except as set forth on Schedule 5.18 hereto, the Company and each of its Subsidiaries has ownership of, or valid licenses to use, all trademarks, copyrights, patents and other proprietary rights used in their respective businesses. To the knowledge of the Company, the operation of the businesses of the Company and its Subsidiaries does not infringe any patent, copyright, trademark or other proprietary rights of others, and, neither the Company nor any of its Subsidiaries has received any notice from any third party of any such alleged infringement by the Company or any of its Subsidiaries. The Company and

each of its Subsidiaries has taken reasonable steps to establish and preserve its respective ownership of all patents, copyrights, trademarks, trade secrets and other proprietary rights. The Company is not aware of any infringement by others of its or any its Subsidiaries' patents, copyrights, trademarks or other proprietary rights.

Section 5.19.  <u>Compliance with Law</u>.  The business and operations of the Company and each of its Subsidiaries have been and are being conducted in all material respects in accordance with all applicable Laws.

Section 5.20.  <u>Environmental Matters</u>.  (a) No part of the Company or any of its Subsidiaries' assets, including, without limitation, any real property owned or leased by the Company or any of its Subsidiaries contains Environmental Contamination, (b) none of the Company or any of its Subsidiaries has caused or suffered to occur any Hazardous Discharge, (c) none of the Company or any of its Subsidiaries has been and such Persons are not currently involved in operations at or near any real property owned, operated or leased by the Company or any of its Subsidiaries which could reasonably be expected to lead to the imposition on the Company or any of its Subsidiaries of liability or creation of a Lien on the Company or any of its Subsidiaries' assets under any Environmental Law and Laws, (d) none of the Company or any of its Subsidiaries has any knowledge of any Environmental Complaint relating to past or present operations of the Company or any of its Subsidiaries, (e) no Environmental Complaint has been received by the Company or any of its Subsidiaries in connection with any Hazardous Discharge at any properties or assets owned or leased by other Persons except with respect to matters which have been fully and finally resolved to the satisfaction of such Persons and the parties making the Environmental Complaint, (f) all activities of the Company and its Subsidiaries are being and have been and will at all times in the future be conducted in material compliance with all applicable Environmental Law and Laws, and (g) there are no facts, conditions or circumstances, which if discovered by a Governmental Authority or other party, could form the basis for or could cause such Governmental Authority or other party to assert an Environmental Complaint, in each case specified in clauses (a) through (g) above which could reasonably be expected to have a Material Adverse Effect.

Section 5.21.  <u>Burdensome Obligations</u>.  Neither the Company nor any of its Subsidiaries nor any of their respective properties or assets is subject to any Law, rule, regulation, order or decree of any Governmental Authority or any pending or threatened change of Law, rule, regulation, order or decree of any Governmental Authority, or is subject to any restriction under its Charter Documents or under any agreement or instrument to which it is a party or by which it or any of its properties (now owned or hereafter acquired) may be subject or bound, which is so unusual or burdensome as to be likely in the foreseeable future to have a Material Adverse Effect on the business, operations or financial condition of the Company or any of its Subsidiaries.

Section 5.22.  <u>Fiscal Year</u>.  The Company's fiscal year ends on the last Sunday of October of each year.

Section 5.23. <u>No Default</u>. Neither a Default nor an Event of Default has occurred and is continuing.

Section 5.24. <u>Insurance</u>. <u>Schedule 5.24</u> attached hereto contains a complete and accurate list and description of all insurance policies maintained by the Company as of the date hereof.

Section 5.25. <u>Government Regulation</u>. Neither the Company nor any of its Subsidiaries is subject to regulation under the Public Utility Holding Company Act of 1935, the Interstate Commerce Act (as either of the preceding acts have been amended), or any other Law which regulates the incurring by the Company or any of its Subsidiaries of Debt, including, but not limited to, Laws relating to common contract carriers of the sale of electricity, gas, steam, water or other public utility services.

Section 5.26. <u>Casualties</u>. Neither the businesses nor the properties of the Company or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or other casualty (whether or not covered by insurance) other than events affecting the restaurant industry generally or restaurants that operate in the same geographic area in which the Company and its Subsidiaries operate.

Section 5.27. <u>Investment Company Act</u>. Neither the Company nor any of its Subsidiaries is an "investment company" registered or required to be registered under the Investment the Company Act of 1940 as amended. Neither the Company nor any of its Subsidiaries is controlled by such a company.

Section 5.28. <u>Securities Laws</u>. Assuming the representations of RRGC made in Article VI herein are true and correct, the offer, issuance and sale of the Note, the Warrants and the Warrant Shares (a) are and will be exempt from the registration and prospectus delivery requirements of the Securities Act, (b) have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities Laws, and (c) are and will be accomplished in conformity with all other federal and applicable state securities Laws.

Section 5.29. <u>Brokers and Finders</u>. <u>Schedule 5.29</u> attached hereto sets forth all arrangements (including amounts payable by the Company or any of its Subsidiaries in connection therewith) pursuant to which any Person has, or as a result of the Closing Transactions will have, any right or valid claim against the Company or any of its Subsidiaries for any commission, fee or other compensation as an investment banker, finder or broker, or in any similar capacity, other than fees payable to RRGC. No Person has or will have any right or valid claim through the Company or any of its Subsidiaries against RRGC for any such commission, fee or other compensation. The Company will indemnify and hold RRGC harmless against any liability or expense arising out of, or in connection with, any such right or claim (including, without limitation, claims arising out of the matters disclosed on <u>Schedule 5.29</u>).

Section 5.30. <u>Full Disclosure</u>. No information heretofore furnished by or on behalf of the Company or any of its Subsidiaries to RRGC for the purposes of this Agreement or any other Transaction Document or any transaction contemplated hereby or thereby, contained, and no

31

written information hereafter furnished by or on behalf of the Company or any of its Subsidiaries to RRGC for purposes of this Agreement or any other Transaction Document or any transaction contemplated hereby or thereby will contain, any untrue statement of a material fact or omit a material fact necessary to make the statements therein not misleading. There is no fact or circumstance which could reasonably be expected to have a Material Adverse Effect on the Company or any of its Subsidiaries which has not been disclosed to RRGC other than events affecting the restaurant industry generally or restaurants that operate in the same geographic area in which the Company and its Subsidiaries operate.

Section 5.31.  <u>Small Business Concern</u>.  The Company, together with its Subsidiaries, is a "small business" within the meaning of Section 107.50 of Title 13 of the United States Code of Federal Regulations as of the Closing Date.  The information to be included in the forms referred to in Section 4.1(a) hereof, when such forms are completed and executed by the Company, will be accurate and complete in all respects.

## ARTICLE VI.
## REPRESENTATIONS AND WARRANTIES OF RRGC

In order to induce the Company to consummate the transactions contemplated hereunder, RRGC hereby represents and warrants to the Company as follows:

Section 6.1.  <u>Due Authorization</u>.  The execution, delivery and performance by RRGC of this Agreement and the other Transaction Documents (a) are within RRGC's partnership powers, (b) have been duly authorized by all necessary partnership action on the part of RRGC and the parties executing and delivering the same on behalf of RRGC are duly authorized to do so, and (c) do not conflict with or violate its Charter Documents or any law, rule or regulation applicable to RRGC, including, without limitation, applicable regulations of the Small Business Administration.

Section 6.2.  <u>Securities Representations</u>.

(a)  <u>No Intended Distribution</u>.  RRGC is acquiring the Note to be purchased by it for investment purposes only, for its own account, and not as nominee or agent for any other Person, and not with a view to, or for resale in connection with, any distribution thereof within the meaning of the Securities Act or other applicable securities laws.

(b)  <u>Accredited Investor</u>.  RRGC is an "accredited investor" within the meaning of Rule 501 under the Securities Act.  RRGC was not organized for the specific purpose of acquiring the Note.

(c)  <u>Investment Experience</u>.  RRGC has sufficient knowledge and experience in investing in companies similar to the Company in terms of the Company's stage of development so as to be able to evaluate the risks and merits of its investment in the Company, and RRGC is able financially to bear the risks thereof.

Section 6.3.  <u>Existence</u>.  RRGC is a limited partnership validly existing and in good standing under the Laws of the State of Delaware.  RRGC is qualified to do business as a limited partnership in the State of Texas.

548774_8.DOC                                    26

Section 6.4.    Enforceability.    This Agreement constitutes the valid and binding agreement of RRGC; each other Transaction Document when executed and delivered in accordance with this Agreement by RRGC, will constitute the valid and binding obligation of the RRGC enforceable in accordance with its terms except as (i) the enforceability thereof may be limited by bankruptcy, insolvency or similar Laws affecting creditors rights generally, and (ii) may be limited by equitable principles of general applicability.

ARTICLE VII.
AFFIRMATIVE COVENANTS

Until the Redemption Date, the Company agrees to comply in every respect with each covenant contained in this Article VII.

Section 7.1.    Information.    The Company will deliver, or cause to be delivered, to the Noteholder:

(a)    Annual Statements.    As soon as available, and in any event within 120 days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its Consolidated Subsidiaries as of the end of such fiscal year and the related consolidated statements of income and cash flow for such fiscal year, setting forth in each case (i) in comparative form the figures for the previous fiscal year, and (ii) comparative figures with respect to the operating budget required to be delivered pursuant to Section 7.1(d) hereof, all reported by the Company in accordance with GAAP and audited by independent public accountants of nationally recognized standing (other than comparative figures with respect to budget);

(b)    Period Statements.    As soon as available, and in any event within thirty (30) days after the end of each Financial Period, (i) a consolidated balance sheet of the Company and its Consolidated Subsidiaries as of the end of such Financial Period and the related consolidated statements of income and cash flow for such month, setting forth in each case (A) in comparative form the figures for the corresponding Financial Period of the Company's previous fiscal year and (B) comparative figures with respect to the operating budget required to be delivered pursuant to Section 7.1(d) hereof, and (ii) consolidated statements of income as of the end of such Financial Period for each store location setting forth comparative figures for the corresponding Financial Period of the Company's previous fiscal year, all certified as to fairness of presentation, GAAP and consistency by the Financial Officer of the Company; provided, that, such financial statements are subject to normal year end audit adjustments made in accordance with GAAP, which in the aggregate will not be material, and such financial statements may not conform to GAAP to the extent they do not contain footnotes;

(c)    Financial Officer's Certificate.    Together with the financial statements and related information required to be delivered to the Noteholders pursuant to Sections 7.1(a) and (b) hereof, a certificate of the Financial Officer of the Company which shall, (i) set forth in reasonable detail the calculations required to establish whether the Company and the Subsidiaries were in compliance with the requirements of Article IX hereof on the date of such financial statements, (ii) state whether there exists on the date of such certificate any Default or Event of Default and, if any Default or Event of Default then exists, setting forth the details thereof and

the action which the Company is taking or proposes to take with respect thereto, and (iii) state whether or not such financial statements fairly reflect the consolidated business and financial condition of the Company and its Consolidated Subsidiaries as of the date of the delivery of such financial statements;

(d) <u>Budget and Business Plan</u>. On or before forty-five (45) days before the commencement of each fiscal year of the Company, an operating budget for the Company for such fiscal year which shall be prepared in the form of the monthly financial statements required to be delivered pursuant to <u>Section 7.1(b)</u> hereof, and shall set forth projected revenues, operating expenses, income, cash flow, Capital Expenditures, Debt and balance sheet conditions of the Company for such fiscal year and a business plan which shall set forth in narrative form the Company's qualitative assessment of its business for such fiscal year. Such budget shall (i) be based on assumptions set forth therein which the Company believes to be reasonable at the time such budget is delivered to the Noteholders, (ii) be prepared based on sound financial planning practices, (iii) represent the Company's reasonable estimate based on then existing circumstances of the financial condition and results of operation for the Company for such fiscal year, and (iv) be accompanied by a certificate of the Financial Officer of the Company certifying as to the matters set forth in (i), (ii) and (iii) preceding;;

(e) <u>Defaults</u>. Immediately upon any Authorized Officer of the Company becoming aware of the occurrence of any Default hereunder, a certificate of an Authorized Officer of the Company setting forth the details thereof and the action which the Company is taking or proposes to take with respect thereto;

(f) <u>Stockholder Information</u>. Promptly upon the mailing thereof to the stockholders of the Company generally, copies of all financial statements, reports and proxy statements so mailed;

(g) <u>SEC Reports</u>. Promptly upon the filing thereof, copies of all registration statements, amendments and supplements thereto and annual, quarterly or special reports and amendments thereto which the Company may file with the Commission;

(h) <u>Litigation</u>. Promptly upon any Authorized Officer of the Company becoming aware thereof, notice (i) of the commencement of any litigation, arbitration or similar proceeding by or against the Company or any of its Subsidiaries in which an unfavorable outcome could have a Material Adverse Effect on the Company or any of its Subsidiaries, (ii) of the occurrence of any event or existence of any condition which could reasonably be expected to have a Material Adverse Effect on the Company or any of its Subsidiaries, or (iii) of the occurrence of a default under any Debt owing by the Company or any of its Subsidiaries or any default under any Material Agreement to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries or any of their properties is bound which could reasonably be expected to have a Material Adverse Effect on the Company; and

(i) <u>Other Information</u>. From time to time, such additional information regarding the financial position or businesses of the Company or any of its Subsidiaries as any Noteholder may reasonably request.

Section 7.2.  <u>Right of Inspection</u>.  The Company will, and will cause each of its Subsidiaries to, permit each general partner of RRGC and their successors, any analyst of RRGC and RRGC's accountants and attorneys that have executed confidentiality agreements with the Company upon reasonable notice and during normal business hours to visit and inspect any of the assets of the Company or any of its Subsidiaries and to examine the Company's or any of its Subsidiaries' books, records, accounts and correspondence.

Section 7.3.  <u>Maintenance of Insurance</u>.  The Company will, and will cause each of its Subsidiaries to, at all times maintain or cause to be maintained insurance issued by insurers of recognized responsibility covering such risks and in such amounts as are customary in the case of companies of established reputation engaged in the same or similar business and similarly situated.

Section 7.4.  <u>Payment of Taxes and Claims</u>.  The Company will, and will cause each of its Subsidiaries to, pay when due all Taxes imposed upon it or its respective assets and, with respect to its respective franchises, business, income or profits, pay such Taxes before any material penalty or interest accrues thereon; provided, however, no payment of Taxes or claims shall be required if (a) the amount, applicability or validity thereof is being contested in good faith by appropriate action promptly initiated and diligently conducted in accordance with good business practices and no material part of the property or assets of each Noteholder is the subject of any pending levy or execution, and (b) the Company has notified each Noteholder of such circumstances in reasonable detail.

Section 7.5.  <u>Compliance with Laws and Documents</u>.  The Company will, and will cause each of its Subsidiaries to, comply in all material respects with the provisions of (a) all Laws, (b) its Charter Documents, and (c) every Material Agreement to which the Company or any of its Subsidiaries is a party or by which the Company's or any of its Subsidiaries' properties are bound.

Section 7.6.  <u>Operation of Properties and Equipment</u>.  The Company will, and will cause each of its Subsidiaries to, at all times, maintain, preserve and keep all operating equipment used or useful in the operation of their respective businesses in proper repair, working order and condition, and make all necessary or appropriate repairs, renewals, replacements, additions and improvements thereto so that the efficiency of such equipment shall at all times be properly preserved and maintained; provided, that, no item of operating equipment need be so repaired, renewed, replaced, added to or improved, if the Company shall in good faith determine that such action is not necessary or desirable for the continued efficient and profitable operation of the Company's and its Subsidiaries' businesses.

Section 7.7.  <u>Additional Documents</u>.  The Company will, and will cause each of its Subsidiaries to, cure promptly any defects in the creation and issuance of the Note, and the execution and delivery of this Agreement and the other Transaction Documents, and, at the Company's sole expense, promptly and duly execute and deliver, and cause each of its Subsidiaries to promptly execute and deliver, to the Noteholders, upon reasonable request, all such other and further documents, agreements and instruments in compliance with or accomplishment of the covenants and agreements of the Company and each of its Subsidiaries in

35

this Agreement and the other Transaction Documents, all as may be reasonably necessary or appropriate in connection therewith.

Section 7.8.   ERISA.  Within thirty (30) days after receipt thereof, the Company shall furnish to each Noteholder (a) a copy of any notice, determination letter, ruling or opinion the Company or any of its Subsidiaries or any ERISA Affiliate receives from the United States Department of Labor or the Internal Revenue Service with respect to any Plan, (b) notification of any material increases in the benefits of any existing Plan or the establishment of any new Plan, or the commencement of contributions to any Plan to which the Company or any of its Subsidiaries or any ERISA Affiliate was not previously contributing, and (c) notice of all actions, suits and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality affecting the Company or any of its Subsidiaries or any ERISA Affiliate with respect to any Plan, except those which, in the aggregate, if adversely determined could not have a Material Adverse Effect.

Section 7.9.   Maintenance of Books and Records.  The Company will, and will cause each of its Subsidiaries to, maintain proper books of record and account in which true and correct entries in conformity with GAAP shall be made on a timely basis of all dealings and transactions in relation to the Company's and its Subsidiaries' businesses and activities.

Section 7.10.   Environmental Matters.

(a)     The Company will, and will cause each of its Subsidiaries to, comply with all Environmental Law and Laws applicable to their respective properties and operations, including, without limitation, all Hazardous Substances transportation, storage, disposal, remediation and similar requirements of applicable Environmental Law and Laws except to the extent failure to comply could not reasonably be expected to have a Material Adverse Effect.

(b)     Notwithstanding any other provision contained within this Agreement or the other Transaction Documents, the Company shall immediately after becoming aware thereof orally notify each Noteholder of any Hazardous Discharge or the receipt of any Environmental Complaint relating to any property or assets owned by the Company or any of its Subsidiaries or affecting any properties or assets owned or leased by other Persons and shall furnish each Noteholder with written notice of such Hazardous Discharge or Environmental Complaint within five (5) days of the oral notification.

Section 7.11.   Subsequent Equity Purchase.  The Company shall cause the Subsequent Equity Purchase to have been consummated no later than 18 months from the Closing Date.

ARTICLE VIII.
NEGATIVE COVENANTS

Until the Redemption Date, the Company will comply in every respect with each covenant contained in this Article VIII.

Section 8.1.   Distributions.  The Company will not, nor will it permit any of its Subsidiaries to, make any Distribution other than (a) Distributions to RRGC required hereunder, (b) the Subsidiaries of the Company may make Distributions to the Company and to wholly

owned (other nominal amounts of stock held by residents of the state of organization of a Subsidiary held by such Persons in order to comply with such state's law) Subsidiaries of the Company, (c) Distribution to Senior Lender as required pursuant to the Senior Loan Documents (but not in respect of Senior Lender's ownership of stock in the Company), (d) Distribution paid to Maplewood Partners, L.P. or its Affiliates in the form of management fees; provided, however, such management fees shall not exceed the amount provided for in the advisory agreement between the Company and Maplewood Partners, L.P. in effect on the date hereof and shall not be permitted to be paid during the existence of a Default or Event of Default or if a Default or Event of Default would result from such payment, and (e) repurchases from employees of the Company or its Subsidiaries in connection with the termination of their employment of options or Common Stock issued upon exercise thereof; provided, that the Company shall not be permitted to make cash payments of more than $250,000 in respect of such repurchases in any fiscal year.

Section 8.2.    <u>Business of the Company</u>.  The Company and its Subsidiaries will not engage in any business other than the business conducted as of the date hereof and all natural extensions thereto.

Section 8.3.    <u>Liens</u>.  The Company will not, and will not permit any of its Subsidiaries to, create, assume or permit to exist any Lien of any kind against any of the assets of any character of the Company or any of its Subsidiaries, whether owned as of the date of this Agreement or hereafter acquired, except Permitted Encumbrances.

Section 8.4.    <u>Incurrence of Debt and Guarantees</u>.  The Company will not, and will not permit any of its Subsidiaries to, incur, become or remain liable for any Debt other than (a) the Obligations, (b) the Seller Notes, (c) the Senior Debt, (d) the Wells Debt, and (e) the Other Permitted Debt.

Section 8.5.    <u>Modification of Capitalization Documents; Ancillary Agreements</u>.  The Company will not, nor will it permit any of its Subsidiaries to, enter into any material amendment or modification of its Charter Documents or the Ancillary Agreements or waive or fail to enforce any material right of the Company or any of its Subsidiaries thereunder

Section 8.6.    <u>Existence and Qualification</u>.  The Company will not, and will not permit any of its Subsidiaries to (a) consolidate or merge with or into any other Person, (b) terminate, or fail to maintain its existence in its jurisdiction of incorporation, (c) sell, lease, transfer or otherwise dispose of, in one or more transactions or series of transactions, assets of the Company and its Subsidiaries which represent fifteen percent (15%) or more of the fair market value of all of the assets of the Company and its Subsidiaries, taken as whole (other than the sale of inventory in the ordinary course of business or the relocation of existing locations), or (d) terminate, or fail to maintain its good standing and qualification to transact business in all jurisdictions where the failure to maintain its good standing or qualification to transact business could reasonably be expected to have a Material Adverse Effect.

Section 8.7.    <u>Use of Proceeds</u>.  The proceeds of the Note will be used by the Company solely (a) to finance the Lucky Acquisition, (b) to pay fees and closing expenses directly related to the Closing Transactions and (c) for other general purposes permitted by applicable Laws.

Section 8.8.    Investments.    The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly, make any Investments other than Permitted Investments.

Section 8.9.    Transactions with Affiliates.    The Company will not, and will not permit any of its Subsidiaries to, enter into any transaction with an Affiliate or make any payment to an Affiliate (whether in cash or property) of any type other than (a) compensation paid to the executive officers of the Company or any of its Subsidiaries which is permitted pursuant to Section 8.16 hereof, (b) advances for, and reimbursement of, reasonable travel, entertainment and similar expenses, (c) payments described on Schedule 5.10 hereto, (d) the transactions contemplated in the Ancillary Agreements, and (e) management fees to Maplewood Partners, L.P. as permitted by Section 8.1.

Section 8.10.    ERISA.    The Company will not, and will not permit any of its Subsidiaries or any ERISA Affiliate to, directly or indirectly, (a) terminate any Pension Plan so as to result in any material liability to the Company or any of its Subsidiaries or any ERISA Affiliate, (b) establish, or become obligated to contribute to or provide benefits under, any Pension Plan, (c) incur any obligation to provide post-employment health care benefits to any of their current or former employees, except as required by COBRA and except as required by the employment agreements described on Schedule 5.11 attached hereto, (d) enter into any new Plan or modify any existing Plan so as to increase its obligations thereunder except in the ordinary course of business consistent with past practice which could result in any material liability to the Company or any of its Subsidiaries or any ERISA Affiliate, or (e) permit to exist any circumstances with respect to any Pension Plan that would have a Material Adverse Effect.

Section 8.11.    [Intentionally Omitted]

Section 8.12.    Capital Expenditures.    The Company will not, and will not permit any of its Subsidiaries to, make Capital Expenditures other than (a) in connection with the development, construction and opening of new restaurant locations which have been approved by the board of directors of the Company, (b) maintenance expenses incurred in the ordinary course of business and (c) other Capital Expenditures during any fiscal year which are not in excess of $75,000 times the number of restaurant locations open at the end of such fiscal year.

Section 8.13.    Lease Obligations.    The Company will not, and will not permit any of its Subsidiaries to, enter into or become or remain liable as lessee under any Operating Leases which require aggregate annual Rentals in excess of $150,000 (other than Operating Leases existing on the Closing Date), excluding Operating Leases for new restaurant locations approved by the board of directors of the Company or equipment and other Operating Leases approved in advance by the board of directors of the Company.

Section 8.14.    Payment of Subordinate Obligations.    The Company will not, and will not permit any of its Subsidiaries to, make any payment on Debt which is subordinate, in right of payment, to the Note prior to the scheduled maturity date of such payment, and the Company will not, and will not permit any of its Subsidiaries to make any payment on any such Debt to the extent such payments would be in violation of the subordination provisions applicable to such Debt. Nothing contained in this Section 8.14 shall be deemed to permit the incurrence of any such Debt not permitted by Section 8.4 hereof.

Section 8.15.  <u>Acquisitions</u>.  The Company will not, and will not permit any of its Subsidiaries to, acquire all or substantially all of the assets or capital stock of any Person or any operating division of any Person or acquire any Person or any operating division of any Person through merger, consolidation, reorganization or any other manner, in which the aggregate consideration (whether in the form of cash, securities, notes or assumption of Debt) for such acquisition is in excess of $10,000,000.

Section 8.16.  <u>Compensation of Officers</u>.  The Company will not, and will not permit any of its Subsidiaries to, provide any of their officers with any compensation, stock options or other securities as a result of serving as an officer the Company or any of its Subsidiaries other as approved by the compensation committee of the board of directors (or, in the absence of such committee, the board of directors) of the Company.

ARTICLE IX.
FINANCIAL COVENANTS

Until the Redemption Date, the Company will comply in every respect with each covenant contained in this <u>Article IX</u>.

Section 9.1.  <u>Consolidated Adjusted Tangible Net Worth</u>.  The Company shall not permit its Consolidated Adjusted Tangible Net Worth to be less than $(2,200,000) at any time.

Section 9.2.  <u>Consolidated EBITDA</u>.  The Company shall not permit its Consolidated EBITDA to be less than $3,300,000 for the period of 13 consecutive Financial Periods ending with and including the first Financial Period ending after the Closing Date and thereafter $3,700,000 for any period of 13 consecutive Financial Periods commencing with the 13 consecutive Financial Periods ending with and including the second Financial Period ending after the Closing Date.

Section 9.3.  <u>Leverage Ratio</u>.  The Company shall not permit its Leverage Ratio to exceed (a) 4.20 to 1.00 at the end of any period of 13 consecutive Financial Periods ending on or prior to June 30, 2002, (b) 4.00 to 1.00 at the end of any period of 13 consecutive Financial Periods ending on or prior to December 31, 2002, and (c) 3.50 to 1.00 at the end of any period of 13 consecutive Financial Periods ending thereafter.  The initial Leverage Ratio test shall be for the 13 consecutive Financial Periods ending with and including the first Financial Period ending after Closing Date.

ARTICLE X.
DEFAULTS

Section 10.1.  <u>Events of Default</u>.  If one or more of the following events (collectively, "<u>Events of Default</u>" and individually, an "<u>Event of Default</u>") shall have occurred and be continuing:

(a)  the Company shall fail to make when due any principal payment on the Note or the Company shall fail to pay any amount payable upon an exercise of the Put (as defined in the Warrant Agreement);

(b)    the Company shall fail to pay when due any interest on the Note and such failure shall continue for ten (10) days following the due date of such payment;

(c)    the Company shall fail to pay when due any fees, expenses, reimbursements, indemnification payments or other monetary obligations when due under any of the Transaction Documents (other than amounts referenced in Section 10.1(a) or (b)) and such failure shall continue for 15 days following the due date of such payment;

(d)    the Company shall fail to observe or perform any covenant or agreement contained in Section 7.11, Article VIII or Article IX hereof;

(e)    the Company shall fail to observe or perform any covenant or agreement contained in this Agreement or any other Transaction Document (other than those covenants referenced in Sections 10.1(a), (b), (c) and (d)) and such failure shall continue for a period of thirty (30) days following the earlier of (i) the discovery of such failure by an Authorized Officer of the Company, or (ii) the date written notice of such failure is given by the Purchasers to the Company with a description of such failure;

(f)    any representation, warranty, certification or statement made or deemed to have been made by the Company in this Agreement or any of the other Transaction Documents or the Company or any other Person on behalf of the Company in any certificate, financial statement or other document delivered pursuant to this Agreement or any of the other Transaction Documents, shall prove to have been incorrect in any material respect when made;

(g)    the Company or any of its Subsidiaries shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its Debts under any bankruptcy, insolvency or other similar Law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its Debts as they become due, or shall take any corporate action to authorize any of the foregoing;

(h)    an involuntary case or other proceeding shall be commenced against the Company or any of its Subsidiaries seeking liquidation, reorganization or other relief with respect to it or its Debts under any bankruptcy, insolvency or other similar Law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of sixty (60) days; or an order for relief shall be entered against the Company under the federal bankruptcy Laws as now or hereafter in effect;

(i)    one (1) or more final and non-appealable judgments or orders for the payment of money aggregating in excess of $250,000 above any insurance the Company or its Subsidiaries have with respect thereto shall be rendered against the Company or any of its Subsidiaries and such judgment or order (i) shall continue unsatisfied and unstayed for a period of thirty (30) days after the date such judgment or order becomes final and non-appealable, or

(ii) is not fully paid and satisfied at least ten (10) days prior to the date on which any of its assets may be lawfully sold to satisfy such judgment or order;

(j)    any Change of Control;

(k)    a default or event which, with the giving of notice, lapse of time or both could (unless cured or waived) become a default, shall occur under the terms of any Debt of the Company or any of its Subsidiaries having a principal balance of $100,000 or more (including, without limitation, the Senior Debt);

(l)    the Company shall use the proceeds of the Note for any purpose other than the purpose specified in Section 8.7 hereof;

(m)    any condition, event or circumstance shall exist or occur which has had or would reasonably be expected to have a Material Adverse Effect; or

(n)    Abdo J. Shashy shall cease for any reason to be actively involved as the Chief Executive Officer of the Company (regardless of whether such cessation of employment or involvement is as a result of death, incapacity, voluntary or involuntary or any other reason) unless a replacement is identified and under contract with the Company within 180 days of such cessation;

then, so long as any such event is continuing, (i) the Noteholder may, at its option, without notice or demand of any kind (including, without limitation, notice of intention to accelerate and acceleration) (unless any such notice is expressly provided for herein or in the other Transaction Documents), all of which are hereby waived, declare the Obligations (including all accrued interest thereon) to be, and the Obligations shall thereupon become, immediately due and payable; provided, that, in the case of any of the Events of Default specified in Section 10.1(g) or (h), without any notice to the Company or any other act by any Noteholder, the Obligations (including all accrued interest thereon) shall become immediately due and payable, and (ii) the Noteholders may take such other actions as may be permitted by the Transaction Documents or applicable Law.

ARTICLE XI.
MISCELLANEOUS

Section 11.1.  Notices.  All notices, requests and other communications to any party hereunder shall be in writing (including bank wire, telex, telecopy or similar writing) and shall be given to such party at its address, telex or telecopy number set forth on the signature pages hereof or such other address, telex or telecopy number as such party may hereafter specify for the purpose by notice to the other party.  Each such notice, request or other communication shall be effective (i) if given by telex or telecopy, when such telex or telecopy is transmitted to the telex or telecopy number specified on the signature page hereto and the appropriate answer back is received or receipt is otherwise confirmed, (ii) if given by mail, five (5) Business Days after deposit in the mails with certified mail postage prepaid and return receipt requested, addressed as aforesaid, or (iii) if given by any other means, when delivered at the address specified on the signature page hereto.

548774_8.DOC

Section 11.2.  No Waivers.  No failure or delay by any Noteholder in exercising any right, power or privilege hereunder or under any other Transaction Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law or in any of the other Transaction Documents.

Section 11.3.  Expenses; Indemnification.

(a)     The Company shall pay on demand (i) all reasonable out-of-pocket expenses incurred by RRGC, including reasonable fees and disbursements of counsel for RRGC, in connection with (A) RRGC's due diligence investigation and analysis of the Company and the Closing Transactions, (B) the preparation and negotiation of this Agreement and the other Transaction Documents and the closing of the transactions contemplated hereby and thereby, (C) any waiver or consent which may be granted in connection herewith, or any amendment hereof or of any other Transaction Document, and (D) any other matters related to the Transaction Documents or RRGC's investment in the Company other than with respect to matters solely arising from RRGC's own circumstances that have no reasonably relation to matters under the Company's control, and (ii) if an Event of Default occurs, all reasonable out-of-pocket expenses incurred by each Noteholder, including (A) reasonable fees and disbursements of counsel to each Noteholder in connection with such Event of Default and collection and other enforcement proceedings resulting therefrom, and (B) reasonable fees of auditors and consultants incurred by each Noteholder in connection therewith.

(b)     The Company agrees to indemnify and hold harmless, RRGC and each subsequent Noteholder and their respective directors, officers, employees, agents, successors and assigns (collectively, the "Indemnified Parties") from and against any and all liabilities, losses, damages, costs and expenses of any kind (including, without limitation, the reasonable fees and disbursements of counsel for the Indemnified Parties in connection with any investigative, administrative or judicial proceeding, whether or not any such Indemnified Party shall be designated a party thereto) which may be incurred by any Indemnified Party relating to or arising out of (a) this Agreement, the other Transaction Documents, the Closing Transactions and all other transactions contemplated hereby or thereby, (b) any actual or proposed use of proceeds of the issuance and sale of the Note hereunder, and (c) the Closing Transaction, including without limitation, any liability, loss, damage, cost or expense incurred by any Indemnified Party with respect to, or resulting from any failure to comply with any or all Laws applicable to the Company or any of its Subsidiaries; provided, that, no Indemnified Party shall have the right to be indemnified hereunder for its own gross negligence or willful misconduct, IT BEING THE INTENTION HEREBY THAT THE INDEMNIFIED PARTIES SHALL BE INDEMNIFIED FOR THE CONSEQUENCES OF THEIR OWN NEGLIGENCE.

Section 11.4.  Amendments and Waivers; Sale of Interest.  Any provision of this Agreement and the other Transaction Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Company and the Majority Noteholder.  The Company hereby consents to any participation, sale, assignment, transfer or other disposition which complies with Article III, at any time or times hereafter, of any Note, this Agreement and any of the other Transaction Documents, or of any portion hereof or thereof,

including, without limitation, RRGC's rights, title, interests, remedies, powers, and duties hereunder or thereunder.

Section 11.5.  Survival.  All representations, warranties and covenants made by the Company herein or in any certificate or other instrument delivered by it or in its behalf under the Transaction Documents shall be considered to have been relied upon by RRGC and shall survive the delivery to RRGC of such Transaction Documents and the purchase of the Note, regardless of any investigation made by or on behalf of RRGC.

Section 11.6.  Limitation on Interest.  Regardless of any provision contained in the Transaction Documents, no Noteholder shall ever be entitled to receive, collect, or apply, as interest on the Note, any amount in excess of the Maximum Lawful Rate, and in the event any Noteholder ever receives, collects or applies as interest any such excess, such amount which would be deemed excessive interest shall be deemed a partial prepayment of principal and treated hereunder as such; and if the Note is paid in full, any remaining excess shall promptly be paid to the Company.  In determining whether or not the interest paid or payable under any specific contingency exceeds the Maximum Lawful Rate, the Company and the Noteholder shall, to the extent permitted under applicable Law, (a) characterize any nonprincipal payment as an expense, fee or premium rather than as interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread, in equal parts, the total amount of the interest throughout the entire contemplated term of the Note, so that the interest rate is the Maximum Lawful Rate throughout the entire term of the Note; provided, however, that, if the unpaid principal balance thereof is paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the Maximum Lawful Rate, the Noteholder shall refund to the Company the amount of such excess and, in such event, to the extent permitted by applicable Law, the Noteholder shall not be subject to any penalties provided by any Laws for contracting for, charging, taking, reserving or receiving interest in excess of the Maximum Lawful Rate.

Section 11.7.  Invalid Provisions.  If any provision of the Transaction Documents is held to be illegal, invalid, or unenforceable under present or future Laws effective during the term thereof, such provision shall be fully severable, the Transaction Documents shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part thereof, and the remaining provisions thereof shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom.  Furthermore, in lieu of such illegal, invalid, or unenforceable provision there shall be added as a part of the Transaction Documents a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

Section 11.8.  Successors and Assigns.  Subject to Section 4.1, the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that the Company may not assign or otherwise transfer any of its rights or obligations under this Agreement.

Section 11.9.  GOVERNING LAW.  THIS AGREEMENT AND THE TRANSACTION DOCUMENTS SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF DELAWARE.

43

Section 11.10. <u>Counterparts; Effectiveness</u>.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when RRGC shall have received counterparts hereof signed by all of the parties hereto.

Section 11.11. <u>No Third Party Beneficiaries</u>.  It is expressly intended that there shall be no third party beneficiaries of the covenants, agreements, representations or warranties herein contained other than transferees or assignees of all or any part of RRGC's interest hereunder.

Section 11.12. <u>FINAL AGREEMENT</u>.  THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS COLLECTIVELY REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Section 11.13. <u>SUBMISSION          TO          JURISDICTION; WAIVER OF SERVICE AND VENUE</u>. ANY SUIT, ACTION OR PROCEEDING BROUGHT BY RRGC WITH RESPECT TO THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS MAY BE BROUGHT IN THE COURTS OF THE STATE OF DELAWARE, OR IN THE FEDERAL COURTS LOCATED IN THE STATE OF DELAWARE, AS RRGC MAY SELECT IN ITS SOLE DISCRETION. THE COMPANY HEREBY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURTS FOR THE PURPOSE OF ANY SUCH SUIT, ACTION OR PROCEEDING. THE COMPANY HEREBY IRREVOCABLY WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT BROUGHT IN THE COURTS LOCATED IN THE STATE OF DELAWARE, AND HEREBY WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM.

Section 11.14. <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  RRGC AND THE COMPANY EACH HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT, ANY TRANSACTION DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM IN RESPECT TO THIS AGREEMENT. RRGC AND THE COMPANY EACH AGREE THAT THE OTHER MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 11.15. <u>Fair Market Value of Note and Warrants</u>.  The Company and RRGC hereby agree that for purposes of IRC Treasury Regulations Section 1.1273-2(h), (a) the "issue price" of the investment unit consisting of the Note and the Warrants is $3,001,000, (b) the fair

market value of the Note is $2,971,000, and (c) the fair market value of the Warrants is $30,000. The Company and RRGC agree to use the foregoing issue price and fair market values for U.S. federal tax purposes with respect to the transactions contemplated by this Agreement (unless otherwise required by a final determination of the Internal Revenue Service or a court of competent jurisdiction).

[The following page is the signature page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective Authorized Officers on the day and year first above written.

COMPANY:

LUCKY BOY CORPORATION

Address for Notice:
Lucky Boy Corporation
c/o Maplewood Partners LP
255 Aragon Avenue, Suite 300
Coral Gables, Florida 33134
Fax No. (305) 350-6810
Attn: Post Acquisition Department –
Julio Acquisition

By: _____
Abdo Joseph Shashy,
President

with a Copy (which shall not consitute notice) to:

Akerman Senterfitt
One Southeast Third Avenue, 28th Floor
Miami, Florida 33131-1714
Fax No.: (305) 374-5095
Attn: Robert Coultas

RRGC:

RETAIL & RESTAURANT GROWTH
CAPITAL, L.P.

Address for Notice:

By:    Retail & Restaurant Growth Partners, L.P.
       its General Partner

By:    Retail & Restaurant Growth
       Management Inc., its General Partner

Retail & Restaurant Growth Capital, L.P.
10,000 North Central Expressway
Suite 1060
Dallas, Texas 75231
Fax No. (214) 750-0060
Attn: J. Eric Lawrence

By: _____
       Name: Mark L. Masinter
       Title: General Partner

[Signature Page]

EXHIBIT A

## PROMISSORY NOTE

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THIS NOTE MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO A VALID EXEMPTION COVERING SUCH TRANSFER.

$3,000,000.00                    Dallas, Texas                    December 17, 2001

FOR VALUE RECEIVED, the undersigned Lucky Boy Corporation, a Delaware corporation ("Maker"), hereby promises to pay to the order of Retail & Restaurant Growth Capital, L.P., a Delaware limited partnership ("Payee"), not later than 2:00 P.M. (Dallas, Texas time), on the date when due, in Federal or other funds immediately available in Dallas, Texas, at Payee's offices at 10,000 North Central Expressway, Suite 1060, Dallas, Texas 75231, or such other address in Dallas, Texas given to Maker by Payee, the principal sum of THREE MILLION AND NO/100 DOLLARS ($3,000,000.00) as hereinafter described. Whenever any payment of principal of, or interest on, this Note shall be due on a day which is not a Business Day, the date for payment thereof shall be extended to the next succeeding Business Day. If the date for payment of principal is extended by operation of law or otherwise, interest thereon shall be payable for such extended time.

This Note has been executed and delivered pursuant to, and is subject to and governed by, the terms of that certain Note Purchase Agreement dated as of December 17, 2001, by and between Maker and Payee (the "Agreement"). This Note is one of the "Notes" referred to in the Agreement. Unless otherwise defined herein or unless the context hereof otherwise requires, each term used herein with its initial letter capitalized has the meaning given to such term in the Agreement.

Interest shall accrue on the principal balance of this Note outstanding from time to time at the rates and in amounts set forth in the Agreement. Accrued but unpaid interest on this Note and the outstanding principal balance of this Note shall be due and payable at the times and in the amounts required by the Agreement.

Upon and subject to the terms and conditions of the Agreement, Maker shall be entitled to prepay the principal of or interest on this Note from time to time and at any time, in whole or in part.

Upon the occurrence and during the continuance of an Event of Default, and upon the conditions stated in the Agreement, the holder hereof may, at its option, declare the entire unpaid principal of and accrued interest on this Note immediately due and payable (provided that, upon the occurrence of certain Events of Default, and upon the conditions stated in the Agreement, such acceleration shall be automatic), without notice, demand, or presentment, all of which are

548774_8.DOC                    A-1

47

Schedule 5.1

Corporate Existence and Power

| Company | State of Incorporation | Foreign Corporation Status |
|---|---|---|
| Lucky Boy Corporation | Delaware | Texas |
| Uncle Julio's Corporation | Texas | |
| The Mexican Restaurant Inc. | Maryland | |
| Uncle Julio's Rio Grande Cafe, Inc. | Virginia | |
| Conroe Foods, Inc. | Texas | |
| Julio and Sons Company | Texas | |
| Uncle Julio's of Illinois, Inc. | Illinois | |
| Uncle Julio's of Georgia, Inc. | Georgia | |
| Uncle Julio's of Reston, Inc. | Virginia | Maryland and D.C. (qualifications have lapsed; requalification in progress) |

Schedule 5.4

Capitalization

(1)    Lucky Boy Corporation:  Authorized capital consisting of 200,000 shares of common stock, par value $.01 per share ("Common Stock"). As of the date hereof, there are of record 64,460.79 shares issued and outstanding and held as follows:

| Shareholder | Number of Shares |
|---|---|
| Julio Investors LLC | 51,408.63 |
| Abdo J. Shashy | 12,852.16 |
| Robert Latham | 200.00 |
| | 64,460.79 |

(2) Uncle Julio's Corporation: Authorized capital consisting of 10,000 shares of common stock, par value $1.00 per share. As of the date hereof, there are of record 1,000 shares of common stock issued and outstanding all of which are held by Lucky Boy Corporation.

(3) The Mexican Restaurant Inc.: Authorized capital consisting of 5,000 shares of common stock, par value $1.00 per share. As of the date hereof, there are of record 500 shares of common stock issued and outstanding and held as follows: (i) Uncle Julio's Corporation – 499 shares; and (ii) Harry C. Perry, Jr. – 1 share.

(4) Uncle Julio's Rio Grande Cafe, Inc.:  Authorized capital consisting of 5,000 shares of common stock, par value $1.00 per share. As of the date hereof, there are of record 5,000 shares of common stock issued and outstanding all of which are held by Uncle Julio's Corporation.

(5) Uncle Julio's of Reston, Inc.:  Authorized capital consisting of 5,000 shares of common stock, par value $1.00 per share. As of the date hereof, there are of record 5,000 shares of common stock issued and outstanding all of which are held by Uncle Julio's Corporation.

(6) Conroe Foods, Inc.: Authorized capital consisting of 10,000 shares of common stock, no par value.  As of the date hereof, there are of record 1,000 shares of common stock issued and outstanding all of which are  held by Uncle Julio's Corporation.

(7) Julio and Sons Company: Authorized capital consisting of  100,000 shares of common stock, par value $1.00 per share. As of the date hereof, there are of record 1,000 shares of common stock issued and outstanding all of which are  held by Uncle Julio's Corporation.

(8)  Uncle Julio's of Illinois, Inc.:  Authorized capital consisting of  10,000 shares of no par value common stock. As of the date hereof, there are of record 500 shares of common stock issued and outstanding all of which are  held by Uncle Julio's Corporation.

{MI737424;3}

(9) <u>Uncle Julio's of Georgia, Inc.</u>:  Authorized capital consisting of  1,000 shares of common stock, par value not indicated.  As of the date hereof, there are of record 1,000 shares of common stock issued and outstanding all of which are  held by Uncle Julio's Corporation.

5.4(x)  Julio Investors LLC holds a $6,000,000 Senior Subordinated Secured Convertible Note, which is convertible into common stock of the Company.  Furthermore, the Company has issued 12,700 options to purchase common stock of the Company, and has reserved 4,260 shares for future issuances under its Amended 1997 Employee Stock Option Plan.

5.4(y)  Each of Uncle Julio's Corporation and Uncle Julio's of Reston, Inc. has granted its shareholders preemptive rights in its respective charter.

## Schedule 5.5

### Sub Debt Request Model

See attached.

{MI737424;3}

# Sub-Debt Request Model
## Uncle Julio's Corporation

Previous Price $25,377

## ACQUISITION ANALYSIS SUMMARY

SOURCES & USES OF FUNDS

COVERAGE RATIOS

SUMMARY FINANCIAL DATA

12/16/01 2:18 PM Page 1

MapleWood Partners LP

In thousands

## Sub-Debt Request Model
### Uncle Julio's Corporation
#### Last Updated: 12/1/01

## Assumptions that are different from the Management Case model

1. Same store sales growth for existing stores is reduced to approximately 4% in 2002
2. The mature store level for new stores is $5 million for stores opened in 2002.
3. Corporate G&A is increased to a minimum of 4.5% of sales in all years.

Confidential

54

*In thousands*

## Sub-Debt Request Model
### Uncle Julio's Corporation
Last Updated: 12/1/01

### New Store Comparison

| | Lemmon Ave. | [shaded] | Ft. Worth | Keller Springs | [shaded] | Ballston Virginia | Reston Virginia | Gaithersburg Maryland | Chicago | Atlanta | 8 Store Average | Percent of Revenue | Projected Average First Year Store | Percent of Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Existing - Projected 2001 | | | | | | | | |
| Sales | $4,300 | | $5,500 | $5,400 | | $5,000 | $5,500 | $5,100 | $5,900 | $2,900 | $4,950 | 100.0% | $5,000 | 100.0% |
| Sq. Ft. | 6.5 | | 7.3 | 8.5 | | 8.6 | 7.0 | 8.4 | 8.5 | 8.4 | 7.9 | | 8.5 | |
| Sales/Sq. Ft. | $662 | | $753 | $635 | | $581 | $786 | $607 | $694 | $345 | $627 | | $588 | |
| COGS | 1,347 | | 1,820 | 1,650 | | 1,440 | 1,621 | 1,414 | 1,673 | 913 | 1,484 | 30.0% | 1,475 | 29.5% |
| Gross Margin | 2,953 | | 3,680 | 3,750 | | 3,560 | 3,879 | 3,686 | 4,227 | 1,987 | 3,466 | 70.0% | 3,525 | 70.5% |
| Salaries & Wages | 1,501 | | 1,683 | 1,714 | | 1,616 | 1,718 | 1,772 | 1,807 | 1,463 | 1,659 | 33.5% | 1,802 | 36.0% |
| Operating Expenses | 540 | | 695 | 662 | | 618 | 655 | 640 | 830 | 521 | 645 | 13.0% | 683 | 13.7% |
| Occupancy Expense | 176 | | 181 | 425 | | 367 | 419 | 238 | 275 | 240 | 290 | 5.9% | 300 | 6.0% |
| Total Store Level Expenses | 2,217 | | 2,559 | 2,801 | | 2,601 | 2,792 | 2,650 | 2,912 | 2,224 | 2,595 | 52.4% | 2,785 | 55.7% |
| Store Level EBITDA | 736 | | 1,121 | 949 | | 959 | 1,087 | 1,036 | 1,315 | (237) | 871 | 17.6% | 740 | 14.8% |
| Per Sq. Ft. | 113 | | 154 | 112 | | 112 | 155 | 123 | 155 | (28) | 110 | | 87 | |
| % of revenue | 17.1% | | 20.4% | 17.6% | | 19.2% | 19.8% | 20.3% | 22.3% | (8.2%) | 17.6% | | 14.8% | |
| Occupancy | 176 | | 181 | 425 | | 367 | 419 | 238 | 275 | 240 | 290 | 5.9% | 300 | 5.9% |
| Per Sq. Ft. | 27 | | 25 | 50 | | 43 | 60 | 28 | 32 | 29 | 37 | | 35 | |
| Store Level EBITDAR | 912 | | 1,302 | 1,374 | | 1,326 | 1,506 | 1,274 | 1,590 | 3 | 1,161 | 23.5% | 1,040 | 20.8% |
| Per Sq. Ft. | 140 | | 178 | 154 | | 154 | 215 | 152 | 187 | 0 | 147 | | 122 | |
| % of revenue | 21.2% | | 23.7% | 25.5% | | 26.5% | 27.4% | 25.0% | 27.0% | 0.1% | 23.5% | | 20.8% | 20.8% |

Note: Shaded stores are not included in 8 store average because they are underperforming and the company may move/close these stores.

MapleWood Partners I.P

In thousands

12/1/601 2:16 PM Page 1

## Sub-Debt Request Model
## Uncle Julio's Corporation
### Last Updated: 12/1/01

### Profitability After Store Improvements

| | Lemmon Ave. | Close (Greenville) | After Closing Greenville Ave. | Ft. Worth | Keller Springs | Move Store | Bethesda Maryland | Ballston Virginia | Reston Virginia | Gaithersburg Maryland | Chicago | Improve Management | After Improvement Atlanta | 9 Store Average | Percent of Revenue | 9 Store Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | *Current Projected 2001 Performance* | | | | | | | |
| Sales | 4,300 | | 0 | 5,500 | 5,600 | | 5,000 | 5,000 | 5,500 | 5,100 | 5,900 | | 5,000 | 5,189 | 100.0% | 46,700 |
| Sq. Ft. | 6.5 | | 0.0 | 7.3 | 8.5 | | 8.1 | 8.6 | 7.0 | 8.4 | 8.5 | | 8.4 | 7.9 | | 71.3 |
| Sales/Sq. Ft. | 662 | | 0 | 753 | 635 | | 617 | 581 | 786 | 607 | 694 | | 595 | 659 | | 655 |
| COGS | 1,347 | | 0 | 1,820 | 1,850 | | 1,494 | 1,440 | 1,621 | 1,414 | 1,673 | | 1,494 | 1,550 | 29.9% | 13,950 |
| Gross Margin | 2,953 | | 0 | 3,680 | 3,750 | | 3,506 | 3,560 | 3,879 | 3,686 | 4,227 | | 3,506 | 3,639 | 70.1% | 32,750 |
| Salaries & Wages | 1,501 | | 0 | 1,683 | 1,714 | | 1,609 | 1,616 | 1,718 | 1,772 | 1,807 | | 1,609 | 1,670 | 32.2% | 15,029 |
| Operating Expenses | 540 | | 0 | 695 | 662 | | 632 | 618 | 655 | 640 | 830 | | 632 | 656 | 12.6% | 5,905 |
| Occupancy Expense | 176 | | 0 | 181 | 425 | | 284 | 367 | 419 | 238 | 215 | | 284 | 294 | 5.7% | 2,648 |
| Total Store Level Expenses | 2,217 | | 0 | 2,559 | 2,801 | | 2,525 | 2,601 | 2,792 | 2,650 | 2,912 | | 2,525 | 2,620 | 50.5% | 23,582 |
| Store Level EBITDA | 736 | | 0 | 1,121 | 949 | | 982 | 959 | 1,087 | 1,036 | 1,315 | | 982 | 1,019 | 19.6% | 9,168 |
| *Per Sq. Ft.* | 113 | | 0 | 154 | 112 | | 121 | 112 | 155 | 123 | 155 | | 117 | 129 | | 129 |
| *% of revenue* | 17.1% | | 0.0% | 20.4% | 17.6% | | 19.6% | 19.2% | 19.8% | 20.3% | 22.3% | | 19.6% | 19.6% | 19.6% | 19.6% |
| Occupancy | 176 | | 0 | 181 | 425 | | 284 | 367 | 419 | 238 | 275 | | 284 | 294 | | 2,648 |
| *Per Sq. Ft.* | 27 | | 0 | 25 | 50 | | 35 | 43 | 60 | 28 | 32 | | 34 | 37 | | 37 |
| Store Level EBITDAR | 912 | | 0 | 1,302 | 1,374 | | 1,265 | 1,326 | 1,506 | 1,274 | 1,590 | | 1,265 | 1,313 | 25.3% | 11,816 |
| *Per Sq. Ft.* | 140 | | 0 | 178 | 162 | | 156 | 156 | 215 | 152 | 187 | | 151 | 166 | | 166 |
| *% of revenue* | 21.2% | | 0.0% | 23.7% | 23.5% | | 25.3% | 26.5% | 27.4% | 25.0% | 27.0% | | 25.3% | 25.3% | 25.3% | 25.3% |

Less Adjusted Corporate EBITDA    (2,648)

Consolidated EBITDA    6,520

Purchase Price/ EBITDA    3.51x

*Note: Shaded figures are not included in calculation of 9 store average or 9 store total.*

Three stores are being looked at for potential improvement. The Bethesda store will be moved and the necessary capital expenditures are included in this model. Management has been changed at the Atlanta store and Uncle Julio's management believes that this will improve the store's performance gradually and that it will reach the level of the performing stores in 6 years, similar to the Chicago ramp-up. The Greenville store will be closed at the end of FY 2003.

MapleWood Partners LP

*In thousands*

12/16/01 2:18 PM Page 1

## Sub-Debt Request Model
### Uncle Julio's Corporation
Last Updated 12/1/01

#### Store Ramp-up

**Revenues**

| Date Opened | Store | Stub year | Stub year Annualized | Year 1 | % Change | Year 2 | % Change | Year 3 | % Change | Year 4 | % Change | Year 5 | % Change | Year 6 | % Change | Year 7 | % Change | Year 8 | % Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aug-93 | Chicago, IL | NA | NA | 3,016 | NA | 3,361 | 11.4% | 3,631 | 8.0% | 3,792 | 4.4% | 4,242 | 11.9% | 5,051 | 19.1% | 5,711 | 13.1% | 5,925 | 3.8% |
| Jan-95 | Keller Springs | 3,927 | 5,105 | 4,747 | (7.0%) | 4,990 | 5.1% | 5,032 | 0.9% | 5,383 | 7.0% | 5,467 | 1.6% | | | | | | | | 1.6% |
| Jan-98 | Atlanta | 2,356 | 2,917 | 2,631 | (9.8%) | 2,871 | 9.1% | 2,927 | 2.0% | | | | | | | | | | |
| Jan-00 | Gaithersburg, MD | 2,074 | 5,392 | 5,144 | (4.6%) | | | | | | | | | | | | | | |

**EBITDA**

| Date Opened | Store | Stub year | Stub year Annualized | Year 1 | % Change | Year 2 | % Change | Year 3 | % Change | Year 4 | % Change | Year 5 | % Change | Year 6 | % Change | Year 7 | % Change | Year 8 | % Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aug-93 | Chicago, IL | NA | NA | (83) | NA | 101 | NM | 355 | 252.1% | 440 | 24.0% | 661 | 50.1% | 933 | 44.1% | 1,277 | 34.0% | 1,298 | 1.6% |
| Jan-95 | Keller Springs | 324 | 421 | 555 | 34.3% | 617 | 9.2% | 621 | 0.7% | 809 | 30.2% | 947 | 17.0% | | | | | | | |
| Jan-98 | Atlanta | (355) | (378) | (639) | 69.3% | (478) | NM | (245) | NM | | | | | | | | | | |
| Jan-00 | Gaithersburg, MD | 416 | 1,082 | 1,034 | (4.4%) | | | | | | | | | | | | | | |

Maple-Wood Partners, L.P.

57

**Sub-Debt Request Model**
**Uncle Julio's Corporation**
Last Updated 12/14/03

## SUMMARY INCOME STATEMENT

|  | HISTORICAL | | | | PROJECTED | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Fiscal Year Ending

Total Year End Sq. Ft.

Beginning Stores
New Stores Opened
Stores Closed
Ending Stores

Same Store Revenues
  Growth
  Comparable Store Growth
New Store Revenues
  Growth

Total Revenues
  % Total Growth
  Revenue per average sq ft

Total Cost of Goods Sold
  % of Revenues

Total Gross Profit
  Gross Margin

Store Oper. Overhead Expenses
  % of Revenues

Store Oper. Overhead Expenses

Adjustments to Corporate Overhead

Total Oper. Expenses (excl. D&A)
  % of Revenues

Total EBITDAR
  % of Revenues

Occupancy
  Per avg square ft.

Total EBITDA
  % of Revenues

### FUTURE EXPECTATIONS

FAS? Fees

Outside Director's Fees

Total Adjustments to Operating Expenses
  % of Revenue

Total Pro forma Adjusted EBITDA
  % of Revenue

Depreciation & Amortization

Total Adjusted EBIT

Total Interest Expense

Other Interest (Income) / Expense

Pre-tax Income

Book taxes

Pro forma Adjusted Net Income
(1) Total assumes no interest expense used for non-cash expense.

Confidential

In thousands

12/10/01 2:18 PM  Page 1

**Sub-Debt Request Model**
**Uncle Julio's Corporation**
Last Updated: 12/10/01

## SUMMARY CONSOLIDATED BALANCE SHEET

| Final Year Ending | 10/31/96 | 10/31/97 | 10/31/98 | 10/31/99 | 10/31/00 | 9/30/00 (EST) | Transaction Adjustments | 12/01/01 | 10/31/01 | 10/31/02 | 10/31/03 | 10/31/04 | 10/31/05 | 10/31/06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | HISTORICAL / EST | | PROJECTED | | | | | | |
| Cash | 1,074 | 436 | 1,857 | 820 | 692 | 692 | | 692 | 0 | 0 | 0 | 0 | 0 | 0 |
| Stock Option Proceeds | | | | | | 700 | 700 | 700 | 700 | 700 | 700 | 0 | 0 | 0 |
| Income Tax Refund Receivable | | | | | | 700 | 700 | 700 | 700 | 700 | 700 | 0 | 0 | 0 |
| Marketable Securities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accounts Receivable | 41 | 58 | 31 | 36 | 90 | 90 | | 90 | 37 | 39 | 49 | 63 | 77 | 91 |
| Inventory | 172 | 180 | 201 | 232 | 219 | 219 | | 219 | 258 | 367 | 264 | 276 | 284 | 290 |
| New Store Inventory | | | | | | | | 0 | 0 | 72 | 151 | 240 | 331 | 331 |
| Prepaid Expenses | 447 | 216 | 170 | 211 | 192 | 192 | | 192 | 211 | 211 | 211 | 211 | 211 | 211 |
| **Total Current Assets** | 1,736 | 890 | 2,239 | 1,319 | 1,194 | 2,394 | 1,400 | 2,394 | 3,285 | 8,430 | 5,189 | 2,927 | 2,975 | 923 |
| **Total PP&E** | 12,086 | 13,769 | 13,245 | 15,435 | 15,825 | 15,825 | | 15,815 | 15,815 | 17,075 | 22,588 | 30,175 | 36,838 | 43,555 |
| **Total Accum Depreciation** | 3,737 | 4,839 | 5,864 | 6,002 | 7,211 | 7,211 | | 7,260 | 7,260 | 7,841 | 8,753 | 10,193 | 11,945 | 14,055 |
| **Total Net PP&E** | 8,349 | 8,931 | 7,381 | 9,474 | 8,614 | 8,614 | | 8,565 | 8,555 | 9,234 | 14,835 | 17,882 | 24,893 | 29,510 |
| Transaction Goodwill | | | | | | | 1,050 | 1,050 | 1,004 | 472 | 212 | 146 | 80 | 18 |
| Capitalized Transaction Expenses | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Assets | 1,266 | 1,396 | 1,555 | 1,777 | 1,832 | 1,832 | 1,050 | 1,832 | 1,832 | 1,832 | 1,832 | 1,832 | 1,832 | 1,832 |
| **TOTAL ASSETS** | 11,351 | 11,217 | 11,135 | 12,530 | 11,640 | 11,640 | 2,450 | 14,090 | 14,787 | 19,567 | 22,569 | 24,888 | 29,780 | 32,283 |
| **Current Liabilities** | | | | | | | | | | | | | | |
| Accounts Payable | 2,046 | 2,159 | 2,096 | 2,327 | 1,849 | 1,849 | | 1,849 | 2,378 | 2,467 | 3,103 | 3,944 | 4,334 | 5,732 |
| Accrued Expenses | 1,456 | 1,127 | 1,233 | 1,056 | 1,037 | 1,037 | | 1,079 | 1,120 | 1,251 | 1,551 | 2,289 | 3,032 | 3,868 |
| Accrued Income Taxes | 143 | 176 | 170 | 344 | 580 | 580 | | 580 | 580 | 580 | 580 | 580 | 580 | 580 |
| Income Taxes Payable | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 237 | 1,161 | 2,169 | 1,191 | 5,252 | 1,118 |
| Current Maturities of Long-Term Debt | 657 | 874 | 272 | 1,022 | 1,097 | 1,097 | (1,092) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Current Liabilities** | 4,302 | 4,376 | 4,363 | 5,649 | 4,584 | 4,584 | (1,097) | 3,486 | 4,275 | 5,318 | 7,403 | 7,084 | 5,352 | 11,238 |
| Existing Capital Leases | 1,435 | 1,421 | 1,377 | 1,693 | 1,493 | 1,493 | (519) | 1,493 | 1,327 | 1,244 | 1,161 | 1,056 | 919 | 919 |
| Former Shareholder Payments | 0 | 0 | 0 | 0 | 1,877 | 1,877 | | 1,877 | 1,866 | 1,728 | 1,642 | 1,547 | 1,441 | 1,334 |
| Total Existing Debt Prior to Transaction | 3,236 | 2,795 | 1,935 | 2,952 | 3,889 | 3,889 | | 3,370 | | | | | | |
| New Debt Structure | | | | | | | | | | | | | | |
| Total Senior Debt | | | | | | | 6,000 | 6,000 | 6,000 | 5,000 | 4,000 | 3,000 | 2,000 | 1,174 |
| Total Subordinated Debt | | | | | | | 5,000 | 5,000 | 5,000 | 5,000 | 4,000 | 4,000 | 0 | 0 |
| Total Long Term Debt | 3,236 | 2,795 | 1,935 | 2,952 | 3,889 | 3,889 | 10,481 | 11,000 | 11,000 | 10,000 | 8,000 | 7,000 | 2,000 | 2,174 |
| Deferred Rent | 451 | 487 | 672 | 703 | 597 | 597 | | 597 | 597 | 597 | 597 | 597 | 597 | 597 |
| **Total Liabilities** | 9,515 | 9,089 | 8,547 | 10,737 | 9,071 | 9,071 | 9,214 | 18,455 | 19,005 | 18,898 | 18,800 | 18,194 | 18,676 | 16,311 |
| Existing Common Equity | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Additional Paid In Capital | 1,818 | 2,129 | 2,570 | 1,715 | 2,561 | 2,561 | | | | | | | | |
| MapleWood Equity Investment | | | | | | | 6,500 | 6,500 | 6,500 | 6,500 | 10,500 | 10,500 | 10,500 | 10,500 |
| Retained Earnings | 1,836 | 2,137 | 2,378 | 1,723 | (10,722) | (10,722) | (6,934) | (10,833) | (9,439) | (7,252) | (3,814) | 596 | 5,464 | 5,464 |
| **Total Shareholder Equity** | 1,836 | 2,137 | 2,578 | 1,723 | 2,561 | 2,561 | (4,355) | (4,219) | 1,069 | 3,265 | 6,694 | 11,104 | 11,104 | 15,972 |
| **TOTAL LIABILITIES & EQUITY** | 11,351 | 11,217 | 11,135 | 12,530 | 11,640 | 11,640 | 2,450 | 14,090 | 14,787 | 19,567 | 22,569 | 24,888 | 29,780 | 32,283 |
| Balance Test | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

MapleWood Partners LP

Confidential

In thousands

12/16/01 2:18 PM  Page 1

**Sub-Debt Request Model**
**Uncle Julio's Corporation**
Last Updated: 12/1/01

## CONSOLIDATED BALANCE SHEET

| | HISTORICAL | | | | | EST. | | PROJECTED | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Fiscal Year Ending: | 10/31/96 | 10/31/97 | 10/31/98 | 10/31/99 | 10/31/00 | 9/30/01 | Transaction Adjustments | 10/1/01 | 10/31/01 | 10/31/02 | 10/31/03 | 10/31/04 | 10/31/05 | 10/31/06 |
| Cash | 444 | 1,074 | 435 | 1,857 | 820 | 692 | | 692 | 0 | 0 | 0 | 0 | 0 | 0 |
| Stock Option Proceeds | | | | | | | 700 | 700 | 700 | 0 | 0 | 0 | 0 | 0 |
| Income Tax Refund Receivable | | | | | | | 700 | 700 | 700 | 0 | 0 | 0 | 0 | 0 |
| Marketable Securities | | 0 | 0 | 0 | 0 | 0 | | 0 | 1,480 | 7,913 | 4,593 | 2,226 | 2,165 | 0 |
| Accounts Receivable | | 41 | 58 | 31 | 36 | 90 | | 90 | 37 | 39 | 38 | 40 | 41 | 42 |
| New Store Receivables | | | | | | | | | 0 | 0 | 11 | 22 | 36 | 49 |
| Inventory | | 173 | 180 | 201 | 252 | 219 | | 219 | 258 | 267 | 264 | 276 | 284 | 290 |
| New Store Inventory | | | | | | | | | 0 | 0 | 72 | 151 | 240 | 331 |
| Prepaid Expenses | | 447 | 216 | 170 | 211 | 192 | | 192 | 211 | 211 | 211 | 211 | 211 | 211 |
| Total Current Assets | | 1,736 | 890 | 2,259 | 1,319 | 1,194 | 1,400 | 2,594 | 3,385 | 8,430 | 5,189 | 2,927 | 2,975 | 923 |
| Existing Base PP&E | | 12,086 | 13,769 | 12,345 | 15,425 | 15,825 | | 15,825 | 15,825 | 17,075 | 17,400 | 17,800 | 18,275 | 18,825 |
| New Store PP&E | | | | | | 0 | | 0 | 0 | 0 | 6,188 | 12,375 | 18,563 | 24,750 |
| Total PP&E | | 12,086 | 13,769 | 12,345 | 15,425 | 15,825 | | 15,825 | 15,825 | 17,075 | 23,588 | 30,175 | 36,838 | 43,575 |
| Existing Base Accum Depreciation | | 3,737 | 4,839 | 5,064 | 6,002 | 7,211 | | 7,211 | 7,260 | 7,841 | 8,501 | 9,182 | 9,891 | 10,632 |
| New Store Accum Depr. | | | | | | 0 | | 0 | 0 | 0 | 252 | 1,011 | 2,054 | 3,434 |
| Total Accum Depreciation | | 3,737 | 4,839 | 5,064 | 6,002 | 7,211 | | 7,211 | 7,260 | 7,841 | 8,753 | 10,193 | 11,945 | 14,066 |
| Existing Base Net PP&E | | 8,349 | 8,931 | 7,281 | 9,424 | 8,614 | | 8,614 | 8,565 | 9,234 | 8,899 | 8,618 | 8,384 | 8,193 |
| New Store Net PP&E | | | | | | 0 | | 0 | 0 | 0 | 5,935 | 11,364 | 16,509 | 21,316 |
| Total Net PP&E | | 8,349 | 8,931 | 7,281 | 9,424 | 8,614 | | 8,614 | 8,565 | 9,234 | 14,835 | 19,982 | 24,893 | 29,510 |
| Capitalized Transaction Expenses | | | | | | | 1,050 | 1,050 | 1,004 | 472 | 212 | 146 | 80 | 18 |
| Other Assets | | 1,266 | 1,396 | 1,855 | 1,777 | 1,832 | | 1,832 | 1,832 | 1,832 | 1,832 | 1,832 | 1,832 | 1,832 |
| TOTAL ASSETS | | 11,351 | 11,217 | 11,125 | 12,520 | 11,640 | 2,450 | 14,090 | 14,287 | 19,967 | 22,069 | 24,888 | 25,780 | 31,283 |

MapleWood Partners LP

Confidential

60

*In thousands*

**Sub-Debt Request Model**
Uncle Julio's Corporation
Last Updated 12/1/01

12/1/01 2:18 PM   Page 2

## CONSOLIDATED BALANCE SHEET - TOTAL LIABILITIES & SHAREHOLDER EQUITY

| Fiscal Year Ending: | HISTORICAL 10/31/96 | 10/31/97 | 10/31/98 | 10/31/99 | 10/31/00 | EST 9/30/01 | Transaction Adjustments | PROJ. 10/1/01 | 10/31/01 | 10/31/02 | 10/31/03 | 10/31/04 | 10/31/05 | 10/31/06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current Liabilities** | | | | | | | | | | | | | | |
| Accounts Payable | | 2,046 | 2,199 | 1,996 | 2,327 | 1,849 | | 1,849 | 2,378 | 2,467 | 2,442 | 2,552 | 2,622 | 2,679 |
| Accrued Expenses | | 1,456 | 1,127 | 1,235 | 1,056 | 1,057 | | 1,057 | 1,079 | 1,120 | 1,252 | 1,638 | 2,048 | 2,464 |
| New Store Accounts Payable | | | | | | | | | | | 661 | 1,392 | 2,213 | 3,053 |
| New Store Accrued Expenses | | | | | | | | | | | 300 | 632 | 1,004 | 1,405 |
| Income Taxes Payable | | 143 | 176 | 170 | 344 | 580 | | 580 | 580 | 580 | 580 | 580 | 580 | 580 |
| Current Maturities of Senior Term / Facilitating Investment | | 657 | 874 | 972 | 1,922 | 1,097 | (1,097) | 0 | | | | | | |
| Current Maturities of LTD & Capital Leases | | | | | | | | | 167 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Current Maturities of Seller Note | | | | | | | | | | | | | 1,000 | |
| Current Maturities of Sub Note | | | | | | | | | | | 1,000 | | 3,000 | |
| Current Maturities of Former Shareholder Note | | | | | | | | | | 78 | 86 | 95 | 105 | |
| Current Maturities of Capital Leases | | | | | | | | | 71 | 83 | 82 | 95 | 147 | 118 |
| **Total Current Liabilities** | | 4,302 | 4,376 | 4,363 | 5,649 | 4,584 | (1,097) | 3,486 | 4,275 | 5,328 | 7,403 | 7,984 | 13,719 | 11,298 |
| | | | | | | | | | | | | | | |
| **Existing Debt Structure** | | | | | | | | | | | | | | |
| Existing Long-term debt | | 3,326 | 2,795 | 1,935 | 1,075 | 519 | (519) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Existing Capital Leases | | 1,435 | 1,421 | 1,577 | 1,493 | 1,493 | 384 | 1,877 | 1,806 | 1,728 | 1,642 | 1,547 | 1,441 | 1,324 |
| Former Shareholder Payments | | | | | 1,877 | 1,877 | (384) | 1,493 | 1,327 | 1,244 | 1,161 | 1,066 | 919 | 919 |
| **New Debt Structure** | | | | | | | | | | | | | | |
| Additional Borrowings | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Term / Facilitating Investment | | | | | | | 6,000 | 6,000 | 6,000 | 6,000 | 5,000 | 4,000 | 2,000 | 2,174 |
| **Total Senior Debt** | | | | | | | 6,000 | 6,000 | 6,000 | 6,000 | 5,000 | 4,000 | 2,000 | 2,174 |
| | | | | | | | | | | | | | | |
| Seller Note | | | | | | | 2,000 | 2,000 | 2,000 | 1,000 | 0 | 0 | 0 | 0 |
| Sub Note | | | | | | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 0 | 0 |
| **Total Subordinated Debt** | | | | | | | 5,000 | 5,000 | 5,000 | 4,000 | 3,000 | 3,000 | 0 | 0 |
| | | | | | | | | | | | | | | |
| **Total Long Term Debt** | | 4,762 | 4,217 | 3,512 | 4,445 | 3,889 | 10,481 | 14,372 | 14,133 | 12,973 | 10,803 | 9,613 | 4,360 | 4,416 |
| | | | | | | | | | | | | | | |
| Deferred Rent | | 451 | 487 | 672 | 703 | 597 | | 597 | 597 | 597 | 597 | 597 | 597 | 597 |
| **Total Liabilities** | | 9,515 | 9,080 | 8,547 | 10,797 | 9,071 | 9,384 | 18,455 | 19,005 | 18,898 | 18,803 | 18,194 | 18,676 | 16,311 |
| | | | | | | | | | | | | | | |
| Existing Common Equity | | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Additional Paid in Capital | | 7 | 7 | 7 | 7 | 7 | | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| MapleWood Equity Investment | | | | | | | 6,500 | 6,500 | 6,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 |
| Retained Earnings | | 1,828 | 2,129 | 2,570 | 1,715 | 2,561 | (13,434) | (10,873) | (10,727) | (9,439) | (7,243) | (3,814) | 596 | 5,464 |
| **Total Shareholders' Equity** | | 1,836 | 2,137 | 2,578 | 1,723 | 2,569 | (6,934) | (4,365) | (4,219) | 1,069 | 3,265 | 6,694 | 11,104 | 15,972 |
| | | | | | | | | | | | | | | |
| **TOTAL LIABILITIES & EQUITY** | | 11,351 | 11,217 | 11,125 | 12,520 | 11,640 | 2,450 | 14,090 | 14,787 | 19,967 | 22,068 | 24,888 | 29,780 | 32,283 |
| Balance Test | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

MapleWood Partners LP

Confidential

*in thousands*

**Sub-Debt Request Model**
Uncle Julio's Corporation
Last Updated: 12/1/01

## RECAPITALIZATION ADJUSTMENTS TO EQUITY

### RETAINED EARNINGS ADJUSTMENTS

| | |
|---|---:|
| Retained Earnings Closing Balance on 9/30/01 | $2,561 |
| Recapitalization Adjustments: | |
| Cash to Current Ownership at Closing | (12,834) |
| Seller Notes | (2,000) |
| Total Recapitalization Adjustments to Retained Earnings | (14,834) |
| Retained Earnings Opening Balance on 10/1/01 | ($12,273) |

### ADDITIONAL PAID IN CAPITAL ADJUSTMENTS

| | |
|---|---:|
| Additional Paid In Capital Closing Balance on 9/30/01 | $0 |
| Recapitalization Adjustments: | |
| MapleWood Equity Investment | 8,000 |
| Equity & Equity Related Transaction Fees Charged Against Shareholder Equity | (1,500) |
| Total Recapitalization Adjustments to Additional Paid In Capital | 6,500 |
| Additional Paid In Capital Opening Balance on 10/1/01 | $6,500 |
| Planned Equity Injection May 31, 2002 | 4,000 |
| Additional Paid In Capital Opening Balance Including May 31, 2002 Investment | $10,500 |

MapleWood Partners LP

Confidential

In thousands

12/16/01 2:18 PM  Page 1

**Sub-Debt Request Model**
**Uncle Julio's Corporation**
Last Updated: 12/1/01

## STATEMENT OF CASH FLOWS

*Items in parenthesis are uses of cash, positive items are sources*

| Fiscal Year Ending: | 10/31/97 | 10/31/98 | 10/31/99 | 10/31/00 | 11/1/2000 - 5/30/01 (Transition Cash Flows) | 10/1/2001 - 10/31/01 | 12 Mo. 10/31/01 | PROJECTED 10/31/02 | 10/31/03 | 10/31/04 | 10/31/05 | 10/31/06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Post-Acq Adjusted EBITDA | 1,702 | 2,168 | 2,108 | 3,052 | 3,331 | 298 | 3,629 | 4,344 | 6,273 | 8,603 | 10,342 | 11,389 |
| Cash Income Taxes | 226 | (214) | (264) | (305) | (118) | (97) | (216) | (859) | (1,464) | (2,286) | (2,940) | (3,245) |
| CASH FLOW BEFORE INTEREST | 1,928 | 1,954 | 1,844 | 2,747 | 3,213 | 200 | 3,413 | 3,486 | 4,809 | 6,317 | 7,402 | 8,144 |
| Interest/(Income) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 130 | 173 | 94 | 61 | 30 |
| Additional Borrowings Interest & Fees | 0 | 0 | 0 | 0 | 0 | (0) | 0 | 0 | 0 | 0 | 0 | (35) |
| Senior Term Financing Investment Interest | (520) | (594) | (484) | (479) | 0 | (0) | 0 | (720) | (675) | (555) | (435) | (315) |
| Seller Note Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (200) | (200) | (200) | (100) | (100) |
| Sub Note Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (383) | (383) | (383) | (383) | (383) |
| Former Shareholder Note Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (184) | (177) | (168) | (159) | (149) |
| Capital Leases Interest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (194) | (181) | (170) | (157) | (141) |
| Total Cash Interest Expense | (520) | (594) | (484) | (479) | 0 | (0) | (0) | (1,680) | (1,616) | (1,476) | (1,334) | (1,123) |
| DISCRETIONARY GROSS CASH FLOWS | 1,408 | 1,361 | 1,360 | 2,268 | 3,213 | 200 | 3,413 | 1,935 | 3,365 | 4,935 | 6,128 | 7,051 |
| Accounts Receivable | 18 | (17) | 27 | (5) | (54) | 53 | (1) | (1) | 0 | (3) | (2) | (1) |
| Inventory | (7) | (7) | (21) | (51) | (219) | (38) | (253) | (10) | 3 | (12) | (8) | (6) |
| New Store Accounts Receivable | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (11) | (12) | (13) | (14) |
| New Store Inventories | (111) | 153 | (203) | 331 | (478) | 539 | 51 | 0 | (72) | (79) | (89) | (91) |
| Accounts Payable | 407 | (329) | 98 | 0 | 0 | 0 | 0 | 89 | (25) | 110 | 70 | 57 |
| New Store Accounts Payable | 0 | 0 | 0 | (169) | 1 | 22 | 23 | 0 | 651 | 731 | 821 | 860 |
| Accrued Expense | 307 | (200) | (99) | 106 | (750) | 566 | 119 | 41 | 132 | 366 | 332 | 416 |
| New Store Accrued Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 300 | 332 | 373 | 400 |
| Total Change in Working Investment | 307 | (200) | (99) | 106 | (750) | 566 | 119 | 119 | 988 | 1,455 | 1,562 | 1,602 |
| CASH FLOW AFTER CHANGES IN WORKING INVESTMENT | 1,715 | 1,161 | 1,261 | 2,374 | 2,462 | 766 | 3,229 | 2,054 | 4,354 | 6,390 | 7,790 | 8,653 |
| Total Maintenance CapEx | 3 | 2 | 1,013 | 0 | (400) | 0 | (400) | (230) | (325) | (400) | (475) | (550) |
| Total New Store Opening Capex | (2,417) | (1,702) | 0 | (3,156) | 0 | 0 | 0 | (1,000) | (5,188) | (6,188) | (6,188) | (6,188) |
| Relocation Capex | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Capital Expenditures / Acquisitions | (2,414) | (1,700) | 1,013 | (3,156) | (400) | 0 | (400) | (1,230) | (6,513) | (6,588) | (6,663) | (6,738) |
| CASH FLOW AFTER WORKING INVESTMENT AND CAPEX | (699) | (539) | 2,274 | (782) | 2,063 | 766 | 2,829 | 824 | (2,159) | (198) | 1,128 | 1,915 |

MapleWood Partners LP

Confidential

12/16/01 2:18 PM   Page 2

**Sub-Debt Request Model**
**Uncle Julio's Corporation**
Last Updated: 12/1/01

## STATEMENT OF CASH FLOWS Cont.

*In thousands*

| Fiscal Year Ending | 10/31/97 | 10/31/98 | 10/31/99 | 10/31/00 | 11/1/2000 - 9/2001 | Transaction Cash Flows | 10/1/2001 - 10/31/01 | 12 Mo. 10/31/01 | 10/31/02 | 10/31/03 | 10/31/04 | 10/31/05 | 10/31/06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASH FLOW AFTER WORKING INVESTMENT AND CAPEX | (699) | (539) | 2,274 | (5783) | 2,063 | | 766 | 3,219 | 804 | (3,159) | (399) | 1,128 | 1,915 |
| Miscellaneous Items | 109 | (41) | 6 | (74) | 0 | | 40 | 40 | 1,867 | 0 | 0 | 0 | 0 |
| CASH FLOW BEFORE INITIAL TRANSACTION ADJUSTMENTS | (659) | (509) | 2,334 | (909) | 1,870 | | 788 | 2,658 | 2,670 | (3,159) | (198) | 1,128 | 1,915 |
| Additional Borrowings | | | | | | | | | | | | | |
| Senior Term / Facilitating Investment | | | | | | | | | | | | | |
| Seller Note | | | | | | | | | | | | | |
| Sub Note | | | | | | | | | | | | | |
| Sale of Stock | | | | | | | | | | | | | |
| Invested In Common Equity | | | | | | | | | | | | | |
| Existing Long-term debt | | | | | | | | | | | | | |
| Existing Capital Leases | | | | | | | | | | | | | |
| Cash at Closing | | | | | | | | | | | | | |
| Payment of Transaction Expense | | | | | | | | | | | | | |
| Net Transaction Cash Flow | | | | | | | | | | | | | |
| INCREASE IN COMMON EQUITY (MapleWood) | | | | | | | 0 | 0 | 4,000 | 0 | 0 | 0 | 0 |
| CASH FLOW AVAILABLE FOR DEBT PAYDOWN | (659) | (509) | 2,334 | (909) | 1,870 | | 788 | 2,658 | 6,670 | (2,159) | (198) | 1,128 | 1,915 |
| Additions to, (Repayment) of Revolver | (11) | (12) | (43) | (139) | | | (0) | (0) | 0 | 0 | 0 | 0 | 1,174 |
| Principle Payments on Leases | | | | | | | | | (167) | (83) | (83) | (95) | (147) |
| Principle Payments on Former Shareholder Note | | | | 11 | | | | | (71) | (78) | (86) | (95) | (105) |
| Senior Term / Facilitating Investment Increased, (Amortized) | 1,229 | (316) | (660) | | | | 0 | 0 | 0 | (1,000) | (1,000) | (1,000) | (1,000) |
| Seller Note Increased, (Amortized) | | | | | | | 0 | 0 | 0 | 0 | (1,000) | 0 | (1,000) |
| Sub Note Increased, (Amortized) | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | (3,000) |
| Gross Borrowings | 1,288 | (329) | (903) | (128) | (1,380) | | 0 | 0 | (237) | (1,161) | (2,169) | (1,191) | (5,252) |
| Gross Repayment of Debt | 1,288 | (329) | (903) | (125) | (1,380) | | (0) | (1,381) | (237) | (1,161) | (2,169) | (1,191) | (4,079) |
| Net Change In Debt | | | | | | | | | | | | | |
| Dividends | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **NET CASH FLOW** | 631 | (638) | 1,421 | (1,037) | 490 | | 787 | 1,277 | 6,433 | 3,319 | 2,567 | (63) | (2,165) |
| Marketable Securities Swept to Reduce Revolver Borrowings | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Change in Cash Balance Sheet | (601) | 638 | (1,421) | 1,037 | 128 | | 692 | 692 | 0 | 3,319 | 2,567 | 63 | 2,163 |
| Mandatory Excess Cash Flow Recapture (Yr. End) | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | (167) | 0 | 0 | 0 | 0 |
| Increase (Decrease) in Cash & Cash Equivalent Balance | 631 | (633) | 1,421 | (1,037) | 1,870 | | 787 | 2,658 | 6,433 | (3,319) | (2,367) | (63) | (2,163) |
| Ending Cash & Cash Equivalent Balance | 1,074 | 436 | 1,857 | 820 | 2,690 | | 1,480 | 4,170 | 7,913 | 4,593 | 2,226 | 2,163 | (0) |
| Cash Balance Test | 0 | 0 | 0 | (0) | 0 | | 0 | 1,998 | 0 | 0 | 0 | 0 | (0) |

MapleWood Partners LP

Confidential

64

*In thousands*

**Sub-Debt Request Model**
**Uncle Julio's Corporation**
Last Updated:12/1/01

12/1/01 2:18 PM  Page 1

## TILLETT SPECIAL REQUEST STATEMENT OF CASH FLOWS

*Items in parentheses are uses of cash, positive items are sources*

| Fiscal Year Ending | 10/31/97 | 10/31/98 | 10/31/99 | 10/31/00 | 11/1/2000-5/10/01 | Transaction Cash Flows | 10/1/2001-10/31/01 | 12 Mo. 10/31/01 | 10/31/02 (PROJECTED) | 10/31/03 | 10/31/04 | 10/31/05 | 10/31/06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Post-Acq Adjusted EBITDA** | 1,702 | 2,168 | 2,108 | 3,052 | 3,331 | | 298 | 3,629 | 4,344 | 6,173 | 8,603 | 10,342 | 11,299 |
| **Operating Requirements:** | | | | | | | | | | | | | |
| Interest (Income) | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 130 | 173 | 94 | 61 | 30 |
| Total Cash Interest Expense | (520) | (594) | (434) | (479) | (943) | | (0) | (0) | (1,487) | (1,434) | (1,390) | (1,077) | (1,826) |
| Total Change in Working Capital | 307 | (200) | (99) | 106 | 0 | | 547 | (395) | 119 | 988 | 1,455 | 1,562 | 1,602 |
| Cash Income Taxes | 226 | (214) | (266) | (395) | (118) | | (97) | (216) | (859) | (1,464) | (2,286) | (2,940) | (3,245) |
| Other | 109 | (41) | 6 | (74) | 0 | | 40 | 40 | 1,867 | 0 | 0 | 0 | 0 |
| **Operating Cash Flows** | 1,824 | 1,130 | 1,267 | 2,300 | 2,270 | | 788 | 3,058 | 4,114 | 4,536 | 6,560 | 7,948 | 7,930 |
| **Capex:** | | | | | | | | | | | | | |
| Maintenance | 3 | 2 | 1,013 | 0 | (400) | | 0 | (400) | (1,250) | (325) | (400) | (475) | (550) |
| Growth | (2,417) | (1,702) | 0 | (3,156) | 0 | | 0 | 0 | 0 | (6,188) | (6,188) | (6,188) | (6,188) |
| **Cash Flow after Capex** | (590) | (580) | 2,280 | (856) | 1,870 | | 788 | 2,658 | 2,864 | (1,977) | (28) | 1,285 | 1,213 |
| **Debt Payments:** | | | | | | | | | | | | | |
| Term Debt | 1,299 | (316) | (860) | 11 | (1,380) | | 0 | (1,380) | 0 | (1,000) | (1,000) | (1,000) | (3,000) |
| Sub Note | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | (1,000) |
| Seller Notes | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | (1,000) |
| Capital Leases | (11) | (12) | (43) | (139) | 0 | | 0 | 0 | (167) | (83) | (83) | (95) | (147) |
| Former Shareholder Note | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | (71) | (78) | (86) | (95) | (105) |
| **(Capital Needed) Provided** | 698 | (909) | 1,377 | (984) | 490 | | 788 | 1,278 | 2,627 | (3,138) | (1,197) | 94 | (4,040) |
| **Provision for Capital Needed:** | | | | | | | | | | | | | |
| Additional MapleWood Equity | 0 | 909 | 0 | 984 | 0 | | 0 | 0 | 4,000 | 0 | 0 | 0 | 0 |
| Cash on Hand | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 3,319 | 2,357 | 63 | 2,163 |
| Additional Borrowings or Additional Capital | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 1,876 |

*in thousands*

12/16/01 2:18 PM   Page 1

## Sub-Debt Request Model
Uncle Julio's Corporation
Last Updated: 12/1/01

### DEBT SCHEDULE

| Fiscal Year Ending: | Amortization | 10/31/01 | 10/31/02 | 10/31/03 | 10/31/04 | 10/31/05 | 10/31/06 |
|---|---|---|---|---|---|---|---|
| **Senior Term / Fascilitating Investment** | | | | | | | |
| Principal  $6,000 | See schedule | | | | | | |
| Term  6 years | | | | | | | |
| Beginning Balance | | 6,000 | 6,000 | 6,000 | 5,000 | 4,000 | 3,000 |
| Additions (Retirements) | | 0 | 0 | (1,000) | (1,000) | (1,000) | (1,000) |
| Ending Balance | | 6,000 | 6,000 | 5,000 | 4,000 | 3,000 | 2,000 |
| Interest Rate (%) | | 12.00% | 12.00% | 12.00% | 12.00% | 12.00% | 12.00% |
| Cash Interest Expense | | 0 | 720 | 675 | 555 | 435 | 315 |
| **Seller Note** | | | | | | | |
| Beginning Balance | Term: 5 years | 2,000 | 2,000 | 2,000 | 2,000 | 1,000 | 1,000 |
| Additions (Retirements) | | 0 | 0 | 0 | (1,000) | 0 | (1,000) |
| Ending Balance | | 2,000 | 2,000 | 2,000 | 1,000 | 1,000 | 0 |
| Interest Rate | | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Accrued Interest Expense During Period | | 0 | 0 | 0 | 0 | 0 | 0 |
| **Sub Note** | | | | | | | |
| Beginning Balance | Term: 5 year | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 |
| Additions (Retirements) | | 0 | 0 | 0 | 0 | 0 | (3,000) |
| Ending Balance | | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 0 |
| Interest Rate | | 12.75% | 12.75% | 12.75% | 12.75% | 12.75% | 12.75% |
| Cash Interest Expense | | 0 | 383 | 383 | 383 | 383 | 383 |
| Accrued Interest Expense During Period | | 0 | 0 | 0 | 0 | 0 | 0 |
| **Former Shareholder Note** | | | | | | | |
| Beginning Balance | Term: 10 years | 1,877 | 1,877 | 1,806 | 1,728 | 1,642 | 1,547 |
| Additions (Retirements) | | 0 | (71) | (78) | (86) | (95) | (105) |
| Ending Balance | | 1,877 | 1,806 | 1,728 | 1,642 | 1,547 | 1,441 |
| Interest Rate | | 6.76% | 6.76% | 6.76% | 6.76% | 6.76% | 6.76% |
| Accrued Interest Expense During Period | | 0 | 0 | 0 | 0 | 0 | 0 |
| **Capital Leases** | | | | | | | |
| Beginning Balance | Term: 5 years | 1,493 | 1,493 | 1,327 | 1,244 | 1,161 | 1,066 |
| Additions (Retirements) | | 0 | (167) | (83) | (83) | (95) | (147) |
| Ending Balance | | 1,493 | 1,327 | 1,244 | 1,161 | 1,066 | 919 |
| Interest Rate | | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Cash Interest Expense | | 0 | 194 | 181 | 170 | 157 | 141 |

MapleWood Partners LP

Confidential

66

*in thousands*

**Sub-Debt Request Model**
**Uncle Julio's Corporation**
Last Updated:12/1/01

**COMMON EQUITY**
**OWNERSHIP SCHEDULE**

### PRE - DILUTION / AT CLOSING / FULLY-DILUTED

Buy-In Price per Share: $1.00 (AT CLOSING) / $1.00 (FULLY-DILUTED)

| | AT CLOSING Shares | Equity Value | Ownership % | FULLY-DILUTED Shares | Equity Value | Ownership % |
|---|---|---|---|---|---|---|
| MapleWood Equity Investment | 8,000 | $8,000 | 80.00% | 8,000 | $8,000 | 60.33% |
| Common Equity Rollover | 2,000 | 2,000 | 20.00% | 2,000 | 2,000 | 15.08% |
| Warrants on Sub Debt | 0 | 0 | 0.00% | 597 | 597 | 4.50% |
| Existing Management Options | 0 | 0 | 0.00% | 2,000 | 2,000 | 15.08% |
| Management Options | 0 | 0 | 0.00% | 663 | 663 | 5.00% |
| | 10,000 | 10,000 | 100.0% | 13,260 | 13,260 | 100.0% |

MapleWood Ownership Percentage     80.00%     60.33%

### PRE - DILUTION / AT 5/31/2002 / FULLY-DILUTED

Buy-In Price per Share: $1.00 (AT 5/31/2002) / $1.00 (FULLY-DILUTED)

| | AT 5/31/2002 Shares | Equity Value | Ownership % | FULLY-DILUTED Shares | Equity Value | Ownership % |
|---|---|---|---|---|---|---|
| MapleWood Equity Investment | 12,000 | $12,000 | 85.71% | 12,000 | $12,000 | 69.53% |
| Common Equity Rollover | 2,000 | 2,000 | 14.29% | 2,000 | 2,000 | 11.59% |
| Warrants on Sub Debt | 0 | 0 | 0.00% | 597 | 597 | 3.46% |
| Existing Management Options | 0 | 0 | 0.00% | 2,000 | 2,000 | 11.59% |
| Management Options | 0 | 0 | 0.00% | 663 | 663 | 3.84% |
| Cumulative Shares Outstanding | 14,000 | 14,000 | 100.0% | 17,260 | 17,260 | 100.0% |

MapleWood Ownership Percentage     85.71%     69.53%

MapleWood Partners LP

Confidential

### Schedule 5.6

#### Material Agreements

1. Lease Agreement, dated October 2, 1992, by and between American National Bank and Trust Company of Chicago and Uncle Julio's of Illinois, Inc. as amended by that First Amendment to Lease Agreement, dated January 14, 1993 between the parties.

2. Commercial Lease Agreement, dated April 1, 1996, between UB Investors, Ltd and Uncle Julio's Corporation

3. Lease Agreement, dated July 18, 1991, between Reston Town Center Phase I Associates and Uncle Julio's of Reston, Inc.

4. Lease Agreement, dated September 14, 1994, between 1860 Peachtree Associates, L.P. as assignee of Branch & Associates and Uncle Julio's of Georgia, Inc. as amended by that Amendment of Lease dated December 22, 1994 between the parties.

5. Ground Lease Agreement, dated October 30, 1998, between Washington Associates L.C. and The Mexican Restaurant, Inc.

6. Lease Agreement, dated July 19, 1999, between Monty, LLC and The Mexican Restaurant, Inc. as amended by that certain Addendum to Lease, dated December 30, 1994 between the parties.

7. Retail Lease, dated as of April 30, 1990, between OTR, as Nominee for the State Teachers Retirement System of Ohio as successor in interest to London & Leeds\Ballston Station Associates Limited Partnership and Uncle Julio Rio Grande Cafe, Inc. as amended by amendments dates as of May 17, 1990, August 27, 1990 and October 19, 2000.

8. Lease Agreement, dated as December 21, 1995, between Julio Partners Limited Partnership as successor in interest to Daryl N. Snadon and Julios and Sons Company.

9. Lease Agreement, dated March 29, 1994, between J&B Realty, Ltd., and Julio and Sons Company.

10. Lease Agreement, dated August 18, 1988 between Genaro Investment Company and Thomas A. Addo and Conroe Foods, Inc., as amended by that certain Agreement Exercising Extension Options and Modifying Lease Terms, dated March 24, 1991, between the parties.

11. Lease Agreement, dated as December 21, 1995, between Daryl N. Snadon and Conroe Foods, Inc.

12. Amended and Restated Loan Agreement, dated September 24, 1999, between Wells Fargo Bank (Texas), N.A. and Uncle Julio's Corporation, as amended on April 30, 2000, March 31, 2001 and the date hereof.

13. Amended and Restated Subordinated Promissory Note, dated as of the date hereof, by the Company in favor of James F. Pinero.

14. Business Broker Letter Agreement, dated November 3, 2000, by and between the Robinson-Humphrey Company LLC and Uncle Julio's Corporation as amended by Letter Agreement dated July 15, 2001, by and between the parties.

15. Insurance policies of the Company as described in the attached Exhibit 5.6.

16. Tip Reporting Alternative Commitment between the Department of Treasury - Internal Revenue Service and each of Uncle Julio Corporation's subsidiaries.

{MI737424;3}

## Schedule 5.7

### Rights Waived under Ancillary Agreements

The Company has waived the condition in Section 9.17 of the Agreement and Plan of Merger, dated as of the date hereof, between the Company, Julio Investors LLC, Julio Acquisition Corp. and the Sellers named therein, that the loan payable to Wells Fargo Bank (Texas), N.A. be paid prior to closing.

## Schedule 5.9

### Outstanding Debt

1. Amended and Restated Loan Agreement, dated September 24, 1999, between Wells Fargo Bank (Texas), N.A. and Uncle Julio's Corporation, as amended on April 30, 2000, March 31, 2001 and the date hereof.

2. Senior Subordinated Secured Convertible Promissory Note, dated as of the date hereof, by the Company in favor of Julio Investors LLC.

3. Subordinated Note, as of the date hereof, by the Company in form of Restaurant & Retail Growth Capital, L.P.

4. Amended and Restated Subordinated Promissory Note, dated as of the date hereof, by the Company in favor of James F. Pinero.

5. Junior Subordinated Promissory Note, dated as of the date hereof, by the Company in favor of Maureen S. Boutilier.

6. Junior Subordinated Promissory Note, dated as of the date hereof by the Company in favor of Guy W. Boutilier.

7. See the Revolving Credit Agreements set forth in Schedule 5.10.

8. Guaranty Agreement of even date herewith between the Company and Wells Fargo Bank (Texas), N.A. ("Wells Fargo")

9. Reaffirmation of Guaranties and Security Documents dated as of the date hereof by each Subsidiary in favor of Wells Fargo and the Amended and Restated Guaranty Agreement, dated as of September 24, 1999, in favor of Wells Fargo.

10. See the capital leases on the attached Exhibit 5.9.

{MI737424;4}

71

## Schedule 5.10

### Transactions with Affiliates

1. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corp. (as Lender) and Julio & Sons Company (as Borrower)

2. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corp. (as Borrower) and Julio & Sons Company (as Lender)

3. Revolving Credit Agreement, dated October 31, 1997, by and between Conroe Foods, Inc. (as Borrower) and Uncle Julio's Corp. (as Lender)

4. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corp. (as Borrower) and Conroe Foods, Inc. (as Lender)

5. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corp. (as Borrower) and Uncle Julio's Rio Grande Café, Inc. (as Lender)

6. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Rio Grande Café, Inc. (as Borrower) and Uncle Julio's Corp. (as Lender)

7. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corp. (as Borrower) and The Mexican Restaurant, Inc. (as Lender)

8. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corp. (as Lender) and The Mexican Restaurant, Inc. (as Borrower)

9. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corp. (as Lender) and Uncle Julio's of Reston, Inc. (as Borrower)

10. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corp. (as Borrower) and Uncle Julio's of Reston, Inc. (as Lender)

11. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corporation (as Borrower) and Uncle Julio's of Illinois (as Lender)

12. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corporation (as lender) and Uncle Julio's of Illinois, Inc. (as Borrower)

13. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's of Georgia, Inc. (as Lender) and Uncle Julio's Corporation (as Borrower)

14. Revolving Credit Agreement, dated October 31, 1997, by and between Uncle Julio's Corporation (as Lender) and Uncle Julio's of Georgia, Inc. (as Borrower)

15. Four separate Management Services Agreements, dated May 9, 1990, entered into by and between Uncle Julio's Corp. (Service Company) and each of Uncle Julio's Rio Grande Café, Inc., The Mexican Restaurant, Inc. and Julio & Sons, Inc., Conroe Foods, Inc.

16. Management and Administrative Services Agreement, dated as of May 12, 1991, by and between Uncle Julio's Corp. (as Service Company) and Uncle Julio's of Reston, Inc. (as Customer)

17. Management and Administrative Services Agreement, dated as of August 20, 1993, by and between Uncle Julio's Corporation (as Service Company) and Uncle Julio's of Illinois (as Customer)

18. Management and Administrative Services Agreement dated September 14 1994, by and between Uncle Julio's Corp (as service company) and Uncle Julio's of Georgia, Inc. (as customer)

19. Management and Administrative Services Agreement dated November 24, 1997 between Lucky Boy Corporation (as service company) and Uncle Julio's Corporation (as customer)

20. Operations and Management Agreement, dated as of September 15, 1994, between The Uncle Julio's Club and Julio and Sons Company

21. Caterers Agreement, undated, between Uncle Julio's Club and Julio and Sons, Company

22. Daryl Snadon, through Beltway Development Company, owns real property at 5301 Camp Bowie Blvd., Fort Worth, Texas which is leased to Conroe Foods, Inc.

23. Sublease, dated September 30, 1994, by and between Julio and Sons, Company and The Uncle Julio's Club, as amended by that certain Amendment, dated December 1, 1994, between the parties.

## Schedule 5.11

### Employment Matters

**Projected Calendar 2001**

|  | Wages & Other Compensation | Fringe Benefits | Total |
|---|---|---|---|
| A. Joey Shashy | 187,692.19 | 21,612.27 | 209,304.46 |
| Henry Barber | 110,499.76 | 6,025.56 | 116,525.32 |

**Calendar 2000**

|  | Wages & Other Compensation | Fringe Benefits | Total |
|---|---|---|---|
| A. Joey Shashy | 201,585.22 | 22,036.04 | 223,621.26 |
| Henry Barber | 150,136.63 | 6,025.56 | 156,162.19 |

See attached Exhibit 5.11 for a description of employee benefit plans.

Employment Agreement, dated as of the date hereof, between the Company and Joey Shashy.

See the Management Agreements set forth on Schedule 5.10.

The Company and/or one of its Subsidiaries has executed an Employee Agreement Regarding Proprietary Information and Non-Competition with each of the following employees:

1. Michael Akers
2. Jeff Anderson
3. Trent Anderson
4. Lisa Banks
5. Henry Barber
6. Stephanie Baird
7. Damon Burlison
8. Armando Cabrera
9. Brian J. Clancy
10. Steven T. Conger/S. Todd Conger
11. Kala Cook
12. Teri Featherly
13. Nick Fetterick III

{MI737424;3}

14. Maria E. Fleet
15. Chris Fulkerson
16. Luis Garcia
17. Joseph Gillispie
18. Gerald Green
19. Chris Grovers
20. Kevin Hansen
21. Scott Head
22. Antonio Hernandez
23. John Wade Holden/Wade Holden
24. C. Konor
25. Gerryl Landry
26. Robert Lathan
27. John-Evin Martin
28. Harvey Ponce Martinez
29. Tosha Moody
30. Tammy Peden
31. Marla Ricks
32. John Roland
33. Jennifer Sims
34. Paul Sisk
35. Melanie Stroh
36. Kevin Tallungan
37. Jason Ullmann
38. Ronald Vasquez
39. Alexander Waters
40. Jay Wolfson
41. Juan Ordonez
42. Gamaro Saldana
43. David F. Coon Jr.
44. Laura A. Nichols
45. Nancy Blum
46. Malcolm Mills Heber III
47. George Valentino Horvat
48. Santiago Cruz
49. Keith B. Harris
50. Martin A. Lara
51. Migel F. Lara
52. Angel Villaneuba
53. Jose S. Marquez
54. Martin Lucio
55. Jose Loperena
56. Jane F. Sillett
57. Eric Wiley Halm
58. Santiago Jazo
59. Jose A. Hernandez

60. John Moomau
61. Robert L. Rivera Jr.
62. Steven Todd Conger
63. David Castalano
64. Martin Mazagon Jr.
65. Gerardo Rivas
66. Edmundo Piedra Rodriguez
67. Luis Juarez
68. Sergio Hernandez
69. Jose Rios
70. Herman Ochoa
71. Jose Morales
72. Miquel Ochoa
73. Monte Kyle Pope
74. Martin Robertson
75. Ada Beck
76. R. Kevin Hunter
77. Jose Mario Ramirez
78. Marker E. Case
79. Leslie Ann Ripple
80. Antonio Hernandez
81. Gary Garrison
82. Julie Siron
83. Jeff Eversull
84. Jennifer Lacey
85. Karen Lavan
86. Mark Cordes
87. Wayne Beebe
88. James Madder
89. David Castalano
90. Jeff Lunenfeld
91. Luis Ortiz
92. Marcos Antonio Cruz
93. Harper Caron
94. Paul E. Davis
95. Ronald Kevin Hunter
96. Dimas Alfredo
97. John Stephen DelGrande

{MI737424;3}

76

## Schedule 5.12

### Operating Leases

Retail Lease, dated as of April 30, 1990, between OTR, as Nominee for the State Teachers Retirement System of Ohio as successor in interest to London & Leeds\Ballston Station Associates Limited Partnership and Uncle Julio Rio Grande Cafe, Inc. as amended by amendments dates as of May 17, 1990, August 27, 1990 and October 19, 2000.

{M1737424;3}

<u>Schedule 5.13</u>

<u>Litigation</u>

EEOC Complaint HRC #2001421E/EEOC #10DA20026, <u>Jackson v. Rio Grande Cafe/Uncle Julio's Inc.</u>

## Schedule 5.14

### ERISA Plans

1997 Lucky Boy Corporation Employee Stock Option Plan

See Exhibit 5.11(b) for a description of all employee benefits.

Note: IRS form 5500 for plan years 1996 through 1999 for the medical insurance plan were filed late and penalties of $10,500 were paid pursuant to the late filing. The form 5500 for the plan year beginning on May 1, 2000 and ending on April 30, 2001 is on extension until February 15, 2002. No amount is due the IRS or any other entity from the Company or any Subsidiary upon the filing of this return.

{MI737424;3}

Schedule 5.16

Real Property

Certain leased property is subject to liens pursuant to those capital and operating leases set forth on Exhibit 5.9.

Owned Real Property:  None

Leased Real Property:

1.  855 W. North Avenue, Chicago, Illinois—See Item 1 of Schedule 5.6 for lease information.

2.  1125 N. Union Bower Road, Irving, Texas—See Item 2 of Schedule 5.6 for lease information.

3.  1827 Library Street, Reston, Virginia—See Item 3 of Schedule 5.6 for lease information.

4.  1860 Peachtree Rd. Atlanta, Georgia—See Item 4 of Schedule 5.6 for lease information.

5.  231 Rio Blvd, Gaitherburg, Maryland—See Item 5 of Schedule 5.6 for lease information.

6.  4919 Fairmont Ave., Bethesda, Maryland—See Item 6 of Schedule 5.6 for lease information.

7.  4301 North Fairfax Drive, Arlington, Virginia—See Item 7 of Schedule 5.6 for lease information.

8.  4125 Lemmon Ave, Dallas, Texas—See Item 8 of Schedule 5.6 for lease information.

9.  16150 Dallas Parkway, Dallas, Texas—See Item 9 of Schedule 5.6 for lease information.

10. 7557 Greenville Ave, Dallas, Texas—See Item 10 of Schedule 5.6 for lease information.

11. 5301 Camp Bowie, Fort Worth, Texas—See Item 11 of Schedule 5.6 for lease information.

{MI737424;3}

80

**Schedule 5.17**

<u>Licenses, Permits, Etc.</u>

The various liquor licenses held by the Company and/or its Subsidiaries must be transferred in connection with the consummation of the transactions contemplated by the Agreement and Plan of Merger, dated as of the date hereof, between the Company, Julio Investors LLC, Julio Acquisition Corp. and the Sellers named therein.

## Schedule 5.18

### Proprietary Rights

Several pending trademark applications have been recently filed that may be considered for opposition by Uncle Julio's Corporation, namely, "TACOS DEL JULIO" (Serial No. 76/178177) for restaurant services and "JULIO'S" (Serial No. 76/331375) for the distribution of spices, corn chips and salsa. Such marks would appear to cause a likelihood of confusion with the marks of Uncle Julio's Corporation should their intended use actually occur.

{M1737424;3}

## Schedule 5.24

<u>Insurance</u>

See the descriptions of the Company's insurance set forth at <u>Exhibit 5.6</u>.

## Schedule 5.29

### Brokers and Finders

1. Business Broker Letter Agreement, dated November 3, 2000, by and between the Robinson-Humphrey Company LLC  and Uncle Julio's Corporation as amended by Letter Agreement dated July 15, 2001, by and between the parties.



Exhibit 5.6
Insurance Policies

**FIRST AMENDMENT
TO
NOTE PURCHASE AGREEMENT**

THIS FIRST AMENDMENT TO NOTE PURCHASE AGREEMENT (this "First Amendment") is entered into this 20th day of November, 2002, by and between LUCKY BOY CORPORATION, a Delaware corporation (the "Company") and RETAIL & RESTAURANT GROWTH CAPITAL, L.P., a Delaware limited partnership ("RRGC").

**RECITALS**

A.     The Company and RRGC are parties to that certain Note Purchase Agreement, dated December 17, 2001 (which, as amended, modified or supplemented, from time to time, is herein referred to as the "Note Purchase Agreement"), pursuant to which the Company issued to RRGC, and RRGC purchased from the Company, that certain Promissory Note, dated of even date therewith, in the principal amount of $3,000,000 (which, as amended, modified or supplemented from time to time, together with any notes issued in substitution therefor or replacement thereof, is herein referred to as the "RRGC Note"). The Note Purchase Agreement sets forth various understandings of the Company and RRGC concerning the terms and conditions of the loan evidenced by the RRGC Note, including, among other matters, various covenants which restricted the right of the Company and its subsidiaries to incur additional debt and grant any liens or security interests in or upon any of its properties or assets.

B.     Uncle Julio's Corporation, a Texas corporation ("Uncle Julio's"), is a wholly-owned subsidiary of the Company.

C.     At the time of RRGC's purchase of the RRGC Note, (i) Uncle Julio's and Wells Fargo Bank (Texas), N.A. ("Wells Fargo") were parties to that certain Amended and Restated Loan Agreement, dated as of September 24, 1999, pursuant to which Wells Fargo had provided certain financing to Uncle Julio's (which, as heretofore amended, modified or supplemented, is herein referred to as the "Wells Credit Agreement") and (ii) RRGC, Wells Fargo, Julio Investors LLC ("Julio Investors") and certain other noteholders entered into that certain Intercreditor and Subordination Agreement dated December 17, 2001 (which, as amended, modified or supplemented, from time to time, is herein referred to as the "Wells Fargo Subordination Agreement"), pursuant to which RRGC's rights under and with respect to the RRGC Note were subordinated to (i) the rights of Wells Fargo to payment of amounts due under the Wells Credit Agreement and (ii) the rights of Julio Investors to payment of amounts due under the terms of that certain Senior Subordinated Secured Convertible Promissory Note in the original principal amount of $6,000,000 dated December 17, 2001 issued by the Company (as successor-by-merger to Julio Acquisition Corp.) to Julio Investors (the "Julio Investors Note").

D.     Subject to the satisfaction of certain conditions, First American Bank, SSB ("First American") has agreed to loan Uncle Julio's the amount of $4,000,000 (together with interest, fees and other related charges, the "First American Loan") for the purpose of (i) refinancing the indebtedness currently payable by Uncle Julio's to Wells Fargo under the terms of the Wells Credit Agreement, (ii) funding the repayment of certain amounts payable to Julio Investors under

the Julio Investors Note and (iii) providing Uncle Julio's with additional working capital. The terms and conditions relative to First American's financing are set forth under the terms of that certain Loan Agreement, dated of even date herewith, which has been entered into between Uncle Julio's and First American (which, as amended, modified or supplemented, from time to time, is herein referred to as the <u>First American Loan Agreement</u>") and all other documents, instruments and agreements now or hereafter evidencing or securing the whole or any part of the obligations of Uncle Julio's thereunder (together with the First American Loan Agreement, the "<u>First American Loan Documents</u>").

     E.    This First Amendment is being entered into by the parties in order to reflect certain changes which are required to be made to the Note Purchase Agreement in order to reflect, among other matters, that (i) the Julio Investors Note is being fully satisfied and discharged, (ii) the "Wells Debt" (as such term is defined in the Note Purchase Agreement) will be refinanced by way of the financing being provided to Uncle Julio's under the terms of the First American Loan Documents and (iii) the Wells Fargo Subordination Agreement is being terminated and replaced by that certain Intercreditor and Subordination Agreement dated of even date herewith, which has been entered into by and among First American, RRGC and the other noteholders (other than Julio Investors) which were parties to the Wells Fargo Subordination Agreement.

PROVISIONS

     NOW, THEREFORE, in consideration of the foregoing, the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is expressly acknowledged, the Company and RRGC hereby agree as follows:

    1.    <u>Definitions</u>.    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Note Purchase Agreement.

    2.    <u>Amendments to Note Purchase Agreement</u>.    The Note Purchase Agreement is hereby amended as follows:

     (a)    Section 1.1 of the Note Purchase Agreement shall be amended by deleting the definitions of "<u>Senior Credit Agreement</u>", "<u>Senior Debt</u>", "<u>Senior Debt Documents</u>", "Senior Lender", "<u>Wells</u>", "<u>Wells Credit Agreement</u>", "<u>Wells Debt</u>" and "<u>Wells Debt Documents</u>".

     (b)    Section 1.1 of the Note Purchase Agreement shall be amended by adding thereto in alphabetical order the definitions of "<u>Credit Borrower</u>", "<u>First American</u>", "<u>First Amendment</u>", "First <u>Amendment Date</u>", "<u>First American</u>", "<u>First American Debt</u>", "<u>First American Loan Agreement</u>", "<u>First American Loan Documents</u>", "<u>First American Note</u>", "<u>Julio Debt</u>" and "<u>Julio Note</u>" as follows:

     "Credit Borrower" means Uncle Julio's Corporation, a Texas corporation, which is a Subsidiary of the Company.

2

"First Amendment" means that certain First Amendment to this Agreement entered into between the Company and RRGC on the First Amendment Date.

"First Amendment Date" means November 20, 2002.

"First American" means First American Bank, SSB, a Texas savings bank, and its successors and assigns.

"First American Debt" means all Debt of the Credit Borrower outstanding from time to time under the First American Agreement, including all amendments, renewals, extensions, replacements or refinancings thereof; the outstanding principal amount of First American Debt shall not at any time exceed $4,000,000; however, such amount can be increased to the extent the increase in such additional principal would be Other Permitted Debt hereunder.

"First American Loan Agreement" means that certain Loan Agreement, dated as of the First Amendment Date, by and between the Credit Borrower and First American, together with all amendments, renewals, extensions, replacements or refinancings thereof.

"First American Loan Documents" means the First American Loan Agreement, First American Note and all other promissory notes, security agreements, mortgages, deeds of trust, assignments, guarantees and other documents or instruments executed and delivered pursuant to the First American Loan Agreement evidencing, securing, guaranteeing or otherwise pertaining to the First American Debt and other obligations arising under the First American Loan Agreement, as the foregoing may be amended, modified or supplemented from time to time to the extent permitted hereunder.

"First American Note" means that certain term note in the original principal amount of $4,000,000, dated as of the First Amendment Date, issued to First American by the Credit Borrower, and each other note from time to time evidencing any First American Debt, together with any notes issued in substitution for, or in replacement of, such note.

"Julio Debt" means all Debt of the Company which may become outstanding under the Julio Note, if and when issued; the outstanding principal amount of the Julio Debt shall not at any time exceed $2,000,000.

"Julio Note" means that certain term note which Uncle Julio's Corporation may issue in the future to Julio Investors LLC in an original principal amount of not more than $2,000,000, bearing interest at a rate no greater than twelve percent (12%) per annum, providing for a maturity date of not less than one year from the date of issuance and providing that no amortization will occur prior to the maturity date thereof; provided, that the Julio Note may not be issued at any time

during which a Default or Event of Default shall have occurred which is continuing.

(c)    Section 1.1 of the Note Purchase Agreement shall be amended by amending and restating the definitions of "Other Permitted Debt", "Senior Subordination Agreement" and "Transaction Documents" in their entirety as follows:

"Other Permitted Debt" means (a) a principal amount of Debt, when combined with the outstanding principal amount of Funded Debt as of such date, which is equal to the applicable Leverage Multiplier times the Company's Consolidated EBITDA for the period of 13 consecutive Financial Periods most recently ended to such determination date, and (b) the Julio Debt. All Other Permitted Debt shall be unsecured and subordinated to the Obligations on terms and conditions acceptable to RRGC, except (i) the First American Debt, which shall be permitted to be secured and senior to the Obligations and (ii) the Julio Debt, which shall be permitted to be secured and senior to the Obligations to the same extent as the interest held by Julio Investors LLC under that certain Intercreditor and Subordination Agreement dated as of December 17, 2001, entered into by and among Wells Fargo Bank (Texas), N.A., Julio Investors LLC, RRGC and the holders of the Sellers Notes. As used in this definition, the Leverage Multiplier shall be (x) 4.0 for all Financial Periods ending on or prior to December 31, 2002, and (y) 3.5 for all Financial Periods ending thereafter."

"Senior Subordination Agreement" means that certain Intercreditor and Subordination Agreement, dated as of the First Amendment Date, entered into among RRGC, First American and the holders of the Seller Notes, as the same may be amended, modified or supplemented from time to time.

"Transaction Documents" means this Agreement, the First Amendment, the Note, the Warrant Agreement, the Registration Rights Agreement, the Stockholders Agreement and all other agreements, certificates, documents or instruments now or at any time hereafter delivered in connection with this Agreement, as the foregoing may be renewed, extended, modified, amended or restated from time to time.

(d)    From and after the First Amendment Date, in each instance where reference is made under the terms of the Note Purchase Agreement to the defined terms "Wells", "Wells Credit Agreement", "Wells Debt" and "Wells Debt Documents", such reference shall be deemed to refer to, and mean, the following:

(i)    references to the term "Wells" shall be deemed to refer to, and mean, "First American";

(ii)    references to the term "Wells Credit Agreement" shall be deemed to refer to, and mean, "First American Loan Agreement";

(iii)    references to the term "Wells Debt" shall be deemed to refer to, and mean, "First American Debt"; and

(iv)    references to the term "Wells Debt Documents" shall be deemed to refer to, and mean, "First American Loan Documents".

Where reference is made under the terms of the Note Purchase Agreement to any other defined term which has been deleted pursuant to Section 2(a) above, (i) such references to any defined terms shall, after the First Amendment Date, be deemed of no further effect, and (ii) the provisions of the Note Purchase Agreement exclusively related to such defined terms shall, after the First Amendment Date, be deemed of no further effect.

3.    _Conditions Precedent._    The effectiveness of each amendment set forth in Section 2 hereof is subject to the satisfaction of each of the following conditions prior to or contemporaneous with the effectiveness of each such amendment:

(a)    the Credit Borrower shall have issued the First American Note pursuant to the First American Loan Agreement on the terms and conditions set forth in the First American Loan Agreement;

(b)    the Company shall deliver, or shall cause to be delivered, to RRGC on or before the First Amendment Date such documentation as RRGC shall reasonably request evidencing that (i) the Julio Investors Note has been fully satisfied and discharged and (ii) the Wells Fargo Subordination Agreement has been terminated.

(c)    the Company shall deliver, or shall cause to be delivered, to RRGC a copy of each First American Loan Document accompanied by a certificate from an Authorized Officer of the Credit Borrower stating that (i) such copies are true and correct copies of the originals thereof, (ii) none of such First American Loan Documents have been amended or modified in any respect and no rights of any party thereunder have been waived and (iii) such First American Loan Documents are valid, binding and enforceable obligations of the parties thereto (except as qualified therein) and represent the complete understanding and agreement of the parties thereto;

(d)    the Company shall deliver, or shall cause to be delivered, to RRGC a copy of each document relating to (i) the full satisfaction and discharging of the Julio Investors Note and (ii) the termination of the Wells Fargo Subordination Agreement, accompanied by a certificate from an Authorized Officer of the Company stating that (A) such copies are true and correct copies of the originals thereof, (B) none of such documents have been amended or modified in any respect and no rights of any party thereunder have been waived and (C) such documents are valid, binding and enforceable obligations of the parties thereto (except as qualified therein) and represent the complete understanding and agreement of the parties thereto;

(e)    the Company shall deliver, or shall cause to be delivered, to RRGC such resolutions, certificates and documents as RRGC may reasonably request relating to (i) the organization, existence, good standing and foreign qualification of the Company, (ii) the corporate authority for the execution, delivery and performance of this First Amendment and (iii)

such other matters relevant to the foregoing as RRGC shall reasonably request, all of which shall be in form and substance satisfactory to RRGC and its counsel;

(f)    the Company shall have paid in full all out of pocket fees, expenses and disbursements incurred by RRGC in connection with this First Amendment and the transactions contemplated herein, including, without limitation, all reasonable fees and expenses of Vinson & Elkins L.L.P., counsel to RRGC;

(g)    the Company shall deliver, or shall cause to be delivered, to RRGC a certificate from an Authorized Officer of the Company certifying that (i) each and every representation and warranty of the Company contained in the Transaction Documents is true and correct, (ii) no Default or Event of Default shall have occurred which is continuing, both prior to and after giving effect to the First Amendment and the First American Loan Documents and (iii) all conditions precedent to the effectiveness of this First Amendment have been satisfied in all respects; and

(h)    the Company shall deliver, or shall cause to be delivered, to RRGC such other documents, instruments and agreements as RRGC shall reasonably request in advance.

5.    Representations and Warranties.  In order to induce RRGC to enter into this First Amendment, the Company hereby represents and warrants to RRGC that:

(a)    each representation and warranty of the Company in each Transaction Document is true and correct as of the date hereof;

(b)    the execution, delivery and performance by the Company of this First Amendment and each of the Transaction Documents are within the Company's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not violate or constitute a default under any provision of applicable law or any material agreement binding upon the Company, or result in the creation or imposition of any Lien upon any of the assets of the Company except for Permitted Encumbrances;

(c)    this First Amendment constitutes the valid and binding obligation of the Company enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally, and the availability of equitable remedies may be limited by equitable principles of general application;

(d)    no Default nor an Event of Default has occurred which is continuing; and

(e)    neither the Company nor any of its Subsidiaries has any defenses to payment, counterclaims or rights of set-off with respect to the Obligations on the date hereof.

6.    Reaffirmation.  Except as amended hereby, the Note Purchase Agreement shall remain in full force and effect, and each party hereto hereby restates and reaffirms all of the terms and provisions of the Note Purchase Agreement and the Transaction Documents.

7.    Parties in Interest.  All of the terms and provisions of this First Amendment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

8.    Counterparts.  This First Amendment may be executed in counterparts, and all parties need not execute the same counterpart; however, no party shall be bound by this First Amendment until this First Amendment has been executed by the Company and RRGC, at which time this First Amendment shall be binding on, enforceable against and inure to the benefit of the Company and RRGC.  Facsimiles shall be effective as originals.

9.    COMPLETE AGREEMENT.  THIS FIRST AMENDMENT, THE NOTE PURCHASE AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

10.    Arms-Length/Good Faith.  This First Amendment has been negotiated at arms-length and in good faith by the parties hereto.

11.    Interpretation.  Wherever the context hereof shall so require, the singular shall include the plural, the masculine gender shall include the feminine gender and the neuter and vice versa.  The headings, captions and arrangements used in this First Amendment are for convenience only and shall not affect the interpretation of this First Amendment.

10.    Severability.  In case any one or more of the provisions contained in this First Amendment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this First Amendment shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

11.    Further Assurances.  The Company agrees to execute, acknowledge, deliver, file and record such further certificates, instruments and documents, and to do all other acts and things, as may be requested by RRGC as necessary or advisable to carry out the intents and purposes of this First Amendment.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this First Amendment by their duly authorized officers as of the day and date first written above.

**LUCKY BOY CORPORATION**

By: _____
Name: _____
Title: _____

**RETAIL & RESTAURANT GROWTH CAPITAL, L.P.**

By:    Retail & Restaurant Growth Partners, L.P., its General partner

    By:    Retail & Restaurant Growth Management, Inc., its General Partner

        By:_____
        Name:_____
        Title:_____

94

IN WITNESS WHEREOF, the parties have executed this First Amendment by their duly authorized officers as of the day and date first written above.

**LUCKY BOY CORPORATION**

By: _____
Name: _____
Title: _____

**RETAIL & RESTAURANT GROWTH CAPITAL, L.P.**

By:    Retail    &    Restaurant    Growth
       Partners, L.P., its General partner

       By:    Retail & Restaurant Growth
              Management,    Inc.,    its
              General Partner

              By: _____
              Name: _Victor Laurana____
              Title: _G.P.____

<u>SECOND AMENDMENT</u>
<u>TO</u>
<u>NOTE PURCHASE AGREEMENT</u>

THIS SECOND AMENDMENT TO NOTE PURCHASE AGREEMENT (this "<u>Second Amendment</u>") is entered into this 11th day of March, 2003, by and between LUCKY BOY CORPORATION, a Delaware corporation (the "<u>Company</u>") and RETAIL & RESTAURANT GROWTH CAPITAL, L.P.,a Delaware limited partnership ("<u>RRGC</u>").

## RECITALS

A.    The Company and RRGC are parties to that certain Note Purchase Agreement, dated December 17, 2001 (which, as amended by that certain First Amendment to Note Purchase Agreement dated November 20, 2002 [the "<u>First Amendment</u>"], and as further amended, modified or supplemented, from time to time, is herein referred to as the "<u>Note Purchase Agreement</u>"), pursuant to which the Company issued to RRGC, and RRGC purchased from the Company, that certain Promissory Note, dated of even date therewith, in the principal amount of $3,000,000 (which, as amended, modified or supplemented from time to time, together with any notes issued in substitution therefor or replacement thereof, is herein referred to as the "<u>RRGC Note</u>"). The Note Purchase Agreement sets forth various understandings of the Company and RRGC concerning the terms and conditions of the loan evidenced by the RRGC Note, including, among other matters, various covenants which restricted the right of the Company and its subsidiaries to incur additional debt and grant any liens or security interests in or upon any of its properties or assets.

B.    Uncle Julio's Corporation, a Texas corporation ("<u>Uncle Julio's</u>"), is a wholly-owned subsidiary of the Company.

C.    Subject to the satisfaction of certain conditions, Julio Investors LLC, a Delaware limited liability company ("<u>Julio Investors</u>") has agreed to loan the Company the aggregate principal amount of $2,000,000, evidenced by that certainSenior Subordinated Convertible Promissory Note of even date herewith issued by the Company in favor of Julio Investors (the "<u>Julio Investors Note</u>"), for the purpose of the Company providing additional working capital to Uncle Julio's.

D.    This Second Amendment is being entered into by the parties in order to reflect certain changes which are required to be made to the Note Purchase Agreement in order to reflect, among other matters, that (i) the Julio Investors Note will be entered into between the Company and Julio Investors (instead of between Uncle Julio's and Julio Investors, as contemplated in the First Amendment) and (ii) the Intercreditor and Subordination Agreement dated November 20, 2002 entered into by and among First American Bank, SSB ("<u>First American</u>"), RRGC, James F. Pinero, Maureen S. Boutilier and GuyW. Boutilier will be replaced by that certain Amended and Restated Intercreditor and Subordination Agreement dated of even date herewith and entered into by and among First American, Julio Investors, RRGC, James F. Pinero, Maureen S. Boutilier and Guy W. Boutilier.

### PROVISIONS

NOW, THEREFORE, in consideration of the foregoing, the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is expressly acknowledged, the Company and RRGC hereby agree as follows:

1.    Definitions.    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Note Purchase Agreement.

2.    Amendments to Note Purchase Agreement.    The Note Purchase Agreement is hereby amended as follows:

(a)    Section 1.1 of the Note Purchase Agreement shall be amended by deleting the definitions of "Julio Debt" and "Julio Note".

(b)    Section 1.1 of the Note Purchase Agreement shall be amended by adding thereto in alphabetical order the definitions of "Mezzanine Debt", "Mezzanine Lender", "Mezzanine Loan Documents", "Mezzanine Note", "Second Amendment", and "Second Amendment Date" as follows:

"Mezzanine Debt" means all Debt of the Company which may become outstanding under the Mezzanine Note; the outstanding principal amount of the Mezzanine Debt shall not at any time exceed $2,000,000.

"Mezzanine Lender" means Julio Investors LLC, a Delaware limited liability company, and its successors and assigns.

"Mezzanine Loan Documents" means the Mezzanine Note and all other promissory notes, security agreements, mortgages, deeds of trust, assignments, guarantees and other documents or instruments evidencing, securing, guaranteeing or otherwise pertaining to the Mezzanine Debt and other obligations arising under the Mezzanine Note, as the foregoing may be amended, modified or supplemented from time to time to the extent permitted hereunder.

"Mezzanine Note" means that certain term note in the original principal amount of $2,000,000, dated as of the Second Amendment Date, issued to Mezzanine Lender by the Company.

"Second Amendment" means that certain Second Amendment to this Agreement entered into between the Company and RRGC on the Second Amendment Date.

"Second Amendment Date" means March 11, 2003.

(c)    Section 1.1 of the Note Purchase Agreement shall be amended by amending and restating the definitions of "First American Debt", "Other Permitted Debt", "Senior Subordination Agreement" and "Transaction Documents" in their entirety as follows:

"First American Debt" means all Debt of the Credit Borrower outstanding from time to time under the First American Agreement, including all amendments, renewals, extensions, replacements or refinancings thereof; the outstanding principal amount of First American Debt shall not at any time exceed $4,500,000; however, such amount can be increased to the extent the increase in such additional principal would be Other Permitted Debt hereunder.

"Other Permitted Debt" means (a) a principal amount of Debt, when combined with the outstanding principal amount of Funded Debt as of such date, which is equal to the applicable Leverage Multiplier times the Company's Consolidated EBITDA for the period of 13 consecutive Financial Periods most recently ended to such determination date, and (b) the Mezzanine Debt. All Other Permitted Debt shall be unsecured and subordinated to the Obligations on terms and conditions acceptable to RRGC, except (i) the First American Debt, which shall be permitted to be secured and senior to the Obligations and (ii) the Mezzanine Debt, which shall be permitted to be secured and senior to the Obligations to the extent, and in the manner, set forth in the Senior Subordination Agreement. As used in this definition, the Leverage Multiplier shall be (x) 4.0 for all Financial Periods ending on or prior to December 31, 2002 and (y) 3.5 for all Financial Periods ending thereafter."

"Senior Subordination Agreement" means that certain Amended and Restated Intercreditor and Subordination Agreement, dated as of the Second Amendment Date, entered into among RRGC, First American, Mezzanine Lender and the holders of the Seller Notes, as the same may be amended, modified or supplemented from time to time.

"Transaction Documents" means this Agreement, the First Amendment, the Second Amendment, the Note, the Warrant Agreement, the Registration Rights Agreement, the Stockholders Agreement and all other agreements, certificates, documents or instruments now or at any time hereafter delivered in connection with this Agreement, as the foregoing may be renewed, extended, modified, amended or restated from time to time.

3.    _Conditions Precedent_.  The effectiveness of each amendment set forth in Section 2 hereof is subject to the satisfaction of each of the following conditions prior to or contemporaneous with the effectiveness of each such amendment:

(a)    the Company shall have issued the Mezzanine Note;

(b)    the Company shall execute, and shall cause to be executed, the Senior Subordination Agreement;

(c)    the Company shall deliver, or shall cause to be delivered, to RRGC a copy of each Mezzanine Loan Document accompanied by a certificate from an Authorized Officer of the Company stating that (i) such copies are true and correct copies of the originals thereof, (ii)

none of such Mezzanine Loan Documents have been amended or modified in any respect and no rights of any party thereunder have been waived and (iii) such Mezzanine Loan Documents are valid, binding and enforceable obligations of the parties thereto (except as qualified therein) and represent the complete understanding and agreement of the parties thereto;

(d)    the Company shall deliver, or shall cause to be delivered, to RRGC such resolutions, certificates and documents as RRGC may reasonably request relating to (i) the organization, existence, good standing and foreign qualification of the Company, (ii) the corporate authority for the execution, delivery and performance of this Second Amendment and (iii) such other matters relevant to the foregoing as RRGC shall reasonably request, all of which shall be in form and substance satisfactory to RRGC and its counsel;

(e)    the Company shall have paid in full all out of pocket fees, expenses and disbursements incurred by RRGC in connection with this Second Amendment and the transactions contemplated herein, including, without limitation, all reasonable fees and expenses of Vinson & Elkins L.L.P., counsel to RRGC;

(f)    the Company shall deliver, or shall cause to be delivered, to RRGC a certificate from an Authorized Officer of the Company certifying that (i) each and every representation and warranty of the Company contained in the Transaction Documents shall be true and correct, (ii) no Default or Event of Default shall have occurred which is continuing, both prior to and after giving effect to the Second Amendment and the Mezzanine Loan Documents and (iii) all conditions precedent to the effectiveness of this Second Amendment have been satisfied in all respects; and

(g)    the Company shall deliver, or shall cause to be delivered, to RRGC such other documents, instruments and agreements as RRGC shall reasonably request in advance.

4.    <u>Representations and Warranties</u>.  In order to induce RRGC to enter into this Second Amendment, the Company hereby represents and warrants to RRGC that:

(a)    each representation and warranty of the Company in each Transaction Document is true and correct as of the date hereof;

(b)    the execution, delivery and performance by the Company of this Second Amendment and each of the Transaction Documents are within the Company's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not violate or constitute a default under any provision of applicable law or any material agreement binding upon the Company, or result in the creation or imposition of any Lien upon any of the assets of the Company except for Permitted Encumbrances;

(c)    this Second Amendment constitutes the valid and binding obligation of the Company enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally, and the availability of equitable remedies may be limited by equitable principles of general application;

(d)    no Default nor an Event of Default has occurred which is continuing; and

4

99

(e)     neither the Company nor any of its Subsidiaries has any defense s to payment, counterclaims or rights of set-off with respect to the Obligations on the date hereof.

5.    <u>Reaffirmation</u>.  Except as amended hereby, the Note Purchase Agreement shall remain in full force and effect, and each party hereto hereby restates and reaffirms all of the terms and provisions of the Note Purchase Agreement and the Transaction Documents.

6.    <u>Parties in Interest</u>.  All of the terms and provisions of this Second Amendment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

7.    <u>Counterparts</u>.  This Second Amendment may be executed in counterparts, and all parties need not execute the same counterpart; however, no party shall be bound by this Second Amendment until this Second Amendment has been executed by the Company and RRGC, at which time this Second Amendment shall be binding on, enforceable against and inure to the benefit of the Company and RRGC.  Facsimiles shall be effective as originals.

8.    <u>COMPLETE AGREEMENT</u>.  THIS SECOND AMENDMENT, THE NOTE PURCHASE AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.    THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

9.    <u>Arms-Length/Good Faith</u>.  This Second Amendment has been negotiated at arms-length and in good faith by the parties hereto.

10.    <u>Interpretation</u>.  Wherever the context hereof shall so require, the singular shall include the plural, the masculine gender shall include the feminine gender and the neuter and vice versa.  The headings, captions and arrangements used in this Second Amendment are for convenience only and shall not affect the interpretation of this Second Amendment.

11.    <u>Severability</u>.  In case any one or more of the provisions contained in this Second Amendment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Second Amendment shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

12.    <u>Further Assurances</u>.  The Company agrees to execute, acknowledge, deliver, file and record such further certificates, instruments and documents, and to do all other acts and things, as may be requested by RRGC as necessary or advisable to carry out the intents and purposes of this Second Amendment.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this Second Amendment by their duly authorized officers as of the day and date first written above.

**LUCKY BOY CORPORATION**

By: _____
Name: _Abdou Shashy_
Title: _President / CEO_

**RETAIL & RESTAURANT GROWTH CAPITAL, L.P.**

By:    Retail    &    Restaurant    Growth
       Partners, L.P., its General partner

    By:    Retail & Restaurant Growth
        Management,    Inc.,    its
        General Partner

        By:_____
        Name:_____
        Title:_____

101

IN WITNESS WHEREOF, the parties have executed this Second Amendment by their duly authorized officers as of the day and date first written above.

LUCKY BOY CORPORATION

RETAIL & RESTAURANT GROWTH CAPITAL, L.P.

By: _____
Name: _____
Title: _____

By:    Retail    &    Restaurant    Growth
       Partners, L.P., its General partner

By:    Retail & Restaurant Growth
       Management, Inc.,    its
       General Partner

By: _____
Name: J. Eric Lawrence
Title: General Partner

# THIRD AMENDMENT
## TO
## NOTE PURCHASE AGREEMENT

THIS THIRD AMENDMENT TO NOTE PURCHASE AGREEMENT (this "Third Amendment") is entered into this 16th day of July, 2003, by and between LUCKY BOY CORPORATION, a Delaware corporation (the "Company") and RETAIL & RESTAURANT GROWTH CAPITAL, L.P., a Delaware limited partnership ("RRGC").

## RECITALS

A.    The Company and RRGC are parties to that certain Note Purchase Agreement, dated December 17, 2001 (which, as amended by that certain First Amendment to Note Purchase Agreement dated November 20, 2002 (the "First Amendment"), and that certain Second Amendment to Note Purchase Agreement, dated March 11, 2003 (the "Second Amendment"), and as further amended, modified or supplemented, from time to time, is herein referred to as the "Note Purchase Agreement"), pursuant to which the Company issued to RRGC, and RRGC purchased from the Company, that certain Promissory Note, dated of even date therewith, in the principal amount of $3,000,000 (which, as amended, modified or supplemented from time to time, together with any notes issued in substitution therefor or replacement thereof, is herein referred to as the "RRGC Note").    The Note Purchase Agreement sets forth various understandings of the Company and RRGC concerning the terms and conditions of the loan evidenced by the RRGC Note, including, among other matters, various covenants which restricted the right of the Company and its subsidiaries to incur additional debt and grant any liens or security interests in or upon any of its properties or assets.

B.    Uncle Julio's Corporation, a Texas corporation ("Uncle Julio's"), is a wholly-owned subsidiary of the Company.

C.    Subject to the satisfaction of certain conditions, Julio Investors LLC, a Delaware limited liability company ("Julio Investors") has agreed to loan the Company the aggregate principal amount of up to $3,000,000, evidenced by that certain Second Subordinated Convertible Promissory Note of even date herewith issued by the Company in favor of Julio Investors (the "Julio Investors Note"), for the purpose of the Company providing additional working capital to Uncle Julio's.

D.    This Third Amendment is being entered into by the parties in order to reflect certain changes which are required to be made to the Note Purchase Agreement in order to reflect, among other matters, that (i) the Julio Investors Note will be issued by the Company to Julio Investors, and (ii) the Amended and Restated Intercreditor and Subordination Agreement dated March 11, 2003, entered into by and among the Company, Uncle Julio's, First American Bank, SSB ("First American"), Julio Investors, RRGC, James F. Pinero, Maureen S. Boutilier and Guy W. Boutilier will be replaced by that certain Second Amended and Restated Intercreditor and Subordination Agreement dated of even date herewith and entered into by and among the Company, Uncle Julio's, First American, Julio Investors, RRGC, James F. Pinero, Maureen S. Boutilier and Guy W. Boutilier.

Third Amendment to Note Purchase Agreement

245822.04

E.     The Company has otherwise requested that RRGC (i) consent to (x) the Company's issuance of the Julio Investors Note, (y) the Company's issuance of certain warrants (the "Julio Investors Warrants") to Julio Investors under the terms of a certain Warrant Agreement of even date herewith between the Company and Julio Investors (the "Julio Investors Warrant Agreement") and (z) the execution and delivery of a certain Registration Rights Agreement of even date herewith between the Company and Julio Investors (the "Julio Investors Registration Rights Agreement" and, together with the Julio Investors Warrant Agreement and Julio Investors Warrants, collectively, the "Julio Investors Warrant Documents") and (ii) waive certain rights it may have under the terms of the "Warrant Agreement" (as defined in the Note Purchase Agreement) in connection with the conversion rights under the "Mezzanine Notes" (as defined in Section 2(a) below) and the issuance of, or exercise of rights under, the Julio Investors Warrants.

## PROVISIONS

NOW, THEREFORE, in consideration of the foregoing, the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is expressly acknowledged, the Company and RRGC hereby agree as follows:

1.     <u>Definitions</u>.     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Note Purchase Agreement.

2.     <u>Amendments to Note Purchase Agreement</u>.     The Note Purchase Agreement is hereby amended as follows:

(a)     Section 1.1 of the Note Purchase Agreement shall be amended by (i) deleting the definition of "Mezzanine Note" and (ii) adding thereto in alphabetical order the definitions of "Mezzanine Notes", "Third Amendment", and "Third Amendment Date" as follows:

"Mezzanine Notes" means, collectively, (i) that certain Senior Subordinated Convertible Promissory Note in the original principal amount of $2,000,000, dated as of March 11, 2003, issued to Mezzanine Lender by the Company, and (ii) that certain Second Subordinated Convertible Promissory Note in the original principal amount of $3,000,000, dated as of the Third Amendment Date, issued to the Mezzanine Lender by the Company, in each instance, as the same may be amended or modified from time to time (to the extent permitted hereunder) and together with any notes issued in substitution for or replacement of such notes.

"Third Amendment" means that certain Third Amendment to this Agreement entered into between the Company and RRGC on the Third Amendment Date.

"Third Amendment Date" means July 16, 2003.

(b)    Section 1.1 of the Note Purchase Agreement shall be amended by amending and restating the definitions of "Fixed Rate," "Mezzanine Debt", "Mezzanine Loan Documents", "Senior Subordination Agreement" and "Transaction Documents" in their entirety as follows:

"Fixed Rate" means (a) as of the first Business Day of each month (each, an "Adjustment Date"), for the period from the Third Amendment Date to January 31, 2004, the per annum rate of interest indicated below based upon the Company's Leverage Ratio for the most recently ended Financial Period, and (b) after January 31, 2004, twelve and three-quarter percent (12.75%) per annum.

| Leverage Ratio | Fixed Rate* |
|---|---|
| ≤ 3.50 to 1.00 | 12.75% |
| > 3.50 to 1.00 and ≤ 3.75 to 1.00 | 13.00% |
| > 3.75 to 1.00 and ≤ 4.25 to 1.00 | 13.75% |
| > 4.25 to 1.00 | 14.50% |

*If the Company does not deliver the financial statements required by Section 7.1(b) within the thirty (30) days required by Section 7.1(b), the Fixed Rate shall be the highest rate indicated above until the next Adjustment Date.

"Mezzanine Debt" means all Debt of the Company which may become outstanding under the Mezzanine Notes; the outstanding principal amount of the Mezzanine Debt shall not at any time exceed $5,000,000.

"Mezzanine Loan Documents" means the Mezzanine Notes and all other promissory notes, security agreements, mortgages, deeds of trust, assignments, guarantees and other documents or instruments evidencing, securing, guaranteeing or otherwise pertaining to the Mezzanine Debt and other obligations arising under the Mezzanine Notes, as the foregoing may be amended, modified or supplemented from time to time to the extent permitted hereunder.

"Senior Subordination Agreement" means that certain Second Amended and Restated Intercreditor and Subordination Agreement, dated as of the Third Amendment Date, entered into among RRGC, First American, Mezzanine Lender and the holders of the Seller Notes, as the same may be amended, modified or supplemented from time to time.

"Transaction Documents" means this Agreement, the First Amendment, the Second Amendment, the Third Amendment, the Note, the Warrant Agreement, the Registration Rights Agreement, the Stockholders Agreement and all other agreements, certificates, documents or instruments now or at any time hereafter delivered in connection with this Agreement, as the foregoing may be renewed, extended, modified, amended or restated from time to time.

(c)    Sections 8.4, 8.5, 9.2 and 9.3 of the Note Purchase Agreement shall be amended and restated in their entirety as follows:

Section 8.4    Incurrence of Debt and Guarantees.  The Company will not, and will not permit any of its Subsidiaries to, incur, become or remain liable for any Debt other than (a) the Obligations, (b) the Seller Notes, (c) the First American Debt and (d) the Other Permitted Debt.

Section 8.5    Modification of Documents.  The Company will not, nor will it permit any of its Subsidiaries to, enter into any material amendment or modification of its Charter Documents or the Ancillary Agreements or waive or fail to enforce any material right of the Company or any of its Subsidiaries thereunder.  The Company will not, nor will it permit any of its Subsidiaries to, enter into any modification of (a) the Mezzanine Loan Documents or the Seller Notes to the extent restricted by the Senior Subordination Agreement, or (b) the Julio Investors Warrant Documents (as defined in the Third Amendment).

Section 9.2    Consolidated EBITDA.  As of the last day of each Financial Period, the Company shall not permit its Consolidated EBITDA to be less than $3,300,000 for each period of 13 consecutive Financial Periods ending on or before January 31, 2004, and $3,700,000 for any period of 13 consecutive Financial Period after January 31, 2004.

Section 9.3    Leverage Ratio.  The Company shall not permit its Leverage Ratio to exceed (a) 4.50 to 1.00 at the end of any Financial Period ending on or prior to January 31, 2004, and (b) 3.50 to 1.00 at the end of any Financial Period ending thereafter.

(d)    The financial statements required by Section 7.1(b) of the Note Purchase Agreement for the Financial Period ending in May 2003 which were to be delivered in June 2003, are now required to be delivered by July 21, 2003, and the failure to deliver such financial statements by such date shall constitute an immediate Event of Default without the benefit of any cure period provided by Section 10.1 of the Note Purchase Agreement.

3.    Consents and Waivers.  Subject to the satisfaction of the conditions set forth in Section 4 below, RRGC hereby acknowledges, and agrees to, the following:

(a) for purposes of Section 8.9 of the Note Purchase Agreement, RRGC hereby consents to (i) the Company's issuance of (x) the "Mezzanine Notes" (as defined in Section 2(a) above) and (y) the Julio Investors Warrants and (ii) the execution and delivery of the Julio Investors Warrant Agreement and Julio Investors Registration Rights Agreement;

(b) for purposes of Section 8.5 of the Note Purchase Agreement, RRGC hereby agrees that the Company may amend its Certificate of Incorporation to authorize such additional shares of capital stock, if any, required to cover the Company's obligations to issue shares (i) upon conversion of all or any part of the Mezzanine Notes or (ii) upon exercise of the Julio Investors Warrants;

(c) RRGC hereby waives its rights under Section 7.3 of the "Warrant Agreement" (as defined in Note Purchase Agreement) with respect to the Company's issuance of the Mezzanine Notes and the Julio Investors Warrants and the issuance of any shares of the Company's capital stock pursuant to the rights of the holder thereunder; and

(d) RRGC hereby consents and agrees that the Julio Investors Warrants, and any shares of capital stock issued upon exercise thereof, shall be considered "Exempt Shares" for purposes of the Warrant Agreement; provided, however, any shares of the Company's capital stock issued upon a conversion of the Mezzanine Notes shall not be considered "Exempt Shares."

4. Conditions Precedent. The effectiveness of each amendment set forth in Section 2 hereof, and the consents and waivers described in Section 3 hereof, are, in each instance, subject to the satisfaction of each of the following conditions prior to or contemporaneous with the effectiveness of each such amendment:

(a) the Company shall have issued the Julio Investors Note;

(b) the Company shall execute, and shall cause to be executed by all other parties thereto, the Senior Subordination Agreement;

(c) the Company shall deliver, or shall cause to be delivered, to RRGC a copy of each Mezzanine Loan Document executed in connection with the issuance of the Julio Investors Note and the making of the loan evidenced thereby, together with copies of the Julio Investors Warrant Documents (together with such Mezzanine Loan Documents, the "2nd Facilitating Loan Documents"), accompanied by a certificate from an Authorized Officer of the Company stating that (i) such copies are true and correct copies of the originals thereof, (ii) none of such 2nd Facilitating Loan Documents have been amended or modified in any respect and no rights of any party thereunder have been waived and (iii) such 2nd Facilitating Loan Documents are valid, binding and enforceable obligations of the parties thereto (except as qualified therein) and represent the complete understanding and agreement of the parties thereto;

(d) the Company shall deliver, or shall cause to be delivered, to RRGC such resolutions, certificates and documents as RRGC may reasonably request relating to (i) the organization, existence, good standing and foreign qualification of the Company, (ii)

245822.04

107

the corporate authority for the execution, delivery and performance of this Third Amendment and (iii) such other matters relevant to the foregoing as RRGC shall reasonably request, all of which shall be in form and substance satisfactory to RRGC and its counsel;

(e)    the Company shall have paid in full all out of pocket fees, expenses and disbursements incurred by RRGC in connection with this Third Amendment and the transactions contemplated herein, including, without limitation, all reasonable fees and expenses of Patton Boggs LLP, counsel to RRGC;

(f)    the Company shall deliver, or shall cause to be delivered, to RRGC a certificate from an Authorized Officer of the Company certifying that (i) each and every representation and warranty of the Company contained in the Transaction Documents shall be true and correct, (ii) no Default or Event of Default shall have occurred which is continuing, both prior to and after giving effect to the Third Amendment and the 2nd Facilitating Loan Documents and (iii) all conditions precedent to the effectiveness of this Third Amendment have been satisfied in all respects;

(g)    the Company shall deliver, or shall cause to be delivered, to RRGC such other documents, instruments and agreements as RRGC shall reasonably request in advance; and

(h)    the Company shall pay to RRGC a non-refundable amendment fee of $10,000.

5.    <u>Representations and Warranties</u>.  In order to induce RRGC to enter into this Third Amendment, the Company hereby represents and warrants to RRGC that:

(a)    each representation and warranty of the Company in each Transaction Document is true and correct as of the date hereof;

(b)    the execution, delivery and performance by the Company of this Third Amendment and each of the Transaction Documents are within the Company's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not violate or constitute a default under any provision of applicable law or any material agreement binding upon the Company, or result in the creation or imposition of any Lien upon any of the assets of the Company except for Permitted Encumbrances;

(c)    this Third Amendment constitutes the valid and binding obligation of the Company enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally, and the availability of equitable remedies may be limited by equitable principles of general application;

(d)    no Default nor an Event of Default has occurred which is continuing; and

108

(e)    neither the Company nor any of its Subsidiaries has any defenses to payment, counterclaims or rights of set-off with respect to the Obligations on the date hereof.

6.    Reaffirmation.  Except as amended hereby, the Note Purchase Agreement shall remain in full force and effect, and each party hereto hereby restates and reaffirms all of the terms and provisions of the Note Purchase Agreement and the Transaction Documents.

7.    Parties in Interest.  All of the terms and provisions of this Third Amendment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

8.    Counterparts.  This Third Amendment may be executed in counterparts, and all parties need not execute the same counterpart; however, no party shall be bound by this Third Amendment until this Third Amendment has been executed by the Company and RRGC, at which time this Third Amendment shall be binding on, enforceable against and inure to the benefit of the Company and RRGC.  Facsimiles shall be effective as originals.

9.    COMPLETE AGREEMENT.  THIS THIRD AMENDMENT, THE NOTE PURCHASE AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

10.    Arms-Length/Good Faith.  This Third Amendment has been negotiated at arms-length and in good faith by the parties hereto.

11.    Interpretation.  Wherever the context hereof shall so require, the singular shall include the plural, the masculine gender shall include the feminine gender and the neuter and vice versa.  The headings, captions and arrangements used in this Third Amendment are for convenience only and shall not affect the interpretation of this Third Amendment.

12.    Severability.  In case any one or more of the provisions contained in this Third Amendment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Third Amendment shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

13.    Further Assurances.  The Company agrees to execute, acknowledge, deliver, file and record such further certificates, instruments and documents, and to do all other acts and things, as may be requested by RRGC as necessary or advisable to carry out the intents and purposes of this Third Amendment.

*[The Remainder of this Page Intentionally Left Blank]*

245822.04

109

IN WITNESS WHEREOF, the parties have executed this Third Amendment by their duly authorized officers as of the day and date first written above.

LUCKY BOY CORPORATION

RETAIL & RESTAURANT GROWTH CAPITAL, L.P.

By:    Retail & Restaurant Growth Partners, L.P.,
       its General partner.

By: _Lisa Banks_____
Name: _LISA BANKS_____
Title: _TREASURER_____

        By:    Retail & Restaurant Growth
           Management, Inc., its General
           Partner

           By: _____
           Name: _____
           Title: _____

IN WITNESS WHEREOF, the parties have executed this Third Amendment by their duly authorized officers as of the day and date first written above.

LUCKY BOY CORPORATION

By: _____
Name: _____
Title: _____

RETAIL & RESTAURANT GROWTH CAPITAL, L.P.

By:  Retail & Restaurant Growth Partners, L.P., its General partner

     By:  Retail & Restaurant Growth Management, Inc., its General Partner

     By: _____
     Name: _J. Eric Lawrence_
     Title: _E V P_

Third Amendment to Note Purchase Agreement

245822

111

# FOURTH AMENDMENT
## TO
## NOTE PURCHASE AGREEMENT

THIS FOURTH AMENDMENT TO NOTE PURCHASE AGREEMENT (this "Fourth Amendment") is entered into this 19th day of August, 2005, by and between JULIO & SONS COMPANY, a Delaware corporation formerly known as Lucky Boy Corporation (the "Company") and RETAIL & RESTAURANT GROWTH CAPITAL, L.P., a Delaware limited partnership ("RRGC").

## RECITALS

A.    The Company and RRGC are parties to that certain Note Purchase Agreement, dated December 17, 2001 (which, as amended by that certain First Amendment to Note Purchase Agreement dated November 20, 2002 (the "First Amendment"), that certain Second Amendment to Note Purchase Agreement dated March 11, 2003 (the "Second Amendment"), and that certain Third Amendment to Note Purchase Agreement dated July 16, 2003 (the "Third Amendment"), and as further amended, modified or supplemented, from time to time, is herein referred to as the "Note Purchase Agreement"), pursuant to which the Company issued to RRGC, and RRGC purchased from the Company, that certain Promissory Note, dated of even date therewith, in the principal amount of $3,000,000 (which, as amended, modified or supplemented from time to time, together with any notes issued in substitution therefor or replacement thereof, is herein referred to as the "RRGC Note"). The Note Purchase Agreement sets forth various understandings of the Company and RRGC concerning the terms and conditions of the loan evidenced by the RRGC Note, including, among other matters, various covenants which restrict the right of the Company and its subsidiaries to incur additional debt and grant any liens or security interests in or upon any of its properties or assets.

B.    Uncle Julio's Corporation, a Texas corporation ("Uncle Julio's"), is a wholly-owned subsidiary of the Company.

C.    This Fourth Amendment is being entered into by the parties in order to reflect certain changes which are required to be made to the Note Purchase Agreement in order to obtain RRGC's consent to the waiver of certain Events of Default which exist.

D.    The Company has requested that RRGC (i) consent to the Company's entering into certain agreements with Tia's, (ii) waive the existing Events of Defaults and (iii) release its officers and directors from liability related to such Events of Default.

## PROVISIONS

NOW, THEREFORE, in consideration of the foregoing, the provisions set forth herein and other good and valuable consideration, the receipt and sufficiency of which is expressly acknowledged, the Company and RRGC hereby agree as follows:

1.    Definitions.    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Note Purchase Agreement.

2.    <u>Amendments to Note Purchase Agreement</u>.    The Note Purchase Agreement is hereby amended as follows:

(a)    Section 1.1 of the Note Purchase Agreement shall be amended by adding thereto in alphabetical order the definitions of "<u>Advisory Services Agreement</u>", "<u>Fourth Amendment</u>", "<u>Fourth Amendment Date</u>", "<u>License Agreement</u>", "<u>Tia's</u>", and "<u>Tia's Loan</u>", as follows:

"<u>Advisory Services Agreement</u>" means that certain Advisory and Administrative Services Agreement between Julio & Sons Company and Tia's dated on or about the date hereof.

"<u>Fourth Amendment</u>" means that certain Fourth Amendment to this Agreement entered into between the Company and RRGC on the Fourth Amendment Date.

"<u>Fourth Amendment Date</u>" means August 19, 2005.

"<u>License Agreement</u>" means that certain License Agreement between Tia's Alamo, LLC, a subsidiary of Tia's and Uncle Julio's Corporation dated on or about the date hereof.

"<u>Tia's</u>" means Tia's Restaurant, Inc., a Delaware corporation.

"<u>Tia's Loan</u>" means the advances made or to be made by the Company to Tia's in an aggregate amount not to exceed $6,250,000, which advances, once repaid, cannot be reborrowed.

(b)    Section 1.1 of the Note Purchase Agreement shall be amended by amending and restating the definitions of "<u>Fixed Rate</u>", "<u>Transaction Documents</u>" and "<u>Warrant Agreement</u>" in their entirety as follows:

"<u>Fixed Rate</u>" means (a) as of the first Business Day of each month (each, an "<u>Adjustment Date</u>"), for the period from the Third Amendment Date to January 31, 2004, the per annum rate of interest indicated below based upon the Company's Leverage Ratio for the most recently ended Financial Period, (b) after January 31, 2004 through and including June 30, 2005, twelve and three-quarter percent (12.75%) per annum, and (c) on an after July 1, 2005, fourteen and three-quarters percent (14.75%) per annum.

| Leverage Ratio | Fixed Rate* |
|---|---|
| $\leq$ 3.50 to 1.00 | 12.75% |
| > 3.50 to 1.00 and $\leq$ 3.75 to 1.00 | 13.00% |

| | |
|---|---|
| > 3.75 to 1.00 and<br>≤ 4.25 to 1.00 | 13.75% |
| > 4.25 to 1.00 | 14.50% |

*If the Company does not deliver the financial statements required by Section 7.1(b) within the thirty (30) days required by Section 7.1(b), the Fixed Rate shall be the highest rate indicated above until the next Adjustment Date.

"Transaction Documents" means this Agreement, the First Amendment, the Second Amendment, the Third Amendment, the Fourth Amendment, the Note, the Warrant Agreement, the Registration Rights Agreement, the Stockholders Agreement, the Guaranty Agreement and all other agreements, certificates, documents or instruments now or at any time hereafter delivered, in connection with this Agreement, as the foregoing may be renewed, extended, modified, amended or restated from time to time.

"Warrant Agreement" means a Warrant Agreement of even date herewith between the Company and RRGC pursuant to which the Company shall issue and sell and RRGC shall purchase the warrants, as amended by Supplement and First Amendment to Warrant Agreement dated August 19, 2005, as the same may be further amended from time to time.

(c)     Section 2.3 of the Note Purchase Agreement shall be amended and restated in its entirety as follows:

Section 2.3     Interest; Interest Payments.  Interest shall accrue on the principal balance of the Note prior to the occurrence of an Event of Default at the Fixed Rate.  Interest shall be payable on the Note as it accrues commencing January 2, 2002 and the first Business Day of each month thereafter until maturity.  After the occurrence and during the continuance of an Event of Default, interest shall accrue on the outstanding principal balance of the Note and, to the extent permitted by applicable law, on accrued but unpaid interest, at the lesser of sixteen and three-quarters percent (16.75%) per annum or the Maximum Lawful Rate.

(d)     New Sections 7.12 and 7.13 are hereby added to the Note Purchase Agreement to read as follows:

Section 7.12.  Refinancing Efforts.  The Company shall use all reasonable efforts to actively market and refinance all outstanding principal owing pursuant to the Note.  The Company shall report to RRGC within 5 days after the end of each calendar month with respect to its efforts to do so during the previous month and shall provide to RRGC

promptly upon its receipt thereof copies of any and all letters of intent, letters of understanding, commitments and similar documents related to its efforts to refinance the principal owing pursuant to the Note.

Section 7.13    Tia's Loan.    The Company shall provide to RRGC from time to time upon RRGC's request, and in any event quarterly, information with respect to Tia's financial performance and repayment of the Tia's Loan.

(e)    Sections 8.1, 8.5, 8.8, and 8.9 of the Note Purchase Agreement shall be amended and restated in their entirety as follows:

Section 8.1    Distributions.    The Company will not, nor will it permit any of its Subsidiaries to, make any Distribution other than (a) Distributions to RRGC required hereunder, (b) the Subsidiaries of the Company may make Distributions to the Company and to wholly owned (other nominal amounts of stock held by residents of the state of organization of a Subsidiary held by such Persons in order to comply with such state's law) Subsidiaries of the Company, (c) Distribution to Senior Lender as required pursuant to the Senior Loan Documents (but not in respect of Senior Lender's ownership of stock in the Company), (d) Distributions paid to Maplewood Partners, L.P. or its Affiliates in the form of management fees; provided, however, such management fees shall not exceed the amount provided for in the advisory agreement between the Company and Maplewood Partners, L.P. in effect on the date hereof and shall not be permitted to be paid during the existence of a Default or Event of Default or if a Default or Event of Default would result from such payment, (e) repurchases from employees of the Company or its Subsidiaries in connection with the termination of their employment of options or Common Stock issued upon exercise thereof; provided, that the Company shall not be permitted to make cash payments of more than $250,000 in respect of such repurchases in any fiscal year, and (f) Distributions to Tia's pursuant to the Tia's Loan made when no Default or Event of Default exists or will result from such Distribution.

Section 8.5    Modification of Documents.    The Company will not, nor will it permit any of its Subsidiaries to, enter into any material amendment or modification of its Charter Documents or the Ancillary Agreements or waive or fail to enforce any material right of the Company or any of its Subsidiaries thereunder.  The Company will not, nor will it permit any of its Subsidiaries to, enter into any modification of (a) the Mezzanine Loan Documents or the Seller Notes to the extent restricted by the Senior Subordination Agreement, (b) the Julio Investors Warrant Documents (as defined in the Third Amendment), (c) the Tia's Loan or any documents evidencing or related to such loan, (d) the Advisory Services Agreement, or (e) the License Agreement.

Section 8.8    Investments.  The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly, make any Investments other than Permitted Investments, the existing Investment owed by Allen Kirsh, Inc. to the Company in the approximate amount of $700,000, accounts receivable created in the ordinary course of business in an aggregate amount not to exceed $100,000 at any time outstanding and credit card receivables created in the ordinary course of business.

Section 8.9.    Transactions with Affiliates.  The Company will not, and will not permit any of its Subsidiaries to, enter into any transaction with an Affiliate or make any payment to an Affiliate (whether in cash or property) of any type other than (a) compensation paid to the executive officers of the Company or any of its Subsidiaries which is permitted pursuant to Section 8.16 hereof, (b) advances for, and reimbursement of, reasonable travel, entertainment and similar expenses, (c) payments described on Schedule 5.10 hereto, (d) the transactions contemplated in the Ancillary Agreements, (e) management fees to Maplewood Partners, L.P. as permitted by Section 8.1, and (f) advances to Tia's permitted by Section 8.1.

(f)    Schedule 5.4 to the Note Purchase Agreement is amended and restated in its entirety in the form of Exhibit A hereto.

3.    Consents and Waivers.  Subject to the satisfaction of the conditions set forth in Section 4 below, RRGC hereby acknowledges, and agrees to, the following:

(a)    RRGC hereby consents to the execution and delivery of that certain Asset Purchase Agreement dated as of October 10, 2003, among Specialty Restaurant Group, LLC, SRG-1, LLC and Tia's Restaurant, Inc. and the transactions described therein (collectively, the "Tia's Transaction");

(b)    Notwithstanding Section 8.9 of the Note Purchase Agreement, RRGC hereby agrees that the Company may enter into and perform under the Advisory Services Agreement;

(c)    RRGC hereby waives the Events of Default which exist under the Note Purchase Agreement as a result of (i) advances to Tia's made prior to the date hereof in an amount not to exceed $6,250,000 (ii) late delivery of payments and financial information on or prior to the date hereof, and (iii) performance by the Company of advisory services for Tia's prior to the effectiveness of this Fourth Amendment (collectively, the "Subject Events"); and

(d)    RRGC has been advised of the poor financial condition and prospects of Tia's Restaurant, Inc., and, accordingly, that collection by the Company under the Tia's Loan is doubtful.

4.    Conditions Precedent.  The effectiveness of each amendment set forth in Section 2 hereof, and the consents and waivers described in Section 3 hereof, are, in each

instance, subject to the satisfaction of each of the following conditions prior to or contemporaneous with the effectiveness of each such amendment:

(a)     the Company shall have obtained all consents to this Fourth Amendment required by the Senior Subordination Agreement, including without limitation a consent from First American Bank, SSB, which shall be required as a condition precedent hereto and which Company agrees to use its best efforts to obtain within three (3) Business Days of execution of this Fourth Amendment by all parties hereto;

(b)     the parties thereto shall have executed and delivered the Supplement and First Amendment to Warrant Agreement in the form attached hereto as <u>Exhibit B</u>, and the Company shall have issued the Supplemental Warrants (as defined therein) to be issued to RRGC thereunder;

(c)     the Company shall deliver, or shall cause to be delivered, to RRGC a copy of each document executed in connection with or evidencing the exclusive ownership of the Eddie P's concept and all related trademarks, trade names, trade dress and other intellectual property by the Company, accompanied by a certificate from an Authorized Officer of the Company stating that (i) such copies are true and correct copies of the originals thereof, (ii) none of such documents have been amended or modified in any respect and no rights of any party thereunder have been waived and (iii) such documents are valid, binding and enforceable obligations of the parties thereto (except as qualified therein) and represent the complete understanding and agreement of the parties thereto;

(d)     the Company shall deliver to RRGC true and correct copies of all documents evidencing the Tia's Loan, the Advisory Services Agreement, and the License Agreement, and the terms thereof shall be reasonably satisfactory to RRGC;

(e)     the Company shall deliver, or shall cause to be delivered, to RRGC such resolutions, certificates and documents as RRGC may reasonably request relating to (i) the organization, existence, good standing and foreign qualification of the Company, (ii) the corporate authority for the execution, delivery and performance of this Fourth Amendment and (iii) such other matters relevant to the foregoing as RRGC shall reasonably request, all of which shall be in form and substance reasonably satisfactory to RRGC and its counsel;

(f)     the Company shall have paid in full all out of pocket fees, expenses and disbursements incurred by RRGC in connection with this Fourth Amendment and the transactions contemplated herein, including, without limitation, all reasonable fees and expenses of Vinson & Elkins L.L.P., counsel to RRGC;

(g)     the Company shall deliver, or shall cause to be delivered, to RRGC a certificate from an Authorized Officer of the Company certifying that (i) each and every representation and warranty of the Company contained in the Transaction Documents shall be true and correct (other than representations or warranties that were made as of a particular date), (ii) no Default or Event of Default shall have occurred which is

continuing, after giving effect to the Fourth Amendment and (iii) all conditions precedent to the effectiveness of this Fourth Amendment have been satisfied in all respects;

(h)     the Company shall deliver, or shall cause to be delivered, to RRGC such other documents, instruments and agreements as RRGC shall reasonably request in advance; and

(i)     the Company shall pay to RRGC a non-refundable amendment fee of $50,000.

5.     Representations and Warranties.  In order to induce RRGC to enter into this Fourth Amendment, the Company hereby represents and warrants to RRGC that:

(a)     each representation and warranty of the Company in each Transaction Document (other than representations or warranties that were made as of a particular date) is true and correct as of the date hereof after giving effect to this Fourth Amendment;

(b)     the execution, delivery and performance by the Company of this Fourth Amendment and each of the Transaction Documents are within the Company's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not violate or constitute a default under any provision of applicable law or any material agreement binding upon the Company, or result in the creation or imposition of any Lien upon any of the assets of the Company except for Permitted Encumbrances;

(c)     this Fourth Amendment constitutes the valid and binding obligation of the Company enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally, and the availability of equitable remedies may be limited by equitable principles of general application;

(d)     no Default nor an Event of Default has occurred which is continuing; and

(e)     neither the Company nor any of its Subsidiaries has any defenses to payment, counterclaims or rights of set-off with respect to the Obligations on the date hereof.

6.     Reaffirmation.  Except as amended hereby, the Note Purchase Agreement shall remain in full force and effect, and each party hereto hereby restates and reaffirms all of the terms and provisions of the Note Purchase Agreement and the Transaction Documents.

7.     Parties in Interest.  All of the terms and provisions of this Fourth Amendment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

8.     Counterparts.  This Fourth Amendment may be executed in counterparts, and all parties need not execute the same counterpart; however, no party shall be bound by this Fourth

Amendment until this Fourth Amendment has been executed by the Company and RRGC, at which time this Fourth Amendment shall be binding on, enforceable against and inure to the benefit of the Company and RRGC. Facsimiles shall be effective as originals.

9. <u>COMPLETE AGREEMENT</u>. THIS FOURTH AMENDMENT, THE NOTE PURCHASE AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

10. <u>Arms-Length/Good Faith</u>. This Fourth Amendment has been negotiated at arms-length and in good faith by the parties hereto. The Company acknowledges and agrees that there is no course of dealing between the parties hereto and that the Company must strictly comply with all terms of the Note Purchase Agreement and the other Transaction Documents.

11. <u>Interpretation</u>. Wherever the context hereof shall so require, the singular shall include the plural, the masculine gender shall include the feminine gender and the neuter and vice versa. The headings, captions and arrangements used in this Fourth Amendment are for convenience only and shall not affect the interpretation of this Fourth Amendment.

12. <u>Severability</u>. In case any one or more of the provisions contained in this Fourth Amendment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Fourth Amendment shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

13. <u>Further Assurances</u>. The Company agrees to execute, acknowledge, deliver, file and record such further certificates, instruments and documents, and to do all other acts and things, as may be requested by RRGC as necessary or advisable to carry out the intents and purposes of this Fourth Amendment.

14. <u>Release</u>. The Company and the Senior Lender, on behalf of themselves and their respective Subsidiaries and their respective officers and directors, hereby unconditionally and irrevocably remise, acquit, and fully and forever release and discharge RRGC and all affiliates and subsidiaries of RRGC, their respective officers, servants, employees, agents, attorneys, principals, directors and shareholders, and their respective heirs, legal representatives, successors and assigns (collectively, the "Released Lender Parties") from any and all claims, demands, causes of action, obligations, remedies, suits, damages and liabilities (collectively, the "Borrower Claims") of any nature whatsoever, whether now known, suspected or claimed, whether arising under common law, in equity or under statute, which the Company, the Senior Lender and/or their respective Subsidiaries ever had or now has against the Released Lender Parties which may have arisen at any time on or prior to the date of this Fourth Amendment and which were in any manner related to any of the Transaction Documents or the enforcement or attempted enforcement by RRGC of rights, remedies or recourses related thereto.

The Company and the Senior Lender, on behalf of themselves and their respective Subsidiaries, covenant and agree never to commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against any of the Released Lender Parties any action or other proceeding based upon any of the Borrower Claims which may have arisen at any time on or prior to the date of this Fourth Amendment and were in any manner related to any of the Transaction Documents.

RRGC, on behalf of itself and its officers and directors, hereby unconditionally and irrevocably remises, acquits, and fully and forever releases and discharges the Company, the Senior Lender, and their respective officers, servants, employees, agents, attorneys, principals, directors and shareholders, and their respective heirs, legal representatives, successors and assigns (collectively, the "Released Company Parties") from any and all claims, demands, causes of action, obligations, remedies, suits, damages and liabilities (collectively, the "Company Claims") of any nature whatsoever, whether now known, suspected or claimed, whether arising under common law, in equity or under statute, which RRGC now has against the Released Company Parties which may have arisen at any time on or prior to the date of this Fourth Amendment and which relate to the Subject Events or to any matter, event or action arising pursuant to the Tia's Transaction or the making of the Tia's Loan other than claims by RRGC that the Released Company Parties have made advances or other distributions to their affiliates in excess of the amount the Tia's Loan in violation of the Note Purchase Agreement as amended by this Fourth Amendment.

RRGC, on behalf of itself and its Subsidiaries, covenants and agrees never to commence, voluntarily aid in any way, prosecute or cause to be commenced or prosecuted against any of the Released Company Parties any action or other proceeding based upon any of the Company Claims which may have arisen at any time on or prior to the date of this Fourth Amendment and which relate to the Subject Events or to any matter, event or action arising pursuant to the Tia's Transaction or the making of the Tia's Loan other than claims by RRGC that the Released Company Parties have made advances or other distributions to their affiliates in excess of the amount the Tia's Loan in violation of the Note Purchase Agreement as amended by this Fourth Amendment.

The agreements of the Company, the Senior Lender, and RRGC set forth in this Section 14 shall survive termination of this Agreement. The Released Lender Parties and the Released Company Parties are intended third party beneficiaries of this Section 14.

IN WITNESS WHEREOF, the parties have executed this Fourth Amendment by their duly authorized officers as of the day and date first written above.

**JULIO & SONS COMPANY**

By: _____
Name: _____
Title: _____

**RETAIL & RESTAURANT GROWTH CAPITAL, L.P.**

By:    Retail & Restaurant Growth Partners, L.P., its General partner

     By:    Retail & Restaurant Growth Management, Inc., its General Partner

          By:_____
          Name:_____
          Title:_____

Julio Investors LLC executes this Fourth Amendment for the purpose of being bound by Section 14 hereof, providing its consent to the amendments herein as required by the Senior Subordination Agreement, and acknowledging and agreeing on behalf of itself and its affiliates to the terms of the Tia's Loan set forth in the Promissory Note dated August 19, 2005, executed by Tia's Restaurant, Inc., and payable to the order of Julio & Sons Company in the principal amount of $6,250,000.

**JULIO INVESTORS LLC**

By:  MapleWood Management, L.P., its Managing Member
By:  MapleWood Holdings LLC, its General Partner

By:_____
Name:_____
Title:_____

121

IN WITNESS WHEREOF, the parties have executed this Fourth Amendment by their duly authorized officers as of the day and date first written above.

**JULIO & SONS COMPANY**

By: _____
Name: _____
Title: _____

**RETAIL & RESTAURANT GROWTH CAPITAL, L.P.**

By:    Retail & Restaurant Growth Partners, L.P.,
       its General partner

By:    Retail & Restaurant Growth
       Management, Inc., its General
       Partner

By: _____
Name: _____JOSEPH L HARDEN'_____
Title: _____CUP_____

Julio Investors LLC executes this Fourth Amendment for the purpose of being bound by Section 14 hereof, providing its consent to the amendments herein as required by the Senior Subordination Agreement, and acknowledging and agreeing on behalf of itself and its affiliates to the terms of the Tia's Loan set forth in the Promissory Note dated August 19, 2005, executed by Tia's Restaurant, Inc., and payable to the order of Julio & Sons Company in the principal amount of $6,250,000.

**JULIO INVESTORS LLC**

By: MapleWood Management, L.P.,
its Managing Member
By: MapleWood Holdings LLC, its
General Partner

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have executed this Fourth Amendment by their duly authorized officers as of the day and date first written above.

**JULIO & SONS COMPANY**

By:_____
Name:_____
Title:_____

**RETAIL & RESTAURANT GROWTH CAPITAL, L.P.**

By:    Retail & Restaurant Growth Partners, L.P., its General partner

By:    Retail & Restaurant Growth Management, Inc., its General Partner

By:_____
Name:_____
Title:_____

Julio Investors LLC executes this Fourth Amendment for the purpose of being bound by Section 14 hereof, providing its consent to the amendments herein as required by the Senior Subordination Agreement, and acknowledging and agreeing on behalf of itself and its affiliates to the terms of the Tia's Loan set forth in the Promissory Note dated August 19, 2005, executed by Tia's Restaurant, Inc., and payable to the order of Julio & Sons Company in the principal amount of $6,250,000.

**JULIO INVESTORS LLC**

By:  MapleWood Management, L.P., its ~~Managing Member~~ Manager
By:  MapleWood Holdings LLC, its General Partner

By: _Wayne Stabile_
Name: WAYNE A. STABILE
Title: AUTHORIZED AGENT

Each of the undersigned Guarantors hereby consents and agrees to this Fourth Amendment, ratifies and confirms its obligations under the Guaranty Agreement and each other Transaction Document to which it is a party, and agrees that each such Transaction Document shall remain in full force and effect and shall continue to be the legal, valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

GUARANTORS:

UNCLE JULIO'S CORPORATION

By: _____
     Abdo Joseph Shashy,
     President

JULIO & SONS COMPANY

By: _____
     Abdo Joseph Shashy,
     President

CONROE FOODS INCORPORATED

By: _____
     Abdo Joseph Shashy,
     President

THE MEXICAN RESTAURANT,
INCORPORATED

By: _____
     Abdo Joseph Shashy,
     President

UNCLE JULIO'S RIO GRANDE CAFÉ,
INC.

By: _____
     Abdo Joseph Shashy,
     President

124

UNCLE JULIO'S OF RESTON, INC.

By:_____
    Abdo Joseph Shashy,
    President

UNCLE JULIO'S OF ILLINOIS, INC.

By:_____
    Abdo Joseph Shashy,
    President

UNCLE JULIO'S OF GEORGIA, INC.

By:_____
    Abdo Joseph Shashy,
    President

## Exhibit A

### Schedule 5.4 to Note Purchase Agreement

Capitalization of Company and Subsidiaries (including options and warrants)

(1)    Julio and Sons Company (formerly known as Lucky Boy Corporation): Authorized capital consisting of 200,000 shares of common stock par value $0.01 per share ("Common Stock").

Immediately prior to the effectiveness of this Fourth Amendment, capitalization on a fully diluted basis was as follows:

|  | Shares | Percentage |
|---|---|---|
| Julio Investors LLC | 124,098.75 | 78.57% |
| Abdo J. Shashy | 11,730.16 | 7.43% |
| Total other employees | 14,022.00 | 8.88% |
| RRGC Warrants | 3,835.00 | 2.43% |
| Management Options | 4,260.00 | 2.70% |
| Total | 157,945.91 | 100% |

Upon effectiveness of this Fourth Amendment and issuance of the Supplemental Warrants, capitalization on a fully diluted basis is as follows:

|  | Shares | Percentage |
|---|---|---|
| Julio Investors LLC | 124,098.75 | 75.37% |
| Abdo J. Shashy | 11,730.16 | 7.12% |
| Total other employees | 14,022.00 | 8.52% |
| RRGC Warrants | 10,537.50 | 6.40 |
| Management Options | 4,260.00 | 2.59 |
| Total | 164,648.41 | 100% |

(2)    Capitalization of subsidiaries is as set forth on the attached (from original Schedule 5.4 to Note Purchase Agreement)

Schedule 5.4

Capitalization

(1)    Lucky Boy Corporation. Authorized capital consisting of 200,000 shares of common stock, par value $.01 per share ("Common Stock"). As of the date hereof, there are of record 64,460.79 shares issued and outstanding and held as follows:

| Shareholder | Number of Shares |
|---|---|
| Julio Investors LLC | 51,408.63 |
| Abdo J. Shashy | 12,852.16 |
| Robert Latham | 200.00 |
| | 64,460.79 |

(2) Uncle Julio's Corporation: Authorized capital consisting of 10,000 shares of common stock, par value $1.00 per share. As of the date hereof, there are of record 1,000 shares of common stock issued and outstanding all of which are held by Lucky Boy Corporation.

(3) The Mexican Restaurant Inc.: Authorized capital consisting of 5,000 shares of common stock, par value $1.00 per share. As of the date hereof, there are of record 500 shares of common stock issued and outstanding and held as follows: (i) Uncle Julio's Corporation – 499 shares; and (ii) Harry C. Perry, Jr. – 1 share.

(4) Uncle Julio's Rio Grande Cafe, Inc.: Authorized capital consisting of 5,000 shares of common stock, par value $1.00 per share. As of the date hereof, there are of record 5,000 shares of common stock issued and outstanding all of which are held by Uncle Julio's Corporation.

(5) Uncle Julio's of Reston, Inc.: Authorized capital consisting of 5,000 shares of common stock, par value $1.00 per share. As of the date hereof, there are of record 5,000 shares of common stock issued and outstanding all of which are held by Uncle Julio's Corporation.

(6) Conroe Foods, Inc.: Authorized capital consisting of 10,000 shares of common stock, no par value. As of the date hereof, there are of record 1,000 shares of common stock issued and outstanding all of which are held by Uncle Julio's Corporation.

(7) Julio and Sons Company: Authorized capital consisting of 100,000 shares of common stock, par value $1.00 per share. As of the date hereof, there are of record 1,000 shares of common stock issued and outstanding all of which are held by Uncle Julio's Corporation.

(8) Uncle Julio's of Illinois, Inc.: Authorized capital consisting of 10,000 shares of no par value common stock. As of the date hereof, there are of record 500 shares of common stock issued and outstanding all of which are held by Uncle Julio's Corporation.

{MI737424;4}

127

(9) <u>Uncle Julio's of Georgia, Inc.</u>: Authorized capital consisting of 1,000 shares of common stock, par value not indicated. As of the date hereof, there are of record 1,000 shares of common stock issued and outstanding all of which are held by Uncle Julio's Corporation.

5.4(x)  Julio Investors LLC holds a $6,000,000 Senior Subordinated Secured Convertible Note, which is convertible into common stock of the Company. Furthermore, the Company has issued 12,700 options to purchase common stock of the Company, and has reserved 4,260 shares for future issuances under its Amended 1997 Employee Stock Option Plan.

5.4(y)  Each of Uncle Julio's Corporation and Uncle Julio's of Reston, Inc. has granted its shareholders preemptive rights in its respective charter.

**Exhibit B**

Supplement and First Amendment to Warrant Agreement

## SUPPLEMENT AND FIRST AMENDMENT TO WARRANT AGREEMENT

This Supplement and First Amendment to Warrant Agreement (this "**Amendment**") is entered into as of August 19, 2005, by and between **JULIO & SONS COMPANY**, a Delaware corporation formerly known as Lucky Boy Corporation (the "**Company**"), and **RETAIL & RESTAURANT GROWTH CAPITAL, L.P.**, a Delaware limited partnership ("**RRGC**).

### WITNESSETH

WHEREAS, the Company and RRGC have entered into a Note Purchase Agreement dated as of December 17, 2001 (as amended by that certain First Amendment to Note Purchase Agreement dated November 20, 2002 (the "**First Amendment**"), that certain Second Amendment to Note Purchase Agreement dated March 11, 2003 (the "**Second Amendment**"), and that certain Third Amendment to Note Purchase Agreement dated July 16, 2003 (the "**Third Amendment**") as of December 20, 2001, the "**Note Agreement**"), pursuant to which RRGC purchased certain notes from the Company in an aggregate amount of $3,000,000 (the "**Notes**"); and

WHEREAS, the Company has requested that RRGC enter into a Fourth Amendment to Note Purchase Agreement to be dated August 19, 2005 (the "**Fourth Amendment**") pursuant to which, among other things, certain Events of Default under and as defined in the Note Purchase Agreement will be waived; and

WHEREAS, the Company and RRGC entered into a Warrant Agreement dated as of December 17, 2001 (the "**Warrant Agreement**"), pursuant to which RRGC purchased certain warrants to purchase common stock of the Company; and

WHEREAS, to induce RRGC to enter into the Fourth Amendment, the Company has agreed to issue to RRGC certain additional warrants to purchase common stock of the Company; and

WHEREAS, the Company and RRGC desire to enter into this Amendment to provide for the issuance of such additional warrants and to amend the Warrant Agreement in certain respects in connection therewith.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and in the Fourth Amendment and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1.      **Certain Definitions**.  Each term used herein which is defined in the preamble or recitals hereto shall have the meaning when used herein as so defined.  Each term used herein which is defined in the Warrant Agreement shall have the meaning when used herein as so defined in the Warrant Agreement, and each of the following terms shall have the meanings set forth opposite such terms below:

"**Supplemental Warrant Certificates**" means certificates evidencing the Supplemental Warrants which shall be in the form of Exhibit A hereto.

"**Supplemental Warrant Shares**" means the shares of Common Stock issuable upon the exercise of the Supplemental Warrants.

"**Supplemental Warrants**" means an aggregate of 6,702.50 warrants issued to RRGC pursuant to the First Amendment, each of which shall entitle the holder thereof to purchase one (1) share of Common Stock at the Warrant Exercise Price (subject to adjustment as provided in Section 3.2).

2.    **Issuance of Supplemental Warrants**.  The Company agrees to issue Supplemental Warrants to RRGC contemporaneous with the execution and delivery of this Amendment.  Such Supplemental Warrants shall be evidenced by Supplemental Warrant Certificates issued to RRGC and shall grant to RRGC (or any subsequent holder of such Supplemental Warrants) the right to purchase a number of Supplemental Warrant Shares equal to the number of Supplemental Warrants. Immediately upon the issuance of the Supplemental Warrants, the Company agrees to register the Supplemental Warrants in the name of RRGC (as applicable) in the Warrant Register.

3.    **Amendments to Warrant Agreement**.  The Warrant Agreement is hereby amended in the manner set forth in this Section 3.

(a)    The definitions of "**Agreement**", "**Warrant Certificate**", and "**Warrants**" contained in Section 1.1 of the Agreement are hereby amended to read in full as follows:

"**Agreement**" means this Agreement as supplemented and amended by the First Amendment.

"**Warrant Certificate**" means (a) in the case of the Initial Warrants, a Warrant Certificate issued by the Company evidencing Initial Warrants which shall be in the form of Exhibit A attached hereto, and (b) in the case of the Supplemental Warrants, a Supplemental Warrant Certificate.

"**Warrants**" means the Initial Warrants and the Supplemental Warrants.

(b)    Section 1.1 of the Agreement is hereby amended to add a definition of "**First Amendment**" and "**Initial Warrants**" thereto which shall read in full as follows:

"**First Amendment**" means that certain Supplement and First Amendment to Warrant Agreement dated as of August 19, 2005 by and between RRGC and the Company.

"**Initial Warrants**" means an aggregate of 3,835 warrants to be issued by the Company to RRGC pursuant to Section 2.1 of this Agreement, each of which shall entitle the holder thereof to purchase one (1) share of Common Stock at the Warrant Exercise Price (subject to adjustment as provided in Section 3.2).

(c)    Article I of the Agreement is hereby amended to add a new Section 1.5 thereto which shall read in full as follows:

SECTION 1.5    Terms Incorporated from First Amendment. Each term used herein which is defined in the First Amendment shall have the meaning when used herein as so defined in the First Amendment.

(d)    Section 7.5 is hereby added to the Agreement to read in full as follows:

The Company shall not, and shall not permit its Subsidiaries to, enter into or permit to exist (i) loans, advances and investments (including the creation of accounts receivable) to any Person other than (a) the advances to Tia's Restaurant, Inc. and its subsidiaries permitted under the Fourth Amendment, (b) loans, advances and investments in an aggregate amount not to exceed $100,000 other than the existing receivable owed by Allen Kirsh, Inc. in the approximate amount of $700,000 and other receivables which RRGC may from time to time approve upon the Company's request, and (c) loans, advances and investments to and in direct and indirect wholly owned Subsidiaries of Borrower, and (ii) any transactions with any of their Affiliates other than (a) those entered into in the ordinary course of business upon reasonable business terms of an arms length nature, and (b) those entered into with direct and indirect wholly owned Subsidiaries of Company.

4.    **Representations and Warranties**.  In order to induce RRGC to enter into this Amendment and the Fourth Amendment, the Company hereby represents and warrants to RRGC that:

(a)    other than representations and warranties that are made as of a particular date and except as otherwise permitted under the Transaction Documents, each representation and warranty of the Company and each of its Subsidiaries in each Transaction Document is true and correct as of the date hereof and after giving effect to the transactions contemplated hereby and by the Fourth Amendment (including the issuance of the Supplemental Warrants);

(b)    the execution, delivery and performance by the Company of this Amendment, the Fourth Amendment, and the Supplemental Warrants are within the Company's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not violate or constitute a default under any provision of applicable law or any material agreement binding upon the Company or its Subsidiaries, or result in the creation or imposition of any Lien upon any of the assets of the Company or any of its Subsidiaries except for Permitted Encumbrances; and

(c)    each of this Amendment, the Fourth Amendment, and the Supplemental Warrants constitutes the valid and binding obligations of the Company and each of its Subsidiaries to the extent each is a party thereto enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or similar laws affecting creditor's rights generally, and the availability of equitable remedies may be limited by equitable principles of general application.

5.    **Reaffirmation**.  Except as amended hereby, the Warrant Agreement shall remain in full force and effect, and each party hereto hereby restates and reaffirms all of the terms and provisions of the Warrant Agreement and the other Transaction Documents.

6.    **Agreement Regarding Dilution and Preemptive Rights**.  RRGC hereby waives any adjustments to the number of Warrant Shares which may be purchased upon an exercise of the Warrants which adjustment would otherwise result from the issuance of the Supplemental Warrants and the exercise thereof in accordance with their terms.

132

7.    **Parties in Interest**.  All of the terms and provisions of this Amendment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

8.    **Counterparts**.  This Amendment may be executed in counterparts, and all parties need not execute the same counterpart; however, no party shall be bound by this Amendment until this Amendment has been executed by the Company and RRGC at which time this Amendment shall be binding on, enforceable against and inure to the benefit of the Company and RRGC.  Facsimiles shall be effective as originals.

9.    **COMPLETE AGREEMENT**.    THIS AMENDMENT, THE WARRANT AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

10.    **Arms-Length/Good Faith**.  This Amendment has been negotiated at arms-length and in good faith by the parties hereto.

11.    **Interpretation**.  Wherever the context hereof shall so require, the singular shall include the plural, the masculine gender shall include the feminine gender and the neuter and vice versa. The headings, captions and arrangements used in this Amendment are for convenience only and shall not affect the interpretation of this Amendment.

12.    **Severability**.  In case any one or more of the provisions contained in this Amendment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Amendment shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

13.    **Further Assurances**.  The Company agrees to execute, acknowledge, deliver, file and record such further certificates, instruments and documents, and to do all other acts and things, as may be requested by RRGC as necessary or advisable to carry out the intents and purposes of this Amendment.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

SIGNATURE PAGE TO
SUPPLEMENT AND FIRST AMENDMENT TO WARRANT AGREEMENT


IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first written above.

**RETAIL & RESTAURANT GROWTH CAPITAL, L.P**

By:   Retail & Restaurant Growth Partners, L.P.,
its general partner

      By:   Retail & Restaurant Growth
Management, Inc., its general partner

      By:  _____
           Name: _____
           Title: _____


**JULIO & SONS COMPANY**

By:  _____
    Name: _____
    Title: _____

Signature Page

134

SIGNATURE PAGE TO
SUPPLEMENT AND FIRST AMENDMENT TO WARRANT AGREEMENT

The undersigned acknowledge and agree that the Warrants, including the Supplemental Warrants, and the Warrant Shares shall constitute Warrants and Warrant Shares under and as defined in that certain Mezzanine Holder Rights Agreement dated as of December 17, 2001 among the Company, Julio Investors LLC and RRGC.

**JULIO & SONS COMPANY**

By: _____
Name: _____
Title: _____

**JULIO INVESTORS LLC**
By:  MapleWood Management, L.P., its Managing
Member
By:  MapleWood Holdings LLC, its General
Partner

By:_____
Name: _____
Title: _____

**RETAIL & RESTAURANT GROWTH CAPITAL, L.P**

By:    Retail & Restaurant Growth Partners, L.P.,
its general partner

By:    Retail & Restaurant Growth
Management, Inc., its general partner

By: _____
Name: _____
Title: _____

# REGISTER OF ACTIONS
## CASE NO. DC-07-01391

| | | |
|---|---|---|
| **RETAIL AND RESTAURANT GROWTH CAPITAL LP vs. MAPLEWOOD PARTNERS LP, et al** | § § § § § § | Case Type: **DEBT/CONTRACT** <br> Date Filed: **02/15/2007** <br> Location: **134th District Court** |

---

### PARTY INFORMATION

| | **Lead Attorneys** |
|---|---|
| DEFENDANT GLASER, ROBERT V | |
| DEFENDANT HARBERG, JOSEPH L | GAUBERT, MICHAEL LEWI <br> *Retained* |
| DEFENDANT HEMMIG, RAYMOND C | GAUBERT, MICHAEL LEWI <br> *Retained* |
| DEFENDANT JULIO AND SON'S COMPANY D/B/A | COX, JOSEPH M <br> *Retained* |
| DEFENDANT JULIO INVESTORS LLC | |
| DEFENDANT LAWRENCE, J ERIC | GAUBERT, MICHAEL LEWI <br> *Retained* |
| DEFENDANT MAPLEWOOD HOLDINGS, LLC | KESSLER, GARY S <br> *Retained* |
| DEFENDANT MAPLEWOOD MANAGEMENT, LP | KESSLER, GARY S <br> *Retained* |
| DEFENDANT MAPLEWOOD PARTNERS LP | KESSLER, GARY S <br> *Retained* |
| DEFENDANT MASINTER, MARK L | GAUBERT, MICHAEL LEWI <br> *Retained* |
| DEFENDANT RETAIL & RESTAURANT GROWTH CAPITAL LP | GAUBERT, MICHAEL LEWI <br> *Retained* |
| DEFENDANT RETAIL AND RESTAURANT GROWTH MANAGEMENT, INC., | GAUBERT, MICHAEL LEWI <br> *Retained* |
| DEFENDANT RETAIL AND RESTAURANT GROWTH | GAUBERT, MICHAEL LEWI |

PARTNERS, L.P.,

*Retained*

DEFENDANT THE HARBERG-MASINTER COMPANY

GAUBERT, MICHAEL LEWI

*Retained*

PLAINTIFF    RETAIL AND RESTAURANT GROWTH
CAPITAL LP

GAUBERT, MICHAEL LEWI

*Retained*

---

### EVENTS & ORDERS OF THE COURT

|  |  |  |  |
|---|---|---|---|
|  | **OTHER EVENTS AND HEARINGS** |  |  |
| 02/15/2007 | **ORIGINAL PETITION (OCA)** |  |  |
| 02/23/2007 | **ISSUE CITATION** |  |  |
| 02/23/2007 | **CITATION** |  |  |
|  | MAPLEWOOD PARTNER LP | unserved |  |
|  | MAPLEWOOD HOLDINGS, LLC | unserved |  |
|  | MAPLEWOOD MANAGEMENT, LP | unserved |  |
|  | JULIO AND SON'S COMPANY D/B/A | served 03/08/2007 |  |
|  | GLASER, ROBERT V | unserved |  |
| 04/02/2007 | **COUNTER CLAIM** |  |  |
| 04/02/2007 | **ISSUE CITATION** |  |  |
| 04/03/2007 | **CITATION** |  |  |
|  | RETAIL AND RESTAURANT GROWTH PARTNERS, L.P., | unserved |  |
|  | RETAIL AND RESTAURANT GROWTH MANAGEMENT, INC., | unserved |  |
| 04/03/2007 | **ISSUE CITATION** |  |  |
| 04/04/2007 | **CITATION** |  |  |
|  | MAPLEWOOD PARTNER LP | unserved |  |
|  | MAPLEWOOD HOLDINGS, LLC | unserved |  |
|  | MAPLEWOOD MANAGEMENT, LP | unserved |  |
|  | GLASER, ROBERT V | unserved |  |
| 04/25/2007 | **ORDER - MEDIATION** |  |  |
|  | Vol./Book 375G, Page 286, 2 pages |  |  |
| 05/21/2007 | **COUNTER CLAIM** |  |  |
| 05/21/2007 | **ISSUE CITATION** |  |  |
| 05/21/2007 | **SPECIAL APPEARANCE** |  |  |
| 05/21/2007 | **AFFIDAVIT** |  |  |
| 05/21/2007 | **BRIEF FILED** |  |  |
| 05/21/2007 | **ORIGINAL ANSWER TO CROSS CLAIM - COUNTER PETITION** |  |  |
| 05/22/2007 | **CITATION** |  |  |
|  | RETAIL AND RESTAURANT GROWTH CAPITAL LP | unserved |  |
|  | RETAIL AND RESTAURANT GROWTH MANAGEMENT, INC., | returned unserved 05/31/2007 |  |
|  | THE HARBERG-MASINTER COMPANY | returned unserved 05/31/2007 |  |
|  | MASINTER, MARK L | served 06/11/2007 |  |
|  | HARBERG, JOSEPH L | served 06/05/2007 |  |
|  | HEMMIG, RAYMOND C | served 06/05/2007 |  |
|  | LAWRENCE, J ERIC | unserved |  |
| 05/22/2007 | **CITATION** |  |  |
|  | RETAIL AND RESTAURANT GROWTH PARTNERS, L.P., | returned unserved 05/31/2007 |  |
| 05/29/2007 | **MOTION - PRO HAC VICE** |  |  |
| 05/29/2007 | **MOTION - PRO HAC VICE** |  |  |
| 06/01/2007 | **ISSUE CITATION** |  |  |
| 06/01/2007 | **CITATION** |  |  |
|  | RETAIL AND RESTAURANT GROWTH MANAGEMENT, INC., | served 06/05/2007 |  |
|  | THE HARBERG-MASINTER COMPANY | served 06/11/2007 |  |
|  | RETAIL AND RESTAURANT GROWTH PARTNERS, L.P., | served 06/05/2007 |  |
| 06/01/2007 | **ORDER - MISC.** |  |  |
|  | Vol./Book 376G, Page 488, 2 pages |  |  |
| 06/06/2007 | **ISSUE CITATION** |  |  |
| 06/06/2007 | **CITATION** |  |  |
|  | LAWRENCE, J ERIC    served 06/13/2007 |  |  |
| 06/08/2007 | **ORDER - LEAVE** |  |  |

|            | Vol./Book 377G, Page 194,  1 pages |
|------------|------------------------------------|
| 06/22/2007 | **ORIGINAL ANSWER TO CROSS CLAIM - COUNTER PETITION** |
| 06/22/2007 | **AMENDED ANSWER - AMENDED GENERAL DENIAL** |
| 06/27/2007 | **AMENDED ANSWER - AMENDED GENERAL DENIAL** |
| 07/02/2007 | **RULE 11** |
| 08/03/2007 | **ORIGINAL ANSWER TO CROSS CLAIM - COUNTER PETITION** |
| 08/10/2007 | **SCHEDULING ORDER** |
|            | Vol./Book 379G, Page 367,  3 pages |
| 08/10/2007 | **ORDER - MEDIATION** |
|            | Vol./Book 379G, Page 365,  2 pages |
| 08/20/2007 | *CANCELED*   **Non Jury Trial**  (9:00 AM) (Judicial Officer ASHBY, ANNE) |
|            | *CASE TRIAL RESET* |
| 08/20/2007 | **AMENDED ANSWER - AMENDED GENERAL DENIAL** |
| 08/20/2007 | **MOTION - PROTECT** |
| 08/20/2007 | **RESPONSE** |
| 10/25/2007 | **AMENDED PETITION** |
| 10/29/2007 | *CANCELED*   **Special Appearance**  (1:30 PM) (Judicial Officer ASHBY, ANNE) |
|            | *HEARING RESCHEDULED* |
| 12/03/2007 | *CANCELED*   **Special Appearance**  (1:30 PM) (Judicial Officer ASHBY, ANNE) |
|            | *HEARING RESCHEDULED* |
| 02/01/2008 | **AFFIDAVIT** |
| 02/04/2008 | *CANCELED*   **Special Appearance**  (1:30 PM) (Judicial Officer ASHBY, ANNE) |
|            | *REQUESTED BY ATTORNEY/PRO SE* |
| 02/07/2008 | **MOTION - MISCELLANOUS** |
| 02/12/2008 | **MISCELLANOUS EVENT** |
|            | Vol./Book 386G, Page 485,  12 pages |
| 02/12/2008 | **MISCELLANOUS EVENT** |
|            | Vol./Book 387G, Page 26,  12 pages |
| 02/12/2008 | **MISCELLANOUS EVENT** |
|            | Vol./Book 387G, Page 14,  12 pages |
| 02/12/2008 | **MISCELLANOUS EVENT** |
|            | Vol./Book 386G, Page 2,  12 pages |
| 03/04/2008 | **MOTION - MODIFY** |
| 03/04/2008 | **MOTION - MODIFY** |
| 03/28/2008 | **AMENDED PETITION** |
| 04/24/2008 | **MOTION - COMPEL** |
| 05/02/2008 | **RETURN OF SERVICE** |
| 05/05/2008 | **NOTE - CLERKS** |
| 05/07/2008 | **RETURN OF SERVICE** |
| 05/08/2008 | *CANCELED*   **Motion - Compel**  (10:00 AM) (Judicial Officer SNELSON, TERESA GUERRA) |
|            | *REQUESTED BY ATTORNEY/PRO SE* |
|            | *05/29/2008  Reset by Court to 05/08/2008* |
| 05/12/2008 | **MISCELLANOUS EVENT** |
| 05/15/2008 | **MISCELLANOUS EVENT** |
| 05/20/2008 | **RETURN OF SERVICE** |
| 05/23/2008 | **MOTION - PROTECT** |
| 05/27/2008 | **RETURN OF SERVICE** |
| 05/27/2008 | **AFFIDAVIT** |
| 05/27/2008 | **AFFIDAVIT** |
| 05/28/2008 | **MISCELLANOUS EVENT** |
| 05/28/2008 | **DESIGNATE LEAD COUNSEL** |
| 05/29/2008 | **RESPONSE** |
| 05/30/2008 | **RETURN OF SERVICE** |
| 05/30/2008 | **RESPONSE** |
| 05/30/2008 | **RESPONSE** |
| 05/30/2008 | **MOTION - PRO HAC VICE** |
| 05/30/2008 | **MOTION - MISCELLANOUS** |
| 06/02/2008 | **Special Appearance**  (1:30 PM) (Judicial Officer ASHBY, ANNE) |
|            | *04/14/2008  Reset by Court to 06/02/2008* |
| 06/02/2008 | **MISCELLANOUS EVENT** |
| 06/03/2008 | **MOTION - COMPEL** |
| 06/03/2008 | **AFFIDAVIT** |
| 06/05/2008 | **ORDER - MISC.** |
|            | Vol./Book 391G, Page 292,  1 pages |
| 06/06/2008 | **MOTION - SEAL** |
| 06/09/2008 | **NOTE - CLERKS** |
| 06/13/2008 | **Motion - Compel**  (1:30 PM) (Judicial Officer ASHBY, ANNE) |
| 06/13/2008 | **RETURN OF SERVICE** |
| 06/13/2008 | **ORDER - COMPEL** |
|            | Vol./Book 392G, Page 470,  4 pages |
| 06/18/2008 | **MOTION - QUASH** |
| 06/20/2008 | **RETURN OF SERVICE** |
| 06/20/2008 | **MOTION - COMPEL** |
| 06/24/2008 | **MOTION - PROTECT** |
| 06/26/2008 | **Motion - Compel**  (2:00 PM) (Judicial Officer ASHBY, ANNE) |

| | |
|---|---|
| 07/08/2008 | MOTION - COMPEL |
| 07/08/2008 | MOTION - COMPEL |
| 07/09/2008 | CERTIFICATE OF DEPOSITION |
| 07/31/2008 | MOTION - PRO HAC VICE |
| 07/31/2008 | MOTION - PRO HAC VICE |
| 08/05/2008 | MOTION - PRO HAC VICE |
| 08/05/2008 | MOTION - PRO HAC VICE |
| 08/07/2008 | ORDER - MISC. |
| | Vol./Book 394G, Page 462,  2 pages |
| 08/12/2008 | CERTIFICATE OF DEPOSITION |
| 10/06/2008 | Non Jury Trial  (9:00 AM) (Judicial Officer ASHBY, ANNE) |
| 10/06/2008 | TRIAL SETTING (NON JURY) |
| 02/16/2009 | Non Jury Trial  (9:00 AM) (Judicial Officer ASHBY, ANNE) |
| 02/16/2009 | TRIAL SETTING (NON JURY) |

## FINANCIAL INFORMATION

**DEFENDANT** JULIO AND SON'S COMPANY D/B/A

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | 41.00 |
| | Total Payments and Credits | | | 41.00 |
| | **Balance Due as of 08/19/2008** | | | **0.00** |
| 04/02/2007 | Transaction Assessment | | | 41.00 |
| 04/02/2007 | PAYMENT (CASE FEES) | Receipt # 17909-2007-DCLK | HUGHES & LUCE LLP | (41.00) |

**DEFENDANT** MAPLEWOOD PARTNERS LP

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | 105.00 |
| | Total Payments and Credits | | | 105.00 |
| | **Balance Due as of 08/19/2008** | | | **0.00** |
| 05/21/2007 | Transaction Assessment | | | 81.00 |
| 05/21/2007 | PAYMENT (CASE FEES) | Receipt # 27831-2007-DCLK | KESSLER& COLLINS PC | (81.00) |
| 06/01/2007 | Transaction Assessment | | | 24.00 |
| 06/04/2007 | PAYMENT (CASE FEES) | Receipt # 30328-2007-DCLK | KESSLER & COLLINS PC | (24.00) |

**PLAINTIFF** RETAIL AND RESTAURANT GROWTH CAPITAL LP

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | 297.00 |
| | Total Payments and Credits | | | 305.00 |
| | **Balance Due as of 08/19/2008** | | | **(8.00)** |
| 02/15/2007 | Transaction Assessment | | | 217.00 |
| 02/15/2007 | PAYMENT (CASE FEES) | Receipt # 8693-2007-DCLK | FRIEDMAN & FEIGER | (217.00) |
| 02/23/2007 | Transaction Assessment | | | 40.00 |
| 02/23/2007 | PAYMENT (CASE FEES) | Receipt # 10192-2007-DCLK | FRIEDMAN & FEIGER LLP | (40.00) |
| 04/03/2007 | Transaction Assessment | | | 32.00 |
| 04/03/2007 | PAYMENT (CASE FEES) | Receipt # 18193-2007-DCLK | FRIEDMAN & FEIGER LLP | (40.00) |
| 06/06/2007 | Transaction Assessment | | | 8.00 |
| 06/06/2007 | PAYMENT (CASE FEES) | Receipt # 31139-2007-DCLK | KESSLER & COLLINS PC | (8.00) |